**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00286-RCL |
| JANE JONES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00401-RCL |
| MARIA MOE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00653-RCL |

**DECLARATION OF DR. DAN H. KARASIC IN SUPPORT OF PLAINTIFFS' MOTION FOR A TRO AND PRELIMINARY INJUNCTION**

I, Dan H. arasic, M.D., hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

## I. BACKGROUND AND QUALIFICATIONS

4. I am a Professor Emeritus of Psychiatry at University of California San Francisco UCSF . I have been on faculty at UCSF since 1991. I have had a telepsychiatry private practice since 2020.

5. I received my Doctor of Medicine M.D. degree from the ale Medical School in 1987. In 1991, I completed my residency in psychiatry at the University of California Los Angeles UCLA Neuropsychiatric Institute, and from 1990 to 1991, I was a postdoctoral fellow in a training program in mental health services research for persons living with AIDS at UCLA.

6. For 35 years, I have worked with patients with gender dysphoria. I am a Distinguished Life Fellow of the American Psychiatric Association and have been the chair of the American Psychiatric Association Workgroup on Gender Dysphoria, as well as the sole author of the chapter on transgender care in the American Psychiatric Press's Clinical Manual of Cultural Psychiatry, Second Edition.

7. Over the past 35 years, I have provided care for thousands of transgender patients. I am familiar with and have knowledge of all aspects of medical treatment for gender dysphoria, including the administration of hormones.

8. I previously sat on the Board of Directors of the World Professional Association for Transgender Health WPATH and am a co-author of WPATH's Standards of Care for the

Health of Transsexual, Transgender, and Gender Nonconforming People, ersion 7, and the lead author on the Mental Health chapter of ersion 8. The WPATH Standards of Care are the internationally accepted guidelines designed to promote the health and welfare of transgender, transsexual, and gender variant persons. I remain active in the work of WPATH.

9. As a member of the WPATH Global Education Initiative, I helped develop a specialty certification program in transgender health and helped train over 2,000 health providers.

10. At UCSF, I developed protocols and outcome measures for the Transgender Surgery Program at the UCSF Medical Center. I also served on the Medical Advisory Board for the UCSF Center of Excellence for Transgender Care and co-wrote the mental health section of the original Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People and the revision in 2016.

11. I have worked with the San Francisco Department of Public Health, helping to develop and implement their program for the care of transgender patients and conducting mental health assessments for gender-affirming surgery. I served on the City and County of San Francisco Human Rights Commission's LGBT Advisory Committee, and I have been an expert consultant for California state agencies and on multiple occasions for the United Nations Development Programme on international issues in transgender care.

12. I have held numerous clinical positions concurrent to my clinical professorship at UCSF. Among these, I served as an attending psychiatrist for San Francisco General Hospital's consultation-liaison service for AIDS care, as an outpatient psychiatrist for HI -AIDS patients at UCSF, as a psychiatrist for the Transgender Life Care Program and the Dimensions Clinic at Castro Mission Health Center, and the founder and co-lead of the UCSF Alliance Health Project's

Transgender Team. In these clinical roles, I speciali ed in the evaluation and treatment of transgender, gender dysphoric, and HI -positive patients.

13. I also regularly provide consultation on challenging cases to psychologists and other psychotherapists working with transgender and gender dysphoric patients. I have been a consultant in transgender care to the California Department of State Hospitals, which treats patients held by forensic commitment and psychiatric patients from the state prisons, and have been a consultant for the California Department of Corrections and Rehabilitation on the care of incarcerated transgender people. I am currently a consultant in transgender mental health to the Alameda County Jails. In my 29 years working with transgender patients in San Francisco public health clinics, I worked with many formerly incarcerated people, including those who spoke of their experiences being denied care while incarcerated.

14. As part of my psychiatric practice treating individuals diagnosed with gender dysphoria and who receive other medical and surgical treatment for that condition, as well as a co-author of the WPATH Standards of Care and UCSF's Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People, I am and must be familiar with additional aspects of medical care for the diagnosis of gender dysphoria, beyond mental health treatment, assessment, and diagnosis.

15. In addition to this work, I have done research on the treatment of depression.

16. I have authored many articles and book chapters on the diagnosis and treatment of gender dysphoria and edited the book Sexual and Gender Diagnoses of the Diagnostic and Statistical Manual DSM : A Reevaluation.

17. Since 2018, I have performed over 130 independent medical reviews for the State of California to determine the medical necessity of transgender care in appeals of denial of insurance coverage.

18. My professional background, experiences, publications inclusive of those authored in the past ten years, and presentations are detailed in my curriculum vitae C . A true and correct copy of my most up-to-date C is attached as Exhibit A.

**I. Compensation**

19. I am being compensated for my work on this matter at a rate of 600.00 per hour for preparation of declarations and expert reports. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

**II. <u>PREVIOUS TESTIMONY</u>**

20. Over the past four years, I have given expert testimony by deposition or trial in the following cases: *L.B. v. Premera Blue Cross*, No. 3:20-cv-06145-RJB W.D. Wash. ; *Misanin v. Wilson*, No. 2:24-cv-04734-BHH D.S.C. ; *Voe v. Mansfield*, No. 1:23-C -864-LCB-LPA M.D.N.C. ; *Boe v. Marshall*, No. 2:22-cv-184-LCB N.D. Ala. ; *Doe v. Ladapo*, No. 4:23-cv-00114 N.D. Fla. ; *Dekker v. Weida*, No. 4:22-cv-00325 N.D. Fla. ; *K.C. v. The Individual Members of the Medical Licensing Board of Indiana*, No. 1:23-cv-00595 S.D. Ind. ; *Brandt v. Rutledge*, No. 4:21-cv-00450 E.D. Ark. ; *C.P. v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145 W.D. Wash. ; *Kadel v. Folwell*, No. 1:19-cv-00272 M.D.N.C. ; *Fain v. Crouch*, No. 3:20-cv-00740 S.D. W. a. ; *Gilyard v. School Bd. of Broward Cnty.*, No. 24-cv-61356-WPD S.D. Fla. ; *Lovdahl v. Kaiser Found. Hosps.*, No. ST -cv-UMM-2023-0006100 Cal. Superior Ct., San Joaquin County ; *Keohane v.Dixon*; *Hein v. UNMC Physicians et al; Bella Boe et al. v. Children's Hospital Colorado* 2026C 30232 .

21. To the best of my recollection, I have not given expert testimony at a trial or at a deposition in any other case during this period.

## III. PRIOR DECLARATIONS IN *KINGDOM V. TRUMP*

22. I've submitted three declarations in the related case, *Kingdom v. Trump*, *et al.*, Case No. 1:25-cv-00691. These declarations are attached hereto as Exhibits B-D. For purposes of this declaration filed in the *Doe, Jones,* and *Moe* actions, I rely upon my sworn declarations from *Kingdom* and incorporate them by reference and treat them as part of this expert declaration in support of my expert opinions discussed below.

## IV. BASES FOR OPINIONS

23. In preparing this report, I have relied on my training and my decades clinical experience as a psychiatrist treating patients with gender dysphoria, as well as my experience conducting research, as set out in my curriculum vitae attached hereto as Exhibit A .

24. I have also relied on my knowledge of the peer-reviewed research regarding the treatment of gender dysphoria, which reflects advancements in the field of transgender health.

25. I have also relied on my knowledge of the clinical practice guidelines for the treatment of gender dysphoria, including my work as a contributing author of the WPATH Standards of Care, ersions 7 and 8, and the UCSF Guidelines.

26. I have reviewed the available Bureau of Prisons' BOP medical records and correctional files of the four individuals discussed in this Declaration: Jane Jones, Wendy Doe, Rachel Doe, Carla Jones all of whom I refer to by pseudonym . I have not met with any of these Plaintiffs in person or clinically evaluated them. I did review declarations that they previously filed in this litigation. It is my understanding that the complete files relating to these individuals are being produced by the BOP on a rolling basis and that there may be additional records produced after I submit this Declaration. I reserve the right to supplement my Declaration, if needed, after I

**MATERIAL UNDER SEAL DELETED**

have had the opportunity to review any subsequently-produced records relating to these individuals.

27. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject. I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

28. Additionally, I have reviewed Executive Order 14168, titled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to The Federal Government, issued on January 20, 2025 EO 14168 , the BOP's Program Statement 5260.01, Management of Inmates with Gender Dysphoria the Program Statement ; and the Memorandum on Program Statement 5260.01, Management of Inmates with Gender Dysphoria Feb. 19, 2026 the Memorandum .

## V. EXPERT OPINIONS

### A. JANE JONES

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

MATERIAL UNDER SEAL DELETED

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**B. RACHEL DOE**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

**C. <u>WENDY DOE</u>**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**D. CARLA JONES**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**VI. <u>CONCLUSION</u>**

92. The BOP has diagnosed or reaffirmed the well-documented and longstanding diagnosis of gender dysphoria for Plaintiffs Jane Jones, Wendy Doe, Rachel Doe, and Carla Jones. Three of these Plaintiffs have had a vaginoplasty, among other gender-affirming surgeries. All of these Plaintiffs have been receiving hormone therapy for years ranging from 8 years to decades . The BOP has been and is currently prescribing, administering, and monitoring these Plaintiffs' hormone medication, which is effectively treating their gender dysphoria.

93. There is no medical or therapeutic justification for terminating this treatment. As I explain extensively in the declarations I filed in the *Kingdom* action, for individuals like these Plaintiffs for whom transition medical care, including hormone therapy, is indicated, there are no alternative evidence-based treatments for gender dysphoria. *See* Exs. B-D

94. Moving these Plaintiffs to men's prisons will also exacerbate their gender dysphoria and cause extreme risk of harm to their physical and mental health, including a heightened risk of self-harm and suicidality. Some of these Plaintiffs are particularly vulnerable to these risks given their prior history of childhood sexual abuse, prior history of sexual assault and harassment in men's facilities, and history of self-harm or suicidality. For these reasons, depriving Plaintiffs of medically necessary treatment and/or placing them in male correctional facilities or the combined impact of both will severely threaten the Plaintiffs' physical and mental well-being.

95. The BOP's policy also compels doctors, nurses, psychologists, and other licensed clinicians to violate basic medical ethics and state licensing rules. Clinicians have a legal, medical, and ethical obligation to practice within applicable medical standards of care and to comply with medical ethics when treating patients. This policy is fundamentally incompatible with these core medical principles and could expose BOP clinicians and staff to licensing complaints, discipline, and even loss of their licenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of May, 2026

Dan H. arasic

# EXHIBIT A

**University of California, San Francisco**

# CURRICULUM VITAE

**Name:** Dan H. Karasic, MD

**Position:** Professor Emeritus
Psychiatry
School of Medicine

## EDUCATION

| | | | |
|---|---|---|---|
| 1978 - 1982 | Occidental College, Los Angeles | A.B.; Summa Cum Laude | Biology |
| 1982 - 1987 | Yale University School of Medicine | M.D. | Medicine |
| 1987 - 1988 | University of California, Los Angeles | Intern | Medicine, Psychiatry, and Neurology |
| 1988 - 1991 | University of California, Los Angeles; Neuropsychiatric Institute | Resident | Psychiatry |
| 1990 - 1991 | University of California, Los Angeles; Department of Sociology | Postdoctoral Fellow | Research Training Program in Mental Health Services for Persons with AIDS |

## LICENSES, CERTIFICATION

| | |
|---|---|
| 1990 | Medical Licensure, California, License Number G65105 |
| 1990 | Drug Enforcement Administration Registration Number BK1765354 |
| 1993 | American Board of Psychiatry and Neurology, Board Certified in Psychiatry |

## PRINCIPAL POSITIONS HELD

| | | |
|---|---|---|
| 1991 - 1993 | University of California, San Francisco | Health Sciences Psychiatry Clinical Instructor |
| 1993 - 1999 | University of California, San Francisco | Health Sciences Psychiatry Assistant Clinical Professor |
| 1999 - 2005 | University of California, San Francisco | Health Sciences Psychiatry Associate Clinical Professor |

| | | |
|---|---|---|
| 2005 - 2020 | University of California, San Francisco | Health Sciences Psychiatry Clinical Professor |
| 2020-present | University of California, San Francisco | Professor Emeritus of Psychiatry |

**OTHER POSITIONS HELD CONCURRENTLY**

| | | | |
|---|---|---|---|
| 1980 - 1980 | Associated Western Universities / U.S. Department of Energy | Honors Undergraduate Research Fellow | UCLA Medicine |
| 1981 - 1981 | University of California, Los Angeles; Medicine American Heart Association, California Affiliate | Summer Student Research Fellow | |
| 1986 - 1987 | Yale University School of Medicine; American Heart Association, Connecticut Research Fellow Affiliate | Medical Student | Psychiatry |
| 1990 - 1991 | University of California, Los Angeles Postdoctoral Sociology | | Fellow |
| 1991 - 2001 | SFGH Consultation-Liaison Service; AIDS Care | Attending Psychiatrist | Psychiatry |
| 1991 - 2001 | AIDS Consultation-Liaison Medical Student Elective | Course Director | Psychiatry |
| 1991 - present | UCSF Positive Health Program at San Francisco General Hospital (Ward 86) | HIV/AIDS Outpatient Psychiatrist | Psychiatry |
| 1991 - present | UCSF AHP (AIDS Health Project/Alliance Health Project) | HIV/AIDS Outpatient Psychiatrist | Psychiatry |
| 1994 - 2002 | St. Mary's Medical Center CARE Unit. The CARE Unit specializes in the care of patients with AIDS dementia. | Consultant | Psychiatry |
| 2001 - 2010 | Depression and Antiretroviral Adherence Study (The H.O.M.E. study: Health Outcomes of Mood Enhancement) | Clinical Director Medicine | Psychiatry and |
| 2003 - 2020 | Transgender Life Care Program and Mission Health Clinic Center | Psychiatrist | Dimensions Clinic, Castro |
| 2013 - 2020 | UCSF Alliance Health Project, Co-lead, Transgender Team | Co-Lead and Psychiatrist | Psychiatry |

**HONORS AND AWARDS**

| | | |
|---|---|---|
| 1981 | Phi Beta Kappa Honor Society | Phi Beta Kappa |
| 1990 | NIMH Postdoctoral Fellowship in Mental Health Services for People with AIDS (1990-1991) | National Institute of Mental Health |

| | | |
|---|---|---|
| 2001 | Lesbian Gay Bisexual Transgender Leadership Award, LGBT Task Force of the Cultural Competence and Diversity Program | SFGH Department of Psychiatry |
| 2006 | Distinguished Fellow | American Psychiatric Association |
| 2012 | Chancellor's Award for Leadership in LGBT Health | UCSF |
| 2023 | Alumni Seal Award for Achievement | Occidental College Professional |

## MEMBERSHIPS

1992 - present Northern California Psychiatric Society

1992 - present American Psychiatric Association

2000 - 2019 Bay Area Gender Associates (an organization of psychotherapists working with transgendered clients)

2001 - present World Professional Association for Transgender Health

## SERVICE TO PROFESSIONAL ORGANIZATIONS

| | | |
|---|---|---|
| 1981 - 1982 | The Occidental | News Editor |
| 1984 - 1985 | Yale University School of Medicine | Class President |
| 1989 - 1991 | Kaposi's Sarcoma Group, AIDS Project Los Angeles | Volunteer Facilitator |
| 1992 - 1996 | Early Career Psychiatrist Committee, Association of Gay and Lesbian Psychiatrists | Chair |
| 1992 - 1996 | Board of Directors, Association of Gay and Lesbian Psychiatrists | Member |
| 1993 - 1993 | Local Arrangements Committee, Association of Gay and Lesbian Psychiatrists | Chair |
| 1994 - 1995 | Educational Program, Association of Gay and Lesbian Psychiatrists, 1995 Annual Meeting | Director |
| 1994 - 1998 | Board of Directors, BAY Positives | Member |
| 1994 - 2020 | Committee on Lesbian, Gay, Bisexual and Transgender Issues, Northern California Psychiatric Society | Member |
| 1995 - 1997 | Board of Directors, Bay Area Young Positives. BAY Positives is the nation's first community-based organization providing psychosocial and recreational services to HIV-positive youth | President |
| 1995 - 1997 | Executive Committee, Bay Area Young Positives. | Chair |

| | | |
|---|---|---|
| 1996 - 2004 | Committee on Lesbian, Gay, Bisexual and Transgender Issues, Northern California Psychiatric Society | Chair |
| 1998 - 2002 | City of San Francisco Human Rights Commission, Lesbian, Gay Bisexual Transgender Advisory Committee | Member |
| 2000 - 2004 | Association of Gay and Lesbian Psychiatrists. Vice President Responsible for the organization's educational programs | |
| 2004 - 2005 | Association of Gay and Lesbian Psychiatrists | President-elect |
| 2005 - 2007 | Caucus of Lesbian, Gay, and Bisexual Psychiatrists of the American Psychiatric Association | Chair |
| 2005 - 2007 | Association of Gay and Lesbian Psychiatrists | President |
| 2007 - 2009 | Association of Gay and Lesbian Psychiatrists | Immediate Past President |
| 2009 - 2010 | Consensus Committee for Revision of the Sexual and Gender Identity Disorders for DSM-V, GID of Adults subcommittee. (Wrote WPATH recommendations as advisory body to the APA DSM V Committee for the Sexual and Gender Identity Disorders chapter revision.) | Member |
| 2010 - 2011 | Scientific Committee, 2011 WPATH Biennial Symposium, Atlanta | Member |
| 2010 -2022 | World Professional Association for Transgender Care Standards of Care Workgroup and Committee (writing seventh and eighth revisions of the WPATH Standards of Care, which is used internationally for transgender care.) | Member |
| 2010 - 2018 | ICD 11 Advisory Committee, World Professional Association for Transgender Health | Member |
| 2012 - 2014 | Psychiatry and Diagnosis Track Co-chair, Scientific Committee, 2014 WPATH Biennial Symposium, Bangkok | Member |
| 2014 - 2016 | Scientific Committee, 2016 WPATH Biennial Symposium, Amsterdam | Member |
| 2014 - 2018 | Board of Directors (elected to 4 year term), World Professional Association for Transgender Health | Member |
| 2014 - 2018 | Public Policy Committee, World Professional Association for Transgender Health | Chair |
| 2014 - 2018 | WPATH Global Education Initiative: Training providers Trainer and specialty certification in transgender health | Steering Committee Member |
| 2014 - 2016 | American Psychiatric Association Workgroup on Gender Dysphoria | Member |
| 2016 - present | American Psychiatric Association Workgroup on Gender Dysphoria | Chair |
| 2016 | USPATH: Inaugural WPATH U.S. Conference, Los Angeles, 2017 | Conference Chair |

## SERVICE TO PROFESSIONAL PUBLICATIONS

2011 - present Journal of Sexual Medicine, reviewer

2014 - present International Journal of Transgenderism, reviewer

2016 - present LGBT Health, reviewer

## INVITED PRESENTATIONS - INTERNATIONAL

| | | |
|---|---|---|
| 2009 | World Professional Association for Transgender Health, Oslo, Norway | Plenary Session Speaker |
| 2009 | World Professional Association for Transgender Health, Oslo, Norway | Symposium Speaker |
| 2009 | Karolinska Institutet, Stockholm Sweden | Invited Lecturer |
| 2012 | Cuban National Center for Sex Education (CENESEX), Havana, Cuba | Invited Speaker |
| 2013 | Swedish Gender Clinics Annual Meeting, Stockholm, Sweden | Keynote Speaker |
| 2013 | Conference on International Issues in Transgender care, United Nations Development Programme - The Lancet, Beijing, China | Expert Consultant |
| 2014 | World Professional Association for Transgender Health, Bangkok, Thailand | Track Chair |
| 2014 | World Professional Association for Transgender Health, Bangkok, Thailand | Invited Speaker |
| 2014 | World Professional Association for Transgender Health, Bangkok, Thailand | Invited Speaker |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium | Invited Speaker |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium | Symposium Chair |
| 2015 | Israeli Center for Human Sexuality and Gender Identity, Tel Aviv | Invited Speaker |
| 2016 | World Professional Association for Transgender Health, Amsterdam | Symposium Chair |
| 2016 | World Professional Association for Transgender Health, Amsterdam | Invited Speaker |
| 2016 | World Professional Association for Transgender Health, Amsterdam | Invited Speaker |
| 2017 | Brazil Professional Association for Transgender Health, Sao Paulo | |
| 2017 | Vietnam- United Nations Development Programme Asia Transgender Health Conference, Hanoi | |

| | | |
|---|---|---|
| 2018 | United Nations Development Programme Asia Conference on Transgender Health and Human Rights, Bangkok | |
| 2018 | World Professional Association for Transgender Health, Buenos Aires | Invited Speaker |
| 2021 | Manitoba Psychiatric Association, Keynote Speaker | |
| 2022 | World Professional Association for Public Health, invited speaker, Montreal | |

**INVITED PRESENTATIONS - NATIONAL**

| | | |
|---|---|---|
| 1990 | Being Alive Medical Update, Century Cable Television | Televised Lecturer |
| 1992 | Institute on Hospital and Community Psychiatry, Toronto | Symposium Speaker |
| 1992 | Academy of Psychosomatic Medicine Annual Meeting, San Diego | Symposium Speaker |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Workshop Chair |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Workshop Speaker |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Paper Session Co-chair |
| 1995 | Spring Meeting of the Association of Gay and Lesbian Psychiatrists, Miami Beach | Symposium Chair |
| 1996 | American Psychiatric Association 152nd Annual Meeting, New York | Workshop Speaker |
| 1997 | American Psychiatric Association Annual Meeting, San Diego | Workshop Speaker |
| 1997 | Gay and Lesbian Medical Association Annual | Invited Speaker Symposium |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Workshop Chair |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Workshop Chair |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Media Session Chair |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Media Session Chair |
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Symposium Chair |
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Symposium Presenter |

| | | |
|---|---|---|
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Workshop Chair |
| 2000 | American Psychiatric Association Annual Meeting, Chicago | Workshop Chair |
| 2000 | National Youth Leadership Forum On Medicine, University of California, Berkeley | Invited Speaker |
| 2001 | American Psychiatric Association Annual Meeting, New Orleans | Workshop Chair |
| 2001 | American Psychiatric Association Annual Meeting, New Orleans | Media Program Chair |
| 2001 | Association of Gay and Lesbian Psychiatrists Chair Symposium, New Orleans | |
| 2001 | Harry Benjamin International Gender Dysphoria Association Biennial Meeting, Galveston, Texas | Invited Speaker |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Media Program Chair |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Workshop Chair |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Workshop Chair |
| 2003 | Association of Gay and Lesbian Psychiatrists CME | Chair Conference |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Chair |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Co-Chair |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Workshop Chair |
| 2003 | American Public Health Association Annual Meeting, San Francisco | Invited Speaker |
| 2004 | Mission Mental Health Clinic Clinical Conference | Invited Speaker |
| 2004 | Association of Gay and Lesbian Psychiatrists Conference, New York | Co-Chair |
| 2004 | Mental Health Care Provider Education Program: Los Angeles. Sponsored by the American Psychiatric Association Office of HIV Psychiatry | Invited Speaker |
| 2005 | American Psychiatric Association Annual Meeting, Atlanta | Workshop Speaker |
| 2005 | Association of Gay and Lesbian Psychiatrists Saturday Symposium | Invited Speaker |

| | | |
|---|---|---|
| 2008 | Society for the Study of Psychiatry and Culture, San Francisco | Invited Speaker |
| 2009 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Speaker |
| 2011 | National Transgender Health Summit, San Francisco | Invited Speaker |
| 2011 | National Transgender Health Summit, San Francisco | Invited Speaker |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI | Symposium Chair |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI | Symposium Speaker |
| 2011 | World Professional Association for Transgender Health Biennial Conference, Atlanta, GA | Invited Speaker |
| 2011 | World Professional Association for Transgender Health Biennial Conference, Atlanta, GA | Invited Speaker |

| | | |
|---|---|---|
| 2011 | World Professional Association for Transgender Health Biennial Conference, Atlanta, GA | |
| 2011 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2012 | Gay and Lesbian Medical Association Annual Meeting | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | American Psychiatric Association Annual Meeting, San Invited Speaker Francisco | |
| 2013 | Gay and Lesbian Medical Association, Denver, CO | Invited Speaker |
| 2014 | American Psychiatric Association Annual Meeting, New York | Invited Speaker |
| 2014 | Institute on Psychiatric Services, San Francisco | Moderator |
| 2014 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2014 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2015 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2015 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2015 | American Psychiatric Association Annual Meeting, Toronto | Workshop Speaker |
| 2015 | American Psychiatric Association Annual Meeting, Toronto | Course Faculty |
| 2016 | American Psychiatric Association Annual Meeting | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Atlanta | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Springfield, MO | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Fort Lauderdale, FL | Course Faculty |
| 2017 | World Professional Association for Transgender Health, GEI, Los Angeles | Course Faculty |
| | World Professional Association for Transgender Health Surgeon’s Training, Irvine, CA | Course Faculty |

| | | |
|---|---|---|
| 2017 | American Urological Association Annual Meeting, San Francisco CA | Invited Speaker |
| 2018 | World Professional Association for Transgender Health GEI, Portland OR | Course Faculty |
| 2018 | World Professional Association for Transgender Health GEI, Palm Springs, | Course Faculty |
| 2019 | American Society for Adolescent Psychiatry Annual Meeting, San Francisco | Speaker |
| 2019 | American Psychiatric Association Annual Meeting, San Francisco | Session Chair |
| 2020 | Psychiatric Congress, Invited Speaker | |
| 2022 | World Professional Association for Transgender Health, Montreal, invited speaker | |
| 2023 | National Transgender Health Summit, San Francisco, invited speaker | |
| 2023 | American Psychiatric Association Annual Meeting, San Francisco, invited speaker | |
| 2023` | US Professional Association for Transgender Health, speaker | |
| 2024 | World Professional Association for Transgender Health, Lisbon | |

**INVITED PRESENTATIONS - REGIONAL AND OTHER INVITED PRESENTATIONS**

| | | |
|---|---|---|
| 1990 | Advanced Group Therapy Seminar, UCLA Neuropsychiatric Institute | Invited Lecturer |
| 1991 | Joint Project of the Southern California AIDS Interfaith Council and UCLA School of Medicine | Symposium Speaker |
| 1991 | Joint Project of the Southern California AIDS Interfaith Council and UCLA School of Medicine | Workshop Panelist |
| 1992 | Advanced Group Therapy Seminar, UCLA Neuropsychiatric Institute | Invited Lecturer |
| 1993 | UCSF School of Nursing Invited Lecturer | |
| 1995 | UCSF/SFGH Department of Medicine Clinical Care Conference | Invited Speaker |
| 1996 | UCSF School of Nursing Invited Speaker | |
| 1996 | Psychopharmacology for the Primary Care AIDS/Clinician, Invited Lecturer series of four lectures, UCSF Department of Medicine | |

| | | |
|---|---|---|
| 1996 | UCSF AIDS Health Project Psychotherapy Internship Training Program | |
| 1996 | UCSF/SFGH Department of Medicine AIDS Quarterly Update | Invited Speaker |
| 1996 | San Francisco General Hospital, Division of Addiction Medicine | Invited Speaker |
| 1996 | UCSF Langley Porter Psychiatric Hospital and Clinics Grand Rounds | Invited Speaker |
| 1997 | UCSF School of Nursing Invited Speaker | |
| 1997 | UCSF Department of Medicine AIDS Program | Invited Speaker |
| 1997 | Northern California Psychiatric Society Annual Meeting, Monterey | Workshop Speaker |
| 1997 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 1997 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 1997 | Northern California Psychiatric Society LGBT Committee Symposium | Chair Fall |
| 1997 | Progress Foundation, San Francisco | Invited Speaker |
| 1998 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 1999 | Northern California Psychiatric Society Annual Meeting, Santa Rosa | Invited Speaker |
| 1999 | Northern California Psychiatric Society Annual Meeting, Santa Rosa | Invited Speaker |
| 1999 | University of California, Davis, Department of Psychiatry Grand Rounds | Invited Speaker |
| 1999 | California Pacific Medical Center Department of Psychiatry Grand Rounds | Invited Speaker |
| 1999 | San Francisco General Hospital Department of Psychiatry Departmental Case Conference | Discussant |
| 2000 | Langley Porter Psychiatric Hospital and Clinics Consultation Liaison Seminar | Invited Speaker |
| 2000 | San Francisco General Hospital, Psychopharmacology Seminar | Invited Speaker |
| 2000 | UCSF Transgender Health Conference, Laurel Heights Conference Center | Invited Speaker |

| | | |
|---|---|---|
| 2000 | Psychiatry Course for UCSF Second Year Medical Students | Invited Lecturer |
| 2000 | Community Consortium Treatment Update Symposium, California Pacific Medical Center, Davies Campus | Invited Speaker |
| 2000 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 2001 | Psychiatry Course for UCSF Second Year Medical Students | Invited Lecturer |
| 2003 | Tom Waddell Health Center Inservice | Invited Speaker |
| 2003 | San Francisco Veterans Affairs Outpatient Clinic | Invited Speaker |
| 2004 | San Francisco General Hospital Psychiatric Emergency Service Clinical Conference | Invited Speaker |
| 2004 | South of Market Mental Health Clinic, San Francisco | Invited Speaker |
| 2005 | Northern Psychiatric Psychiatric Society Annual Meeting | Invited Speaker |
| 2005 | Equality and Parity: A Statewide Action for Transgender HIV Prevention and Care, San Francisco | Invited Speaker |
| 2005 | San Francisco General Hospital Department of Psychiatry Grand Rounds. | Invited Speaker |
| 2006 | SFGH/UCSF Department of Psychiatry Grand Rounds | Invited Speaker |
| 2007 | UCSF Department of Medicine, HIV/AIDS Grand Rounds, Positive Health Program | Invited Speaker |
| 2007 | California Pacific Medical Center LGBT Health Symposium, San Francisco LGBT Community Center | Invited Speaker |
| 2007 | UCSF CME Conference, Medical Management of HIV/AIDS, Fairmont Hotel, San Francisco | Invited Speaker |
| 2008 | UCSF Department of Medicine, Positive Health Program, HIV/AIDS Grand Rounds | Invited Speaker |
| 2008 | San Francisco General Hospital Psychiatry Grand Rounds | Invited Speaker |
| 2008 | UCSF CME Conference, Medical Management of HIV/AIDS, Fairmont Hotel, San Francisco | Invited Speaker |
| 2010 | Northern California Psychiatric Society Annual Meeting, Monterey, CA | Invited Speaker |
| 2011 | Transgender Mental Health Care Across the Life Span, Stanford University | Invited Speaker |
| 2011 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |

| | | |
|---|---|---|
| 2012 | UCSF AIDS Health Project 2012 San Francisco Veterans Affairs Medical Center. | Invited Speaker |
| 2013 | Association of Family and Conciliation Courts Conference, Los Angeles, CA | Invited Speaker |
| 2014 | UCSF Transgender Health elective | Invited Speaker |
| 2014 | UCSF Department of Psychiatry Grand Rounds | Invited Speaker |
| 2014 | California Pacific Medical Center Department of Psychiatry Grand Rounds | Invited Speaker |
| 2014 | UCLA Semel Institute Department of Psychiatry Grand Rounds | Invited Speaker |
| 2015 | UCSF Transgender Health elective | Invited Speaker |
| 2015 | Fenway Health Center Boston, MA (webinar) | Invited Speaker |
| 2015 | Transgender Health Symposium, Palm Springs | Invited Speaker |
| 2015 | Transgender Health Symposium, Palm Springs | Co-Chair |
| 2015 | Santa Clara Valley Medical Center Grand Rounds | Invited Speaker |
| 2016 | UCSF School of Medicine Transgender Health elective | Invited Speaker |
| 2016 | Langley Porter Psychiatric Institute APC Case Conference | Invited Speaker (2 session series) |
| 2016 | Zuckerberg San Francisco General Department of Psychiatry Grand Rounds | Invited Speaker |
| 2016 | UCSF Mini-Medical School Lectures to the Public | Invited Speaker |
| 2021 | Los Angeles County Department of Mental Health, | Invited Speaker |
| 2023 | Alameda County Department of Behavioral Health, | Invited Speaker |

## CONTINUING EDUCATION AND PROFESSIONAL DEVELOPMENT ACTIVITIES

| | |
|---|---|
| 2005 | Northern California Psychiatric Society |
| 2005 | Northern California Psychiatric Society Annual Meeting, Napa |
| 2005 | Association of Gay and Lesbian Psychiatrist Annual Conference |
| 2006 | Annual Meeting, American Psychiatric Association, Atlanta |
| 2006 | Annual Meeting, American Psychiatric Association, Toronto |
| 2006 | Institute on Psychiatric Services, New York |
| 2007 | Association of Gay and Lesbian Psychiatrists Annual Conference |
| 2007 | American Psychiatric Association Annual Meeting, San Diego |

| | |
|---|---|
| 2007 | The Medical Management of HIV/AIDS, a UCSF CME Conference |
| 2008 | Society for the Study of Psychiatry and Culture, San Francisco |
| 2009 | American Psychiatric Association, San Francisco |
| 2009 | World Professional Association for Transgender Health, Oslo, Norway |
| 2010 | Annual Meeting of the Northern California Psychiatric Society, Monterey, CA |
| 2011 | Transgender Mental Health Care Across the Life Span, Stanford University |
| 2011 | National Transgender Health Summit, San Francisco |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI |
| 2011 | World Professional Association for Transgender Health Biennial Conference, Atlanta, GA |
| 2011 | Institute on Psychiatric Services, San Francisco |
| 2012 | Gay and Lesbian Medical Association Annual Meeting, San Francisco |
| 2013 | National Transgender Health Summit, Oakland, CA |
| 2013 | American Psychiatric Association Annual Meeting, San Francisco |
| 2013 | Gay and Lesbian Medical Association, Denver, CO |
| 2014 | American Psychiatric Association Annual Meeting, New York |
| 2014 | Institute on Psychiatric Services, San Francisco |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium |
| 2015 | National Transgender Health Summit, Oakland |
| 2015 | American Psychiatric Association Annual Meeting, Toronto |
| 2016 | American Psychiatric Association Annual Meeting, Atlanta |
| 2016 | World Professional Association for Transgender Health, Amsterdam |

## GOVERNMENT AND OTHER PROFESSIONAL SERVICE

| | |
|---|---|
| 1998 - 2002 | City and County of San Francisco Human Rights Member Commission LGBT Advisory Committee |

I was the chair of the American Psychiatric Association Workgroup on Gender Dysphoria, which developed a CME course for the 2015 and 2016 APA Annual Meetings, and has an larger educational mission to train American psychiatrists to better care for transgender patients. I have been leading education efforts in transgender health at APA meetings since 1998. On the APA Workgroup on Gender Dysphoria, I am a co-author of a paper of transgender issues that has been approved by the American Psychiatric Association as a resource document and is in press for the American Journal of Psychiatry. I am also the sole

author of the chapter on transgender care in the American Psychiatric Press's Clinical Manual of Cultural Psychiatry, Second Edition.

I have been active internationally in transgender health through my work as a member of the Board of Directors of the World Professional Association for Transgender Health. I am an author of the WPATH Standards of Care, Version 7, and am Chapter Lead for the Mental Health Chapter of SOC 8.

I chaired of the WPATH Public Policy Committee and was a member of the Global Education Initiative, which developed a specialty certification program in transgender health. I helped plan the 2016 WPATH Amsterdam conference, and was on the scientific committee for the last four biennial international conferences. I was on the founding committee of USPATH, the national affiliate of WPATH, and I chaired the inaugural USPATH conference, in Los Angeles in 2017. As a member of the steering committee of the WPATH Global Educational Initiative, I helped train over 2000 health providers in transgender health, and helped develop a board certification program and examination in transgender health.

**UNIVERSITY SERVICE UC SYSTEM AND MULTI-CAMPUS SERVICE**

| | | |
|---|---|---|
| 1991 – 2003 | HIV/AIDS Task Force | Member |
| 1992 - 1993 | HIV Research Group | Member |
| 1992 - 1997 | Space Committee | Member |
| 1992 - 2003 | Gay, Lesbian and Bisexual Issues Task Force | Member |
| 1994 - 1997 | SFGH Residency Training Committee | Member |
| 1996 - 1997 | Domestic Partners Benefits Subcommittee. | Chair |
| 1996 - 2000 | Chancellor's Advisory Committee on Gay, Lesbian, Bisexual and Transgender Issues. | Member |
| 1996 - 2003 | HIV/AIDS Task Force | Co-Chair |
| 1996 - 2003 | Cultural Competence and Diversity Program | Member |
| 2009 - present | Medical Advisory Board, UCSF Center of Excellence for Transgender Health | Member |
| 2010 - 2013 | Steering Committee, Child Adolescent Gender Center | Member |
| 2011 – 2017 | Mental Health Track, National Transgender Health Summit | Chair |

**DEPARTMENTAL SERVICE**

| | | |
|---|---|---|
| 1991 - 2003 | San Francisco General Hospital, Department of Psychiatry, HIV/AIDS Task Force | Member |
| 1992 - 1993 | San Francisco General Hospital, Department of Psychiatry, HIV Research Group | Member |
| 1992 - 1997 | San Francisco General Hospital, Department of Psychiatry, Space Committee | Member |

1992 - 2003 San Francisco General Hospital, Department of Psychiatry, GLBT Issues Task Force — Member

1994 - 1997 San Francisco General Hospital, Department of Psychiatry, Residency Training Committee — Member

1996 – 2003 San Francisco General Hospital, Department of Psychiatry, Cultural Competence and Diversity Program — Member

1996 - 2003 San Francisco General Hospital, Department of Psychiatry, HIV/AIDS Task Force — Co-Chair

2012 - 2020 San Francisco Department of Public Health Gender Competence Trainings Committee — Member

2013 - 2020 San Francisco Department of Public Health Transgender Health Implementation Task Force — Member

2014 - 2020San Francisco General Hospital, Department of Psychiatry, Transgender Surgery Planning Workgroup — Member

**PEER REVIEWED PUBLICATIONS**

1. Berliner JA, Frank HJL, **Karasic D**, Capdeville M. Lipoprotein-induced insulin resistance in aortic endothelium. Diabetes. 1984; 33:1039-44.
2. Bradberry CW, **Karasic DH**, Deutch AY, Roth RH. Regionally-specific alterations in mesotelencephalic dopamine synthesis in diabetic rats: association with precursor tyrosine. Journal of Neural Transmission. General Section, 1989; 78:221-9.
3. Targ EF, **Karasic DH**, Bystritsky A, Diefenbach PN, Anderson DA, Fawzy FI. Structured group therapy and fluoxetine to treat depression in HIV-positive persons. Psychosomatics. 1994; 35:132-7.
4. Karasic DH. Homophobia and self-destructive behaviors. The Northern California Psychiatric Physician. 1996; 37 Nov.-Dec. Reprinted by the Washington State Psychiatric Society and the Southern California Psychiatric Society newsletters.
5. Karasic D. Anxiety and anxiety disorders. Focus. 1996 Nov; 11(12):5-6. PMID: 12206111
6. Polansky JS, **Karasic DH**, Speier PL, Hastik KL, Haller E. Homophobia: Therapeutic and training considerations for psychiatry. Journal of the Gay and Lesbian Medical Association. 1997 1(1) 41-47.
7. Karasic DH. Progress in health care for transgendered people. Editorial. Journal of the Gay and Lesbian Medical Association, 4(4) 2000 157-8.
8. Perry S, **Karasic D**. Depression, adherence to HAART, and survival. Focus: A Guide to AIDS Research and Counseling. 2002 17(9) 5-6.
9. Fraser L, **Karasic DH**, Meyer WJ, Wylie, K. Recommendations for Revision of the DSM Diagnosis of Gender Identity Disorder in Adults. International Journal of Transgenderism. Volume 12, Issue 2. 2010, Pages 80-85.

10. Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W., Monstrey, S., **Karasic D** and 22 others. (2011). Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Version. International Journal of Transgenderism, 13:165-232, 2011

11. Tsai AC, **Karasic DH**, et al. Directly Observed Antidepressant Medication Treatment and HIV Outcomes Among Homeless and Marginally Housed HIV-Positive Adults: A Randomized Controlled Trial. American Journal of Public Health. February 2013, Vol. 103, No. 2, pp. 308-315.

12. Tsai AC, Mimmiaga MJ, Dilley JW, Hammer GP, **Karasic DH**, Charlebois ED, Sorenson JL, Safren SA, Bangsberg DR. Does Effective Depression Treatment Alone Reduce Secondary HIV Transmission Risk? Equivocal Findings from a Randomized Controlled Trial. AIDS and Behavior, October 2013, Volume 17, Issue 8, pp 2765-2772.

13. **Karasic DH**. Protecting Transgender Rights Promotes Transgender Health. LGBT Health. 2016 Aug; 3(4):245-7. PMID: 27458863

14. Winter S, Diamond M, Green J, **Karasic D**, Reed T, Whittle S, Wylie K. Transgender people: health at the margins of society. Lancet. 2016 Jul 23;388(10042):390-400. doi: 10.1016/S0140-6736(16)00683-8. Review./> PMID: 27323925

15. Grelotti DJ, Hammer GP, Dilley JW, **Karasic DH**, Sorensen JL, Bangsberg DR, Tsai AC. Does substance use compromise depression treatment in persons with HIV? Findings from a randomized controlled trial. AIDS Care. 2016 Sep 2:1-7. [Epub ahead of print]/> PMID: 27590273

16. Strang JF, Meagher H, Kenworthy L, de Vries AL, Menvielle E, Leibowitz S, Janssen A, Cohen-Kettenis P, Shumer DE, Edwards-Leeper L, Pleak RR, Spack N, **Karasic DH**, Schreier H, Balleur A, Tishelman A, Ehrensaft D, Rodnan L, Kuschner ES, Mandel F, Caretto A, Lewis HC, Anthony LG. Initial Clinical Guidelines for Co-Occurring Autism Spectrum Disorder and Gender Dysphoria or Incongruence in Adolescents. J Clin Child Adolesc Psychol. 2016 Oct 24:1-11. [Epub ahead of print]/> PMID: 27775428

17. Milrod C, **Karasic DH**. Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States. J Sex Med 2017;14:624–634.

18. William Byne, Dan H. Karasic, Eli Coleman, A. Evan Eyler, Jeremy D. Kidd, Heino F.L. Meyer-Bahlburg, Richard R. Pleak, and Jack Pula.Gender Dysphoria in Adults: An Overview and Primer for Psychiatrists.Transgender Health.Dec 2018.57-A3.http://doi.org/10.1089/trgh.2017.0053

19. Identity recognition statement of the world professional association for transgender health (WPATH). International Journal of Transgenderism. 2018 Jul 3; 19(3):1-2. Knudson KG, Green GJ, Tangpricha TV, Ettner ER, Bouman BW, Adrian AT, Allen AL, De Cuypere DG, Fraser FL, Hansen HT, **Karasic KD**, Kreukels KB, Rachlin RK, Schechter SL, Winter WS, Committee and Board of Direct

20. **Karasic, DH** & Fraser, L Multidisciplinary Care and the Standards of Care for Transgender and Gender Non-conforming Individuals. Schechter, L & Safa, B. (Eds.) Gender Confirmation Surgery, Clinics in Plastic Surgery Special Issue, Vol 45, Issue 3, pp 295-299. 2018 Elsevier,Philadelphia**.** https://doi.org/10.1016/j.cps.2018.03.016

21. Milrod C, Monto M, **Karasic DH.** Recommending or Rejecting "the Dimple": WPATHAffiliated Medical Professionals' Experiences and Attitudes Toward GenderConfirming Vulvoplasty in Transgender Women. J Sex Med. 2019 Apr;16(4):586-595. doi:
10.1016/j.jsxm.2019.01.316. Epub 2019 Mar 2.

22. ICD-11 and gender incongruence of childhood: a rethink is needed. Lancet Child Adolesc Health. 2019 10; 3(10):671-673. Winter S, Ehrensaft D, Telfer M, T'Sjoen G, Koh J, Pickstone-Taylor S, Kruger A, Griffin L, Foigel M, De Cuypere G, **Karasic D**. PMID: 31439494.

23. Gender Dysphoria in Adults: An Overview and Primer for Psychiatrists. Focus (Am Psychiatr Publ). 2020 Jul; 18(3):336-350. Byne W, Karasic DH, Coleman E, Eyler AE, Kidd JD, Meyer-Bahlburg HFL, Pleak RR, Pula J. PMID: 33343244; PMCID: PMC7587914.

24. WPATH Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. E. Coleman, A. E. Radix, W. P. Bouman, G. R. Brown, A. L. C. de Vries, M. B. Deutsch, R. Ettner, L. Fraser, M. Goodman, J. Green, A. B. Hancock, T. W. Johnson, D. H. Karasic… J. Arcelus (2022) Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, International Journal of Transgender Health, 23:sup1, S1-S259, DOI: 10.1080/26895269.2022.2100644

**BOOKS AND CHAPTERS**

1. **Karasic DH**, Dilley JW. Anxiety and depression: Mood and HIV disease. In: The UCSF AIDS Health Project Guide to Counseling: Perspectives on Psychotherapy, Prevention, and Therapeutic Practice. Dilley JW and Marks R, eds. Jossey-Bass. San Francisco, 1998, pp.227-248.
2. **Karasic DH**, Dilley JW. Human immunodeficiency-associated psychiatric disorders. In: The AIDS Knowledge Base, Third Edition. Cohen PT, Sande MA, Volberding PA, eds. Lippincott-Williams &Wilkens, Philadelphia, 1999, pp. 577-584.
3. **Karasic DH** and Drescher J. eds. Sexual and Gender Diagnoses of the Diagnostic and Statistical Manual (DSM): A Reevaluation. 2005. Haworth Press, Binghamton, NY. (Book Co-Editor)
4. **Karasic DH**. Transgender and Gender Nonconforming Patients. In: Clinical Manual of Cultural Psychiatry, Second Edition. Lim RF ed. pp 397-410. American Psychiatric Publishing, Arlington VA. 2015.
5. **Karasic DH**. Mental Health Care of the Transgender Patient. In: Comprehensive Care of the Transgender Patient, Ferrando CA ed. pp. 8-11. Elsevier, 2019.

6. **Karasic DH.** The Mental Health Assessment for Surgery. In: Gender Confirmation Surgery – Principles and Techniques for an Emerging Field. Schechter L ed. Springer Nature, in press 2019.

**OTHER PUBLICATIONS**

1. **Karasic DH**, Dilley JW. HIV-associated psychiatric disorders: Treatment issues. In: Cohen P, Sande MA, Volberding P, eds., The AIDS Knowledge Base. Waltham, MA: The Medical Publishing Group/ Massachusetts Medical Society. 1994. pp. 5.31-1-5.
2. **Karasic DH**, Dilley JW. HIV-associated psychiatric disorders: Clinical syndromes and diagnosis. In: Cohen P, Sande MA, Volberding P, eds., The AIDS Knowledge Base, Second Edition. Waltham, MA: The Medical Publishing Group/Massachusetts Medical Society. 1994 pp. 5.30-1-5.
3. **Karasic DH**. A primer on transgender care. In: Gender and sexuality. The Carlat Report Psychiatry. April 2012. Vol 10, Issue 4.
4. **Karasic D and Ehrensaft D.** We must put an end to gender conversion therapy for kids. Wired. 7/6/15.

**EXPERT WITNESS AND CONSULTATION ON TRANSGENDER CARE AND RIGHTS**
(Partial List)

2008 Consultant, California Department of State Hospitals

2012 Dugan v. Lake, Logan UT

2012 XY v. Ontario http://www.canlii.org/en/on/onhrt/doc/2012/2012hrto726/2012hrto726.html

2014 Cabading v California Baptist University

2014 CF v. Alberta
http://www.canlii.org/en/ab/abqb/doc/2014/2014abqb237/2014abqb237.html

2017 United Nations Development Programme consultant, transgender health care and legal rights in the Republic of Vietnam; Hanoi.

2017- 2018 Forsberg v Saskatchewan; Saskatchewan Human Rights v Saskatchewan

2018 United Nations Development Programme consultant, transgender legal rights in Southeast Asia; Bangkok.

2018 Consultant, California Department of State Hospitals

2019, 2021 Consultant/Expert, Disability Rights Washington

2019, 2021 Consultant/Expert, ACLU Washington

2021 Consultant, California Department of Corrections and Rehabilitation

2021 Expert, Kadel v. Folwell, 1:19-cv-00272 (M.D.N.C.).

2021 Expert, Drew Glass v. City of Forest Park, No.1:20-cv-914 (S.D. Ohio)

2021-2022 Expert, Brandt et al v. Rutledge et al. 4:21-cv-00450 (E.D. Ark.)

2021-2022 Expert, Fain v. Crouch, 3:20-cv-00740 (S.D.W. Va.)

2022 Expert, C.P. v. Blue Cross Blue Shield of Illinois, No. 3:20-cv-06145-RJB (W.D. Wash.)

2022-2023 Expert, Dekker, et al. v. Weida, et al., No. 4:22-cv-00325-RH-MAF

2019-2023 Expert, Disability Rights Washington v Washington State Department of Corrections, No. 2:23-cv-01553

2023 Expert, K.C. et al. v Individual Members of the Indiana Licensing Board, et al- No. 1:23-CV-595

2023 Expert, Doe, et al v Ladapo -No. 4:23-cv-00114-RH-MAF

2023 Expert, Doe et al v Thornbury -No. 3:23-cv-00230-DJH

2023 Expert, Lovdahl v. Kaiser Foundation Hospitals

2023 Expert, Brockman v Kaiser Foundation Hospitals

2024 Expert, Raven v Polis

2024 Expert, Mosely v. Tree of Life, Inc.

2024 Expert Voe v Mansfield, No. 1:23-CV-864-LCB-LPA

2024 Expert Boe v. Marshall, No. 2:22-cv-184-LCB (N.D. Ala.)

2024 Expert AB. v. Premera Blue Cross, No. 3:20-cv-06145-RJB (W.D. Wash.)

2024 Expert Misanin v. Wilson, No. 2:24-cv-04734-BHH (D.S.C.)

2025 Expert, PFLAG v. Trump

2025 Expert, Kingdom v. Trump

2025 Expert, Marcum v. Crews

2025 Expert, Keohane v. Dixon

2026 Expert, Hein v. Smith et al

2023 Expert, Lovdahl v Kaiser Foundation Hospitals, No. STK-CV-UMM-2023-00061000 (Cal. Sup. Ct.)

2025 Expert, Gilyard v Broward County, No. 24-cv-61356 (S.D. Fla.)

2025 Expert, Keohane v Dixon, No. 25-cv-23880 (S.D. Fla.)

2026 Hein v Smith et al

2026 Expert, Boe et al v. Children's Hospital Colorado, No. 2026-cv-30232

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALISHEA KINGDOM, et al.,<br>Plaintiff,<br>v.<br>DONALD J. TRUMP, et al.,<br>Defendants. | Case No. 1:25-cv-00691 |

**DECLARATION OF DR. DAN H. KARASIC IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Dan H. Karasic, M.D., hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

## I. BACKGROUND AND QUALIFICATIONS

### A. Qualifications

4. I am a Professor Emeritus of Psychiatry at University of California – San Francisco (UCSF). I have been on faculty at UCSF since 1991. I have also had a telepsychiatry private practice since 2020.

5. I received my Doctor of Medicine (M.D.) degree from the Yale Medical School in 1987. In 1991, I completed my residency in psychiatry at the University of California – Los Angeles (UCLA) Neuropsychiatric Institute, and from 1990 to 1991, I was a postdoctoral fellow in a training program in mental health services for persons living with AIDS at UCLA.

6. For over 30 years, I have worked with patients with gender dysphoria. I am a Distinguished Life Fellow of the American Psychiatric Association and have been the chair of the American Psychiatric Association Workgroup on Gender Dysphoria, as well as the sole author of the chapter on transgender care in the American Psychiatric Press's Clinical Manual of Cultural Psychiatry, Second Edition.

7. Over the past 30 years, I have provided care for thousands of transgender patients.

8. I previously sat on the Board of Directors of the World Professional Association for Transgender Health (WPATH) and am a co-author of WPATH's Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7, and the lead author on the Mental Health chapter of Version 8. The WPATH Standards of Care are the internationally accepted guidelines designed to promote the health and welfare of transgender, transsexual, and gender variant persons. I remain active in the work of WPATH.

9. As a member of the WPATH Global Education Initiative, I helped develop a specialty certification program in transgender health and helped train over 2,000 health providers.

10. At UCSF, I developed protocols and outcome measures for the Transgender Surgery Program at the UCSF Medical Center. I also served on the Medical Advisory Board for the UCSF Center of Excellence for Transgender Care and co-wrote the mental health section of the original Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People and the revision in 2016.

11. I have worked with the San Francisco Department of Public Health, helping to develop and implement their program for the care of transgender patients and conducting mental health assessments for gender-affirming surgery. I served on the City and County of San

Francisco Human Rights Commission's LGBT Advisory Committee, and I have been an expert consultant for California state agencies and on multiple occasions for the United Nations Development Programme on international issues in transgender care.

12. I have held numerous clinical positions concurrent to my clinical professorship at UCSF. Among these, I served as an attending psychiatrist for San Francisco General Hospital's consultation-liaison service for AIDS care, as an outpatient psychiatrist for HIV-AIDS patients at UCSF, as a psychiatrist for the Transgender Life Care Program and the Dimensions Clinic at Castro Mission Health Center, and the founder and co-lead of the UCSF Alliance Health Project's Transgender Team. In these clinical roles, I specialized in the evaluation and treatment of transgender, gender dysphoric, and HIV-positive patients.

13. I also regularly provide consultation on challenging cases to psychologists and other psychotherapists working with transgender and gender dysphoric patients. I have been a consultant in transgender care to the California Department of State Hospitals, which treats patients held by forensic commitment and psychiatric patients from the state prisons, and have been a consultant for the California Department of Corrections and Rehabilitation on the care of incarcerated transgender people. I am currently a consultant in transgender mental health to the Alameda County Jails. In my 29 years working with transgender patients in San Francisco public health clinics, I worked with many formerly incarcerated people, including those who spoke of their experiences being denied care while incarcerated.

14. As part of my psychiatric practice treating individuals diagnosed with gender dysphoria and who receive other medical and surgical treatment for that condition, as well as a co-author of the WPATH Standards of Care and UCSF's Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People, I am and must be familiar with

additional aspects of medical care for the diagnosis of gender dysphoria, beyond mental health treatment, assessment, and diagnosis.

15. In addition to this work, I have done research on the treatment of depression.

16. I have authored many articles and book chapters on the diagnosis and treatment of gender dysphoria and edited the book Sexual and Gender Diagnoses of the Diagnostic and Statistical Manual (DSM): A Reevaluation.

17. Since 2018, I have performed over 130 independent medical reviews for the State of California to determine the medical necessity of transgender care in appeals of denial of insurance coverage.

18. My professional background, experiences, publications inclusive of those authored in the past ten years, and presentations are detailed in my curriculum vitae ("CV"). A true and correct copy of my most up-to-date CV is attached as Exhibit A.

**B. Compensation**

19. I am being compensated for my work on this matter at a rate of $400.00 per hour for preparation of declarations and expert reports. I will be compensated $3,200.00 per day for any deposition testimony or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

**C. Previous Testimony**

20. Over the past four years, I have given expert testimony by deposition or trial in the following cases: *L.B. v. Premera Blue Cross*, No. 3:20-cv-06145-RJB (W.D. Wash.); *Misanin v. Wilson*, No. 2:24-cv-04734-BHH (D.S.C.); *Voe v. Mansfield*, No. 1:23-CV-864-LCB-LPA (M.D.N.C.); *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.); *Doe v. Ladapo*, No. 4:23-cv-00114 (N.D. Fla.); *Dekker v. Weida*, No. 4:22-cv-00325 (N.D. Fla.); *K.C. v. The Individual Members of the Medical Licensing Board of Indiana*, No. 1:23-cv-00595 (S.D. Ind.); *Brandt v.*

*Rutledge*, No. 4:21-cv-00450 (E.D. Ark.); *C.P. v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145 (W.D. Wash.); *Kadel v. Folwell*, No. 1:19-cv-00272 (M.D.N.C.); and *Fain v. Crouch*, No. 3:20-cv-00740 (S.D. W. Va.). To the best of my recollection, I have not given expert testimony at a trial or at a deposition in any other case during this period.

## II. BASIS FOR OPINIONS

21. In preparing this report, I have relied on my training and my decades clinical experience as a psychiatrist treating patients with gender dysphoria, as well as my experience conducting research, as set out in my curriculum vitae (attached hereto as Exhibit A).

22. I have also relied on my knowledge of the peer-reviewed research regarding the treatment of gender dysphoria, which reflects advancements in the field of transgender health. I have reviewed the materials listed in the bibliography attached hereto as Exhibit B. The sources cited therein include authoritative, scientific peer-reviewed publications. They include the documents specifically cited as supportive examples in particular sections of this report.

23. I have also relied on my knowledge of the clinical practice guidelines for the treatment of gender dysphoria, including my work as a contributing author of the WPATH Standards of Care, Versions 7 and 8, and the UCSF Guidelines.

24. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject. I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

25. Additionally, I have reviewed Executive Order 14168, titled “Defending Women from Gender Ideology Extremism and Restoring Biological Truth to The Federal Government,”

issued on January 20, 2025 ("EO 14168").

## III. SUMMARY OF EXPERT OPINIONS

26. Gender dysphoria is a serious condition which, if left untreated, can impair a person's ability to function and cause significant depression, anxiety, self-harm and suicidality.

27. EO 14168, by prohibiting "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the "opposite sex," with "sex" being defined as immutable from the time of conception, prohibits treatments that are part of widely accepted protocols for the treatment of gender dysphoria that are supported by every major medical association in the country—social transition and gender-affirming medical care.

28. Decades of scientific research and clinical experience have demonstrated that social transition and gender-affirming medical care can significantly relieve the distress of gender dysphoria and are medically necessary for many people with this condition. I have seen first-hand, countless times over decades of practice, the many benefits of social transition and gender-affirming medical care.

29. For individuals for whom gender-affirming medical care is indicated, there are no alternative evidence-based treatments for gender dysphoria.

30. Prohibiting people with gender dysphoria from socially transitioning and withdrawing or denying gender-affirming medical care to those for whom it is indicated would put them at risk of significant harm to their health and well-being, including heightened risk of self-harm and suicidality.

31. When incarcerated people are unable to receive gender-affirming medical care to treat their gender dysphoria, some have resorted to self-castration or other self-harm to get relief, or have attempted to end their lives.

## IV. EXPERT OPINIONS

### A. Sex and Gender Identity

32. At birth, infants are assigned a sex, either male or female, based on the appearance of their external genitalia.

33. While the terms "male sex" and "female sex" are sometimes used in reference to a person's genitals, chromosomes, and hormones, the reality is that sex is complicated and multifactorial. Aside from external genital characteristics, chromosomes, and endogenous hormones, other factors related to sex include gonads, gender identity, and variations in brain structure and function.

34. EO 14168 defines "sex" as "an individual's immutable biological classification as either male or female," that "does not include the concept of 'gender identity.'" EO 14168 § 2(a). It further defines "Female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and "[m]ale" as "a person belonging, at conception, to the sex that produces the small reproductive cell." EO 14168 §§ 2(d), (e).

35. EO 14168's definition of "sex" is not consistent with how it is commonly understood in medicine. According to the American Medical Association, sex is made up of many diverse components. (AMA, 2023). Similarly, the Endocrine Society notes that because a person's sex characteristics "may not [always] be in line with each other …, the terms biological sex and biological male or female are imprecise and should be avoided." (Hembree, et al., 2017).

36. Gender identity is "a person's deeply felt, inherent sense of being a girl, woman, or female; a man, or male; a blend of male or female; or an alternative gender" (American Psychological Association, 2015, at 834).

37. Gender identity does not always align with sex assigned at birth.

38. Gender identity, which has biological bases (Fischer and Cocchetti, 2020), is not merely a product of external influence, nor is it subject to voluntary change.

39. As documented by multiple leading medical authorities, efforts to change a person's gender identity are ineffective, can cause harm, and are unethical. (American Psychological Association, 2021, Byne, et al., 2018, Coleman, et al., 2012).

40. EO 14168 defines "gender identity" as "a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." EO 14168 § 2(g).

41. EO 14168's definition of "gender identity" differs from how this term is commonly understood and used in medicine and science. Gender identity does provide a meaningful basis for identification and has been a basis for identification federally as well as in most states, and in many other countries, for years.

42. For most people, their sex assigned at birth, or assigned sex, matches their gender identity. For transgender people, their assigned sex does not align with their gender identity.

43. Based on data from the Williams Institute, approximately 0.6% of the United States population age 13 or older, or about 1.6 million people, identify as transgender. (Herman, et al., 2022).

44. Being transgender is widely accepted as a normal variation in human development. Simply being transgender or gender nonconforming is not a medical condition to be treated and is not considered a mental illness. People who are transgender have no impairment in their ability to be productive, contributing members of society simply because of their transgender status.

45. In the replacement of Gender Identity Disorder in DSM-IV with Gender Dysphoria in DSM-5, the American Psychiatric Association recognized that the clinically significant distress and social/occupational impairment of gender dysphoria is the disorder, not transgender identity. DSM-5 notes that diagnosis and treatment are "focus[ed] on dysphoria as the clinical problem, not identity per se." (DSM-5, at 451). The World Health Organization, in placing Gender Incongruence outside the chapter of mental health conditions, states, "trans-related and gender diverse identities are not conditions of mental ill-health." (World Health Organization, Gender Incongruence).

46. Similarly, WPATH's Standards of Care, Version 8 states: "The expression of gender characteristics, including identities, that are not stereotypically associated with one's sex assigned at birth is a common and a culturally diverse human phenomenon that should not be seen as inherently negative or pathological. … It should be recognized gender diversity is common to all human beings and is not pathological. However, gender incongruence that causes clinically significant distress and impairment often requires medically necessary clinical interventions." (Coleman, et al. 2022).

**B. Gender Dysphoria**

47. The term "gender dysphoria" is distress related to the incongruence between one's gender identity and attributes related to one's sex assigned at birth.

48. The diagnosis of Gender Dysphoria (capitalized) is a serious medical condition, and it is codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM). The current version, known as the *Fifth Edition, Text Revision* (DSM-5-TR), was released in 2022.

49. The DSM's diagnosis of Gender Dysphoria in Adolescents and Adults involves two major diagnostic criteria:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two of the following (one of which must be Criterion A1):

1. A marked incongruence between one's experienced/expressed gender and primary or secondary sex characteristics.
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.
3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

50. Gender dysphoria is a condition that is highly amenable to treatment, and the prevailing treatment for it is highly effective.

51. When untreated, gender dysphoria can cause significant distress including increased risk of depression, anxiety, self-harm and suicidality. It can also impair individuals' ability to function in all aspects of life, including school or work, and in family and other personal relationships. These risks decline when transgender individuals are supported and live according to their gender identity.

52. With access to medically-indicated care, transgender people can experience significant and potentially complete relief from their symptoms of gender dysphoria. Not only is this documented in scientific literature and published data, but I have witnessed this in thousands of patients over three decades.

C. **Evidence-Based Guidelines for Treatment of Gender Dysphoria**

53. The World Professional Association of Transgender Health (WPATH) has issued *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* ("WPATH SOC") since 1979. The current version, published in 2022, is WPATH SOC 8. The SOC 8 provides guidelines for multidisciplinary care of transgender individuals and describes criteria for medical interventions to treat gender dysphoria, including hormone treatment and surgery when medically indicated.

54. The SOC 8 utilized a rigorous evidence-based approach to developing the guidelines. (Coleman, et al., 2022). The process of developing the SOC 8 was a multistep, several years long effort that started in 2017. This process is outlined in great detail in Appendix A to SOC 8.

55. This "process for development of the SOC-8 incorporated recommendations on clinical practice guideline development from the National Academies of Medicine and the World Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process." (Coleman, et al., 2022, at S247 (citing Institute of Medicine Committee on Standards for Developing Trustworthy Clinical Practice, 2011; World Health Organization, 2019)). And "[t]he SOC-8 revision committee was multidisciplinary and consisted of subject matter experts, health care professionals, researchers and stakeholders with diverse perspectives and geographic representation." (Coleman, et al., 2022, at S247).

56. WPATH SOC 8's evidence-based recommendations were drafted "based on the results of the systematic, and background literature reviews plus consensus-based expert opinions." (Coleman, et al., 2022, at S250). The recommendations were developed and are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. A consensus of the

final recommendations was attained using the Delphi process that included all members of the Standards of Care Revision committee, and supportive and explanatory text of the evidence for the statements was written.

57. The Delphi process is a procedure by which a panel of experts are asked for their opinion on a relevant issue, summarizing and presenting their collective responses and repeating this process for a certain number of rounds. (Shang, 2023; Hsu and Sanford, 2019). It is "a well-established approach to answering a research question through the identification of a consensus view across subject experts." (Barrett and Healey, 2020).

58. The recommendations submitted to a vote under the Delphi process required approval of 75% of the authors of SOC 8 as a whole. More specifically, for a recommendation to be approved, a minimum of 75% of the voters had to approve the statement. (Coleman, et al., 2022, at S250). With regards to SOC 8, every member of the SOC revision committee voted for each statement. Following the aforementioned process, recommendations contained in SOC 8, as published in 2022, were approved by 75% or more of the revision committee.

59. A clinical practice guideline from the Endocrine Society (the Endocrine Society Guideline) provides similar guidelines for clinicians to provide safe and effective treatment for gender dysphoria. (Hembree, et al., 2017).

60. Each of these guidelines are evidence-based and supported by scientific research and literature, as well as extensive clinical experience.

61. The evidence base supporting the recommendations in these guidelines is comparable to the evidence base supporting treatment for other conditions.

62. The protocols and policies set forth by the WPATH Standards of Care and the Endocrine Society Guideline are endorsed and cited as authoritative by the major professional

medical and mental health associations in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the American College of Obstetrics and Gynecology, the American College of Physicians, and the World Medical Association, among others. They are also relied upon by clinicians treating patients with gender dysphoria.

**D. Treatment of Gender Dysphoria**

63. Under the WPATH SOC and the Endocrine Society Guideline, the overarching goal of treatment is to eliminate the distress of gender dysphoria by helping the patient live consistently with their gender identity by aligning their presentation and body with their gender identity.

64. Social transition is an integral part of addressing gender dysphoria for transgender people. Social transition involves changing appearance (e.g. garments, hair, make-up) and social role, with change of signifiers of gender, including name and pronouns, and public presentation in the identified gender.

65. In earlier versions of the Standards of Care, social transition was required before medical interventions were considered. While the current WPATH SOC 8 recognizes the necessity for individualized paths for transition, social transition remains central to addressing gender dysphoria for many transgender people.

66. While social transition alone can adequately address gender dysphoria for some people, many individuals with gender dysphoria cannot obtain relief without also receiving medical interventions to align the body with their gender identity. In accordance with the WPATH SOC and the Endocrine Society Guidelines, medical interventions to treat adults with gender dysphoria may include hormone therapy and surgeries, based on a patient's individual needs.

67. For assessing an adult for gender-affirming medical care, WPATH SOC 8 states that the health professional should be licensed and trained in identifying gender dysphoria as well as co-existing mental health and psychosocial concerns, and that medical or surgical treatment should only be recommended when "gender incongruence is marked and sustained," when there is capacity for consent, when other conditions that might affect outcomes have been assessed, and when diagnostic criteria for Gender Dysphoria of DSM 5-TR (in the US) or Gender Incongruence of ICD-11(outside the US) are met.

68. If a patient is assessed to have a medical need for hormone therapy, gender-affirming hormone therapy involves administering testosterone for transgender men and estrogen and testosterone suppression for transgender women. The purpose of this treatment is to attain the appropriate masculinization or feminization of the transgender person that matches as closely as possible to their gender identity. Gender-affirming hormone therapy is a partially reversible treatment.

69. Some transgender individuals need surgical interventions to help bring their phenotype into alignment with their gender. Surgical interventions may include, inter alia, vaginoplasty and orchiectomy for transgender female individuals, and chest reconstruction and hysterectomy for transgender male individuals.

70. For patients for whom gender-affirming medical care is indicated, no alternative treatments have been demonstrated to be effective.

71. The treatment protocols for gender dysphoria are comparable to those for other mental health and medical conditions. Indeed, these or similar procedures are provided for cisgender people with other diagnoses. For example, breast reduction surgery is much more commonly performed on cisgender males who have unwanted excess breast tissue

(gynecomastia), than on transgender males. Dai, et al. (2024) recently found that of the adolescents who had these surgeries, 97% were cisgender males and only 3% were transgender males. Testosterone treatment for transgender males, like for cisgender males with testosterone insufficiency (hypogonadism), involves administering testosterone to bring blood levels up to the normal male range.

**E. Social Transition Has Been Shown to Help Alleviate Gender Dysphoria.**

72. Social transition has been shown to positively affect mental health (Hughto, et al 2020). Bringing one's presentation into alignment with gender identity can help one see oneself and be recognized and treated by others consistent with one's gender identity. Recognition of chosen name with social transition has been associated with decreases in depression and suicidality. (Russell, et al 2018). In my work with thousands of transgender patients, social transition has been a critical step towards improved mental health. In patients who have been forced to socially detransition, while incarcerated or due to family or career, mental health impacts have been severe to my patients, with increased gender dysphoria, depression, anxiety and in some patients, suicidality and self-harm.

**F. Gender-Affirming Medical Care Has Been Shown To Be Safe and Effective Treatment for Gender Dysphoria.**

73. There is a substantial body of research and clinical evidence that gender-affirming medical care is effective in treating gender dysphoria. This evidence includes scientific studies assessing mental health outcomes for transgender people who are treated with these interventions, and decades of clinical experience, including my own.

74. The research and studies supporting the necessity, safety, and effectiveness of medical care for gender dysphoria are the same type of evidence that the medical community routinely relies upon when treating other medical conditions.

75. Medical treatment for gender dysphoria has been studied for over half a century, and there is substantial evidence that it improves quality of life and measures of mental health.[1] There is also substantial evidence that the risks of these treatments are low and manageable, and comparable to the type of risks that exist in the same treatments when given to cisgender patients and in many other medical treatments. For example, the cardiovascular risks associated with estrogen apply whether the person is receiving treatment for gender dysphoria, menopause, or other conditions. Regret rates for gender-affirming surgeries are very low, often much lower than for similar surgeries in cisgender patients. (Thornton, et al 2024).

76. The studies on gender-affirming medical care for treatment of dysphoria are consistent with decades of clinical experience of mental health providers across the U.S. and around the world. At professional conferences and other settings in which I interact with colleagues, clinicians report that gender-affirming medical care, for those for whom it is indicated, provides great clinical benefit. In my over 30 years of clinical experience treating gender dysphoric patients, I have seen the benefits of gender-affirming medical care on my patients' health and well-being. I have seen many patients show improvements in mental health, as well as in performance in school and work, in social functioning with peers, and in family relationships when they experience relief from gender dysphoria with gender-affirming medical care.

77. As part of the treatment process for gender dysphoria, patients provide informed consent to their care. In addition, a treating doctor will not offer gender-affirming medical

[1] *See, e.g.*, Dopp, et al., 2024; Shelemy, et al., 2024; Ascha, et al., 2022; Aldridge, et al., 2021; Almazan, et al., 2021; Baker, et al., 2021; Murad, et al., 2010; Nobili, et al., 2018; Pfafflin & Junge, 1998; T'Sjoen et al. 2019; Turan, et al., 2018; van de Grift et al., 2018; Olson-Kennedy, et al., 2018; Cornell, What We Know, 2018; Nguyen, et al., 2018; Oda, et al.,2017; White, Hughto and Reisner, 2016; Fisher, et al., 2016; Keo-Meier, et al., 2015; Wierckx et al., 2014; Colizzi, et al., 2014; Colizzi, et al., 2013.

treatments unless they have concluded after weighing the risks and benefits of care that treatment is appropriate. The risks and benefits of care are discussed with the transgender patient, who must consent.

78. Gender-affirming medical interventions provided in accordance with the WPATH SOC 8 and Endocrine Society Guidelines are widely recognized in the medical community as safe, effective, and medically necessary for many people with gender dysphoria. (*See, e.g.*, the American Psychological Association, 2024 and 2021; American Academy of Pediatrics, 2018 (reaffirmed in 2023); the American Medical Association, 2021; the Pediatric Endocrine Society, 2021; the American College of Obstetricians and Gynecologists, 2021; the Endocrine Society, 2020; the American Academy of Family Physicians, 2020; the American Psychiatric Association, 2018; and WPATH, 2022).

79. For all the reasons above, I am aware of no basis in medicine or science for categorically prohibiting gender-affirming medical care.

### G. Harms of a Blanket Prohibition Against Social Transition and Hormone Therapy[2]

80. The overarching goal of treatment is to eliminate the distress of gender dysphoria by aligning an individual patient's body and presentation with their internal sense of self. The denial of medically-indicated care to transgender people not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, post-traumatic stress disorder, and suicidality. In other words, lack of access to gender-affirming care directly contributes to poorer mental health outcomes for transgender people. (Owen-Smith, et al., 2018).

[2] Because the preliminary injunction motion does not seek relief related to gender-affirming surgeries, this portion of the declaration does not address surgery.

81. For patients for whom gender-affirming medical care is indicated, no alternative treatments have been demonstrated to be effective. To the extent one proposed alternative is psychotherapeutic treatment to encourage identification with a person's assigned sex at birth, the American Psychological Association has stated that such efforts provide no benefit and instead do harm. (APA, 2021). Or if an alternative approach is to treat the worsening dysphoria only with therapy, that has not shown to be effective in any research. (Dopp, et al., 2024). Psychotherapy is a critical treatment modality for many patients, but it does not address the underlying gender dysphoria, which when persistent can only be addressed by bringing a patient's body and sex characteristics into alignment with the patient's gender identity.

82. Denying patients with gender dysphoria the ability to socially transition or obtain gender-affirming medical care where indicated predictably will lead to significant deterioration in mental health.

83. I have had patients over the years who were unable to access gender-affirming medical care when it was clinically indicated, including in the years before this care was more widely available. In many of these patients, delayed or denied care resulted in increased depression, anxiety, suicidal ideation and self-harm, increased substance use, and a deterioration in school or work performance. Some patients attempted to self-castrate or remove breasts. For patients with severe distress due to their gender dysphoria, psychotherapeutic approaches did not alleviate this distress absent medical intervention. Some of my patients had years of intensive mental health interventions, including long-term psychotherapy, without relief of gender dysphoria until receiving medical intervention.

84. Research documents the harms to incarcerated individuals with gender dysphoria who have not been able to receive necessary treatment, including attempts at self-castration.

(Brown, 2010, Aldrich et al, 2023). I have provided care for transgender patients after incarceration who had suffered severe mental health consequences, including intolerable gender dysphoria, depression, anxiety, self-harm and suicidality, from denial of the ability to socially and medically transition.

85. A blanket policy withdrawing hormone therapy and the ability to socially transition from individuals with gender dysphoria currently receiving that care would be expected to cause severe negative impact on patients' mental health. I have cared for or consulted on patients who were forced to socially and medically detransition and I've seen the suffering that it caused. For example, I consulted on a patient who, while in the long-term custody of a forensic psychiatry unit, was forced to detransition—both medically and socially. He severely decompensated and attempted suicide. After obtaining legal representation to request that the institution bring in an expert in the treatment of gender dysphoria, he was able to resume gender-affirming hormone therapy and live consistently with his male identity, and his mental health greatly improved. Eventually he was able to have gender affirming surgery, and then be released, and he has flourished in his life and work after release.

## V. CONCLUSION

86. Executive Order 14168, which categorically prohibits gender-affirming medical care and social transition for individuals with gender dysphoria who are in the custody of the Bureau of Prisons, regardless of their medical needs, is contrary to widely accepted evidence-based medical protocols for the treatment of gender dysphoria and puts these individuals at risk of significant harm, including heightened risk of depression, self-harm, and suicidality.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of March, 2025

Dan H. Karasic

# EXHIBIT A

**MATERIAL UNDER SEAL DELETED**

**University of California, San Francisco**

# CURRICULUM VITAE

**Name:** Dan H. Karasic, MD

**Position:** Professor Emeritus
Psychiatry
School of Medicine

[redacted]

## EDUCATION

| | | | |
|---|---|---|---|
| 1978 - 1982 | Occidental College, Los Angeles | A.B.; Summa Cum Laude | Biology |
| 1982 - 1987 | Yale University School of Medicine | M.D. | Medicine |
| 1987 - 1988 | University of California, Los Angeles | Intern | Medicine, Psychiatry, and Neurology |
| 1988 - 1991 | University of California, Los Angeles; Neuropsychiatric Institute | Resident | Psychiatry |
| 1990 - 1991 | University of California, Los Angeles; Department of Sociology | Postdoctoral Fellow | Research Training Program in Mental Health Services for Persons with AIDS |

## LICENSES, CERTIFICATION

| | |
|---|---|
| 1990 | Medical Licensure, California, License Number G65105 |
| 1990 | Drug Enforcement Administration Registration Number BK1765354 |
| 1993 | American Board of Psychiatry and Neurology, Board Certified in Psychiatry |

## PRINCIPAL POSITIONS HELD

| | | |
|---|---|---|
| 1991 - 1993 | University of California, San Francisco | Health Sciences Psychiatry Clincial Instructor |
| 1993 - 1999 | University of California, San Francisco | Health Sciences Psychiatry Assistant Clinical Professor |

| | | |
|---|---|---|
| 1999 - 2005 | University of California, San Francisco | Health Sciences Psychiatry Associate Clinical Professor |
| 2005 - 2020 | University of California, San Francisco | Health Sciences Psychiatry Clinical Professor |
| 2020-present | University of California, San Francisco | Professor Emeritus of Psychiatry |

**OTHER POSITIONS HELD CONCURRENTLY**

1980 - 1980 Associated Western Universities / U.S. Department of Energy — Honors Undergraduate Research Fellow — UCLA Medicine

1981 - 1981 University of California, Los Angeles; Summer Student UCLA Medicine American Heart Association, California Research Fellow Affiliate

1986 - 1987 Yale University School of Medicine; Medical Student Psychiatry American Heart Association, Connecticut Research Fellow Affiliate

1990 - 1991 University of California, Los Angeles Postdoctoral Sociology Fellow

1991 - 2001 SFGH Consultation-Liaison Service; Attending Psychiatry AIDS Care Psychiatrist

1991 - 2001 AIDS Consultation-Liaison Medical Student Elective — Course Director — Psychiatry

1991 - present UCSF Positive Health Program at San HIV/AIDS Psychiatry Francisco General Hospital (Ward 86) Outpatient Psychiatrist

1991 - present UCSF AHP (AIDS Health Project/Alliance Health Project) — HIV/AIDS Outpatient Psychiatrist — Psychiatry

1994 - 2002 St. Mary's Medical Center CARE Unit. The CARE Unit specializes in the care of patients with AIDS dementia. — Consultant — Psychiatry

2001 - 2010 Depression and Antiretroviral Adherence Study (The H.O.M.E. study: Health Outcomes of Mood Enhancement) — Clinical Director — Psychiatry and Medicine

2003 - 2020 Transgender Life Care Program and Psychiatrist Dimensions Dimensions Clinic, Castro Mission Health Clinic Center

2013 - 2020 UCSF Alliance Health Project, Co-lead, Transgender Team — Co-Lead and Psychiatrist — Psychiatry

## HONORS AND AWARDS

| | | |
|---|---|---|
| 1981 | Phi Beta Kappa Honor Society | Phi Beta Kappa |
| 1990 | NIMH Postdoctoral Fellowship in Mental Health Services for People with AIDS (1990-1991) | National Institute of Mental Health |
| 2001 | Lesbian Gay Bisexual Transgender Leadership Award, LGBT Task Force of the Cultural Competence and Diversity Program | SFGH Department of Psychiatry |
| 2006 | Distinguished Fellow | American Psychiatric Association |
| 2012 | Chancellor's Award for Leadership in LGBT Health | UCSF |
| 2023 | Alumni Seal Award for Professional Achievement | Occidental College |

## MEMBERSHIPS

1992 - present Northern California Psychiatric Society

1992 - present American Psychiatric Association

2000 - 2019 Bay Area Gender Associates (an organization of psychotherapists working with transgendered clients)

2001 - present World Professional Association for Transgender Health

## SERVICE TO PROFESSIONAL ORGANIZATIONS

| | | |
|---|---|---|
| 1981 - 1982 | The Occidental | News Editor |
| 1984 - 1985 | Yale University School of Medicine | Class President |
| 1989 - 1991 | Kaposi's Sarcoma Group, AIDS Project Los Angeles | Volunteer Facilitator |
| 1992 - 1996 | Early Career Psychiatrist Committee, Association of Gay and Lesbian Psychiatrists | Chair |
| 1992 - 1996 | Board of Directors, Association of Gay and Lesbian Psychiatrists | Member |
| 1993 - 1993 | Local Arrangements Committee, Association of Gay and Lesbian Psychiatrists | Chair |
| 1994 - 1995 | Educational Program, Association of Gay and Lesbian Psychiatrists, 1995 Annual Meeting | Director |
| 1994 - 1998 | Board of Directors, BAY Positives | Member |
| 1994 - 2020 | Committee on Lesbian, Gay, Bisexual and Transgender | Member |

Issues, Northern California Psychiatric Society

1995 - 1997 Board of Directors, Bay Area Young Positives. BAY President
Positives is the nation's first community-based organization providing psychosocial and recreational services to HIV-positive youth

1995 - 1997 Executive Committee, Bay Area Young Positives. Chair

1996 - 2004 Committee on Lesbian, Gay, Bisexual and Transgender Chair Issues, Northern California Psychiatric Society

1998 - 2002 City of San Francisco Human Rights Commission, Member Lesbian, Gay Bisexual Transgender Advisory Committee

2000 - 2004 Association of Gay and Lesbian Psychiatrists. Vice President Responsible for the organization's educational programs

2004 - 2005 Association of Gay and Lesbian Psychiatrists President-elect

2005 - 2007 Caucus of Lesbian, Gay, and Bisexual Psychiatrists of the Chair American Psychiatric Association

2005 - 2007 Association of Gay and Lesbian Psychiatrists President

2007 - 2009 Association of Gay and Lesbian Psychiatrists Immediate Past President

2009 - 2010 Consensus Committee for Revision of the Sexual and Member
Gender Identity Disorders for DSM-V, GID of Adults subcommittee. (Wrote WPATH recommendations as advisory body to the APA DSM V Committee for the Sexual and Gender Identity Disorders chapter revision.)

2010 - 2011 Scientific Committee, 2011 WPATH Biennial Symposium, Member Atlanta

2010 -2022 World Professional Association for Transgender Care Member
Standards of Care Workgroup and Committee (writing seventh and eighth revisions of the WPATH Standards of Care, which is used internationally for transgender care.)

2010 - 2018 ICD 11 Advisory Committee, World Professional Member Association for Transgender Health

2012 - 2014 Psychiatry and Diagnosis Track Co-chair, Scientific Member Committee, 2014 WPATH Biennial Symposium, Bangkok

2014 - 2016 Scientific Committee, 2016 WPATH Biennial Symposium, Member Amsterdam

2014 - 2018 Board of Directors (elected to 4 year term), World Member Professional Association for Transgender Health

2014 - 2018 Public Policy Committee, World Professional Association Chair for Transgender Health

2014 - 2018 WPATH Global Education Initiative: Training providers Trainer and and specialty certification in transgender health Steering

| | | |
|---|---|---|
| | | Committee Member |
| 2014 - 2016 | American Psychiatric Association Workgroup on Gender Dysphoria | Member |
| 2016 - present | American Psychiatric Association Workgroup on Gender Dysphoria | Chair |
| 2016 | USPATH: Inaugural WPATH U.S. Conference, Los Angeles, 2017 | Conference Chair |

## SERVICE TO PROFESSIONAL PUBLICATIONS

2011 - present Journal of Sexual Medicine, reviewer

2014 - present International Journal of Transgenderism, reviewer

2016 - present LGBT Health, reviewer

## INVITED PRESENTATIONS - INTERNATIONAL

| | | |
|---|---|---|
| 2009 | World Professional Association for Transgender Health, Oslo, Norway | Plenary Session Speaker |
| 2009 | World Professional Association for Transgender Health, Oslo, Norway | Symposium Speaker |
| 2009 | Karolinska Institutet, Stockholm Sweden | Invited Lecturer |
| 2012 | Cuban National Center for Sex Education (CENESEX), Havana, Cuba | Invited Speaker |
| 2013 | Swedish Gender Clinics Annual Meeting, Stockholm, Sweden | Keynote Speaker |
| 2013 | Conference on International Issues in Transgender care, United Nations Development Programme - The Lancet, Beijing, China | Expert Consultant |
| 2014 | World Professional Association for Transgender Health, Bangkok, Thailand | Track Chair |
| 2014 | World Professional Association for Transgender Health, Bangkok, Thailand | Invited Speaker |
| 2014 | World Professional Association for Transgender Health, Bangkok, Thailand | Invited Speaker |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium | Invited Speaker |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium | Symposium Chair |
| 2015 | Israeli Center for Human Sexuality and Gender Identity, Tel Aviv | Invited Speaker |
| 2016 | World Professional Association for Transgender Health, Amsterdam | Symposium Chair |
| 2016 | World Professional Association for Transgender Health, Amsterdam | Invited Speaker |

| | | |
|---|---|---|
| 2016 | World Professional Association for Transgender Health, Amsterdam | Invited Speaker |
| 2017 | Brazil Professional Association for Transgender Health, Sao Paulo | |
| 2017 | Vietnam- United Nations Development Programme Asia Transgender Health Conference, Hanoi | |
| 2018 | United Nations Development Programme Asia Conference on Transgender Health and Human Rights, Bangkok | |
| 2018 | World Professional Association for Transgender Health, Buenos Aires | Invited Speaker |
| 2021 | Manitoba Psychiatric Association, Keynote Speaker | |
| 2022 | World Professional Association for Public Health, invited speaker, Montreal | |

**INVITED PRESENTATIONS - NATIONAL**

| | | |
|---|---|---|
| 1990 | Being Alive Medical Update, Century Cable Television | Televised Lecturer |
| 1992 | Institute on Hospital and Community Psychiatry, Toronto | Symposium Speaker |
| 1992 | Academy of Psychosomatic Medicine Annual Meeting, San Diego | Symposium Speaker |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Workshop Chair |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Workshop Speaker |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Paper Session Co-chair |
| 1995 | Spring Meeting of the Association of Gay and Lesbian Psychiatrists, Miami Beach | Symposium Chair |
| 1996 | American Psychiatric Association 152nd Annual Meeting, New York | Workshop Speaker |
| 1997 | American Psychiatric Association Annual Meeting, San Diego | Workshop Speaker |
| 1997 | Gay and Lesbian Medical Association Annual | Invited Speaker Symposium |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Workshop Chair |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Workshop Chair |

| | | |
|---|---|---|
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Media Session Chair |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Media Session Chair |
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Symposium Chair |
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Symposium Presenter |
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Workshop Chair |
| 2000 | American Psychiatric Association Annual Meeting, Chicago | Workshop Chair |
| 2000 | National Youth Leadership Forum On Medicine, University of California, Berkeley | Invited Speaker |
| 2001 | American Psychiatric Association Annual Meeting, New Orleans | Workshop Chair |
| 2001 | American Psychiatric Association Annual Meeting, New Orleans | Media Program Chair |
| 2001 | Association of Gay and Lesbian Psychiatrists Orleans | Chair Symposium, New |
| 2001 | Harry Benjamin International Gender Dysphoria Association Biennial Meeting, Galveston, Texas | Invited Speaker |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Media Program Chair |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Workshop Chair |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Workshop Chair |
| 2003 | Association of Gay and Lesbian Psychiatrists CME | Chair Conference |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Chair |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Co-Chair |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Workshop Chair |
| 2003 | American Public Health Association Annual Meeting, San Francisco | Invited Speaker |
| 2004 | Mission Mental Health Clinic Clinical Conference | Invited Speaker |

| | | |
|---|---|---|
| 2004 | Association of Gay and Lesbian Psychiatrists Conference, New York | Co-Chair |
| 2004 | Mental Health Care Provider Education Program: Los Angeles. Sponsored by the American Psychiatric Association Office of HIV Psychiatry | Invited Speaker |
| 2005 | American Psychiatric Association Annual Meeting, Atlanta | Workshop Speaker |
| 2005 | Association of Gay and Lesbian Psychiatrists Saturday Symposium | Invited Speaker |
| 2008 | Society for the Study of Psychiatry and Culture, San Francisco | Invited Speaker |
| 2009 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Speaker |
| 2011 | National Transgender Health Summit, San Francisco | Invited Speaker |
| 2011 | National Transgender Health Summit, San Francisco | Invited Speaker |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI | Symposium Chair |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI | Symposium Speaker |
| 2011 | World Professional Association for Transgender Health Conference, Atlanta, GA | Invited Speaker Biennial |
| 2011 | World Professional Association for Transgender Health Conference, Atlanta, GA | Invited Speaker Biennial |

| | | |
|---|---|---|
| | | Invited Speaker |
| 2011 | World Professional Association for Transgender Health Biennial Conference, Atlanta, GA | |
| 2011 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2012 | Gay and Lesbian Medical Association Annual Meeting | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | American Psychiatric Association Annual Meeting, San Francisco | Invited Speaker |
| 2013 | Gay and Lesbian Medical Association, Denver, CO | Invited Speaker |
| 2014 | American Psychiatric Association Annual Meeting, New | Invited Speaker York |
| 2014 | Institute on Psychiatric Services, San Francisco | Moderator |
| 2014 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2014 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2015 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2015 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2015 | American Psychiatric Association Annual Meeting, Toronto | Workshop Speaker |
| 2015 | American Psychiatric Association Annual Meeting, Toronto | Course Faculty |
| 2016 | American Psychiatric Association Annual Meeting | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Atlanta | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Springfield, MO | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Fort Lauderdale, FL | Course Faculty |
| 2017 | World Professional Association for Transgender Health, GEI, Los Angeles Course Faculty | |
| | World Professional Association for Transgender Health | |

Surgeon's Training, Irvine, CA Course Faculty

2017 American Urological Association Annual Meeting, San Francisco CA Invited Speaker

2018 World Professional Association for Transgender Health GEI, Portland OR, Course Faculty

2018 World Professional Association for Transgender Health GEI, Palm Springs, Course Faculty

2019 American Society for Adolescent Psychiatry Annual Meeting, San Francisco, Speaker

2019 American Psychiatric Association Annual Meeting, San Francisco, Session Chair

2020 Psychiatric Congress, Invited Speaker

2022 World Professional Association for Transgender Health, Montreal, invited speaker

2023 National Transgender Health Summit, San Francisco, invited speaker

2023 American Psychiatric Association Annual Meeting, San Francisco, invited speaker

2023` US Professional Association for Transgender Health, speaker

2024 World Professional Association for Transgender Health, Lisbon

**INVITED PRESENTATIONS - REGIONAL AND OTHER INVITED PRESENTATIONS**

| | | |
|---|---|---|
| 1990 | Advanced Group Therapy Seminar, UCLA Neuropsychiatric Institute | Invited Lecturer |
| 1991 | Joint Project of the Southern California AIDS Interfaith Council and UCLA School of Medicine | Symposium Speaker |
| 1991 | Joint Project of the Southern California AIDS Interfaith Council and UCLA School of Medicine | Workshop Panelist |
| 1992 | Advanced Group Therapy Seminar, UCLA Neuropsychiatric Institute | Invited Lecturer |
| 1993 | UCSF School of Nursing Invited Lecturer | |
| 1995 | UCSF/SFGH Department of Medicine Clinical Care Conference | Invited Speaker |
| 1996 | UCSF School of Nursing Invited Speaker | |

| | | |
|---|---|---|
| | | Invited Speaker |
| 1996 | Psychopharmacology for the Primary Care AIDS/Clinician, series of four lectures, UCSF Department of Medicine | Invited Lecturer |
| 1996 | UCSF AIDS Health Project Psychotherapy Internship Training Program | |
| 1996 | UCSF/SFGH Department of Medicine AIDS Quarterly Update | Invited Speaker |
| 1996 | San Francisco General Hospital, Division of Addiction Medicine | Invited Speaker |
| 1996 | UCSF Langley Porter Psychiatric Hospital and Clinics | Invited Speaker Grand Rounds |
| 1997 | UCSF School of Nursing | Invited Speaker |
| 1997 | UCSF Department of Medicine AIDS Program | Invited Speaker |
| 1997 | Northern California Psychiatric Society Annual Meeting, Monterey | Workshop Speaker |
| 1997 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 1997 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 1997 | Northern California Psychiatric Society LGBT Committee | Chair Fall Symposium |
| 1997 | Progress Foundation, San Francisco | Invited Speaker |
| 1998 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 1999 | Northern California Psychiatric Society Annual Meeting, Santa Rosa | Invited Speaker |
| 1999 | Northern California Psychiatric Society Annual Meeting, Santa Rosa | Invited Speaker |
| 1999 | University of California, Davis, Department of Psychiatry | Invited Speaker Grand Rounds |
| 1999 | California Pacific Medical Center Department of Psychiatry Grand Rounds | Invited Speaker |
| 1999 | San Francisco General Hospital Department of Psychiatry Departmental Case Conference | Discussant |
| 2000 | Langley Porter Psychiatric Hospital and Clinics Consultation Liaison Seminar | Invited Speaker |
| 2000 | San Francisco General Hospital, Psychopharmacology Seminar | Invited Speaker |

| | | |
|---|---|---|
| 2000 | UCSF Transgender Health Conference, Laurel Heights Conference Center | Invited Speaker |
| 2000 | Psychiatry Course for UCSF Second Year Medical Students | Invited Lecturer |
| 2000 | Community Consortium Treatment Update Symposium, California Pacific Medical Center, Davies Campus | Invited Speaker |
| 2000 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 2001 | Psychiatry Course for UCSF Second Year Medical Students | Invited Lecturer |
| 2003 | Tom Waddell Health Center Inservice | Invited Speaker |
| 2003 | San Francisco Veterans Affairs Outpatient Clinic | Invited Speaker |
| 2004 | San Francisco General Hospital Psychiatric Emergency Service Clinical Conference | Invited Speaker |
| 2004 | South of Market Mental Health Clinic, San Francisco | Invited Speaker |
| 2005 | Northern Psychiatric Psychiatric Society Annual Meeting | Invited Speaker |
| 2005 | Equality and Parity: A Statewide Action for Transgender Prevention and Care, San Francisco | Invited Speaker HIV |
| 2005 | San Francisco General Hospital Department of Psychiatry Grand Rounds. | Invited Speaker |
| 2006 | SFGH/UCSF Department of Psychiatry Grand Rounds | Invited Speaker |
| 2007 | UCSF Department of Medicine, HIV/AIDS Grand Rounds, Positive Health Program | Invited Speaker |
| 2007 | California Pacific Medical Center LGBT Health San Francisco LGBT Community Center | Invited Speaker Symposium, |
| 2007 | UCSF CME Conference, Medical Management of HIV/AIDS, Fairmont Hotel, San Francisco | Invited Speaker |
| 2008 | UCSF Department of Medicine, Positive Health Program, HIV/AIDS Grand Rounds | Invited Speaker |
| 2008 | San Francisco General Hospital Psychiatry Grand Rounds | Invited Speaker |
| 2008 | UCSF CME Conference, Medical Management of HIV/AIDS, Fairmont Hotel, San Francisco | Invited Speaker |
| 2010 | Northern California Psychiatric Society Annual Meeting, Monterey, CA | Invited Speaker |
| 2011 | Transgender Mental Health Care Across the Life Span, Stanford University | Invited Speaker |
| 2011 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |

| | | |
|---|---|---|
| 2012 | UCSF AIDS Health Project Veterans Affairs Medical Center. | Invited Speaker Invited Speaker 2012 San Francisco |
| 2013 | Association of Family and Conciliation Courts Conference, Invited Speaker Los Angeles, CA | |
| 2014 | UCSF Transgender Health elective | Invited Speaker |
| 2014 | UCSF Department of Psychiatry Grand Rounds | Invited Speaker |
| 2014 | California Pacific Medical Center Department of Grand Rounds | Invited Speaker Psychaitry |
| 2014 | UCLA Semel Institute Department of Psychiatry Grand | Invited Speaker Rounds |
| 2015 | UCSF Transgender Health elective | Invited Speaker |
| 2015 | Fenway Health Center Boston, MA (webinar) | Invited Speaker |
| 2015 | Transgender Health Symposium, Palm Springs | Invited Speaker |
| 2015 | Transgender Health Symposium, Palm Springs | Co-Chair |
| 2015 | Santa Clara Valley Medical Center Grand Rounds | Invited Speaker |
| 2016 | UCSF School of Medicine Transgender Health elective | Invited Speaker |
| 2016 | Langley Porter Psychiatric Institute APC Case Conference | Invited Speaker (2 session series) |
| 2016 | Zuckerberg San Francisco General Department of Psychiatry Grand Rounds | Invited Speaker |
| 2016 | UCSF Mini-Medical School Lectures to the Public | Invited Speaker |
| 2021 | Los Angeles County Department of Mental Health, Invited Speaker | |
| 2023 | Alameda County Department of Behavioral Health, Invited Speaker | |

**CONTINUING EDUCATION AND PROFESSIONAL DEVELOPMENT ACTIVITIES**

| | |
|---|---|
| 2005 | Northern California Psychiatric Society |
| 2005 | Northern California Psychiatric Society Annual Meeting, Napa |
| 2005 | Association of Gay and Lesbian Psychiatrist Annual Conference |
| 2006 | Annual Meeting, American Psychiatric Association, Atlanta |
| 2006 | Annual Meeting, American Psychiatric Association, Toronto |
| 2006 | Institute on Psychiatric Services, New York |
| 2007 | Association of Gay and Lesbian Psychiatrists Annual Conference |

| | |
|---|---|
| 2007 | American Psychiatric Association Annual Meeting, San Diego |
| 2007 | The Medical Management of HIV/AIDS, a UCSF CME Conference |
| 2008 | Society for the Study of Psychiatry and Culture, San Francisco |
| 2009 | American Psychiatric Association, San Francisco |
| 2009 | World Professional Association for Transgender Health, Oslo, Norway |
| 2010 | Annual Meeting of the Northern California Psychiatric Society, Monterey, CA |
| 2011 | Transgender Mental Health Care Across the Life Span, Stanford University |
| 2011 | National Transgender Health Summit, San Francisco |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI |
| 2011 | World Professional Association for Transgender Health Biennial Conference, Atlanta, GA |
| 2011 | Institute on Psychiatric Services, San Francisco |
| 2012 | Gay and Lesbian Medical Association Annual Meeting, San Francisco |
| 2013 | National Transgender Health Summit, Oakland, CA |
| 2013 | American Psychiatric Association Annual Meeting, San Francisco |
| 2013 | Gay and Lesbian Medical Association, Denver, CO |
| 2014 | American Psychiatric Association Annual Meeting, New York |
| 2014 | Institute on Psychiatric Services, San Francisco |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium |
| 2015 | National Transgender Health Summit, Oakland |
| 2015 | American Psychiatric Association Annual Meeting, Toronto |
| 2016 | American Psychiatric Association Annual Meeting, Atlanta |
| 2016 | World Professional Association for Transgender Health, Amsterdam |

## GOVERNMENT AND OTHER PROFESSIONAL SERVICE

| | |
|---|---|
| 1998 - 2002 | City and County of San Francisco Human Rights Member Commission LGBT Advisory Committee |

I am the chair of the American Psychiatric Association Workgroup on Gender Dysphoria, which developed a CME course fort the 2015 and 2016 APA Annual Meetings, and has an larger educational mission to train American psychiatrists to better care for transgender patients. I have been leading education efforts in transgender health at APA meetings since 1998. On the APA Workgroup on Gender Dysphoria, I am a co-author of a paper of transgender issues that has been approved by the American Psychiatric Association as a resource document and is in press for the American Journal of Psychiatry. I am also the sole author of the chapter on transgender care in the American Psychiatric Press's Clinical Manual of Cultural Psychiatry, Second Edition.

I have been active internationally in transgender health through my work as a member of the Board of Directors of the World Professional Association for Transgender Health. I am an author of the WPATH Standards of Care, Version 7, and am Chapter Lead for the Mental Health Chapter of SOC 8.
I chaired of the WPATH Public Policy Committee and was a member of the Global Education Initiative, which developed a specialty certification program in transgender health. I helped plan the 2016 WPATH Amsterdam conference, and was on the scientific committee for the last four biennial international conferences. I was on the founding committee of USPATH, the national affiliate of WPATH, and I chaired the inaugural USPATH conference, in Los Angeles in 2017. As a member of the steering committee of the WPATH Global Educational Initiative, I helped train over 2000 health providers in transgender health, and helped develop a board certification program and examination in transgender health.

**UNIVERSITY SERVICE UC SYSTEM AND MULTI-CAMPUS SERVICE**

1991 – 2003 HIV/AIDS Task Force Member

1992 - 1993 HIV Research Group Member

| | | |
|---|---|---|
| 1992 - 1997 | Space Committee | Member |
| 1992 - 2003 | Gay, Lesbian and Bisexual Issues Task Force | Member |
| 1994 - 1997 | SFGH Residency Training Committee | Member |
| 1996 - 1997 | Domestic Partners Benefits Subcommittee. | Chair |
| 1996 - 2000 | Chancellor's Advisory Committee on Gay, Lesbian, and Transgender Issues. | Member Bisexual |
| 1996 - 2003 | HIV/AIDS Task Force | Co-Chair |
| 1996 - 2003 | Cultural Competence and Diversity Program | Member |
| 2009 - present | Medical Advisory Board, UCSF Center of Excellence for Health | Member Transgender |
| 2010 - 2013 | Steering Committee, Child Adolescent Gender Center | Member |
| 2011 – 2017 | Mental Health Track, National Transgender Health Summit | Chair |

## DEPARTMENTAL SERVICE

1991 - 2003 San Francisco General Hospital, Department of Psychiatry, Member HIV/AIDS Task Force

1992 - 1993 San Francisco General Hospital, Department of Psychiatry, Member HIV Research Group

1992 - 1997 San Francisco General Hospital, Department of Psychiatry, Member Space Committee

1992 - 2003 San Francisco General Hospital, Department of Psychiatry, Member GLBT Issues Task Force

1994 - 1997 San Francisco General Hospital, Department of Psychiatry, Member Residency Training Committee

1996 - 2003 San Francisco General Hospital, Department of Psychiatry, Member Cultural Competence and Diversity Program

1996 - 2003 San Francisco General Hospital, Department of Psychiatry, Co-Chair HIV/AIDS Task Force

2012 - 2020 San Francisco Department of Public Health Gender Member Competence Trainings Committee

2013 - 2020 San Francisco Department of Public Health Transgender Member Health Implementation Task Force

2014 - 2020San Francisco General Hospital, Department of Psychiatry, Member Transgender Surgery Planning Workgroup

## PEER REVIEWED PUBLICATIONS

1. Berliner JA, Frank HJL, **Karasic D**, Capdeville M. Lipoprotein-induced insulin resistance in aortic endothelium. Diabetes. 1984; 33:1039-44.
2. Bradberry CW, **Karasic DH**, Deutch AY, Roth RH. Regionally-specific alterations in mesotelencephalic dopamine synthesis in diabetic rats: association with precursor tyrosine. Journal of Neural Transmission. General Section, 1989; 78:221-9.
3. Targ EF, **Karasic DH**, Bystritsky A, Diefenbach PN, Anderson DA, Fawzy FI. Structured group therapy and fluoxetine to treat depression in HIV-positive persons. Psychosomatics. 1994; 35:132-7.
4. Karasic DH. Homophobia and self-destructive behaviors. The Northern California Psychiatric Physician. 1996; 37 Nov.-Dec. Reprinted by the Washington State Psychiatric Society and the Southern California Psychiatric Society newsletters.
5. Karasic D. Anxiety and anxiety disorders. Focus. 1996 Nov; 11(12):5-6. PMID: 12206111
6. Polansky JS, **Karasic DH**, Speier PL, Hastik KL, Haller E. Homophobia: Therapeutic and training considerations for psychiatry. Journal of the Gay and Lesbian Medical Association. 1997 1(1) 41-47.

7. Karasic DH. Progress in health care for transgendered people. Editorial. Journal of the Gay and Lesbian Medical Association, 4(4) 2000 157-8.

8. Perry S, **Karasic D**. Depression, adherence to HAART, and survival. Focus: A Guide to AIDS Research and Counseling. 2002 17(9) 5-6.

9. Fraser L, **Karasic DH**, Meyer WJ, Wylie, K. Recommendations for Revision of the DSM Diagnosis of Gender Identity Disorder in Adults. International Journal of Transgenderism. Volume 12, Issue 2. 2010, Pages 80-85.

10. Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W., Monstrey, S., **Karasic D** and 22 others. (2011). Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Version. International Journal of Transgenderism, 13:165-232, 2011

11. Tsai AC, **Karasic DH**, et al. Directly Observed Antidepressant Medication Treatment and HIV Outcomes Among Homeless and Marginally Housed HIV-Positive Adults: A Randomized Controlled Trial. American Journal of Public Health. February 2013, Vol. 103, No. 2, pp. 308-315.

12. Tsai AC, Mimmiaga MJ, Dilley JW, Hammer GP, **Karasic DH**, Charlebois ED, Sorenson JL, Safren SA, Bangsberg DR. Does Effective Depression Treatment Alone Reduce Secondary HIV Transmission Risk? Equivocal Findings from a Randomized Controlled Trial. AIDS and Behavior, October 2013, Volume 17, Issue 8, pp 2765-2772.

13. **Karasic DH**. Protecting Transgender Rights Promotes Transgender Health. LGBT Health. 2016 Aug; 3(4):245-7. PMID: 27458863

14. Winter S, Diamond M, Green J, **Karasic D**, Reed T, Whittle S, Wylie K. Transgender people: health at the margins of society. Lancet. 2016 Jul 23;388(10042):390-400. doi: 10.1016/S0140-6736(16)00683-8. Review./> PMID: 27323925

15. Grelotti DJ, Hammer GP, Dilley JW, **Karasic DH**, Sorensen JL, Bangsberg DR, Tsai AC. Does substance use compromise depression treatment in persons with HIV? Findings from a randomized controlled trial. AIDS Care. 2016 Sep 2:1-7. [Epub ahead of print]/> PMID: 27590273

16. Strang JF, Meagher H, Kenworthy L, de Vries AL, Menvielle E, Leibowitz S, Janssen A, Cohen-Kettenis P, Shumer DE, Edwards-Leeper L, Pleak RR, Spack N, **Karasic DH**, Schreier H, Balleur A, Tishelman A, Ehrensaft D, Rodnan L, Kuschner ES, Mandel F, Caretto A, Lewis HC, Anthony LG. Initial Clinical Guidelines for Co-Occurring Autism Spectrum Disorder and Gender Dysphoria or Incongruence in Adolescents. J Clin Child Adolesc Psychol. 2016 Oct 24:1-11. [Epub ahead of print]/> PMID: 27775428

17. Milrod C, **Karasic DH**. Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States. J Sex Med 2017;14:624–634.

18. William Byne, Dan H. Karasic, Eli Coleman, A. Evan Eyler, Jeremy D. Kidd, Heino F.L. Meyer-Bahlburg, Richard R. Pleak, and Jack Pula.Gender Dysphoria in Adults:

An Overview and Primer for Psychiatrists.Transgender Health.Dec 2018.57-A3.http://doi.org/10.1089/trgh.2017.0053

19. Identity recognition statement of the world professional association for transgender health (WPATH). International Journal of Transgenderism. 2018 Jul 3; 19(3):1-2. Knudson KG, Green GJ, Tangpricha TV, Ettner ER, Bouman BW, Adrian AT, Allen AL, De Cuypere DG, Fraser FL, Hansen HT, **Karasic KD**, Kreukels KB, Rachlin RK, Schechter SL, Winter WS, Committee and Board of Direct

20. **Karasic, DH** & Fraser, L Multidisciplinary Care and the Standards of Care for Transgender and Gender Non-conforming Individuals. Schechter, L & Safa, B. (Eds.) Gender Confirmation Surgery, Clinics in Plastic Surgery Special Issue, Vol 45, Issue 3, pp 295-299. 2018 Elsevier,Philadelphia. https://doi.org/10.1016/j.cps.2018.03.016

21. Milrod C, Monto M, **Karasic DH.** Recommending or Rejecting "the Dimple": WPATHAffiliated Medical Professionals' Experiences and Attitudes Toward GenderConfirming Vulvoplasty in Transgender Women. J Sex Med. 2019 Apr;16(4):586-595. doi: 10.1016/j.jsxm.2019.01.316. Epub 2019 Mar 2.

22. ICD-11 and gender incongruence of childhood: a rethink is needed. Lancet Child Adolesc Health. 2019 10; 3(10):671-673. Winter S, Ehrensaft D, Telfer M, T'Sjoen G, Koh J, Pickstone-Taylor S, Kruger A, Griffin L, Foigel M, De Cuypere G, **Karasic D**. PMID: 31439494.

23. Gender Dysphoria in Adults: An Overview and Primer for Psychiatrists. Focus (Am Psychiatr Publ). 2020 Jul; 18(3):336-350. Byne W, **Karasic DH**, Coleman E, Eyler AE, Kidd JD, Meyer-Bahlburg HFL, Pleak RR, Pula J. PMID: 33343244; PMCID: PMC7587914.

24. WPATH Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. E. Coleman, A. E. Radix, W. P. Bouman, G. R. Brown, A. L. C. de Vries, M. B. Deutsch, R. Ettner, L. Fraser, M. Goodman, J. Green, A. B. Hancock, T. W. Johnson, **D. H. Karasic**… J. Arcelus (2022) Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, International Journal of Transgender Health, 23:sup1, S1-S259, DOI: 10.1080/26895269.2022.2100644

## BOOKS AND CHAPTERS

1. **Karasic DH**, Dilley JW. Anxiety and depression: Mood and HIV disease. In: The UCSF AIDS Health Project Guide to Counseling: Perspectives on Psychotherapy, Prevention, and Therapeutic Practice. Dilley JW and Marks R, eds. Jossey-Bass. San Francisco, 1998, pp.227-248.

2. **Karasic DH**, Dilley JW. Human immunodeficiency-associated psychiatric disorders. In: The AIDS Knowledge Base, Third Edition. Cohen PT, Sande MA, Volberding PA, eds. Lippincott-Williams &Wilkens, Philadelphia, 1999, pp. 577-584.

3. **Karasic DH** and Drescher J. eds. Sexual and Gender Diagnoses of the Diagnostic and Statistical Manual (DSM): A Reevaluation. 2005. Haworth Press, Binghamton, NY. (Book Co-Editor)
4. **Karasic DH**. Transgender and Gender Nonconforming Patients. In: Clinical Manual of Cultural Psychiatry, Second Edition. Lim RF ed. pp 397-410. American Psychiatric Publishing, Arlington VA. 2015.
5. **Karasic DH**. Mental Health Care of the Transgender Patient. In: Comprehensive Care of the Transgender Patient, Ferrando CA ed. pp. 8-11. Elsevier, 2019.
6. **Karasic DH.** The Mental Health Assessment for Surgery. In: Gender Confirmation Surgery – Principles and Techniques for an Emerging Field. Schechter L ed. Springer Nature, in press 2019.

## OTHER PUBLICATIONS

1. **Karasic DH**, Dilley JW. HIV-associated psychiatric disorders: Treatment issues. In: Cohen P, Sande MA, Volberding P, eds., The AIDS Knowledge Base. Waltham, MA: The Medical Publishing Group/ Massachusetts Medical Society. 1994. pp. 5.31-1-5.
2. **Karasic DH**, Dilley JW. HIV-associated psychiatric disorders: Clinical syndromes and diagnosis. In: Cohen P, Sande MA, Volberding P, eds., The AIDS Knowledge Base, Second Edition. Waltham, MA: The Medical Publishing Group/Massachusetts Medical Society. 1994 pp. 5.30-1-5.
3. **Karasic DH**. A primer on transgender care. In: Gender and sexuality. The Carlat Report Psychiatry. April 2012. Vol 10, Issue 4.
4. **Karasic D and Ehrensaft D.** We must put an end to gender conversion therapy for kids. Wired. 7/6/15.

## EXPERT WITNESS AND CONSULTATION ON TRANSGENDER CARE AND RIGHTS

2008 Consultant, California Department of State Hospitals

2012 Dugan v. Lake, Logan UT

2012 XY v. Ontario http://www.canlii.org/en/on/onhrt/doc/2012/2012hrto726/2012hrto726.html

2014 Cabading v California Baptist University

2014 CF v. Alberta
http://www.canlii.org/en/ab/abqb/doc/2014/2014abqb237/2014abqb237.html

2017 United Nations Development Programme consultant, transgender health care and legal rights in the Republic of Vietnam; Hanoi.

2017- 2018 Forsberg v Saskatchewan; Saskatchewan Human Rights v Saskatchewan
https://canliiconnects.org/en/summaries/54130
https://canliiconnects.org/en/cases/2018skqb159

2018 United Nations Development Programme consultant, transgender legal rights in Southeast Asia; Bangkok.

2018 Consultant, California Department of State Hospitals

2019, 2021 Consultant/Expert, Disability Rights Washington

2019, 2021 Consultant/Expert, ACLU Washington

2021 Consultant, California Department of Corrections and Rehabilitation

2021 Expert, Kadel v. Folwell, 1:19-cv-00272 (M.D.N.C.).

2021 Expert, Drew Glass v. City of Forest Park - Case No. 1:20-cv-914 (Southern District Ohio)

2021-2022 Expert, Brandt et al v. Rutledge et al. 4:21-cv-00450 (E.D. Ark.)

2021-2022 Expert, Fain v. Crouch, 3:20-cv-00740 (S.D.W. Va.)

2022 Expert, C.P. v. Blue Cross Blue Shield of Illinois, No. 3:20-cv-06145-RJB (W.D. Wash.)

2022-3 Expert, Dekker, et al. v. Weida, et al., No. 4:22-cv-00325-RH-MAF

2019-2023 Expert, Disability Rights Washington v Washington State Department of Corrections

2023 Expert, K.C. et al. v Individual Members of the Indiana Licensing Board, et al- No. 1:23-CV-595

2023 Expert, Doe, et al v Ladapo -No. 4:23-cv-00114-RH-MAF

2023 Expert, Doe et al v Thornbury -No. 3:23-cv-00230-DJH

2024 Expert Voe v Mansfield, *No. 1:23-CV-864-LCB-LPA*

2024 Expert *Boe v. Marshall, No. 2:22-cv-184-LCB (N.D. Ala.)*

2024 Expert *.B. v. Premera Blue Cross, No. 3:20-cv-06145-RJB (W.D. Wash.)*

2024 Expert *Misanin v. Wilson, No. 2:24-cv-04734-BHH (D.S.C.)*

# EXHIBIT B

# BIBLIOGRAPHY

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *International journal of pediatric endocrinology*, *2020*, 8.

Aldrich, J. et al, Gender-Affirming Care, Incarceration, and the Eighth Amendment, AMA J Ethics. 2023;25(6):E407-413.

Aldridge, Z., Patel, S., Guo, B., Nixon, E., Bouman, W. P., Witcomb, G. L., & Arcelus, J. (2021). Long-term effect of gender-affirming hormone treatment on depression and anxiety symptoms in transgender people: A prospective cohort study. *Andrology*, 9(6), 1808-1816.

Allen, L. R., Watson, L. B., Egan, A. M., & Moser, C. N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology, 7*(3), 302–311.

Almazan, A. N., & Keuroghlian, A. S. (2021). Association Between Gender-Affirming Surgeries and Mental Health Outcomes. *JAMA surgery*, 156(7), 611–618.

American Academy of Family Physicians (2020). Care for the Transgender and Nonbinary Patient, www.aafp.org/about/policies/all/transgender-nonbinary.html.

American Academy of Pediatrics (2018). Policy Statement: Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents, https://pediatrics.aappublications.org/content/142/4/e20182162.

American College of Obstetricians and Gynecologists (2021). Committee Opinion No. 823: Health Care for Transgender and Gender Diverse Individuals, https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals.

American Medical Association. (2023). AMA Resolution: Clarification of Evidence-Based Gender-Affirming Care. https://policysearch.ama-assn.org/policyfinder/detail/gender%20affirming%20care?uri=%2FAMADoc%2FHOD-185.927.xml

American Medical Association. (2023). Issue Brief: Sex and gender in medical education: Best practices for sex and gender diversity in medical education. https://www.ama-assn.org/system/files/cme-issue-brief-sex-gender-medical-education.pdf

American Medical Association and GLMA (2019). Issue Brief: Health insurance coverage for gender-affirming care of transgender patients, https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf.

American Psychiatric Association. (2022). Diagnostic and statistical manual of mental disorders (5th ed., text rev.). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th ed.). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association (2018). Position Statement on Access to Care for Transgender and Gender Diverse Individuals, https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Access-to-Care-for-Transgender-and-Gender-Diverse-Individuals.pdf.

American Psychological Association. (2024). APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science. https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf

American Psychological Association (2021). APA Resolution on Gender Identity Change Efforts, https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

American Psychological Association (2015). Guidelines for psychological practice with transgender and gender nonconforming people. *American Psychologist*, 70, 832-864.

Ascha, M., Sasson, D. C., Sood, R., Cornelius, J. W., Schauer, J. M., Runge, A., Muldoon, A. L., Gangopadhyay, N., Simons, L., Chen, D., Corcoran, J. F., & Jordan, S. W. (2022). Top Surgery and Chest Dysphoria Among Transmasculine and Nonbinary Adolescents and Young Adults. *JAMA pediatrics*, *176*(11), 1115–1122.

Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society*, 5(4), 1-16.

Barrett D., Heale R. (2020). What are Delphi studies? *Evidence-Based Nursing*, 23:68-69.

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. *BMC public health*, *15*, 525.

Bruce, L., Khouri, A. N., Bolze, A., Ibarra, M., Richards, B., Khalatbari, S., Blasdel, G., Hamill, J. B., Hsu, J. J., Wilkins, E. G., Morrison, S. D., & Lane, M. (2023). Long-Term Regret and Satisfaction With Decision Following Gender-Affirming Mastectomy. *JAMA surgery*, e233352. Advance online publication. https://doi.org/10.1001/jamasurg.2023.3352

Brown, G. R. (2010). Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with Gender Identity Disorder. International Journal of Transgenderism, 12(1), 31–39.

Bustos, V. P., Bustos, S. S., Mascaro, A., Del Corral, G., Forte, A. J., Ciudad, P., Kim, E. A., Langstein, H. N., & Manrique, O. J. (2021). Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence. *Plastic and reconstructive surgery. Global open*, *9*(3), e3477.

Byne, W., Karasic, D. H., Coleman, E., Eyler, A. E., Kidd, J. D., Meyer-Bahlburg, H. F. L., … Pula, J. (2018). Gender dysphoria in adults: An overview and primer for psychiatrists. *Transgender Health*, 3(1), 57-70.

Cavve, B. S., Bickendorf, X., Ball, J., Saunders, L. A., Thomas, C. S., Strauss, P., Chaplyn, G., Marion, L., Siafarikas, A., Ganti, U., Wiggins, A., Lin, A., & Moore, J. K. (2024). Reidentification With Birth-Registered Sex in a Western Australian Pediatric Gender Clinic Cohort. *JAMA pediatrics*, *178*(5), 446–453.

Chelliah, P., Lau, M., & Kuper, L. E. (2024). Changes in Gender Dysphoria, Interpersonal Minority Stress, and Mental Health Among Transgender Youth After One Year of Hormone Therapy. *The Journal of Adolescent Health*, S1054-139X(24)00005-3.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, *23*(Suppl 1), S1–S259.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., ... & Zucker, K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism*, 13(4), 165-232.

Colizzi, M., Costa, R., & Todarello, O. (2014). Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*, *39*, 65–73.

Colizzi, M., Costa, R., Pace, V., & Todarello, O. (2013). Hormonal treatment reduces psychobiological distress in gender identity disorder, independently of the attachment style. *The journal of sexual medicine*, *10*(12), 3049–3058.

Colton-Meier, S. L., Fitzgerald, K. M., Pardo, S. T., & Babcock, J. (2011). The effects of hormonal gender affirmation treatment on mental health in female-to-male transsexuals. *Journal of Gay & Lesbian Mental Health*, 15(3), 281-299.

Crissman, H. P., Berger, M. B., Graham, L. F., & Dalton, V. K. (2017). Transgender Demographics: A Household Probability Sample of US Adults, 2014. *American journal of public health*, *107*(2), 213–215.

Dai, D., Charlton, B. M., Boskey, E. R., Hughes, L. D., Hughto, J. M. W., Orav, E. J., & Figueroa, J. F. (2024). Prevalence of Gender-Affirming Surgical Procedures Among Minors and Adults in the US. *JAMA network open*, *7*(6), e2418814.

Daniel, H., & Butkus, R. (2015). Lesbian, gay, bisexual, and transgender health disparities: Executive summary of a policy position paper from the American College of Physicians. *Annals of Internal Medicine, 163*(2), 135-137.

Danker, S., Narayan, S. K., Bluebond-Langner, R., Schechter, L. S., & Berli, J. U. (2018). Abstract: A Survey Study of Surgeons' Experience with Regret and/or Reversal of Gender-Confirmation Surgeries. *Plastic and Reconstructive Surgery Global Open*, *6*(9 Suppl), 189-189.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment. *Pediatrics*, *134*(4), 696-704.

Deutsch, M.B. (ed.). (2016). Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People (2d ed.). San Francisco, CA: UCSF Center of Excellence for Transgender Health.

Dhejne, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960-2010: prevalence, incidence, and regrets. *Archives of Sexual Behavior*, *43*(8), 1535–1545.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS one*, *6*(2), e16885.

Dopp, Alex R., Allison Peipert, John Buss, Robinson De Jesús-Romero, Keytin Palmer, and Lorenzo Lorenzo-Luaces. (2024). Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research. Santa Monica, CA: RAND Corporation. https://www.rand.org/pubs/research_reports/RRA3223-1.html.

Drescher, J., Haller, E., & Yarbrough, E. (2018). Position statement on access to care for transgender and gender diverse individuals. Caucus of LGBTQ Psychiatrists and the Council on Minority Mental Health and Health Disparities, American Psychiatric Association.

Durwood, L., McLaughlin, K. A., & Olson, K. R. (2017). Mental Health and Self-Worth in Socially Transitioned Transgender Youth. *Journal of the American Academy of Child and Adolescent Psychiatry*, *56*(2), 116–123.e2.

Endocrine Society (2020). Transgender Health, an Endocrine Society position statement, https://www.endocrine.org/advocacy/position-statements/transgender-health.

Fisher, Alessandra & Cocchetti, Carlotta. (2020). Biological basis of gender identity. 10.1016/B978-0-12-815968-2.00009-8.

Fisher, A. D., Castellini, G., Ristori, J., Casale, H., Cassioli, E., Sensi, C., Fanni, E., Amato, A. M., Bettini, E., Mosconi, M., Dèttore, D., Ricca, V., & Maggi, M. (2016). Cross-Sex Hormone Treatment and Psychobiological Changes in Transsexual Persons: Two-Year Follow-Up Data. The Journal of clinical endocrinology and metabolism, 101(11), 4260–4269.

Fleming, P. S., Koletsi, D., Ioannidis, J. P., & Pandis, N. (2016). High quality of the evidence for medical and other health-related interventions was uncommon in Cochrane systematic reviews. Journal of clinical epidemiology, 78, 34–42.

Green, A. E., DeChants, J. P., Price, M. N., & Davis, C. K. (2022). Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth. *The Journal of adolescent health: official publication of the Society for Adolescent Medicine*, *70*(4), 643–649.

Guyatt, G., Oxman, A. D., Akl, E. A., Kunz, R., Vist, G., Brozek, J., Norris, S., Falck-Ytter, Y., Glasziou, P., & deBeer, H. (2011). GRADE guidelines: 1. Introduction—GRADE evidence profiles and summary of findings tables. *Journal of Clinical Epidemiology*, *64*(4), 383– 394.

Hatswell AJ, Baio G, Berlin JA, Irs A, Freemantle N. (2016). Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014. *BMJ Open*. 2016 Jun 30;6(6):e011666.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S., Meyer, W. J., Murad, M. H., … T'Sjoen, G. G. (2017). Endocrine treatment of genderdysphoric/gender-incongruent persons:

An Endocrine Society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, *102*(11), 3869-3903.

Herman, J.L., Flores, A.R., O'Neill, K.K. (2022). How Many Adults and Youth Identify as Transgender in the United States? The Williams Institute, UCLA School of Law.

Herman, J. (2013). Costs and Benefits of Providing Transition-related Health Care Coverage in Employee Health Benefits Plans: Findings from a Survey of Employers. The Williams Institute, UCLA School of Law. Retrieved from https://escholarship.org/uc/item/5z

Hughto JMW, Gunn HA, Rood BA, Pantalone DW. Social and Medical Gender Affirmation Experiences Are Inversely Associated with Mental Health Problems in a U.S. Non-Probability Sample of Transgender Adults. Arch Sex Behav. 2020 Oct;49(7):2635-2647.

Howick, J., Koletsi, D., Pandis, N., Fleming, P. S., Loef, M., Walach, H., Schmidt, S., & Ioannidis, J. P. A. (2020). The quality of evidence for medical interventions does not improve or worsen: a metaepidemiological study of Cochrane reviews. *Journal of clinical epidemiology*, 126, 154–159.

Hsu, Chia-Chien and Sandford, Brian A. (2019). "The Delphi Technique: Making Sense of Consensus," Practical Assessment, Research, and Evaluation: Vol. 12, Article 10.

Institute of Medicine (2011). Clinical Practice Guidelines We Can Trust. Washington, DC: The National Academies Press.

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, 74, 213–219.

Keo-Meier, C. L., Herman, L. I., Reisner, S. L., Pardo, S. T., Sharp, C., & Babcock, J. C. (2015). Testosterone treatment and MMPI-2 improvement in transgender men: a prospective controlled study. *Journal of consulting and clinical psychology*, *83*(1), 143–156.

Korpaisarn, S., & Safer, J. D. (2019). Etiology of Gender Identity. *Endocrinology and metabolism clinics of North America*, *48*(2), 323–329.

Lane, M., Ives, G. C., Sluiter, E. C., Waljee, J. F., Yao, T. H., Hu, H. M., & Kuzon, W. M. (2018). Trends in Gender-affirming Surgery in Insured Patients in the United States. *Plastic and reconstructive surgery. Global open*, *6*(4), e1738.

Movsisyan, A., Melendez-Torres, G. J., & Montgomery, P. (2016). Outcomes in systematic reviews of complex interventions never reached “high” GRADE ratings when compared with those of simple interventions. *Journal of clinical epidemiology*, *78*, 22–33.

Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J., & Montori, V. M. (2010). Hormonal therapy and sex reassignment: A systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology*, 72(2), 214-231.

Nguyen, H. B., Chavez, A. M., Lipner, E., Hantsoo, L., Kornfield, S. L., Davies, R. D., & Epperson, C. N. (2018). Gender-Affirming Hormone Use in Transgender Individuals: Impact on Behavioral Health and Cognition. *Current psychiatry reports*, *20*(12), 110.

Nobili, A., Glazebrook, C., & Arcelus, J. (2018). Quality of life of treatment-seeking transgender adults: A systematic review and meta-analysis. *Reviews in endocrine & metabolic disorders*, *19*(3), 199–220.

Oda, H., & Kinoshita, T. (2017). Efficacy of hormonal and mental treatments with MMPI in FtM individuals: cross-sectional and longitudinal studies. *BMC psychiatry*, *17*(1), 256.

Olson-Kennedy, J., Warus, J., Okonta, V., Belzer, M., & Clark, L. F. (2018). Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts. *JAMA pediatrics*, *172*(5), 431–436.

Owen-Smith, A. A., Gerth, J., Sineath, R. C., Barzilay, J., Becerra-Culqui, T. A., Getahun, D., Giammattei, S., Hunkeler, E., Lash, T. L., Millman, A., Nash, R., Quinn, V. P., Robinson, B., Roblin, D., Sanchez, T., Silverberg, M. J., Tangpricha, V., Valentine, C., Winter, S., . . . Goodman, M. (2018). Association between gender confirmation treatments and perceived gender congruence, body image satisfaction, and mental health in a cohort of transgender individuals. *Journal of Sexual Medicine*, 15(4), 591-600.

Padula, W. V., Heru, S., & Campbell, J. D. (2016). Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis. *Journal of general internal medicine*, *31*(4), 394–401.

Park, R. H., Liu, Y. T., Samuel, A., Gurganus, M., Gampper, T. J., Corbett, S. T., Shahane, A., & Stranix, J. T. (2022). Long-term Outcomes After Gender-Affirming Surgery: 40-Year Follow-up Study. *Annals of plastic surgery*, *89*(4), 431–436.

Pediatric Endocrine Society (2021). Pediatric Endocrine Society Opposes Bills that Harm Transgender youth, https://pedsendo.org/news-announcements/the-pediatric-endocrine-society-opposes-bills-that-harm-transgender-youth-2/.

Pfafflin, F., & Junge, A. (1998). Sex reassignment: Thirty years of international follow-up studies after sex reassignment surgery, a comprehensive review, 1961-1991. (Jacobson & Meir, trans.).

Roblin, D., Sanchez, T., Silverberg, M. J., Tangpricha, V., Valentine, C., Winter, S., Woodyatt, C., … Goodman, M. (2018). Association Between Gender Confirmation Treatments and Perceived Gender Congruence, Body Image Satisfaction, and Mental Health in a Cohort of Transgender Individuals. *The journal of sexual medicine*, *15*(4), 591–600.

Russell ST, Pollitt AM, Li G, Grossman AH. Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth. J Adolesc Health. 2018 Oct;63(4):503-505.

Saraswat, A., Weinand, J.D., & Safer, J. (2015). Evidence supporting the biologic nature of gender identity. *Endocrine Practice, 21 2*, 199-204.

Shang Z. (2023). Use of Delphi in health sciences research: A narrative review. *Medicine*, *102*(7), e32829.

Sheehan, J., Sherman, K. A., Lam, T., & Boyages, J. (2008). Regret associated with the decision for breast reconstruction: the association of negative body image, distress and surgery characteristics with decision regret. *Psychology & health*, *23*(2), 207–219.

Shelemy, L., Cotton, S., Crane, C., & Knight, M. (2024). Systematic review of prospective adult mental health outcomes following affirmative interventions for gender dysphoria. *International Journal of Transgender Health*, 1–21.

Smith, Y., Van Goozen, S., Kuiper, A., & Cohen-Kettenis, P. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological Medicine* 35(1): 89-99.

Substance Abuse and Mental Health Services Administration. (2015). Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth. HHS Publication No. (SMA) 15-4928. Rockville, MD: Substance Abuse and Mental Health Services Administration.

Tang, A., Hojilla, J. C., Jackson, J. E., Rothenberg, K. A., Gologorsky, R. C., Stram, D. A., Mooney, C. M., Hernandez, S. L., & Yokoo, K. M. (2022). Gender-Affirming Mastectomy Trends and Surgical Outcomes in Adolescents. *Annals of plastic surgery*, *88*(4 Suppl), S325–S331.

Thornton, S. M., Edalatpour, A., & Gast, K. M. (2024). A systematic review of patient regret after surgery- A common phenomenon in many specialties but rare within gender-affirmation surgery. *American journal of surgery*, S0002-9610(24)00238-1. Advance online publication.

Tordoff, D. M., Wanta, J. W., Collin, A., Stepney, C., Inwards-Breland, D. J., & Ahrens, K. (2022). Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care. *JAMA network open*, *5*(2), e220978.

T'Sjoen, G., Arcelus, J., Gooren, L., Klink, D. T., & Tangpricha, V. (2019). Endocrinology of Transgender Medicine. *Endocrine reviews*, *40*(1), 97–117.

Turan, Ş., Aksoy Poyraz, C., Usta Sağlam, N. G., Demirel, Ö. F., Haliloğlu, Ö., Kadıoğlu, P., & Duran, A. (2018). Alterations in Body Uneasiness, Eating Attitudes, and Psychopathology Before and After Cross-Sex Hormonal Treatment in Patients with Female-to-Male Gender Dysphoria. *Archives of sexual behavior*, *47*(8), 2349–2361.

U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality (2015). Off-Label Drugs: What You Need to Know. https://www.ahrq.gov/patients-consumers/patient-involvement/off-label-drug-usage.html (last accessed Feb. 15, 2023).

van de Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., & Kreukels, B. (2018). Surgical Satisfaction, Quality of Life, and Their Association After Gender-Affirming Surgery: A Follow-up Study. *Journal of sex & marital therapy*, *44*(2), 138–148.

van der Loos, M. A. T. C., Hannema, S. E., Klink, D. T., den Heijer, M., & Wiepjes, C. M. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. *The Lancet. Child & adolescent health*, *6*(12), 869–875.

van der Miesen, A. I. R., Steensma, T. D., de Vries, A. L. C., Bos, H., & Popma, A. (2020). Psychological Functioning in Transgender Adolescents Before and After Gender- Affirmative Care Compared With Cisgender General Population Peers. *Journal of Adolescent Health*, 66(6), 699-704.

What We Know Project, Ctr. for the Study of Inequality, Cornell Univ. (2018). What does the scholarly research say about the effect of gender transition on transgender well-being? (online literature review), *available at* https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/.

White, Hughto, J. M.W., & Reisner, S. L. (2016). A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgender Health*, 1(1), 21-31.

Wiepjes, C.M., Nota, N. M., de Blok, C.J., Klaver, M., de Vries, A.L., Wensing-Kruger, S.A., ... & Gooren, L.J. (2018). The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets. *The Journal of Sexual Medicine*, 15(4), 582-590.

Wierckx, K., Van Caenegem, E., Schreiner, T., Haraldsen, I., Fisher, A. D., Toye, K., Kaufman, J. M., & T'Sjoen, G. (2014). Cross-sex hormone therapy in trans persons is safe and effective at short-time follow-up: results from the European network for the investigation of gender incongruence. *The journal of sexual medicine*, *11*(8), 1999–2011.

Wittich, C. M., Burkle, C. M., & Lanier, W. L. (2012). Ten common questions (and their answers) about off-label drug use. *Mayo Clinic proceedings*, *87*(10), 982–990.

World Health Organization, Frequently Asked Questions- Gender incongruence and transgender health in the ICD, https://www.who.int/standards/classifications/frequently-asked-questions/gender-incongruence-and-transgender-health-in-the-icd

World Health Organization. (2018). Gender Incongruence. In International Classification of Diseases, 11th Revision, https://icd.who.int/browse11/l-m/en#/http%3A%2F%2Fid.who.int%2Ficd%2Fentity%2F411470068.

Word Health Organization: Regional Office for Europe. WHO/Europe brief – transgender health in the context of ICD-11, https://perma.cc/ABZ4-KMPT?view-mode=client-side&type=image.

World Medical Association. (2017, February 17). WMA statement on transgender people, https://www.wma.net/policies-post/wma-statement-on-transgender-people/.

World Professional Association for Transgender Health. (2016). Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A. https://www.wpath.org/newsroom/medical-necessity-statement.

Zhang, Q., Goodman, M., Adams, N., Corneil, T., Hashemi, L., Kreukels, B., Motmans, J., Snyder, R., & Coleman, E. (2020). Epidemiological considerations in transgender health: A systematic review with focus on higher quality data. *International journal of transgender health*, *21*(2), 125–137.

Zucker, K. J., Cohen-Kettenis, P. T., Drescher, J., Meyer-Bahlburg, H. F., Pfäfflin, F., & Womack, W. M. (2013). Memo outlining evidence for change for gender identity disorder in the DSM-5. *Archives of sexual behavior*, *42*(5), 901–914.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALISHEA KINGDOM, et al.,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 1:25-cv-00691 |

**SECOND DECLARATION OF DR. DAN H. KARASIC IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Dan H. Karasic, M.D., hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4. I submitted an expert declaration in this case on March 14, 2025. My background and qualifications are discussed in that declaration.

5. I submit this declaration to respond to a few points made in defendants' opposition to Plaintiff's motion and to provide observations regarding the subsequently filed amici brief.

6. First, defendants' brief asserts that there is "ongoing scientific and medical debate over the necessity and efficacy of hormone medication as a treatment for gender dysphoria." *See, e.g.*, Defendants' brief, at 2; *see also id.* at 15 (suggesting treating for gender dysphoria is a "highly controversial area of medical practice"). This is simply untrue. While there is some

discussion within the field about how to best care for minors with gender dysphoria,[1] there is no serious debate or controversy within the medical and mental health fields about the necessity and efficacy of hormone therapy to treat adults with gender dysphoria. As I explained in my first declaration, decades of research and clinical experience have shown the benefits of hormone therapy to individuals with gender dysphoria.

7. Defendants' brief suggests that if BOP were to discontinue hormone therapy, there will be no harm because, it says, there are alternative treatments that could be provided. *See* Defendants' brief, at 10. That is untrue. As I discussed in my first declaration, while not everyone with gender dysphoria needs hormone therapy, for those for whom it is clinically indicated, there is no alternative treatment. There is no evidence-based psychotherapeutic treatment to treat gender dysphoria. Withdrawing hormone therapy from those who have a medical need for it would be expected to result in an exacerbation of their gender dysphoria, putting them at significant risk of depression, anxiety, self-harm and suicidality.

8. The declaration of the Bureau of Prisons' Assistant Director of the Health Services Division, Chris Bina, suggests that if incarcerated people are taken off of hormone therapy, there will be no harm because he says they would "receive treatment for any symptoms they may experience as clinically indicated." *See* Bina declaration, par. 15. But the symptom that people would experience if hormones are withdrawn is a rise in gender dysphoria, and, as discussed above, there are no alternative treatments for gender dysphoria for those who need gender-affirming medical interventions. Thus, withdrawing or withholding such care when

[1] *See, e.g.*, The Cass Review, Independent Review of Gender Identity Services for Children and Young People: Final Report at 195 (April 2024) (the "Cass review") (recommending that puberty blockers be provided within the context of clinical research trials and that hormone therapy be provided "with caution" for youth ages 16 and 17). I do not reference the Cass Review to suggest that I agree with it; indeed, it has been widely criticized. *See, e.g.*, British Medical Association, "BMA to undertake an evaluation of the Cass Review on gender identity services for children and youth people," July 31, 2024, available at https://www.bma.org.uk/bma-media-centre/bma-to-undertake-an-evaluation-of-the-cass-review-on-gender-identity-services-for-children-and-young-people.

indicated puts people at risk of significant harm to their mental health.

9. Defendants cite the Cass Review's finding that "while deaths by suicide in trans-identifying individuals are tragically above the national average, there is 'no evidence that gender-affirmative treatments reduce this.'" Defendants' brief, at 16. As an initial matter, suicide prevention is not the only reason for providing hormone therapy to individuals with gender dysphoria. This condition can cause other severe harms to mental health as I discussed in my first declaration. Moreover, the Cass Review and the cited passage are focused on minors. The cited passage that was excerpted in Defendants' brief specifically refers to "risk of death by suicide among gender diverse youth." Cass Review, at 94. It is difficult to get data on completed suicides for any population,[2] but there is substantial evidence that gender-affirming medical care reduces suicidal ideation and suicide attempts,[3] which are significant risk factors for suicide (*see* n. 2, *supra*), and it is a serious mental health concern in its own right when people think about ending their lives.

10. I'd like to address some confusion reflected in the Defendants' brief about the purpose of hormone therapy in the treatment of gender dysphoria. Defendants' brief states that "[t]he Court apparently assumed that all hormone medication provided to treat gender dysphoria is 'for the purpose of conforming an inmate's appearance to that of the opposite sex,' Exec.

---

[2] Because completed suicides are so rare, it's difficult to get data. For example, in clinical trials of over 4400 youth receiving antidepressants, there were no suicides. Nevertheless, there's a black box warning about increased risk of suicidality when antidepressants are used for people under the age of 25, which is based on increased suicidal ideation and attempts. *See* https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/suicidality-children-and-adolescents-being-treated-antidepressant-medications

[3] *See, e.g* Kaltiala, R., Heino, E., Työläjärvi, M., & Suomalainen, L. (2019). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. Nordic Journal of Psychiatry, 74(3), 213–219. https://doi.org/10.1080/08039488.2019.1691260; Allen, et al 2019
Allen LR, Watson LB, Egan AM, Moser CN. Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones. Clinical Practice in Pediatric Psychology. 2019;7(3):302-311. doi:10.1037/cpp0000288
Turban et al 2022 https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0261039
Tordoff et al 2022
doi:10.1001/jamanetworkopen.2022.0978

Order No. 14168, § 4(c), regardless of the inmate's individual medical condition.'" Defendants' brief, at 13. Hormone therapy alleviates gender dysphoria by conforming an individual's body to be consistent with their gender identity. Defendants appear to assert that medically necessary hormone treatment and hormone treatment "for the purpose of conforming an inmate's appearance to that of the opposite sex" are separate things. They are not. The use of hormones to change the patient's appearance is medically necessary for the treatment of gender dysphoria.

11. Defendants point to some statements suggesting that WPATH's guidelines are based on ideology, not science or "extensive clinical experience." *See* Defendants' brief at 17. This is not true. As I discussed in my first declaration, WPATH's guidelines were developed by experts in the field using a rigorous evidence-based approach. *See* Karasic initial declaration, pars. 53-62. The authors of the WPATH guidelines include university professors and individuals with extensive clinical experience in providing care for people with gender dysphoria. I myself have been involved in the development of the WPATH guidelines and have over 30 years of clinical experience treating individuals with gender dysphoria. Since the first WPATH guidelines in 1979, WPATH has drawn on the expertise of the most experienced clinicians. And these guidelines were developed using widely accepted methods recommended by the National Academy of Medicine that have been used to develop other medical guidelines such as all American Psychiatric Association's practice guidelines for various psychiatric illnesses, such as schizophrenia, eating disorders, and alcohol use disorder, since 2011.[4] The WPATH guidelines are recognized as authoritative by every major medical association in the United States, including the National Commission on Correctional Health Care.[5]

---

[4] *See* https://www.psychiatry.org/psychiatrists/practice/clinical-practice-guidelines/guideline-development-process.
[5] *See* National Commission on Correctional Health Care, Position Statement- Transgender and Gender Diverse Health Care in Correctional Settings, November, 2020, available at https://www.ncchc.org/position-statements/transgender-and-gender-diverse-health-care-in-correctional-settings-2020/.

12. Defendants' brief also attempts to discredit the WPATH guidelines by citing references in Judge Lagoa's concurring opinion in *Eknes-Tucker v. Governor of Alabama* in which she cites a publication entitled "The WPATH Files." The WPATH Files is a collection of select out-of-context excerpts of communications among WPATH members on a message board over a four-year period that was obtained and published by a journalist and activist opposed to gender-affirming medical care, along with a narrative she created based on those cherry-picked excerpts in an attempt to discredit WPATH. These select, out-of-context statements do not permit the conclusions about WPATH asserted by the author. Moreover, the author is not someone within the field of medicine or mental health nor experienced in the treatment of gender dysphoria, and this document is not published in a scientific journal. It is an activist's opinion piece based on a highly misleading presentation of excerpts of communications.

13. I have reviewed the amicus brief filed by several states in this case and have a few observations.

a. First, while the amicus brief claims that hormone therapy is a "controversial practice" and attempts to support that claim by citing three studies, none of those studies permit such a conclusion. The first study[6] did not evaluate the evidence because the authors set criteria for inclusion in their review that excluded all of the studies. *See id.* ("We could not appraise the quality of the evidence because no studies met our review's inclusion criteria."). The second study[7] found that hormone therapy was associated with increased quality of life, decreased depression, and decreased anxiety. That the authors were unable to

---

[6] Haupt et al, Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020).

[7] Kellan E. Baker, et al., Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review, 5 J. Endocrine Soc. 1, 12–13 (2021).

draw conclusions about the impact on death by suicide is an ongoing challenge in research. *See supra*, par. 9. Finally, the state amici suggest that a third study[8] indicated that hormone therapy increased suicidality, but that study showed a "reduction in suicidality following gender-affirming treatment." Within the medical and mental health fields, hormone therapy has long been widely recognized as an effective treatment for gender dysphoria.

b. The states' amicus brief also suggests that that psychotherapy is "widely recognized" as an alternative treatment for gender dysphoria in lieu of gender-affirming medical care, citing Anderson et al., Gender Dysphoria and Its Non-Surgical and Surgical Treatments, 10 Health Psych. Rsch., at 4 (2022). But that study, which notes the benefits of psychotherapy for patients with gender dysphoria (e.g. providing support, help with coming out), does not suggest that psychotherapy is a substitute for gender-affirming medical interventions when indicated. Indeed, the study cites to the WPATH Standards of Care and a paper that discusses psychotherapy in the context of preparation for gender-affirming surgery. As discussed above, there is no evidence-based psychotherapeutic treatment to treat gender dysphoria in lieu of hormones.

c. In sum, the amici states make baseless assertions about treatment for gender dysphoria based on a highly misleading characterization of the sources they cite.[9]

[8] Daniel Jackson, Suicide-Related Outcomes Following Gender-Affirming Treatment: A Review, 15(3) Cureus 11–13 (2023).

[9] The states' amicus brief also offers a misleading presentation of the evidence on gender-affirming surgery, but since the motion before the court does not address surgery, I have not provided an analysis of that discussion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct,

Executed this 3rd day of March, 2025

Dan H. Karasic

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALISHEA KINGDOM, et al.,

Plaintiff,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 1:25-cv-00691

**EXPERT DECLARATION OF DR. DAN KARASIC IN SUPPORT OF PLAINTIFFS' MOTION FOR AN UPDATED PRELIMINARY INJUNCTION**

I, Dan H. Karasic, M.D., hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4. I submitted an expert declaration in this case on March 14, 2024 (my "Initial Declaration") and a second declaration on April 4, 2025 (my "Second Declaration"). I incorporate both declarations by reference.

5. My background and qualifications are discussed in my Initial Declaration, which also includes my CV.

6. Since my Initial Declaration, I have given expert testimony by deposition or trial in the following cases: Hein v. UNMC Physicians et al; Keohane v Dixon; *Bella Boe et al. v.*

*Children's Hospital Colorado* (2026CV30232).

7. Since my prior two declarations in this case, I have reviewed the following documents related to this case: the Bureau of Prison's ("BOP") Program Statement 5260.01, Management of Inmates with Gender Dysphoria (the "Program Statement"); the Memorandum on Program Statement 5260.01, Management of Inmates with Gender Dysphoria (Feb. 19, 2026) (the "Memorandum"); and the Declaration of Dr. Kristopher Kaliebe dated September 19, 2025 ("Kaliebe Declaration" or "Kaliebe Dec.").

8. I submit this declaration in support of Plaintiffs' Motion for an Updated Preliminary Injunction to address the Program Statement and respond to erroneous statements about gender dysphoria and its treatment contained in the Memorandum and the Kaliebe Declaration, upon which the Memorandum significantly relies.

## II. SUMMARY OF EXPERT OPINIONS

9. The Program Statement—by prohibiting and withdrawing hormone therapy and social accommodations from individuals with gender dysphoria—puts these individuals at risk of significant harm to their health and well-being just as the Implementing Memoranda did. The provision for a tapering process for withdrawing hormone therapy does not prevent the predictable serious harms of denying this treatment to those who have a medical need for it.

10. The assertion in the Memorandum and Kaliebe Declaration that social transition and hormone therapy are "unproven" treatments for gender dysphoria is baseless. These interventions are supported by the same type of research that is routinely relied on in medicine, as well as decades of clinical experience.

11. Contrary to assertions made in the Memorandum and Kaliebe Declaration, social transition and hormone therapy for the treatment of adults with gender dysphoria are not the

subject of controversy or debate within the medical and mental health fields. They are widely accepted treatments. To the extent there is any controversy about these treatments in public discourse, it is limited to the context of pediatric patients with gender dysphoria.

12. Dr. Kaliebe's assertion that social transition for individuals with gender dysphoria falls outside of the concept of medically necessary care because it involves things like clothing and grooming has no basis in medicine; all sorts of medically necessary interventions can involve everyday items and activities as opposed to prescriptions or other therapies.

13. The fact that an individual with gender dysphoria is incarcerated does not erase their medical need to socially transition or be treated with hormone therapy and does not make these interventions ineffective.

14. The Program Statement prohibits well-established treatments for gender dysphoria and, instead, provides for psychotherapy and psychotropic medications despite the absence of any evidence that these interventions are effective treatments for this condition. There is no basis for Dr. Kaliebe's assertion that "psychotherapy is the preferred treatment for gender dysphoria" (Kaliebe Dec. p. 14), or the Memorandum's assertion that the Program Statement "is more aligned with the latest scientific information." (Memorandum at 3)

15. There is no basis for the assertion in the Memorandum and Kaliebe Declaration that making gender-affirming care available to those who need it would reward threats of self-harm and that prohibiting such care may reduce self-harm. To the contrary, prohibiting this care regardless of medical need would increase the risk of self-harm.

16. Dr. Kaliebe's report rests on a fundamental lack of understanding of gender dysphoria and its treatment under the prevailing protocols. He has a personal idiosyncratic view of gender dysphoria that is at odds with how this condition is understood within the field of

psychiatry. And his description of what he calls the "affirming model" of care bears no resemblance to the widely accepted protocols for treatment.

17. The Memorandum and Kaliebe Declaration's claims about the lack of integrity of WPATH and all of the major medical and mental health professional organizations that support gender-affirming care for gender dysphoria are baseless.

## III. EXPERT OPINIONS

### A. The Program Statement—by prohibiting and withdrawing hormone therapy and social accommodations from individuals with gender dysphoria—puts these individuals at the same risk of significant harm to their health and well-being as the Implementing Memoranda did.

18. The Program Statement, like the Implementing Memoranda, prohibits social accommodations and hormone therapy for individuals with gender dysphoria. The Program Statement provides that for those currently receiving hormone therapy to treat gender dysphoria, they should be withdrawn from such care pursuant to a "tapering plan" for each patient. Program Statement at 8. It recognizes that individuals who have been receiving hormones to address gender dysphoria for an extended period of time may "develop severe physiological and psychological withdrawal effects from tapering" and, thus, "it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones," but such plans "should be reevaluated regularly with respect to cessation of hormones." Program Statement at 8.

19. By prohibiting and withdrawing social accommodations and hormone therapy from individuals with gender dysphoria, the Program Statement puts them at the same risk of significant harm to their health and well-being as the Implementing Memoranda did. The fact that hormone therapy is withdrawn through a tapering process rather than cold turkey does not prevent the predictable serious harms of denying hormone therapy to those who have a medical

need for it. All of the anticipated harms to patients I identified in my Initial Declaration, thus, apply equally to the Program Statement. As I explained in my Initial Declaration, gender dysphoria is a serious condition which, if untreated, can cause serious distress and result in depression, anxiety, self-harm and suicidality. Patients who are stripped of this medically necessary care would be expected to see a resumption of the distress and other symptoms they experienced from gender dysphoria prior to treatment.

20. It is disturbing to read the Program Statement, which appears to recognize that some people will be deliberately put through a process that BOP anticipates could cause a "severe physiological and psychological" impact. Dr. Kaliebe suggests that the only harm from discontinuing hormone therapy for individuals with gender dysphoria is the withdrawal effect, which he compares to the impact of withdrawing standard psychiatric medications. Kaliebe Dec. par. 115. Focusing solely on withdrawal effects disregards the harm from losing medical care the patients need. The more apt comparison would be the long-term harm experienced by patients on standard psychiatric medications who are withdrawn from those medications even though they still have a medical need for them.

21. Moreover, there is no evidence that withdrawing people from hormone therapy they have been receiving to treat gender dysphoria (with or without a tapering process) can be done safely without causing significant mental health distress. And there is no evidence that provision of psychotherapy would make this safe

22. In my clinical experience, patients who have needed to discontinue hormone therapy temporarily due to medical issues experienced great distress due to the development of secondary sex characteristics that did not accord with their gender identity and their mental health decompensated. Subjecting this group of individuals to the withdrawal of hormone

therapy in the absence of a medical need to do so and against their will constitutes medical experimentation without consent.

23. In sum, the Program Statement, just like the Implementing Memorandum, imposes a draconian denial of medically-necessary hormone therapy[1] and social transition accommodations and if implemented, BOP should anticipate a mental health crisis for many inmates with gender dysphoria.

**B. Contrary to the Memorandum and Kaliebe Declaration's assertion that social transition and hormone therapy are "unproven" treatments for gender dysphoria, substantial evidence of the type routinely relied on in the medical field shows the efficacy of these treatments.**

24. The assertion made in the Memorandum and Kaliebe Declaration that social transition and hormone therapy are "unproven" treatments for gender dysphoria is baseless. As discussed in my Initial Declaration, research and decades of clinical experience demonstrate that social transition and hormone therapy can effectively alleviate gender dysphoria and improve patient mental health and functioning. Hormone therapy has been researched and recognized as an effective treatment since the 1950's. (Pfafflin and Junge, 1998)

<u>Hormone therpy</u>

25. The Memorandum asserts that "there is little (if any) reliable evidence showing that hormones address gender dysphoria." Memorandum at 21. It relies on Dr. Kaliebe and various review articles noting that the evidence supporting this care is "low quality". Kaliebe Dec. pars. 83-84. The term "low quality" evidence in scientific research is a term of art that

[1] There are other medications apart estrogen and testosterone, that can be part of hormonal treatment for gender dysphoria. They include testosterone blockers such as spironolactone and finasteride (the latter of which is sometimes used to treat male pattern hair loss). Such medications are part of treatment to help align the patient's body and appearance with their gender identity and, thus, can also be medically necessary.

generally refers to research that uses methods other than randomized controlled trials, which are generally considered "high quality" and provide the strongest evidence, though even many randomized controlled trials do not provide "high quality" evidence. "Low quality" evidence does not have the colloquial meaning of "poor quality" and these methods are not considered "unreliable" as the Memorandum asserts. To the contrary, the research methods used in this body of research—largely cross-sectional and longitudinal observational studies—are widely relied on in the field of medicine. Many widely recommended medical treatments are supported by these kinds of studies rather than by randomized controlled clinical trials, which are not always feasible or ethical. In one large study of systematic reviews, only 5.6% of all medical interventions, and 0% of all endocrine interventions, had a high GRADE score—a scoring system used to rate the quality of scientific research; most had low or very low GRADE scores. (Howick, et al 2022). But banning all endocrine care has not been suggested.

26. The authors of the North American systematic reviews of research on gender affirming medical care for minors that discussed the low quality (also called "low certainty") evidence in this area—Guyatt et al—put out a statement expressing their concern about that being inappropriately used as a basis to ban care, stating:

> It is profoundly misguided to cast health care based on low-certainty evidence as bad care or as care driven by ideology, and low-certainty evidence as bad science. Many of the interventions we offer are based on low certainty evidence, and enlightened individuals often legitimately and wisely choose such interventions. Thus, forbidding delivery of gender-affirming care and limiting medical management options on the basis of low certainty evidence is a clear violation of the principles of evidence-based shared decision-making and is unconscionable.

https://hei.healthsci.mcmaster.ca/systematic-reviews-related-to-gender-affirming-care/.

27. The Memorandum's reliance on two systematic reviews—Haupt et al, "Antiandrogen or estradiol treatment or both during hormone therapy in transitioning

transgender women," 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, (2020), and Baker, et al, "Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review, 5 J. Endocrine Soc. 1 (2021)—is misplaced. These reviews merely note that the research on the treatment of gender dysphoria is the type of "low quality" research discussed above that is not as strong as randomized controlled trials. They do not suggest in any way that the research is unreliable. The Baker review concluded that "gender-affirming hormone therapy is likely associated with improvements in [quality of life], depression and anxiety." Baker 2021 at 13. The Haupt review, which was a review of studies comparing the safety and efficacy of two different approaches to hormone therapy for transgender women, limited inclusion criteria to controlled studies and found a lack of such studies. The authors said they plan to "include non-controlled cohort studies in the next iteration of this review, as our review has shown that such studies provide the highest quality evidence currently available in this field." Haupt 2020 at 2.[2]

28. Dr. Kaliebe's claim that a study by Dhejne had "unfavorable" findings about the efficacy of hormone therapy for the treatment of gender dysphoria (Kaliebe Dec. par. 92) is baseless. Dhejne's study found 10 suicides by transgender people in Sweden from 1973-2003, compared to 5 in its general population matched controls, but no statistically significant difference in suicidality in those who transitioned in the second 15 years of the 30-year period.

[2] Dr. Kaliebe misleadingly cites Miroshneychenko 2025, saying "[t]he best available evidence reporting on the effects of GAHT [cross sex hormones] in individuals with [Gender Dysphoria] ranged from moderate to high certainty for cardiovascular events and low to very low certainty for the outcomes of [Gender Dysphoria], global function, depression, sexual dysfunction, BMD [bone mineral density] and death by suicide." (Kaliebe Dec. par 88). The studies referenced by Miroshneychenko found that the risk of cardiovascular events was exceedingly low (.04%) and that various mental health measures improved with treatment. The certainty of findings regarding the low-risk of cardiovascular events was greater than the certainty of the findings regarding the mental health benefits of treatment given the quality of the evidence.

The paper did not compare transgender people who received gender-affirming medical treatment to those who had not, only recording higher suicidality compared to the general population, especially for those transitioning in the 1970's and 1980's. Therefore, no conclusions can be drawn from the study about the efficacy of hormone therapy for the treatment of gender dysphoria. Indeed, the lead author has stated that the study has been misused to justify blocking the provision of gender affirming care as the study was not designed to evaluate the efficacy of such care., that gender affirming care is beneficial to mental health, and that elevated suicidality in transgender people in Sweden likely is a reflection of societal discrimination.[3]

29. Dr. Kaliebe's suggestion that hormone therapy could actually worsen mental health, citing a study by Glintborg, is baseless. (Kaliebe Dec. par. 86.) Glintborg showed nothing of the kind. The study explains that because a psychological assessment was required to initiate hormone treatment among the subjects of the study, the engagement with mental health professionals resulted in greater mental health diagnoses and treatment of transgender people recorded in this Danish registry study. (Glintborg 2023) It did not suggest that hormone therapy worsens mental health.

30. Dr. Kaliebe speculates that the benefits of hormone therapy found in the research could be the result of a placebo effect. (Kaliebe Dec. par. 90) He offers no basis for making such an assumption that this accounts for all or most of the benefits of treatment found in the research;

---

[3] *See* https://www.reddit.com/r/science/comments/6q3e8v/science_ama_series_im_cecilia_dhejne_a_fellow_of/; https://www.transadvocate.com/fact-check-study-shows-transition-makes-trans-people-suicidal_n_15483.htm

Dr. Kaliebe also cites a comment by Anckarsater and Gillberg to support his assertion that the data on the effectiveness of medical transition is unfavorable. (Kaliebe Dec. par. 92) It does not. It was a letter to the editor critiquing the methodology of a study on gender-affirming surgery.

nor does he explain why the findings of an entire body of research should be discounted based on this hypothesis (and if so, why all research on mental health treatments shouldn't be disregarded on this basis).

Social transition

31. As for the Memorandum and Kaliebe Declaration's assertion that social transition is an "unproven" treatment for gender dysphoria, as discussed in my Initial Declaration, research shows that social transition positively affects the mental health of individuals with gender dysphoria. *See also* James, et al 2024 (finding that transgender adults who reported social transition more often reported they were "very to pretty happy" (71% vs. 52%), "thriving" (36% vs. 18%), and satisfied with their lives (43% vs. 24%) compared to those who have not socially transitioned). As discussed above, the lack of "high quality" evidence supporting this intervention is not unusual for widely-used treatments. Additionally, decades of clinical experience show the benefits of social transition in alleviating the distress of gender dysphoria.

**C. In the medical and mental health fields, social transition and hormone therapy are not controversial or disputed treatments for gender dysphoria in adults.**

32. Contrary to assertions made in the Memorandum, social transition and hormone therapy for the treatment of adults with gender dysphoria are not "controversial" or "medically disputed".

33. Gender-affirming care—including social transition and hormone therapy—is widely accepted in the medical community as effective treatment for gender dysphoria. This is recognized by every major medical and mental health professional organization in the United States including the American Medical Association, the American Psychological Association, the American Psychiatric Association, and the Endocrine Society.

34. While gender-affirming care for minors has been debated in public discourse, that is not the case regarding such care for adults. And there is no debate or controversy within the medical and mental health fields about the necessity and efficacy of social transition and hormone therapy for the treatment of adults with gender dysphoria. As I have explained, decades of research and clinical experience have shown the benefits of gender-affirming care—including social transition and hormone therapy—to individuals with gender dysphoria and there are no other treatments that have been shown to be effective.

35. The Memorandum asserts that other countries and organizations are "reevaluating their clinical guidance for patients suffering from gender dysphoria, in light of recent debate." (Memorandum at 2). While government entities in some countries have urged caution in providing gender-affirming care for *minors* with gender dysphoria, none of those countries have moved away from gender-affirming care for adults. The Memorandum suggests, without basis that UCSF's announcement of a forthcoming revision of their guidelines means they are shifting away from gender affirming care. The UCSF guidelines, which I helped develop, are over 10 years old and it is the norm to periodically update clinical practice guidelines as the field accumulates more knowledge, as was done with the Endocrine Society Guideline and the WPATH SOC. A revision does not indicate a retreat from recommended best practices. I am not aware of any clinical practice guidelines for gender dysphoria that are shifting away from or questioning the effectiveness of hormone therapy for adults with gender dysphoria.

**D. The fact that social transition involves everyday items like clothing does not mean it is not medically necessary.**

36. Dr. Kaliebe claims that social transition is not medically necessary because, he says, "as can be seen from the list of activities related to social transition [--such as altering

appearance and expression and changing one's name and pronouns]—none are related to healing medical illness or disease." (Kaliebe Dec. pars. 131, 132) He seems to be suggesting that when treatment is for a mental health condition, it can never be medically necessary. But there are medically necessary interventions for many mental health conditions. And medically necessary interventions—whether for physiological or mental health conditions—can include not only medications but also other interventions such as prosthetic devices, particular clothing, and behavioral interventions. For example, people with orthopedic issues may have a medical need to wear certain types of shoes even though a doctor's prescription isn't needed to purchase these items. Diabetics have a medical need to eat sugar when their blood glucose is low even though they don't need a doctor's prescription to get juice or candy. And medically necessary treatment for eating disorders may include lifestyle/behavioral interventions focused on changing how one eats. The fact that there is no medication prescription does not make an intervention any less medically necessary.

**E. The fact that an individual with gender dysphoria is incarcerated does not remove their medical need to socially transition or be treated with hormone therapy and does not make such care ineffective.**

37. The Memorandum and Kaliebe Declaration say there is a lack of evidence that social transition or hormone therapy are effective at treating gender dysphoria if the patient is incarcerated. The Memorandum states that "[e]ven if there is some reliable evidence that social accommodations address gender dysphoria when the individual is in society at large," that does not apply to the correctional environment. Memorandum at 13. Dr. Kaliebe asserts that there is a lack of studies in the carceral setting that would support hormone therapy for inmates with gender dysphoria. (Kaliebe Dec. par. 83). But there is no basis for the speculation that treatments that have been shown to be effective treatments for gender dysphoria would be

ineffective if the patient is incarcerated. Gender dysphoria is an internal sense of incongruity between assigned gender and experienced gender and the distress that comes from that. The prison environment does not change it.[4]

38. Dr. Kaliebe points to incarcerated people having "histories, characteristics, and vulnerabilities that differ substantially from community-dwelling people with Gender Dysphoria" (Kaliebe Dec. par. 141) and he says that the concept of socially transitioning through accommodations, hormones or surgery is "out of place in the correctional context because an inmate does not live in society at large but a security prison environment." (Kaliebe Dec. par. 142) But none of this explains why this treatment should be presumed to be ineffective for patients in prison. Nothing in Dr. Kaliebe's Declaration offers a medically-based explanation for denying this care to individuals because they are incarcerated.

39. My own experience with patients who are incarcerated is at odds with Dr. Kaliebe's speculation that gender-affirming care is not effective in the prison context. As a consultant for the California Department of Corrections and Rehabilitation, the California Department of State Hospitals (forensic psychiatric hospitals), and the Alameda County jails, I reviewed the medical files of many patients with gender dysphoria, most of whom were receiving hormone therapy and social transition accommodations. And as an expert witness in a cases in Colorado and Washington, I evaluated eight incarcerated people with gender dysphoria who were receiving those interventions. For these patients, as with people with gender dysphoria in the community, these treatments helped alleviate gender dysphoria and improve mental health.

[4] It is worth noting that it can be difficult to do studies in prison because of the ethical issues in obtaining consent in that context in which they may not have the free will to refuse consent without consequences. (Knight 2012) And there is no need to wait for studies on incarcerated people before a medical treatment is used in prisons.

40. While the Memorandum and Dr. Kaliebe assert that gender-affirming care for gender dysphoria is inappropriate in the prison environment, the National Commission on Correctional Health Care—the organization that develops nationally-recognized standards for health services in jails and prisons—supports hormone therapy and social transition accommodations for incarcerated people with gender dysphoria. *See* Position Statement: Transgender and Gender Diverse Health Care in Correctional Settings, National Commission on Correctional Health Care, available at https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf.

**F. There is no evidence that psychotherapy or psychotropic medications are effective treatments for gender dysphoria.**

41. The Program Statement prohibits well-established treatments for gender dysphoria and, instead, provides for psychotherapy and psychotropic medications despite the absence of any evidence that these interventions are effective treatments for gender dysphoria.

42. The Memorandum asserts that "[p]sychotherapy is a well-known and well-established treatment for gender dysphoria," Memorandum at 29, referencing Dr. Kaliebe's Declaration. But neither the Memorandum nor the Kaliebe Declaration provide any studies finding that psychotherapy effectively treats gender dysphoria as a substitute for medical intervention. That is because there are none.

43. For decades, psychotherapy was attempted to try to alleviate gender dysphoria without success. (Brown, 1960) No studies have shown it to be effective. Dopp, et al. 2024 found that psychotherapy aimed at trying to resolve gender incongruence was not effective and

associated only with harm.[5]

44. There are no established psychotherapeutic protocols for the treatment of gender dysphoria.

45. In my experience with patients in the years before medical transition was widely available, many patients with gender dysphoria underwent psychotherapy for years and did not experience relief until they were able to medically transition.

46. This is not to say that psychotherapy can't be helpful in other ways for individuals with gender dysphoria. It can be important to address comorbidities, to help the patient come to understand their gender identity, and to provide support. But it cannot alleviate distress due to gender incongruence.

47. To the extent the goal of psychotherapy is to encourage identification with a person's assigned sex at birth, the American Psychological Association has stated that such efforts are not effective and instead do harm. (APA, 2021).

48. Given that the Program Statement prohibits the evidence-based treatments that exist for gender dysphoria and replaces them with treatments for which there is no evidence of efficacy, there is no basis for Dr. Kaliebe's assertion that "psychotherapy is the preferred treatment for gender dysphoria," (Kaliebe Dec. p. 14), or the claim in the Memorandum that the Program Statement "is more aligned with the latest scientific information." (Memorandum at 3)[6]

---

[5] For this reason, Dr. Kaliebe's speculation that the benefits seen in those being treated with hormone therapy could be due to psychosocial support patients may receive while being provided treatment (Kaliebe Dec. par. 91) is without basis. *See also* Kaltiala 2020 (patients who had already been receiving mental health care treatment prior to hormone therapy for suicidality, depression, and anxiety saw significant improvement in those symptoms after being treated with hormone therapy).

[6] Dr. Kaliebe also asserts without any basis that social transition "may undermine an individual's desire to participate in psychotherapy," which he says can provide relief of gender-related distress. (Kaliebe Dec. par 135) As I discussed, no psychotherapy protocol resolves gender

**G. There is no basis for the assertion in the Memorandum and Kaliebe Declaration that making gender-affirming care available to those who need it would reward threats of self-harm and that prohibiting such care may reduce self-harm.**

49. The Memorandum, relying on Dr. Kaliebe's Declaration, says that one of the reasons for prohibiting gender affirming care is that it "avoids rewarding threats of self-harm and may reduce overall self-harm." (Memorandum at 16; Kaliebe Dec. pars 148-50). This is one of the most bizarre justifications I've seen for denying care. Self-harm is one of the manifestations of the distress of gender dysphoria among some people who are unable to access treatment, including in prisons. Long-term incarceration with limited access to gender affirming care has been associated with a much elevated risk of suicide attempts. (Drakeford 2018) This is consistent with my clinical experience. One of my patients who was being held in a state psychiatric hospital after being convicted of a crime experienced such distress from the denial of gender-affirming care that he attempted to cut off his breasts. But there is no logical basis to conclude that if treatment *is available* to those who need it, people will engage in self-harm to access care. If care is being provided based on assessment of the patient's condition and need for treatment, there should be no reason patients would resort to self-harm as a plea for care. The notion that withholding care could reduce self-harm is, thus, nonsensical. Research and clinical experience make clear that the opposite is true.

---

dysphoria, but therapy can be important for comorbidities. It is illogical to speculate that people who would otherwise seek psychotherapy to treat depression, anxiety or other comorbidities would not do so if permitted to socially transition. And this speculation is at odds with my experience as many of my patients are socially transitioned and also participating in psychotherapy.

**H. Dr. Kaliebe's declaration demonstrates a lack of understanding of gender dysphoria and its treatment.**

50. The Memorandum relies heavily on the Kaliebe Declaration to support its asserted justifications for the policy. But Dr. Kaliebe's declaration reflects a significant lack of understanding of gender dysphoria and its treatment.

51. First, Dr. Kaliebe's declaration reflects a personal idiosyncratic view of gender dysphoria that is at odds with how this condition is understood within the field of psychiatry. He claims that gender dysphoria is a "temporary" disorder that is not likely to be long-lasting if a patient is not provided gender affirming care (Kaliebe Dec. par. 38), which he claims can prolong gender dysphoria (Kaliebe Dec. par. 133). There is no basis for these assertions.

52. Dr. Kaliebe does not provide any support for his claim that "most" cases of gender dysphoria are not long-lasting and there is none, particularly with respect to adults. Some who oppose gender-affirming care for minors have argued that research shows that gender dysphoria in children tends to resolve on its own as they grow up. That is a misreading of that research, which does not actually look at children diagnosed with gender dysphoria, but rather, whether gender non-conforming children grow up to be transgender. But even if one accepted that reading, it has no bearing on adults. Dr. Kaliebe cites no evidence that gender incongruence in adults is likely to resolve on its own, and there is no such evidence. To the contrary, it is widely recognized that when gender incongruence persists past childhood and into adolescence and adulthood, it is highly unlikely to desist. (Zucker et al. 2010; van der Loos, et al 2022). Withholding gender-affirming care as Dr. Kaliebe suggests does not make gender incongruence go away. It only increases suffering by denying treatment that is known to alleviate the distress of gender dysphoria.

53. Dr. Kaliebe's claim that gender affirming care can prolong gender dysphoria in

adults is similarly based on a misreading of inapplicable research on children. He points to research he claims shows that "social transition appears to prolong transgender identification and continue Gender Dysphoria." (Kaliebe Dec. par. 133-134). The studies he cites found that most youth who socially transitioned continued to identify as transgender at follow up. But they did not demonstrate that social transition causes continued transgender identification. One of those studies, Steensma 2013, found that subjects with the most severe gender dysphoria were the ones who socially transitioned and also the ones who were more likely to continue to identify as transgender. In any case, however one interprets this research on children, as noted, gender incongruence in adults is highly unlikely to desist. Thus, withholding gender-affirming care will not promote a cisgender identification; it will cause unnecessary suffering.

54. Further reflecting what appears to be a lack of experience with gender dysphoria, Dr. Kaliebe speculates that because psychotherapy can be effective for body dysmorphic disorder and eating disorders, it could be effective for gender dysphoria. But as discussed, psychotherapy to resolve gender dysphoria was tried for decades and not found to be effective. Kaliebe's assertion that psychotherapy is helpful for other disorders does not change the fact that psychotherapy is ineffective in resolving gender dysphoria.

55. In addition to his lack of understanding of gender dysphoria, Dr. Kaliebe appears to have a profound misunderstanding of gender-affirming care as he offers a description of such care that bears no resemblance to the widely accepted protocols for treatment. He refers to the "affirmation model" of care, implying that what he describes is an accepted mode of treatment, but the model he describes is not what is recommended by the WPATH SOC 8 or the Endocrine Society Guideline or any other well-accepted guideline for treatment of gender dysphoria.

56. First, Dr. Kaliebe says the so-called "affirmation model" of care "promotes

affirmation of the transgender identity immediately and decisively." (Kaliebe Dec. par. 35) Neither WPATH nor the Endocrine Society suggest such treatment. As WPATH has explained: "Treatment is available to assist people with such distress to explore their gender identity and find a gender role that is comfortable for them . . . . Treatment is individualized: What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change in gender expression or body modifications." (Coleman, et al., 2012) Psychotherapy, therefore, should be respectful of the patient and allow them the space to explore or express their gender identity, without preconceptions imposed by the therapist: "[Mental health providers] working with transgender people should use active listening as a method to encourage exploration in individuals who are uncertain about their gender identity. Rather than impose their own narratives or preconceptions, MHPs should assist their clients in determining their own path." (Coleman, et al., 2022 p.S171) Contrary to Dr. Kaliebe's assertion, "questions about the patients' self-identification" are not "viewed as hostile and potentially harmful to the patient" (Kaliebe Dec. par. 37), if these questions are part of a respectful process of helping the patient explore their gender, as opposed to an effort by a therapist to suppress the patient's gender expression or to attempt to change their identity.

57. Next, contrary to what Dr. Kaliebe suggests, the prevailing treatment protocols do not ignore comorbidities or shun psychotherapy. (Kaliebe Dec. pars. 32-35) Addressing comorbidities is part of care. Psychotherapy is important to address comorbidities as well as to help patients better understand their gender identity. WPATH SOC 8 states that the health professional should be licensed and trained in identifying gender dysphoria as well as co-existing mental health and psychosocial concerns. (Coleman et al., 2022, at S32) As a psychiatrist working with transgender patients with co-occurring mental illness, treating co-morbidities in

transgender people has been my life's work.

58. Finally, the prevailing treatment protocols do not "minimize discussion of" potential risks. (Kaliebe Dec. par. 37). Hormone therapy is not provided without patients first being informed of the potential risks as part of the informed consent process and treating doctors will not offer such treatment unless they have concluded after weighing the risks and benefits of care that treatment is appropriate.

59. In sum, Dr. Kaliebe creates a straw man by providing a false description of care under the prevailing protocols and then attacks it. He either misunderstands the prevailing protocols or assumes, without basis, that clinicians providing care to patients with gender dysphoria disregard them.

**I. The Memorandum and Kaliebe Declaration's attempt to attack the professional medical organizations' support for gender-affirming care is unsupported.**

60. The Memorandum and Kaliebe Declaration attempt to cast doubt on the integrity of the major American medical organizations, all of which support gender-affirming care for the treatment of gender dysphoria. They do this this by making a range of allegations about WPATH and the SOC 8 and arguing that all of the other major medical groups' positions are tainted by WPATH. Even if there were such a conspiracy encompassing all of the major medical organizations in the country, that would not change the fact that decades of research and clinical experience demonstrate the effectiveness of gender-affirming care at alleviating gender dysphoria, and the absence of any other evidence-based treatments. But there is no basis for these allegations and I will address some of the key problems with these claims.

61. The Memorandum, relying largely on Dr. Kaliebe's Declaration, asserts that WPATH makes treatment recommendations based on ideology rather than science, suppresses

evidence, and used inappropriate methodology used in developing SOC 8. As I discussed in my Initial Declaration, WPATH's SOC 8 was developed by experts in the field using a well-accepted rigorous process. Kaliebe falsely states that WPATH Standards of Care 8 did not follow the Institute of Medicine's recommendations. They did, as I discussed in my initial declaration.

62. Dr. Kaliebe attempts to discredit the WPATH SOC by discussing cherry-picked excerpts of a document production from WPATH in the case *Boe v. Marshall* (M.D. Ala.) to make assertions about WPATH and its process for developing SOC 8. (Kaliebe Dec. pars. 62, 63) Dr. Kaliebe had access to the documents in the case, most of which remain under seal, because he served as an expert witness in the case. I also served as an expert witness in the case and had access to the same document production. His reliance on select out-of-context excerpts from a production containing thousands of pages of documents does not permit the conclusions that he draws. Nor do his conclusions gain validity by the fact that some opinion writers who have long opposed gender-affirming care and a non-scientific magazine (without an identified author) offered similar commentary about the WPATH document production. (Kaliebe Dec. par. 62)

63. Dr. Kaliebe also relies on a publication called "The WPATH Files," which similarly tries to cobble together a disparaging narrative of WPATH based on excerpts of communications among WPATH members on a clinical care message board. As I discussed in my Second Declaration, this misleading presentation was created by a journalist and activist opposed to gender-affirming medical care and published on an advocacy organization's website.

64. Dr. Kaliebe suggests that the involvement of members of other professional medical groups in the development of the WPATH SOC is a flaw that makes the other

professional groups' guidelines tainted by WPATH's SOC. (Kaliebe Dec. par. 74) This reflects a misunderstanding of WPATH as a multidisciplinary organization. WPATH enlists experts from the relevant fields, including endocrinology and psychology, to develop its clinical guidelines for patients with gender dysphoria. Contrary to Dr. Kaliebe's implication, WPATH is not dictating guidelines for other professional groups to follow; rather, WPATH's guidelines are developed based on the expertise of members of those fields. WPATH exists to coordinate educational and scientific sessions as well as to periodically release practice guidelines. WPATH's SOC is a reflection of the expertise and experience clinicians and academics who practice and study transgender health care around the world. It is therefore unsurprising that those groups' guidelines would agree with WPATH's recommendations.

65. The provision of gender-affirming care for adults around the world is not based solely on WPATH's guidelines; it has been practiced globally for decades, even preceding the first WPATH Standards of Care in 1979. This care has been provided and considered beneficial for over 70 years, and fabricated controversies about WPATH does not change this fact.

66. The Memorandum's reliance on the United States Department of Health and Human Services report "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices," Nov. 19, 2025, to support its attack on the scientific integrity of WPATH and all of the major medical groups that support gender-affirming should not be given any credence. This publication was mandated by President Trump's Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation" ("EO 14187"). EO 14187 refers to gender-affirming medical care as "dangerous" treatment that is "maiming" and "mutilat[ing]" children, and directs HHS to take action to "end the chemical and surgical mutilation of children." In this same EO, the President directed HHS to "publish a review of the existing literature and best

practices for promoting the health of children who assert gender dysphoria . . . ." That the report comes out against gender-affirming medical care for minors is, thus, hardly surprising. Moreover, the authors selected by HHS had publicly been on record opposing such care or transgender rights more generally. And most do not have experience treating transgender people because they are not licensed clinicians.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of April, 2025

Dan H. Karasic

Bibliography

American Psychological Association (2021). APA Resolution on Gender Identity Change Efforts, https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

Baker, K, et al (2021). Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society*, 5(4), 1-16.

Brown, D., Psychosexual Disturbances: Transvestism and Sex-Role. Source: Marriage and Family Living, Vol. 22, No. 3 (Aug., 1960), pp. 218-227. Published by: National Council on Family Relations. Stable URL: http://www.jstor.org/stable/347641.

Coleman, E., et al (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, 23(Suppl 1), S1–S259.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS one*, 6(2), e16885.

Dopp, Alex R., et al (2024). Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research. Santa Monica, CA: RAND Corporation. https://www.rand.org/pubs/research_reports/RRA3223-1.html.

Drakeford L. (2018). Correctional Policy and Attempted Suicide Among Transgender Individuals. *J Correct Health Care*. 2018 Apr;24(2):171-182.

Glintborg, D., et al. (2023). Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study. *European Journal of Endocrinology*, 189(3), 336-345.

Howick J, et al (2022). Most healthcare interventions tested in Cochrane Reviews are not effective according to high quality evidence: a systematic review and meta-analysis. *J Clin Epidemiol*. 2022 Aug;148:160-169.

Haupt et al, "Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women," 11 Cochrane Database of Systematic Reviews, Art. No. CD013138 (2020).

James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). Early Insights: A Report of the 2022 U.S. Transgender Survey. National Center for Transgender Equality, Washington, DC.

Kaltiala, R, et al. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, 74, 213–219.

Knight K, Flynn PM. Clinical trials involving prisoners: a bioethical perspective. *Clin Investig*.

(Lond). 2012;2(12):1147-1149.

Miroshnychenko, A., et al. (2025). Gender affirming hormone therapy for individuals with gender dysphoria aged < 26: a systematic review and meta-analysis. *Archives of Disease in Childhood*, 110(6), 437-445.

National Commission on Correctional Health Care, Position Statement: Transgender and Gender Diverse Health Care in Correctional Settings, available at https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf.

Pfafflin, F., & Junge, A. (1998). Sex reassignment: Thirty years of international follow-up studies after sex reassignment surgery, a comprehensive review, 1961-1991. (Jacobson & Meir, trans.).

Steensma, T., et al. (2013). Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study, *Journal of the American Academy of Child & Adolescent Psychiatry*, Volume 52, Issue 6, 2013, Pages 582-59.

United States Department of Health and Human Services report "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices," Nov. 19, 2025.

van der Loos, M. A. T. C., et al. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. *The Lancet. Child & adolescent health*, 6(12), 869–875.

Zucker, K., et al (2010) Puberty-Blocking Hormonal Therapy for Adolescents with Gender Identity Disorder: A Descriptive Clinical Study, *Journal of Gay & Lesbian Mental Health*, 15:1, 58-82.

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al.,<br>Plaintiffs,<br>v.<br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al.,<br>Defendants. | Case No. 1:25-cv-00286-RCL |
| JANE JONES, et al.,<br>Plaintiffs,<br>v.<br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al.,<br>Defendants. | Case No. 1:25-cv-00401-RCL |
| MARIA MOE, et al.,<br>Plaintiffs,<br>v.<br>DONALD TRUMP, in his official capacity as President of the United States, et al.,<br>Defendants. | Case No. 1:25-cv-00653-RCL |

**DECLARATION OF RANDI ETTNER, PHD, IN SUPPORT OF PLAINTIFFS' MOTION FOR A TRO AND PRELIMINARY INJUNCTION**

**DECLARATION OF RANDI ETTNER, Ph.D.**

I, Randi Ettner, Ph.D., state as follows:

## I. Qualifications and Basis for Opinions.

1. I am a licensed clinical and forensic psychologist with a specialization in the diagnosis, treatment, and management of individuals with gender dysphoria. I received my doctorate in psychology (with honors) from Northwestern University in 1979. I am a Fellow and Diplomate in Clinical Evaluation of the American Board of Psychological Specialties, and a Fellow and Diplomate in Trauma/Post-Traumatic Stress Disorder. A copy of my *curriculum vitae* is attached as Exhibit A.

2. I have evaluated, diagnosed, and treated over 3,000 individuals with gender dysphoria from 1980 to the present. I have published four books related to the treatment of individuals with gender dysphoria, including the medical text entitled *Principles of Transgender Medicine and Surgery* (Monstrey & Coleman, co-eds., 2d ed. 2016). I am currently under contract to produce the 3rd edition of this text. In addition, I have authored numerous articles in peer-reviewed journals regarding the provision of health care to the transgender population. I have served as a member of the University of Chicago Gender Board, and I am on the editorial boards of The International Journal of Transgenderism and the International Journal of Transgender Health. I am a past Secretary and have previously served as a member of the Board of Directors of the World Professional Association of Transgender Health (WPATH) for twelve years. I have lectured throughout North America, Europe, South America and Asia on topics related to gender dysphoria and have given grand rounds on gender dysphoria at university hospitals. I am the honoree of the externally funded Randi and Fred Ettner Fellowship in Transgender Health at the University of Minnesota. I have been an invited guest at the National Institutes of Health to participate in developing a strategic research plan to advance the health of sexual and gender minorities, and in November 2017 was

invited to address the Director of the Office of Civil Rights of the United States Department of Health and Human Services regarding the medical treatment of gender dysphoria. I received a commendation from the United States Congress House of Representatives on February 5, 2019, recognizing my work for WPATH.

3. I am familiar with and have knowledge of all aspects of medical treatment for gender dysphoria, including the administration of hormones. The treatment of gender dysphoria is multi-disciplinary, involving regular interaction and communication between psychologists, primary care physicians, endocrinologists, surgeons and other health care providers. To be a clinician as deeply involved as I have been for decades in the care of patients with gender dysphoria, I must maintain an accurate, detailed, and up-to-date understanding of the medical treatments for gender dysphoria. I participate in a regular multidisciplinary meeting of providers, including endocrinologists, to discuss and evaluate client cases, treatment decisions, challenges, and outcomes. Through this meeting and other similar professional endeavors, I understand how the administration of hormone therapy will affect my patients. I have evaluated clients' readiness and need for the initiation of gender transition medical interventions, including hormone therapy, and worked with clients who have been on long-term hormone replacement therapy.

4. I have decades of active involvement in the professional community of multidisciplinary experts who have researched and studied gender dysphoria. WPATH has implemented a Global Education Initiative to train providers about the medical and mental health aspects of gender dysphoria. I was part of the development of this curriculum. I and others were then trained by leading medical experts to teach the curriculum, including sections on the endocrine system, hormone therapy, surgery, and mental health.

5. I have significant experience related to the evaluation of transgender individuals in prison, including determinations of necessary medical treatment for gender dysphoria and safe and appropriate housing placement. I have evaluated over 100 transgender individuals confined in correctional and detention facilities in 26 states, including in state and federal prisons, immigration detention centers, and forensic psychiatric hospitals. I was a consultant to two prison systems about their medical policies for transgender prisoners. I co-authored the chapter on institutionalized persons for the eighth version of the *WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (the "WPATH SOC 8") published in 2022 and have written a book chapter on healthcare for transgender prisoners. I have lectured widely on that subject.

6. My opinions are based on my education and training; my experience evaluating, diagnosing and treating individuals with gender dysphoria, including in the corrections context; the medical and research literature on transgender health and medical care; and my communications and interactions with other clinicians and leading experts on transgender health and medical care.

7. I am being compensated at the hourly rate of $400.00 plus expenses for my time spent preparing this report and subsequent declaration. I will be compensated $600.00 per hour for any pre-deposition and/or pre-trial preparation and any deposition testimony or trial testimony. I will receive a flat fee of $2,500.00 for any travel time to attend a deposition or trial and will be reimbursed for reasonable out-of-pocket travel expenses incurred for the purpose of providing expert testimony in this matter. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

8. In the last four years, I have testified as an expert at trial or by deposition in the following cases: *Casey Perkins v. State of Montana*, No. DV-32-2025-282 Mont. Dist. Ct. (Missoula

County); *Wagoner v. Dahlstrom*, No. 3:18-cv-0211-RRB (D. Alaska); *Bernier v. Turbocam*, No. 1:23-cv-523-LM-AJ (D.N.H.); *Cordellione v. Commissioner, Dept. of Corrections*, No. 3:23-cv-135-RLY-CSW (S.D. Ill.); *Shawntee Anne Levy v. Robert Green*, No. 18-1291-TDC (D. Md.); *D.T. v. Christ*, No. 4:20-cv-484-JAS (D. Ariz.); *Kenautica Zayre-Brown v. North Carolina Dept. of Public Safety*, No. 3:22-cv-00191 (W.D.N.C.); *Roe v. Herrington*, No. 4:20-cv-00484-JAS 9 (D. Ariz.); *Diamond v. Ward*, No. 5:20-cv-00543 (M.D. Ga.); *Stillwell v. Dwenger*, No. 1:21-cv-1452-JRS-MPB (S.D. Ind.); *Letray v. Jefferson Cty.*, No. 20-cv-1194 (N.D.N.Y.); *C.P. v. BCBSIL*, No. 3:20-cv-06145-RJB (W.D. Wash.); *Kadel v. Folwell*, No. 1:19-cv-00272 (M.D.N.C.); *Iglesias v. Connor*, No. 3:19-cv-00415-NJR (S.D. Ill. 2021); *Monroe v. Jeffreys*, No. 3:18-CV-00156-NJR (S.D. Ill.); *Singer v. Univ. of Tennessee Health Sciences Ctr.*, No. 2:19-cv-02431-JPM-cgc (W.D. Tenn.); *Morrow v. Tyson Fresh Meats, Inc.*, No. 6:20-cv-02033 (N.D. Iowa); *Claire v. Fla. Dep't of Mgmt. Servs.*, No. 4:20-cv-00020-MW-MAF (N.D. Fla.); *Williams v. Allegheny Cty.*, No. 2:17-cv-1556 (W.D. Pa.); *Gore v. Lee*, No. 3:19-cv-00328 (M.D. Tenn.); *Eller v. Prince George's Cty. Public Sch.*, No. 8:18-cv-03649-TDC (D. Md.); *Monroe v. Baldwin*, No. 18-cv-00156-NIR-MAB (S.D. Ill.); *Gilbert v. Dell Technologies*, No. 19-cv-1938 (JGK) (S.D.N.Y. ); *Ray v. Acton*, No. 2:18-cv-00272 (S.D. Ohio); *Soneeya v. Turco,* No. 07-12325-DPW (D. Mass.); *Edmo v. ldaho Dep't of Corr.*, No. 1:17-cv-00151-BLW (D. Idaho).

## II. Hormone Therapy is an Effective and Essential Medical Intervention for Gender Dysphoria.

9. At birth, infants are classified as male or female. This classification becomes the person's birth sex. Most people live as their birth sex.

10. An individual who cannot live and function in their birth sex is transgender.

11. A transgender woman is an individual whose birth sex was male but who cannot live and function in her birth sex.

12. Gender dysphoria is a medical diagnosis characterized by clinically significant distress or impairment in functioning which results when a person cannot live and function in their birth sex.

13. Gender dysphoria is an established and recognized diagnosis in the field of medicine.

14. The diagnostic criteria for gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association ("DSM-5-TR"), the authoritative source in the field of medicine and psychology for the diagnosis of mental disorders.

15. The diagnostic criteria for Gender Dysphoria in Adolescents and Adults in DSM-5-TR are as follows:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated sex characteristics).
3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

16. Gender dysphoria is a serious medical condition that requires treatment.

17. Gender dysphoria is highly treatable and can be ameliorated or resolved through

medical treatment. The standards of care for the treatment of gender dysphoria are set forth in WPATH's Standards of Care, which have been issued since 1979. The current WPATH SOC 8 provide criteria for medical interventions to treat gender dysphoria, including hormone treatment and surgery when medically indicated.

18. Without treatment, many people with gender dysphoria are unable to adequately function and are at increased risk for debilitating physical and mental distress, including depression, anxiety, self-harm, and suicidality. In extreme situations, people may also attempt self-surgery, although this is almost exclusively something that happens in institutionalized settings.

19. For a transgender woman with gender dysphoria, a key goal of medical interventions is to eliminate the distress of gender dysphoria by changing her primary and secondary sex characteristics so that she can live and function as a woman. When medically indicated for individual patients, hormone therapy is essential to achieve this feminization. If this goal is impeded, it will undermine an individual's psychological health and ability to function.

20. Major medical and mental health organizations support medical interventions for gender dysphoria, including hormones, as safe, effective and medically necessary. *See, e.g.*, *Clarification of Evidence-Based Gender-Affirming Care*, Pol'y No. H-185.927, Am. Med. Ass'n (2024), https://policysearch.ama-assn.org/policyfinder/detail/%22Clarification%20of%20Evidence-Based%20Gender-Affirming%20Care%22?uri=%2FAMADoc%2FHOD-185.927.xml ("Our American Medical Association recognizes that medical and surgical treatments for gender dysphoria and gender incongruence, as determined by shared decision making between the patient and physician, are medically necessary as outlined by generally-accepted standards of medical and surgical practice."); Am. Psychiatric Ass'n, *APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing*

*Misinformation, and the Role of Psychological Practice and Science* 2 (Feb. 2024), https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf (noting "the comprehensive body of psychological and medical research supporting the positive impact of gender-affirming treatments")[1]; Am. Psychological Ass'n, Task Force on Gender Identity and Gender Variance, *Report of the Task Force on Gender Identity and Gender Variance* 32 (2009), https://www.apa.org/pi/lgbt/resources/policy/gender-identity-report.pdf (noting that "[f]or individuals who experience such distress, hormonal and/or surgical sex reassignment may be medically necessary to alleviate significant impairment"); *Gender Dysphoria/Gender Incongruence Guideline Resources*, Endocrine Soc'y (Oct. 25, 2024), https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence (reaffirming Endocrine Society guidance that people with gender dysphoria "should receive a safe and effective hormone regimen that will suppress the body's sex hormone secretion, determined at birth and manifested at puberty, and maintain levels of sex steroids within the normal range for the person's affirmed gender")[2]; Am. Coll. of Obstetricians and Gynecologists, Cmte. Op. No. 823, *Health Care for Transgender and Gender Diverse Individuals*, 137 Obstetrics & Gynecology e75, e76 (2021) ("The majority of medications used for gender transition are common and can be safely prescribed by a wide variety of health care professionals with appropriate training and education . . . ."); MaryAnn Dakkak, Am. Fam. Physician Practice Guidelines, *Caring for Transgender and Gender-Diverse People:*

---

[1] *See also* Jack Drescher & Ellen Haller, Am. Psychiatric Ass'n Official Actions, *Position Statement on Access to Care for Transgender and Gender Diverse Individuals* 1 (Jul. 2018), https://www.psychiatry.org/getattachment/d3ef4763-8a0e-4da3-ab01-efe932ca9478/Position-2018-Access-to-Care-for-Transgender-and-Gender-Diverse-Individuals.pdf.

[2] *See also Endocrine Society Statement in Support of Gender-Affirming Care*, Endocrine Soc'y (May 8, 2024), https://www.endocrine.org/news-and-advocacy/news-room/2024/statement-in-support-of-gender-affirming-care; Wylie C. Hembree et al., 102 J. Clin. Endocrinol. Metab. 3869 (2017) (clinical practice guidelines).

*Guidelines from WPATH*, 108 Am. Fam. Physician 626, 627 (2023) ("Gender-affirming treatments show positive mental and physical health impacts in patients with persistent gender incongruence who meet the diagnostic criteria for gender dysphoria.").

21. There is extensive scientific and medical research demonstrating that hormone therapy is effective and when indicated based on an individualized patient assessment, medically necessary for the treatment of gender dysphoria. Some recent examples of this significant body of medical research include: Shelemy et al. (2024) (systematic review of 29 studies with a total of 2,789 participants demonstrating that hormone therapy is associated with significant improvements in mental health, especially depression)[3]; Van de Grift et al. (2024) (study of individuals on waiting list for hormone therapy concluded that delayed access is associated with increased depression, anxiety and hopelessness and worsening gender dysphoria; study strongly supports that delays are associated with harm, not neutrality)[4]; Van Leerdam et al. (2023) (systematic review of 38 studies demonstrating that hormone therapy is generally associated with reductions in gender dysphoria and psychological distress)[5]; Baker et al. (2021) (systematic review of 20 studies showing that

---

[3] Shelemy, L., Cotton, S., Crane, C., & Knight, M. (2024). Systematic review of prospective adult mental health outcomes following affirmative interventions for gender dysphoria. *International Journal of Transgender Health* (Print), 1–21. https://doi.org/10.1080/26895269.2024.2333525.

[4] van de Grift, T. C., Martens, C., van Ginneken, L., & Mullender, M. G. (2024). Waiting for transgender care and its effects on health and equality: a mixed-methods population study in the Netherlands. *eClinicalMedicine*, *73*, 102657–102657. https://doi.org/10.1016/j.eclinm.2024.102657

[5] van Leerdam, T. R., Zajac, J. D., & Cheung, A. S. (2021). The Effect of Gender-Affirming Hormones on Gender Dysphoria, Quality of Life, and Psychological Functioning in Transgender Individuals: A Systematic Review. *Transgender Health*, 8(1). https://doi.org/10.1089/trgh.2020.0094

hormone therapy is consistently associated with improved quality of life (QOL[6]))[7]; Rowniak et al. (2019) (study participants prescribed hormone therapy had statistically significant scores demonstrating improvement in quality of life, anxiety and depression)[8]; Nobili et al. (2018) (overall, transgender people display poorer QOL than the general population prior to hormone therapy and improvements in QOL, especially mental health and social functioning, after hormone therapy)[9]; Murad et al. (2010) (meta-analysis totaling 1,833 subjects demonstrating improvements in gender dysphoria, psychological functioning and comorbidities).[10]

22. The scientific and medical research literature demonstrating the safety and efficacy of hormone therapy in patients with gender dysphoria is consistent with my own clinical experience

---

[6] In psychological research "Quality of Life" refers to an individual's overall well-being and functioning, including psychological health, emotional stability, social functioning, physical health, and ability to carry out daily activities. In the correctional context, QOL is particularly important because incarcerated individuals have limited autonomy, limited ability to avoid stressors, and limited access to protective supports. When gender dysphoria is untreated or hormone therapy is denied, deterioration in QOL may reflect clinically significant worsening of mental health, safety, functioning, and ability to tolerate the prison environment. For that reason, studies showing improvements in QOL after hormone therapy are directly relevant to whether hormone therapy is medically necessary and effective for incarcerated individuals with gender dysphoria.

[7] Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone Therapy, Mental Health, and Quality of Life among Transgender People: A Systematic Review. *Journal of the Endocrine Society*, *5*(4). https://doi.org/10.1210/jendso/bvab011

[8] Rowniak, S., Bolt, L., & Sharifi, C. (2019). Effect of cross-sex hormones on the quality of life, depression and anxiety of transgender individuals. *JBI Database of Systematic Reviews and Implementation Reports*, 17(9), 1826–1854. https://doi.org/10.11124/jbisrir-2017-003869

[9] Nobili, A., Glazebrook, C., & Arcelus, J. (2018). Quality of life of treatment-seeking transgender adults: A systematic review and meta-analysis. *Reviews in Endocrine & Metabolic Disorders*, 19(3), 199–220. https://doi.org/10.1007/s11154-018-9459-y

[10] Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J., & Montori, V. M. (2010). Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology*, 72(2), 214–231. https://doi.org/10.1111/j.1365-2265.2009.03625.x

with thousands of patients over more than four decades.

23. The standards and protocols for the medical management of gender dysphoria do not change because a person is incarcerated. The disease process and efficacy of medically indicated treatments are the same, as they are for all other health conditions.

24. The denial of hormone therapy for an individual for whom it is medically indicated will result in severe harm. These individuals would experience increased and protracted gender dysphoria with its well-established attendant consequences, including anxiety, depression, post-traumatic stress disorder (PTSD), self-harm, potentially self-surgery, or suicide. The most predictive factor of a person completing suicide is prior suicide attempts. For people with a history of multiple attempts, method-switching is also highly predictive of a completed suicide (*e.g.* overdosing on pills, attempts at hanging, or artery cutting, etc.)

25. The termination and withdrawal of feminizing hormone therapy will also inflict severe physical and psychological harm. These individuals will experience a resurgence of gender dysphoria and regress in the treatment of their disease. Many individuals who have been feminized with female hormones and the suppression of testosterone will experience the reversal of physical changes, such as the loss of breast tissue, and a return of testosterone driven male features. This will be psychologically devastating for those individuals who will be at even greater risk for self-harm and suicidality.

26. The withdrawal of feminizing hormone therapy will also have profoundly injurious physiological consequences. Taking a transgender woman off medically indicated hormones is like taking a diabetic person off insulin. Hormones are sex steroids that affect every organ in the body and cross the blood-brain barrier. Hormones affect brain chemistry, bone metabolism, cardiovascular physiology, body composition, the endocrine system, and metabolic systems including

insulin sensitivity and lipid profiles. Even with tapering, the withdrawal of feminizing hormones would be physiologically dangerous. In such individuals one would expect to see massive physiological dysregulation, including fluid retention, increased risk of hypertension, immune system suppression, body composition changes, bone loss and osteoporosis, increased risk of cardiovascular events, neurological and cognitive impacts including mood instability, and, as noted above, increased gender dysphoria and the involuntary and forced return of male features.

27. For transgender women who have had an orchiectomy (the surgical removal of the testes), such surgery eliminates the body's main source of sex hormones. Termination of exogenous estrogen, and their inability to produce testosterone, in such cases will result in severe harm, including impaired immune function, muscular weakness, hypertension and hypoglycemia (leading to metabolic dysregulation and diabetes), electrolyte imbalance, osteoporosis, obesity, poor wound healing, severe fatigue, and depression. As explained above, hormones are sex steroids that affect every organ in the body and cross the blood-brain barrier. All people need sex steroids circulating in their bodies, whether from their own production or through exogenous hormones. Denying a post-surgical transgender woman estrogen would result in her having virtually no circulating hormones in her body.

28. For an individual with gender dysphoria for whom medical intervention, such as hormone therapy, is indicated, there is no evidence-based alternative treatment.

29. There is no recognized or effective psychiatric or psychological treatment for gender dysphoria. Gender dysphoria is not ameliorated by psychotherapy (or counseling) or psychiatric medications such as anxiolytics or antidepressant medications. Counseling or medications may be recommended by a health care provider to help an individual cope with the challenges of living with gender dysphoria, which include the all-too-frequent lack of access to appropriate standard

of care hormonal or surgical treatments. Neither psychotherapy nor medication cures or ameliorates the underlying medical condition.

**III. <u>The Severe Harm from Housing Transgender Women in Male Prisons</u>.**

30. Over the course of my career, I have evaluated over 100 transgender individuals confined in prisons and other detention settings. These evaluations have consistently demonstrated the profound psychological distress and physical danger experienced by transgender women housed in male facilities.

31. In my professional opinion, incarcerating transgender women in male facilities constitutes severe psychological hardship and exposes them to medically significant harm. Placement of a transgender woman in a male facility is consistently associated with severe trauma, development or exacerbation of PTSD, and long-term physical and psychological deterioration.

32. The placement of transgender women in male correctional facilities exposes them to an exceptionally elevated risk of sexual violence. The Bureau of the Justice Statistics reported that 35% of transgender inmates in state and federal prisons experienced sexual victimization in a single year, compared with 4% in the general inmate population. *See* U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates,* tbl. 1 (Dec. 2014). In addition, high percentages of transgender inmates have histories that compound their vulnerability to exploitation and trauma. A 2010 empirical study found that 70% of transgender inmates reported lifetime sexual victimization, 85% had been physically assaulted either inside or outside of custody, and nearly half had been homeless prior to imprisonment. Over two-thirds developed or experienced worsened mental health problems during incarceration. Sexton, L., Jenness, V., & Sumner, J. M. (2010). Where the Margins Meet: A Demographic Assessment

of Transgender Inmates in Men's Prisons. *Justice Quarterly*, *27*(6), 835–866. The high percentage of these risk factors comport with my own experience evaluating transgender inmates.

33. It is my opinion that a transgender woman who is being transferred from a women's prison to a men's prison is at even greater risk of sexual violence *because* she is coming from a women's prison. Based on my evaluation of transgender women in men's prisons, I have insight into the factors that create an increased risk of sexual violence. The more a person is perceived as authentically female the greater the risk of sexual assault and violence. When people determine whether someone is male or female, they rely constantly – and often unconsciously, on visual and behavioral signals, such as physical appearance, grooming, posture, and voice. People also make assumptions about gender from social context. A person housed in a women's prison is likely to be perceived as female. A transgender woman transferred from a women's prison is thus uniquely at risk because her history in a women's facility communicates to other inmates that she is, and has been recognized as, female. The very fact of her transfer thus increases her vulnerability as compared to a transgender woman who has been in a men's facility all along.

34. The incarceration of transgender women in men's prisons results in predictable and extreme harm. Constant exposure to threat creates an environment of perpetual fear and humiliation, leading to hypervigilance, self-injury, and potentially leading to suicide. For transgender women who have previously experienced abuse or victimization, placement in a men's facility constitutes direct re-exposure to trauma. The combination of physical threat, social degradation, and institutional powerlessness establishes the conditions under which PTSD and other psychiatric conditions are triggered or intensified.

35. Persistent trauma affects both the brain and body. PTSD is not a transient reaction but a chronic neurobiological condition that worsens over time. It involves dysregulation of the

brain's stress response circuitry resulting in persistent hyperarousal, intrusive memories, and physiological overactivation of the hypothalamic-pituitary-adrenal axis which generates excessive stress hormones. When trauma is repeated, as occurs when individuals with PTSD are re-exposed to coercive environments or threats, symptoms may become intractable resulting in chronic autonomic dysregulation, hypertension, immune dysfunction, and ultimately, endocrine dysregulation and impaired stress response. These physical and emotional sequelae are cumulative. In the context of incarceration, repeated victimization or exposure to constant threat can transform an already treatable condition into a permanent, disabling stress disorder.

## IV. My Assessments of Emily Doe, Lois Doe, Donna Jones, and Barbara Jones.

36. I reviewed BOP records provided to me by Plaintiffs' counsel for four of the Plaintiffs in this case: Emily Doe, Lois Doe, Donna Jones, and Barbara Jones. I have not met with any of these Plaintiffs or clinically evaluated them. I understand that additional documents are being produced to Plaintiffs' counsel on a rolling basis, which may include documents about these women. If other documents become relevant to my opinions, I reserve the right to supplement these opinions at an appropriate time.

37. As stated in more detail below, each of these four Plaintiffs has well-documented diagnoses of gender dysphoria with years of hormone therapy by the BOP ranging from 6 to 10 years. BOP clinicians have repeatedly documented their gender dysphoria and provided them with treatment. There is no medical or therapeutic reason to stop this care for any of these women. In fact, stopping that care is medically *contraindicated*. Hormone medication treats their gender dysphoria and there is no alternative intervention. Gender dysphoria is not ameliorated by psychotherapy (counseling) or psychiatric medications such as anxiolytics or antidepressant medications. Forcing

**MATERIAL UNDER SEAL DELETED**

these women to reverse the long-term effects of their hormone medication puts their physical and mental health in extreme risk of harm.

38. Moving these women to men's prisons will also result in foreseeable and predictable harms as described in more detail below.

39. The BOP's policy also implicates serious professional and ethical issues for its clinicians and staff. A policy requiring the cessation of medical care, without regard for medical need, forces BOP clinicians to disregard the medical standard of care and to knowingly expose their patients to harm. This places staff in an untenable position—either they follow the policy or they

---

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

MATERIAL UNDER SEAL DELETED

[redacted]

MATERIAL UNDER SEAL DELETED

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

MATERIAL UNDER SEAL DELETED

[redacted]

---

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of May, 2026

Randi Ettner, PhD

# EXHIBIT A

# RANDI ETTNER, PHD

## POSITIONS HELD

Clinical Psychologist
Forensic Psychologist
Fellow and Diplomate in Clinical Evaluation, American Board of Psychological Specialties
Fellow and Diplomate in Trauma/PTSD
President, New Health Foundation Worldwide
Past Secretary, World Professional Association for Transgender Health (WPATH)
Chair, Committee for Institutionalized Persons, WPATH
Global Education Initiative Committee Curriculum Development, WPATH
University of Minnesota Medical Foundation: Leadership Council
Psychologist, Center for Gender Confirmation Surgery, Weiss Memorial Hospital
Adjunct Faculty, Prescott College
Editorial Board, *International Journal of Transgender Health*
Editorial Board, *Transgender Health*
Television and radio guest (more than 100 national and international appearances)
Internationally syndicated columnist on women's health issues
Private practitioner
Adjunct Medical staff; Department of Medicine: Weiss Memorial Hospital, Chicago, IL
Advisory Council, National Center for Gender Spectrum Health
Global Clinical Practice Network; World Health Organization
Harvard Law School LGBTQ Clinic Leadership Council

## EDUCATION

| | |
|---|---|
| PhD, 1979 | Northwestern University (with honors) Evanston, Illinois |
| MA, 1976 | Roosevelt University (with honors) Chicago, Illinois |
| BA, 1969-73 | Indiana University<br>Bloomington, Indiana<br>Cum Laude<br>Major: Clinical Psychology; Minor: Sociology |
| 1972 | Moray College of Education<br>Edinburgh, Scotland<br>International Education Program |
| 1970 | Harvard University<br>Cambridge, Massachusetts Social Relations Undergraduate<br>Summer Study Program in Group Dynamics and Processes |

## CLINICAL AND PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2017-2026 | Psychologist: Weiss Memorial Hospital Center for Gender Confirmation Surgery |
| | Consultant: Walgreens; Tawani Enterprises; Starbucks, Rush University Medical Center |
| 2015-2017 | Private practitioner: clinical and forensic practice; Medical staff attending psychologist Advocate Lutheran General Hospital |
| 2013 | Instructor, Prescott College: Gender-A multidimensional approach |
| | ICD-11 Member of International Working Group |
| 2011 | Consultant to Wisconsin Public Schools |
| 2010 | President New Health Foundation Worldwide |
| 2000 | Instructor, Illinois School of Professional Psychology |
| 1995-present | Supervision of clinicians in counseling gender non-conforming clients |
| 1993 | Post-doctoral continuing education with Dr. James Butcher in MMPI-2 Interpretation, University of Minnesota |
| 1992 | Continuing advanced tutorial with Dr. Leah Schaefer in psychotherapy |
| 1983-1984 | Staff psychologist, Women's Health Center, St. Francis Hospital, Evanston, Illinois |
| 1981-1984 | Instructor, Roosevelt University, Department of Psychology: Psychology of Women, Tests and Measurements, Clinical Psychology, Personal Growth, Personality Theories, Abnormal Psychology |
| 1976-1978 | Research Associate, Cook County Hospital, Chicago, Illinois, Department of Psychiatry |
| 1975-1977 | Clinical Internship, Cook County Hospital, Chicago, Illinois, Department of Psychiatry |
| 1971 | Research Associate, Department of Psychology, Indiana University |
| 1970-1972 | Teaching Assistant in Experimental and Introductory Psychology Department of Psychology, Indiana University |

1969-1971 Experimental Psychology Laboratory Assistant, Department of Psychology, Indiana University

## INVITED PRESENTATIONS AND GRAND ROUNDS

*Evolution of Transgender Prisoners' Access to Health Care Behind Bars: 25 Years of Expert Witness Experience Using the WPATH SOC (Versions5-8).* WPATH 28th Scientific Symposium, Lisbon, Portugal, 2024. Ettner, R. and Brown, G.

*Clinical Perspectives and the Experience of Transgender Prisoners* Federal Death Penalty Strategy Session, 2023

IGEN POLITICS intergenerational politics podcast; July, 12, 2023 Episode 199; Apple Podcast, Spotify, YouTube

*Working with Transgender Clients* National Employment Lawyers Association, St. Louis, MO, 2023

*Shifting Sands: Challenges in Providing Surgical Care* American Society of Reconstructive Microsurgery, Miami, FL 2023

*The Standard of Care for Institutionalized Persons* WPATH 27th Scientific Symposium, Montreal, Canada 2022

*Healthcare for Transgender Prisoners* Rush University, Department of Plastic and Reconstructive Surgery, Chicago, IL 2022

*Sexual Function: Expectations and outcomes for patients undergoing gender-affirming surgery.* Whitney, N., Ettner, R., Schechter, L. Rush University, Department of Plastic and Reconstructive Surgery, Chicago, IL 2022

*Care of the Older Transgender Patient,* Weiss Memorial Hospital, Chicago, IL, 2021

*Working with Medical Experts,* The National LGBT Law Association, webinar presentation, 2020

*Legal Issues Facing the Transgender Community,* Illinois State Bar Association, Chicago, IL, 2020

*Providing Gender Affirming Care to Transgender Patients,* American Medical Student Association, webinar presentation, 2020

*Foundations in Mental Health for Working with Transgender Clients;* Center for Supporting Community Development Initiatives, Vietduc University Hospital, Hanoi, Vietnam, 2020

*Advanced Mental Health Issues, Ethical Issues in the Delivery of Care,* Development Initiaves, Vietduc University Hospital, Hanoi, Vietnam, 2020

*What Medical Students Need to Know about Transgender Health Care,* American Medical Student Association, webinar presentation, 2019

*The Transgender Surgical Patient,* American Society of Plastic Surgeons, Miami, FL 2019

*Mental health issues in transgender health care,* American Medical Student Association, webinar presentation, 2019

*Sticks and stones: Childhood bullying experiences in lesbian women and transmen,* Buenos Aires, 2018

*Gender identity and the Standards of Care,* American College of Surgeons, Boston, MA, 2018

*Expectations of individuals undergoing gender-confirming surgeries* Schechter, L., White, T., Ritz, N., Ettner, R. Buenos Aires, 2018

*The mental health professional in the multi-disciplinary team, pre-operative evaluation and assessment for gender confirmation surgery,* American Society of Plastic Surgeons, Chicago, IL, 2018; Buenos Aires, 2018

*Navigating transference and countertransference issues,* WPATH Global Education Initiative, Portland, OR; 2018

*Psychological aspects of gender confirmation surgery* International Continence Society, Philadelphia, PA 2018

*The role of the mental health professional in gender confirmation surgeries,* Mt. Sinai Hospital, New York City, NY, 2018

*Mental health evaluation for gender confirmation surgery,* Gender Confirmation Surgical Team, Weiss Memorial Hospital, Chicago, IL 2018

*Transitioning; Bathrooms are only the beginning,* American College of Legal Medicine, Charleston, SC, 2018

*Gender Dysphoria: A medical perspective,* Department of Health and Human Services, Office for Civil Rights, Washington, D.C, 2017

*Multi-disciplinary health care for transgender patients*, James A. Lovell Federal Health Care Center, North Chicago, IL, 2017

*Psychological and Social Issues in the Aging Transgender Person,* Weiss Memorial Hospital, Chicago, IL, 2017

*Psychiatric and Legal Issues for Transgender Inmates,* USPATH, Los Angeles, CA, 2017

*Transgender 101 for Surgeons,* American Society of Plastic Surgeons, Chicago, IL, 2017

*Healthcare for transgender inmates in the US,* Erasmus Medical Center, Rotterdam, Netherlands, 2016

*Tomboys Revisited: Replication and Implication;* Amsterdam, Netherlands, 2016

*Orange Isn't the New Black Yet-* Care for incarcerated transgender persons, WPATH symposium, Amsterdam, Netherlands, 2016

*Can two wrongs make a right? Expanding models of care beyond the divide*, Amsterdam, Netherlands, 2016

*Foundations in mental health;* WPATH Global Education Initiative, Chicago, IL 2015

*Role of the mental health professional in legal and policy issues,* WPATH Global Education Initiative, Chicago, IL 2015

*Healthcare for transgender inmates;* WPATH Global Education Initiative, Chicago, IL 2015

*Children of transgender parents;* WPATH Global Education Initiative; Atlanta, GA, 2016

*Transfeminine genital surgery assessment:* WPATH Global Education Initiative, Columbia, MO, 2016

*Foundations in Mental Health;* WPATH Global Education Initiative; Ft. Lauderdale, FL, 2016; Washington, D.C., 2016, Los Angeles, CA, 2017, Minneapolis, MN, 2017, Chicago, IL, 2017; Columbus, Ohio, 2017; Portland, OR, 2018; Cincinnati, OH, 2018, Buenos Aires, 2018.

*Role of the forensic psychologist in transgender care;* WPATH Global Education Initiative, Minneapolis, MN, 2017; Columbus, Ohio, 2017.

*Pre-operative evaluation in gender affirming surgery-*American Society of Plastic Surgeons, Boston, MA, 2015

*Gender affirming psychotherapy;* Fenway Health Clinic, Boston, 2015

*Transgender surgery-* Midwestern Association of Plastic Surgeons, Chicago, 2015

*Assessment and referrals for surgery-Standards of Care-* Fenway Health Clinic, Boston, 2015

*Adult development and quality of life in transgender healthcare-* Eunice Kennedy Shriver National Institute of Child Health and Human Development, 2015

*How do patients choose a surgeon?* WPATH Symposium, Bangkok, Thailand 2014

*Healthcare for transgender inmates*- American Academy of Psychiatry and the Law, Chicago, 2014

*Supporting transgender students: best school practices for success*- American Civil Liberties Union of Illinois and Illinois Safe School Alliance, 2014

*Addressing the needs of transgender students on campus*- Prescott College, Prescott, AZ, 2014

*The role of the behavioral psychologist in transgender healthcare* – Gay and Lesbian Medical Association, 2013

*Understanding transgender*- Nielsen Corporation, Chicago, 2013

*Grand Rounds: Evidence-based care of transgender patients*- North Shore University Health Systems, University of Chicago, Illinois, 2011

*Care of the aging transgender patient University of California San Francisco, Center for Excellence, 2013*

*Grand Rounds*: *Evidence-based care of transgender patients* Roosevelt-St. Vincent Hospital, New York, 2011

*Grand Rounds*: *Evidence-based care of transgender patients* Columbia Presbyterian Hospital, Columbia University, New York, 2011

*Hypertension: Pathophysiology of a secret.* WPATH symposium, Atlanta, GA, 2011

*Exploring the Clinical Utility of Transsexual Typologies*- Oslo, Norway, 2009

*Children of Transsexual Parents*-International Association of Sex Researchers, Ottawa, Canada, 2005

*Children of Transsexual Parents*- Chicago School of Professional Psychology, Chicago, 2005

*Gender and the Law*- DePaul University College of Law, Chicago, Illinois, 2003

*Family and Systems Aggression against Providers,* WPATH Symposium, Ghent, Belgium 2003

*Children of Transsexual Parents*-American Bar Association annual meeting, New York, 2000

*Grand Rounds: Gender Incongruence in Adults,* St. Francis Hospital, 1999.

*Gender Identity, Gender Dysphoria and Clinical Issues*:

WPATH Symposium, Bangkok, Thailand, 2014
Argosy College, Chicago, Illinois, 2010
Cultural Impact Conference, Chicago, Illinois, 2005

Weiss Hospital, Department of Surgery, Chicago, Illinois, 2005

Resurrection Hospital Ethics Committee, Evanston, Illinois, 2005

Wisconsin Public Schools, Sheboygan, Wisconsin, 2004, 2006, 2009

Rush North Shore Hospital, Skokie, Illinois, 2004

Nine Circles Community Health Centre, University of Winnipeg, Winnipeg, Canada, 2003

James H. Quillen VA Medical Center, East Tennessee State University, Johnson City, Tennessee, 2002

Sixth European Federation of Sexology, Cyprus, 2002

Fifteenth World Congress of Sexology, Paris, France, 2001

Illinois School of Professional Psychology, Chicago, Illinois 2001

Lesbian Community Cancer Project, Chicago, Illinois 2000

Emory University Student Residence Hall, Atlanta, Georgia, 1999

Parents, Families and Friends of Lesbians and Gays National Convention, Chicago, Illinois, 1998;

In the Family: Psychotherapy Network National Convention, San Francisco, California, 1998;

Evanston City Council, Evanston, Illinois 1997;

Howard Brown Community Center, Chicago, Illinois, 1995;

YWCA Women's Shelter, Evanston, Illinois, 1995;

Center for Addictive Problems, Chicago, 1994

Highland Park Early Child Development Program, Highland Park, IL 1994

*Psychosocial Assessment of Risk and Intervention Strategies in Prenatal Patients*- St. Francis Hospital, Center for Women's Health, Evanston, Illinois, 1984; Purdue University School of Nursing, West Layette, Indiana, 1980

*Psychonueroimmunology and Cancer Treatment*- St. Francis Hospital, Evanston, Illinois, 1984
*Psychosexual Factors in Women's Health*- St. Francis Hospital, Center for Women's Health, Evanston, Illinois, 1984.

*Grand Rounds: Sexual Dysfunction in Medical Practice*- St. Francis Hospital, Dept. of OB/GYN, Evanston, Illinois, 1990

*Sleep Apnea* - St. Francis Hospital, Evanston, Illinois, 1996; Lincolnwood Public Library, Lincolnwood, Illinois, 1996

*The Role of Denial in Dialysis Patients* - Cook County Hospital, Department of Psychiatry, Chicago, Illinois, 1977

**PUBLICATIONS**

Hamadian, A., Whitney, N., Reynolds, A., Stoehr, J., Ettner, R. (2024) Improving access to care and consent for transgender and gender diverse youth in the United States. *Georgian Medical News*, 1(346).

Ettner, R., Schechter, L., & Coleman, E. (Eds.) Principles of Transgender Medicine and Surgery, 3rd edition; Routledge, (under contract).

Coleman, E., Radix, A., Bouman, W., Brown, G., deVries, A.L., Deutsch, M., Ettner, R., et. al. Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International Journal of Transgender Health*, 23:sup1S1-S259.

Robles, C., Hamidian, A., Ferragamo, B., Radix, A., De Cuypere, G., Green, J., Ettner, R., Monstrey, S., Schechter, L. Gender affirmation surgery: A collaborative approach between the surgeon and the mental health professional. *Journal of Plastic and Reconstructive Surgery* in press.

Ettner, R. Healthcare for transgender prisoners. In Garcia (Ed.) Genital Gender Affirming Surgery: An Illustrated Guide and Video Atlas. Springer: 2025

Narayan, S., Danker, S Esmonde, N., Guerriero, J., Carter, A., Dugi III, D., Ettner, R., Radix A., Bluebond-Langner, R., Schechter, L., Berli, J. (2021) Guiding the conversation: Types of regret after gender-affirming surgery and their associated etiologies. *Annals of Translational Medicine,*9(7):605.

Ettner, R., White, T., Ettner, F., Friese, T., Schechter, L. (2018) Tomboys revisited: A retrospective comparison of childhood behaviors in lesbians and transmen. *Journal of Child and Adolescent Psychiatry*.

Ettner, R. Mental health evaluation. Clinics in Plastic Surgery. (2018) Elsevier, 45(3): 307-311.

Ettner, R. Etiology of gender dysphoria in Schechter (Ed.) Gender Confirmation Surgery: Principles and Techniques for an Emerging Field. Elsevier, 2017.

Ettner, R. Pre-operative evaluation. In Schechter (Ed.) Surgical Management of the Transgender Patient. Elsevier, 2017.

Berli, J., Kudnson, G., Fraser, L., Tangpricha, V., Ettner, R., et al. Gender Confirmation Surgery: what surgeons need to know when providing care for transgender individuals. *JAMA Surgery*; 2017.

Ettner, R., Ettner, F. & White, T. Choosing a surgeon: an exploratory study of factors influencing the selection of a gender affirmation surgeon. *Transgender Health*, 1(1), 2016.

Ettner, R. & Guillamon, A. Theories of the etiology of transgender identity. In Principles of Transgender Medicine and Surgery. Ettner, Monstrey & Coleman (Eds.), 2nd edition; Routledge, June, 2016.

Ettner, R., Monstrey, S, & Coleman, E. (Eds.) Principles of Transgender Medicine and Surgery, 2nd edition; Routledge, June, 2016.

Bockting, W, Coleman, E., Deutsch, M., Guillamon, A., Meyer, I., Meyer, W., Reisner, S., Sevelius, J. & Ettner, R. Adult development and quality of life of transgender and gender nonconforming people. *Current Opinion in Endocrinology and Diabetes*, 2016.

Ettner, R. Children with transgender parents in Sage Encyclopedia of Psychology and Gender. Nadal (Ed.) Sage Publications, 2017.

Ettner, R. Surgical treatments for the transgender population in Lesbian, Gay, Bisexual, Transgender, and Intersex Healthcare: A Clinical Guide to Preventative, Primary, and Specialist Care. Ehrenfeld & Eckstrand, (Eds.) Springer: MA, 2016.

Ettner, R. Etiopathogenetic hypothesis on transsexualism in Management of Gender Identity Dysphoria: A Multidisciplinary Approach to Transsexualism. Trombetta, Liguori, Bertolotto, (Eds.) Springer: Italy, 2015.

Ettner, R. Care of the elderly transgender patient. *Current Opinion in Endocrinology and Diabetes, 2013, Vo*l. 20(6), 580-584.

Ettner, R., and Wylie, K. Psychological and social adjustment in older transsexual people. *Maturitas,* March, 2013, Vol. 74, (3), 226-229.

Ettner, R., Ettner, F. and White, T. Secrecy and the pathophysiology of hypertension. *International Journal of Family Medicine* 2012, Vol. 2012.

Ettner, R. Psychotherapy in Voice and Communication Therapy for the Transgender/Transsexual Client: A Comprehensive Clinical Guide. Adler, Hirsch, Mordaunt, (Eds.) Plural Press, 2012.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W., Monstrey, S., Adler, R., Brown, G., Devor, A., Ehrbar, R., Ettner, R., et.al. Standards of Care for the health of transsexual, transgender, and gender-nonconforming people. World Professional Association for Transgender Health (WPATH). 2012.

Ettner, R., White, T., and Brown, G. Family and systems aggression towards therapists. *International Journal of Transgenderism,* Vol. 12, 2010.

Ettner, R. The etiology of transsexualism in Principles of Transgender Medicine and Surgery, Ettner, R., Monstrey, S., and Eyler, E. (Eds.). Routledge Press, 2007

Ettner, R., Monstrey, S., and Eyler, E. (Eds.) Principles of Transgender Medicine and Surgery. Routledge Press, 2007.

Monstrey, S. De Cuypere, G. and Ettner, R. Surgery: General principles in Principles of Transgender Medicine and Surgery, Ettner, R., Monstrey, S., and Eyler, E. (Eds.) Routledge Press, 2007.

Schechter, L., Boffa, J., Ettner, R., and Ettner, F. Revision vaginoplasty with sigmoid interposition: A reliable solution for a difficult problem. The World Professional Association for Transgender Health (WPATH), 2007, *XX Biennial Symposium,* 31-32.

Ettner, R. Transsexual Couples: A qualitative evaluation of atypical partner preferences. *International Journal of Transgenderism,* Vol. 10, 2007.

White, T. and Ettner, R. Adaptation and adjustment in children of transsexual parents. *European Journal of Child and Adolescent Psychiatry,* 2007: 16(4)215-221.

Ettner, R. Sexual and gender identity disorders in Diseases and Disorders, Vol. 3, Brown Reference, London, 2006.

Ettner, R., White, T., Brown, G., and Shah, B. Client aggression towards therapists: Is it more or less likely with transgendered clients? *International Journal of Transgenderism,* Vol. 9(2), 2006.

Ettner, R. and White, T. in Transgender Subjectives: A Clinician's Guide Haworth Medical Press, Leli (Ed.) 2004.

White, T. and Ettner, R. Disclosure, risks, and protective factors for children whose parents are undergoing a gender transition. *Journal of Gay and Lesbian Psychotherapy,* Vol. 8, 2004.

Witten, T., Benestad, L., Berger, L., Ekins, R., Ettner, R., Harima, K. Transgender and Transsexuality. Encyclopeida of Sex and Gender. Springer, Ember, & Ember (Eds.) Stonewall, Scotland, 2004.

Ettner, R. Book reviews. *Archives of Sexual Behavior,* April, 2002.

Ettner, R. Gender Loving Care: A Guide to Counseling Gender Variant Clients. WW Norton, 2000.

*Social and Psychological Issues of Aging in Transsexuals*, proceedings, Harry Benjamin International Gender Dysphoria Association, Bologna, Italy, 2005.

*The Role of Psychological Tests in Forensic Settings*, *Chicago Daily Law Bulletin,* 1997.

Confessions of a Gender Defender: A Psychologist's Reflections on Life amongst the Transgender. Chicago Spectrum Press. 1996.

*Post-traumatic Stress Disorder*, *Chicago Daily Law Bulletin*, 1995.

*Compensation for Mental Injury, Chicago Daily Law Bulletin*, 1994.

*Workshop Model for the Inclusion and Treatment of the Families of Transsexuals,* Proceedings of the Harry Benjamin International Gender Dysphoria Symposium; Bavaria, Germany, 1995.

*Transsexualism- The Phenotypic Variable,* Proceedings of the XV Harry Benjamin International Gender Dysphoria Association Symposium; Vancouver, Canada, 1997.

*The Work of Worrying: Emotional Preparation for Labor* in Pregnancy as Healing. A Holistic Philosophy for Prenatal Care, Peterson, G. and Mehl, L. Vol. II. Chapter 13, Mindbody Press, 1985.

## PROFESSIONAL AFFILIATIONS

University of Minnesota Institute for Sexual and Gender Health–Leadership Council

American College of Forensic Psychologists

World Professional Association for Transgender Health

WPATH GEI SOC 8 Certified Member

New Health Foundation Worldwide

World Health Organization (WHO) Global Access Practice Network

TransNet national network for transgender research

American Psychological Association

American College of Forensic Examiners

Society for the Scientific Study of Sexuality

Screenwriters and Actors Guild

Phi Beta Kappa

**AWARDS AND HONORS**

University of Minnesota, Institute for Sexual and Gender Health; 50 *Distinguished Sex and Gender Revolutionaries* award, 2021

Letter of commendation from United States Congress for contributions to public health in Illinois, 2019

WPATH Distinguished Education and Advocacy Award, 2018

*The Randi and Fred Ettner Transgender Health Fellowship*-Program in Human Sexuality, University of Minnesota, 2016

Phi Beta Kappa, 1972

Indiana University Women's Honor Society, 1970-1972

Indiana University Honors Program, 1970-1972

Merit Scholarship Recipient, 1970-1972

Indiana University Department of Psychology Outstanding Undergraduate Award Recipient, 1970-1972

Representative, Student Governing Commission, Indiana University, 1970

Sponsor 2nd International Trans Studies Conference 2025

**LICENSE**

Clinical Psychologist, State of Illinois, 1980

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00286-RCL |
| JANE JONES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00401-RCL |
| MARIA MOE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00653-RCL |

**DECLARATION OF DR. ALIX MCLEAREN IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Dr. Alix McLearen, declare as follows:

1. I served as the National Administrator of the Women and Special Populations Branch at the Department of Justice's Bureau of Prisons (BOP) from 2014 to 2018, and as BOP's Acting Assistant Director and/or Senior Deputy Assistant Director for Reentry Services from 2018 through 2022. As a subject matter expert and member of BOP's senior executive team, I was responsible for the development, implementation, and oversight of policies balancing institutional safety, constitutional obligations, and rehabilitative goals. In addition to managing a wide variety of treatment and reentry workstreams, my responsibilities included drafting and operationalizing BOP policy governing the management and housing of transgender individuals, as well as reviewing and guiding hundreds of individualized determinations involving housing placement, medical and mental health care, and accommodations in secure correctional environments. My role required the integration of clinical judgment, correctional best practices, and evolving legal standards to ensure compliance and safety at the individual level, the facility level, and the system level.

2. Based on my experience as a BOP official and my nearly three decades of professional expertise in corrections, I can attest that transgender women must be individually evaluated for placement in women's or men's facilities. A categorical rule requiring transgender women to be housed in men's facilities would predictably endanger individuals who, based on their characteristics and circumstances, are at serious risk of severe physical and mental harm in men's facilities. Applying such a categorical rule to transfer transgender women from women's to men's facilities creates additional, distinct health and safety risks that are both significant and foreseeable.

## BACKGROUND AND QUALIFICATIONS

3. I am a clinical psychologist with a doctorate in Clinical Psychology and the Law from the University of Alabama. I began working in justice settings in 1995 and completed my predoctoral internship at the Federal Bureau of Prisons' Medical Center for Federal Prisoners in 2003, after which I continued my career with BOP until my retirement nearly two years ago.

4. Over approximately 22 years with BOP, I held positions of increasing responsibility in institutions and at headquarters. In these roles, I provided clinical services, supervised multidisciplinary staff, and worked collaboratively with correctional, medical, and administrative personnel to support institutional safety, legal compliance, and rehabilitative programming.

5. After being chosen for and completing the Department of Justice's executive development program, I was appointed National Administrator of the Women and Special Populations Branch, where I provided guidance and oversight to all federal institutions on the management of specialized populations, including transgender individuals. In that role, I developed and implemented policy and training governing the management, housing, and care of transgender persons in federal custody. I was also responsible for updating and implementing national sexual safety policy following the 2012 publication of national regulatory standards under the Prison Rape Elimination Act (PREA). I served as the agency's PREA coordinator and participated in DOJ's PREA Working Group, which provided sexual safety and standard implementation technical guidance across correctional systems.

6. I later served as Acting and Senior Deputy Assistant Director of the Reentry Services Division, and as Acting Assistant Director, where I oversaw national programs including psychology services, education, chaplaincy, and special populations, and was responsible for major policy and operational decisions across the federal system. In December

2022, I was appointed by the Attorney General as Acting Director of the National Institute of Corrections, the only federal agency mandated to shape corrections at the national level and assist 750,000 American corrections professionals.

7. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. I am being compensated at the hourly rate of $500.00 for my time spent preparing this declaration, and I will be compensated at the same rate for any pre-deposition and/or pre-trial preparation. I will be compensated at a daily rate of $4,000 for any deposition testimony or trial testimony. I will be compensated at an hourly rate of $200 for any travel time to attend a deposition or trial and will be reimbursed for out-of-pocket travel expenses incurred for the purpose of providing expert testimony in this matter. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

8. I have previously testified as an expert at trial or by deposition in the following cases: *Janiah Monroe v. Latoya Hughes*, No. 19-cv-1060-JEH (S.D. Ill.); *Delisa Hernandez Reid, Administrator of the Estate of Damian Hernandez v. The GEO Group, Inc., et al.*, No. 3:24-cv-309 (E.D. Va.); *A.B.O. Comix v. San Mateo County*, No. 23-civ-01075 (N.D. Cal.); *Travis v. Behavioral Systems Southwest Inc.*, et al., No. 23-ST-CV-31227 (Cal. Super. Ct.).

**BASES FOR OPINIONS**

9. In preparing this declaration, I have relied on my experience as a BOP official and my decades of professional expertise in corrections, as well as my training and experience as a clinical psychologist, as set forth in my curriculum vitae (attached as Exhibit A).

10. In addition, in preparing this report, I have reviewed five declarations previously filed in these actions by Rick Stover, Senior Deputy Assistant Director of BOP's Designation and

Sentence Computation Center, one legal memorandum previously filed by Defendants in opposition to preliminary injunctive relief, and the materials cited in this document.

## EXPERT OPINIONS

### A. Men's facilities are distinct from women's facilities in ways that put transgender women at disproportionately high risk of sexual and physical violence.

11. Men's and women's facilities differ in ways that are directly relevant to safety for transgender women. Within BOP, men's facilities house populations with more extensive histories of violence, higher rates of serious and violent offenses, and greater involvement in organized groups and gangs. These factors shape the institutional environment and contribute to social dynamics in which dominance, reputation, and the use or threat of violence play a significant role.

12. In my professional experience, individuals in men's facilities are more likely to test boundaries, assess vulnerability, and engage in behavior intended to establish hierarchy or control. These dynamics affect how individuals are expected to present themselves and interact with others. Individuals who are perceived as physically smaller, feminine, or otherwise vulnerable are more likely to be identified as targets for physical and sexual violence.

13. Transgender women as a group face severely elevated risks of sexual abuse in men's prisons.[1] This elevated risk is well understood within the field of corrections and is not meaningfully disputed among practitioners responsible for classification, housing, or PREA compliance. Across systems, transgender women are consistently identified as among the most vulnerable populations in custody.

---

[1] Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* 73-74 (June 2009), https://www.govinfo.gov/content/pkg/GOVPUB-Y3-PURL-gpo91294/pdf/GOVPUB-Y3-PURL-gpo91294.pdf; Allen J. Beck, U.S. Dep't of Just. Bureau of Just. Stat., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, *Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates* (December 2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.

**B. To ensure individual and institutional safety, housing placements for transgender women must be based on individual circumstances rather than a categorical rule.**

14. Although transgender women as a group face extraordinarily high rates of violence and sexual victimization in men's facilities, the risks to individual transgender women are not uniform. Some transgender women face much higher risks, and other relevant circumstances vary as well. As a result, it is essential that corrections officials determine housing placements at the individual level.

15. The PREA National Standards require correctional facilities to make case-by-case decisions about whether to house individual transgender women in male or female facilities, considering the individual's health and safety as well as any management or security concerns that may result from the placement.

16. In addition to being required by law, such case-by-case determinations are necessary to protect the safety of individual transgender women and to ensure safety and security of the prison environment for all incarcerated people. Housing decisions for transgender women cannot be made categorically without increasing risk of harm.

17. In deciding whether to house a transgender woman in a male or female facility, corrections officials consider all relevant circumstances bearing on both individual health and safety and prison management and security. For example, corrections officials may look to the transgender woman's age, criminal record, disciplinary record and behavior while incarcerated, physical and mental health status, current functioning, education level, gang involvement, risks to other incarcerated people, propensity for sexual abuse of other incarcerated people, vulnerability to sexual abuse by other incarcerated people, vulnerability to violence by other incarcerated people, ability to function in the general population in a men's or women's facility, and the individual's own views regarding their safety.

18. Transgender status is relevant to an individual's risk of sexual victimization and other health and safety issues. But transgender status, standing alone, does not indicate that an individual presents a risk to others and does not raise management or security concerns.

19. Certain characteristics tend to put individual transgender women at especially high risk of violence and sexual victimization in men's facilities. For example, a transgender woman is likely to face severe risks of harm in a male facility if she has had a vaginoplasty; if she has had other feminizing surgeries; or if she has breasts and a female physique as a result of consistent hormone therapy. Within custodial environments, individuals who are perceived as female are more likely to be approached, pressured, exploited, and treated as potential targets.

20. Past sexual abuse is also a strong predictor of future sexual victimization in prisons. A transgender woman who has been raped or sexually assaulted in men's correctional facilities would likely be at an especially high risk of revictimization in men's facilities, especially if the individual was assaulted on multiple occasions, by multiple perpetrators, or in multiple men's facilities.

21. Prior experiences of sexual harassment in male correctional facilities may similarly indicate a high risk of victimization. In the prison environment, verbal sexual harassment often serves to identify individuals as potential targets and frequently precedes more serious forms of sexual abuse or rape.

22. Weighing all the relevant circumstances requires corrections officials to exercise discretion and decide, based on their expert judgment, what housing placement is most appropriate for the individual. This approach is designed to reduce harm by allowing correctional staff to make placement decisions based on individual risk rather than fixed classifications. Removing discretion and expert judgment from the equation creates foreseeable risks. In my

opinion, a categorical requirement that all transgender women must be housed in male facilities will lead to unsafe conditions for transgender women who are at serious risk of harm in male facilities due to their individual characteristics and circumstances.

**C. Transferring transgender women from women's to men's facilities because of a categorical policy would predictably put them at high risk of sexual victimization.**

23. Based on my professional experience, transgender women who are housed in BOP's women's facilities present with some or all of the characteristics that make individual transgender women especially vulnerable to sexual violence in men's facilities, such as female appearance, female body parts (breasts, female genitalia), and mannerisms and carriage consistent with having lived and functioned as a woman. These characteristics affect how an individual is perceived and may increase the likelihood that she will be identified and targeted as vulnerable in a men's facility.

24. Transgender women who are housed in women's BOP facilities also often have histories of past sexual abuse, including in men's correctional facilities. As already explained, transgender women who have been raped or assaulted in men's facilities would likely be at a high risk of physical and sexual violence if transferred back to men's facilities, in addition to facing significant mental health risks as detailed below.

25. In addition to their individual characteristics and histories of sexual abuse, transgender women would likely face an increased risk of sexual victimization in men's facilities simply because they were involuntarily transferred to men's facilities after adjusting to a female correctional environment. Women's facilities operate with different social expectations and patterns of interaction than men's facilities. Individuals who function appropriately in women's prison environments are likely to present in ways that are consistent with those norms. In my

experience, behaviors and presentation that are consistent with functioning in a women's facility are often interpreted as indicators of vulnerability in a men's facility.

26. It is also likely that male prisoners would become aware that a transgender woman was transferred from a women's facility. Within BOP, movement between institutions is known to staff and becomes known within the incarcerated population through routine intake procedures, staff communication, and interactions among individuals. Individuals who are new to a facility are commonly asked where they came from, and attempts to avoid answering can draw additional attention. Once that information becomes known, it increases the likelihood that an individual will be singled out, questioned, and targeted for exploitation, coercion, or sexual victimization. In my professional experience, predatory men in male facilities are skilled at identifying victims and would be likely to recognize specific vulnerabilities associated with transfer from a women's facility.

27. Transgender women without prior experience in men's facilities may be uniquely vulnerable because of their lack of familiarity with the social dynamics, expectations, and informal structures that influence safety in male prison settings. These individuals may be less able to recognize or respond to emerging threats and, as a result, may be singled out as especially easy targets.

28. For all these reasons, a transgender woman involuntarily transferred from women's to men's facilities is likely to face extraordinarily high risks of sexual violence and exploitation. Vulnerability may be particularly acute during the initial period following transfer, as the individual would not have any relationships or stability within the institution.

**D. Assault rates in low-security men's facilities are not a reliable indicator of risk to individual transgender women if transferred to those facilities.**

29. I am aware that BOP has cited overall assault rates and the low security level of certain men's facilities to support its argument that Plaintiffs would be safe in those facilities. Specifically, BOP has relied on "guilty findings" for assault-related disciplinary infractions. These data reflect only substantiated disciplinary outcomes and do not capture the full scope of harmful conduct within a facility. They exclude unreported incidents, allegations that cannot be substantiated, threats, coercion, and other forms of conduct that may significantly affect individual safety. In addition, the category of "assault" encompasses a range of behaviors of varying severity. Assault data do not distinguish between types of harm and do not provide information about sexual victimization or other serious abuse. As a result, these figures provide a limited and incomplete picture of institutional safety. They also have no direct relevance to the assessment of risk for a specific individual.

30. To the extent BOP relies on data related to sexual assault, as distinct from the general category of "assault," the data still would not tell the whole story. Reports and guilty findings of sexual assault would not be expected to reflect the full scope of abusive sexual conduct that can occur in custody, and they do not speak to the particular risks faced by transgender women in men's facilities. In custodial settings, it is well understood that transgender women are especially vulnerable to sexual and physical harm. To secure protection from these harms, transgender women may enter arrangements involving sexual activity that is not meaningfully consensual. These arrangements can involve coercion, control, or violence, but may not be reported or may not result in disciplinary findings due to fear of retaliation, concerns about credibility, or how the conduct is characterized.

31. Concerns about the reliability of these data are also informed by how allegations of sexual abuse are identified and investigated within BOP. Under PREA, facilities are required to respond to, document, and investigate allegations of sexual abuse, but substantiation depends on the availability of evidence, the ability to develop a case under those standards, and adequate staffing to conduct thorough investigations. In practice, not all incidents result in substantiated findings, and some forms of abuse, including coercion or exploitation, may not be reflected in disciplinary outcomes.

32. Moreover, in my experience, BOP does not rely on this type of disciplinary data to make individual placement decisions and has not historically used it in determining housing for transgender individuals. Rather, placement decisions have been made through individualized, multidisciplinary review processes that consider specific risk factors, institutional functioning, and management and security needs. If BOP is now relying on this data in this context, that departs from established practice and appears to be used to support a predetermined outcome rather than to inform a neutral assessment of risk.

33. The use of reported disciplinary findings to compare safety across men's and women's facilities is also misleading because it treats reported disciplinary findings across facilities as directly comparable measures of safety. Men's and women's facilities differ in population characteristics, reporting practices, staff responses, and enforcement standards, all of which affect how conduct is documented and adjudicated. Within BOP, women's facilities have historically reflected higher rates of reported incidents in part due to differences in how conduct is identified, reported, and adjudicated. These differences can result in higher documented rates of misconduct without indicating a higher underlying level of violence or risk. As a result,

comparing rates of disciplinary findings across men's and women's facilities presents an incomplete and potentially misleading picture of relative safety.

34. The comparison of assault data between certain women's and men's facilities also does not account for the differences in housing environments and population dynamics that are relevant to Plaintiffs' safety. Low-security men's facilities tend to have larger populations and more congregate living conditions than women's facilities. These changes increase the number and frequency of interactions with other incarcerated individuals and expand the range of potential risk. Men's facilities also tend to have lower levels of mental health and medical staffing resources relative to women's facilities. As a result, transfer from women's to men's facility results in increased exposure to potential risk factors without a corresponding increase in protective capacity.

35. Overall assault data in identified men's facilities has limited relevance for another reason. Even if Plaintiffs are initially placed in the low-security male facilities identified by BOP in prior court filings, there is no assurance that they would remain there. In light of the risks described above, they may be placed in restrictive housing or seek protective custody in response to safety threats, or may experience incidents that affect their institutional adjustment. In addition, disruption of established supports, including medical, mental health, and social stability, may affect functioning and adjustment. These factors can lead to changes in classification and placement and could result in transfer to higher-security facilities. The analysis presented by BOP does not account for the foreseeable potential for placement in more restrictive or higher-risk environments.

36. For these reasons, the data and comparisons relied upon by BOP do not provide a sound basis for evaluating the safety of a categorical policy requiring transfers from women's to

men's facilities. Reliance on this information to support a categorical placement approach is inconsistent with established correctional practice and does not provide a rational basis for assessing safety in individual cases.

**E. Forcibly transferring transgender women from female facilities to male facilities creates unnecessary and severe mental health risks, which could potentially lead to self-harm or suicide.**

37. In addition to increasing victimization risks, transferring transgender women from women's to men's facilities against their will under a categorical policy raises major health and safety concerns. Within BOP, mental health and suicide risk are core components of classification and housing decisions, and changes in housing environment are recognized as clinically significant events. Under that framework, individuals who have been assessed, placed, and functioning appropriately in a given environment are not reassigned absent a safety, security, or clinical justification.

38. A categorical reassignment to a male facility, without regard to those individualized determinations, represents a departure from standard practice. As a result of such a reassignment, a transgender woman would lose continuity in healthcare, mental health provider relationships, social supports and relationships, and programming—in addition to facing an unfamiliar and dangerous institutional and social environment that is dramatically different from the women's correctional environment. In my professional judgment, such a change has a high and foreseeable likelihood of causing significant psychological distress. Risks include worsening symptoms of gender dysphoria, anxiety, depression, and other mental health conditions, which may lead to suicidal ideation and self-harm.

39. Individuals who have previously experienced rape or sexual assault in male facilities are particularly vulnerable. They are likely to experience worsening mental health

symptoms from being returned to the environment associated with that harm. Potential consequences of a deliberate exposure to the initial stressor without cause can reactivate trauma symptoms, increase anxiety, and cause hypervigilance and other functional impairments.

40. In addition, transgender women who have never been housed in men's correctional environments may experience severe disorientation and functional impairments in a men's facility. Resulting psychological damage and trauma could have significant and lasting mental and physical health consequences.

41. The destabilizing effect of transfer from women's to men's facilities could be further exacerbated by the implementation of recently published BOP medical policies. Under those policies, transgender people must be tapered off hormone therapy and denied other medical treatments for gender dysphoria. Restricting access to medical interventions that have alleviated an individual's symptoms of gender dysphoria and promoted healthy functioning—in combination with removing that individual from an appropriate women's correctional environment and placing her in a men's facility where she faces high risks of sexual and physical violence—will predictably cause grave harm.

42. Deteriorating mental health is a serious health and safety issue. Worsening mental health symptoms and trauma can lead to suicidality, violence to the self, and possibly even death. To prevent these outcomes, corrections officials must account for mental health risks when determining whether to house a transgender person in a men's or women's facility. Transferring transgender women from women's to men's facilities regardless of these risks is likely to cause severe harm.

**F. The risks of transferring transgender women from women's to men's facilities cannot be sufficiently mitigated through protective measures.**

43. Protective measures available in BOP facilities are not capable of meaningfully reducing the risks to transgender women who are transferred from women's to men's facilities, and some protective measures may cause harm.

44. The most powerful protective measure in place for transgender women is a proactive assessment of their individual risk factors and other relevant characteristics to determine their housing placement, including whether they should be placed in men's or women's facilities, consistent with PREA National Standards. A categorical policy prohibiting case-by-case assessment limits the ability of staff to manage risk through appropriate housing decisions, effectively eliminating the primary mechanism that correctional systems rely on to prevent harm to incarcerated transgender people.

45. The remaining safeguards are left to address risk after it has already been created rather than prevent it through informed placement. For example, BOP's sexual abuse prevention policy focuses on how staff respond to risk and incidents of misconduct. These safeguards are important, but they depend on staff identifying risk, observing behavior, or receiving a report. They are not designed to reduce individual vulnerability and may not prevent sexual violence in the first instance.

46. BOP policies requiring staff to monitor interactions, intervene in incidents, and investigate allegations of sexual abuse are also important safeguards. But they rely on consistent staffing, visibility, and timely reporting. Unfortunately, over the past several years, understaffing in BOP facilities has been a major cause for concern, as detailed in multiple reports by the Office

of Inspector General and the Government Accountability Office.[2] And even with adequate staffing, staff cannot continuously monitor all interactions, and visibility is often constrained by facility layout, blind spots, security system weaknesses,[3] movement patterns, competing responsibilities, and the pace of institutional operations. These constraints make it difficult to prevent victimization in real time.

47. Placement in protective custody or the Special Housing Unit (SHU) is frequently used to separate vulnerable individuals from the general population, but this approach is not a long-term solution and may itself result in significant harm, including social isolation, restricted movement, reduced access to programming, and deterioration in mental health. Prolonged or repeated use of such placements for vulnerable individuals can increase the risk of death by suicide and contribute to worsening mental health symptoms, including anxiety, depression, and increased risk of self-harm. In addition, protective custody is not a guarantee of safety. The same types of victimization risks that exist for transgender women in the general population of a male facility can exist in SHU as well. Within BOP, individuals may be placed in SHU for a range of reasons unrelated to protective custody, such as a pending transfer; an upcoming medical procedure; or an investigation into an individual's behavior or risk of victimization. As a result, transgender women placed in SHU for their own protection may still share space, or even share a

---

[2] *Ongoing Challenges Facing the Federal Bureau of Prisons*, U.S. Dep't of Just. Off. of the Inspector Gen. (last accessed May 11, 2026), https://oig.justice.gov/tmpc/challenge-1; U.S. Dep't of Just. Off. of the Inspector Gen., *Top Management and Performance Challenges Facing the Department of Justice 2025*, https://oig.justice.gov/sites/default/files/2026-01/TMPC-2025.pdf; U.S. Gov't Accountability Off., GAO-21-123, *Bureau of Prisons: Opportunities Exist to Better Analyze Staffing Data and Improve Employee Wellness Programs* (Feb. 24, 2021), https://www.gao.gov/products/gao-21-123.

[3] *DOJ OIG Releases Management Advisory Memorandum on Needed Upgrades to the Federal Bureau of Prisons' Security Camera System*, U.S. Dep't of Just. Off. of the Inspector Gen. (Oct. 28, 2021), https://oig.justice.gov/news/doj-oig-releases-management-advisory-memorandum-needed-upgrades-federal-bureau-prisons; U.S. Dep't of Just. Off. of the Inspector Gen., *Top Management and Performance Challenges Facing the Department of Justice 2025*, https://oig.justice.gov/sites/default/files/2026-01/TMPC-2025.pdf.

cell, with men who have histories of predatory or assaultive behavior or who are otherwise likely to target them for abuse.

48. Similar limitations apply to measures intended to address risks of self-harm and suicide. Within BOP, suicide prevention efforts rely heavily on staff observation, screening, and responses to expressed distress. These measures are important but inherently reactive and depend on individuals disclosing symptoms or staff identifying warning signs. In practice, psychological distress may not be visible or may escalate rapidly, particularly following a destabilizing event such as involuntary transfer to a higher-risk environment. As a result, once risk has been created, available interventions may not be sufficient to prevent serious harm. A recent report by the Office of the Inspector General found that "suicide represents a significant risk area for the BOP," and that "a combination of recurring policy violations and operational failures contributed to inmate suicides."[4]

49. For the most vulnerable transgender women, no available combination of protective measures is sufficient to mitigate the severe safety risks in a male facility. The most vulnerable transgender women have historically been subjected to serious harms in male facilities, including physical and sexual violence; long-term or frequent placements in the SHU or protective custody, leading to deterioration in mental health and overall functioning; or both.

50. In my professional opinion, the protective measures available in BOP facilities cannot adequately prevent harm to transgender women who are reassigned from female to male facilities based on a categorical housing policy unrelated to any individual circumstances.

[4] U.S. Dep't of Just. Off. of the Inspector Gen., *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions* 10-11 (Feb. 2024), https://oig.justice.gov/sites/default/files/reports/24-041.pdf.

**G. Serious risks of harm are also likely to result from transferring transgender women from female to male halfway houses.**

51. Transfers from women's halfway houses to men's halfway houses would also foreseeably increase the risks of harm to transgender women. BOP uses the term "residential reentry centers (RRCs)" to refer to halfway houses.

52. Male RRCs receive men from prisons of all security levels. It is not uncommon for individuals leaving low-security facilities to be placed in RRCs alongside men with histories of violent and predatory behavior. Residents of male RRCs are typically required to share bedrooms and other spaces and interact with each other in close quarters. In addition, RRC residents experience relatively more freedom and less oversight than individuals who are incarcerated, as appropriate to facilitate their reentry into the community. As a result, RRC staff do not continuously monitor interactions among residents and may not directly observe threatening, abusive, or violent conduct. Based on these factors, in my opinion, transgender women with the distinct vulnerabilities described above would foreseeably face an increased risk of victimization if transferred from women's RRCs to men's RRCs.

53. The mental health consequences of transfer from a female RRC to a male RRC are both predictable and significant. A transgender woman who is presenting as female in the community, including at work and medical appointments, would likely experience a deterioration in mental health if transferred to a housing environment where she is not recognized or treated as a woman. In addition, placement in a male RRC would cause employers and healthcare providers to learn she is transgender, which could expose her to harassment and discrimination and could prevent her safe reintegration into the community. All these circumstances are very likely to trigger increased anxiety, depression, and gender dysphoria and could lead to suicidal ideation or self-harm—especially if combined with denials of medical care for gender dysphoria.

## CONCLUSION

54. The core mission of the Bureau of Prisons is to "foster a humane and secure environment and ensure public safety by preparing individuals for successful reentry into our communities."[5] Adopting a categorical policy requiring reassignment of transgender women from women's to men's facilities is inconsistent with this mission and is a deliberate decision that will cause egregious and unnecessary harms to some of the most vulnerable individuals in BOP custody.

---

[5] *About our Agency*, Federal Bureau of Prisons (last accessed May 11, 2026), https://www.bop.gov/about/agency/agency_pillars.jsp.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11 th day of May, 2026.

Dr. Alix McLearen

# EXHIBIT A

# ALIX MCLEAREN, PHD

AMM SOLUTIONS, LLC – alixmclearen@gmail.com – 813.625.6227



## EDUCATION

**2002** **DOCTOR OF PHILOSOPHY IN CLINICAL PSYCHOLOGY AND THE LAW**

The University of Alabama

Tuscaloosa, AL

**1999** **MASTER OF SCIENCE IN CLINICAL PSYCHOLOGY**

Missouri State University

Springfield, MO

**1996** **BACHELOR OF SCIENCE IN PSYCHOLOGY**

James Madison University

Harrisonburg, VA

## EXPERIENCE

***2024-Present*** ***Chief Executive Officer, AMM Solutions, Washington, DC***

Provide consultation, training and subject matter expertise to include investigative support, litigation support and expert witness testimony on a wide range of correctional and mental health topics. Analyze complaints to develop mitigation reports or strategy guidance. Deliver workshops and design curricula and interventions.

***2022-2023*** ***Chief Executive Officer/Director (Acting), National Institute of Corrections, Washington, DC***

Appointed by the Attorney General of the United States to lead the only federal agency with a legislative mandate created to shape corrections across all portions of this branch of law enforcement. Developed and oversaw the creation and dissemination of expert guidance and training for leadership and line staff in jails/pretrial holding facilities, prisons and sentenced facilities, and community systems inclusive of probation, parole, and halfway houses. Led numerous networks of high-level constituents to share cutting edge corrections trends. Designed an interagency civil legal services pilot to evaluate the DOJ's first program focused on supporting the resolution of non-criminal barriers to reentry such as debt or child support. Created new vehicles for sharing correctional innovations in technology, special populations, and interventions.

***2018-2022*** ***Assistant Director (Acting)/Senior Deputy Assistant Director, Reentry Services Division, Federal Bureau of Prisons (BOP), Washington, DC***

As a member of the senior leadership team for the largest federal law enforcement component, led all agency reentry work, ensuring access to rehabilitative services for incarcerated persons. Designed and oversaw the implementation of women's institution cultural assessments to improve the quality of prison operations. Spearheaded suicide prevention efforts for staff, leading to the successful implementation of both a new Employee Assistance Program and leadership-driven model of staff well-being. Led agency implementation of the First Step Act, resulting in the delivery of more than 85 structured programs for prisoners and negotiation and issuance of new policies compliant with the law. Directed agency work with transgender individuals, approving the first gender confirmation for a person in federal custody. Coordinated community transitions during the COVID Pandemic, resulting

in the agency successfully implementing the CARES Act. Created and launched new mental health treatment, vocational, and education programs, including adding college courses for incarcerated people. Authored the Female Offender Manual, the agency's policy pertaining to the management of pregnant offenders. Implemented drug treatment services, including Medication Assisted Treatment impacting the health of thousands of prisoners with opioid and substance use histories. Worked regularly with White House staff and DOJ leadership on high priority directives associated with treatment access and stakeholder partnerships. Developed training for more than 35,000 staff on trauma, special populations, sexual assault, and rehabilitation. Led the agency's executive working group on addressing solitary confinement. Consulted with the White House and DOJ on proposed legislation affecting women in detention, such as The Violence Against Women Act.

***2014-2018*** ***National Administrator, Women and Special Populations Branch and National PREA Coordinator, BOP, Washington, DC***

Selected especially to build and implement the agency's first office focused solely on the needs of women, juveniles, veterans, and persons who are transgender, pregnant or a parent, or living with disabilities. Represented DOJ as a national expert on justice-involved women regularly in discussions with Congress and the White House, implemented the first policies and programs for them and was chosen to consult with attorneys on litigation involving women and special populations outside BOP. Directed agency work with the transgender population, including the creation of protocols for gender affirming treatments. Evaluated security-related agency policies, resulting in nationwide training to improve such procedures for individuals with special needs. Awarded the highest honor for innovation following development of an entirely new model for operating facilities, resulting in the successful implementation of a women's treatment-based prison that is gender-responsive and trauma-informed. Planned and hosted a large White House event focused on children of incarcerated parents and offender reentry. Appointed as agency's PREA Coordinator, developed the agency's first policy and compliance standards to address sexual assault in federal prisons and jails.

***2010-2014*** ***Sex Offender Certification Psychologist, BOP, Washington, DC***

Chosen to assist in standing up the office responsible for assessing sexual dangerousness in compliance with the Adam Walsh Child Protection and Safety Act. Provided written and oral subject matter expertise, oversight, training, and consultation on male and female sexual offenders to over 35,000 staff, clinicians and managers in the field, executive staff/administration, and outside agencies, resulting in decreasing the release of sexually dangerous offenders into the community. Developed and implemented research protocols related to sex offenders and broader correctional and reentry issues to include dissemination of findings via national conference presentation and publications. Compiled and analyzed data on sexual offenders to inform national sex offender programming, reentry, and policy needs and make implementation modifications based on this information. Served in collateral capacities as the leader of a national future planning group that recommended steps for managing and measuring the institutional and reentry needs of the growing population of geriatric inmates and. As a staff mentor and recruiter, led junior staff into higher-level leadership positions.

***2007-2010*** ***Chief Psychologist, Federal Correctional Institution, BOP, Memphis, TN***

Oversaw and delivered comprehensive mental health services for a population of over 1,600 offenders, including violent and sexually deviant criminals in pretrial, medium, and minimum-security correctional facilities. Managed the prevention program and crisis intervention/emergency response protocol implementation and institution-wide training. Administered the local Employee Assistance Program (EAP) and provided counseling to law enforcement staff. Led the Affirmative Action Committee, ensuring recruitment and hiring practices properly conformed with legal and diversity requirements, including interviewing all new staff to ensure appropriate hiring decision-making for all disciplines. Chaired the Staff Workplace Violence panels and supervised the completion of risk assessments. Appointed as Sexually Abusive Behavior Prevention and Intervention Coordinator, chairing panels responding to incidents of reported sexual assault. Developed and delivered training locally, regionally, and nationally on mental health topics, sexual assault prevention (PREA), and management/leadership to improve agency standards. Collaborated with medical staff to

provide psychopharmacological treatment to inmates and implemented a protocol to streamline this process.

**TESTIFYING EXPERIENCE**

General: As a psychologist and executive for the BOP, testified in a variety of cases involving both staff and inmates as a management official and subject matter expert. Testified concerning the facts in the following matters:

- EEO/Personnel Actions
- Workplace Violence
- Gender Accommodations

Testified in significant hearings to include:

**2021 US v Texas 1:21-cv-796rp**

Testified as a corrections witness in federal district court on the impact of a state law limiting abortion on women held in federal custody in both secure and community environments. Explained conditions of confinement in both settings, the duties of impacted staff, and the ways in which decisions about medical and other care are made.

**2019 US Commission on Civil Rights: "Women in Prison: Seeking Justice Behind Bars"**

Testified on behalf of the DOJ on a wide range of topics affecting incarcerated women. Information provided in my testimony was used to develop a report sent to the President recommending improvements to conditions of confinement for women.

**2025 Fleming v Pistro 4:21cv325-MW/MJF**

Testified on behalf of DOJ to uphold its policy on providing affirming accommodations and treatment to transgender persons in BOP custody.

Expert: Since October 2024, I have provided expert legal consultation in more than 25 cases involving correctional topics such as gender, sexual assault/PREA, mental and physical health mitigation, and post-conviction relief. I have been disclosed as an expert in the following cases:

**2025 Janiah Monroe v. Latoya Hughes 19-1060-JEH**

**2025 Raymond Lewis and Aaron Ortega, on behalf of all others similarly situated v. City of New York, et. al., 23-cv-9460**

**2025 Delisa Hernandez Reid, Administrator of the Estate of Damian Hernandez v. The GEO Group, Inc., et. al., 3:24-cv-309**

**2025 Expert Consultant to the Department of Justice on women's prisons**

**2026 Pricilla Ellis v. United States of America, 23-0632**

**2026 A.B.O. Comix v. San Mateo County, 23-civ-01075**

**2026 Mozzy Clark v. State of Washington, Department of Corrections, et. al., 3:2024cv06058**

**2026 Travis v. Behavioral Systems Southwest Inc., et al., 23-ST-CV-31227**

**2026 Eugenio S. Mathis v. New Mexico Corrections Department, et al., D-101-cv-2022-01074**

**2026 Commonwealth of Virginia v. Jessia Bigler**

**2026 Upperco, et al. v. Lucas County, et al., 3:23-cv-01283**

**TEACHING EXPERIENCE**

**2024 Guest Lecturer, George Washington University**

Taught large undergraduate class about general corrections issues including solitary confinement, mental health treatment, career development, and the role of gender in management and programming.

**2024 Guest Lecturer, Loyola University**

Delivered information on corrections operations and the application of principles of forensic and correctional psychology to approximately 30 undergraduates.

**2021- 2023 Guest Lecturer, American University**

Provided a series of lectures to upper- level to about 100 undergraduate students on corrections operations, emphasizing ethical decision-making and policy development. Taught specific content related to management of women and transgender people in prison.

**2016 Guest Lecturer, George Mason University**

Delivered a presentation and led discussion on corrections and special populations amongst graduate students in a special education class.

**2001 Instructor, Introduction to Psychology**

Developed and delivered lectures and assessments for a semester-long course to approximately 30 undergraduate students.

**1999 Instructor, Experimental Psychology Laboratory**

Prepared weekly lessons, taught in-depth research concepts, and coached in statistics for a section of psychology undergraduate students.

**1992 - 2002 Instructor, Introduction to Psychology**

Prepared weekly lessons, taught in-depth research concepts, and coached in statistics for a section of psychology undergraduate students.

**1992 - 2002 Instructor, Experimental Psychology**

Prepared weekly lessons, taught in-depth research concepts, and coached in statistics for a section of psychology undergraduate students.

**TRAINING AND PRESENTATIONS PROVIDED**

Sought after to both develop and deliver training to internal corrections employees as well as prosecutors, law enforcement communities and public safety officials both nationally and internationally, providing intensive hands-on instruction, seminars and training over the course of 20 years about a variety of topics such as gender

in corrections, program development, management of difficult cases, trauma, reentry, and application of laws to the prison environment, including:

- Educated hundreds of federal judges, prosecutors, defense attorneys, probations officers, and advocates about programs to inform sentencing decisions. During these sessions, delivered details about mental health conditions appropriate for various types of treatment, including sex offender and substance use interventions.
- Chosen to represent the US twice at the United Nations Office on Drugs and Crime's "Criminal Justice Forum for Asia and the Pacific." Collaborated with heads of justice agencies representing more than 20 countries to identify best practices in both secure and community corrections settings. Presented on risk assessment in US prisons, partnership, programming and intervention, and women's services.
- Created agency plan for adopting a trauma-informed approach to prison management, then developed and delivered training on this topic for over 35,000 employees that has been in use for nearly a decade.
- Crafted comprehensive and multi-level training on women offenders, including the development of training for both line staff and executives used by the entire agency for many years
- Developed the BOP's needs assessment tool, "SPARC-13," developed training to implement it agency-wide, and delivered training to all employees and senior colleagues on its use and applications. Briefed congress, DOJ, and external leaders and researchers about this assessment.

Developed and delivered numerous trainings and presentations to thousands of correctional workers within the BOP on the following subjects:

- First Step Act implementation
- Group treatment interventions and programs
- Managing female offenders
- Mental health treatment
- Physical and visual searches of members of special populations
- Reentry and rehabilitation
- Sex offender management
- Sexually Abusive Behavior and PREA
- Substance use treatment, including Medication Assisted Treatment
- Trauma-informed correctional care

Provided presentations, training and seminars to the following national or international agencies and organizations:

- Correctional Leader's Association
- Federal Judiciary
- Major County Sheriffs of America
- National Institute of Justice

- Small and Rural Law Enforcement Executives Association
- Singaporean Delegation
- United Nations Office on Drugs and Crime
- US Attorneys
- US Probation
- US Sentencing Commission

Provided presentations, training and seminars at the following professional conferences or university colloquia:

- American Jail Association
- American Probation and Parole Association
- American Psychological Association
- American Psychology-Law Society
- Association of Female and Juvenile Offenders
- National Sheriff's Institute
- Palo Alto University
- Yale University

**ACCOLADES, RECOGNITIONS AND AWARDS**

- **Alliance for Incarcerated Women Advisory Board**, 2024 - Present
- **Senior Executive Service Appointment**, 2020
- **BOP Special Act Award**, 2019, 2018, 2016, 2012, 2011
- **BOP Myrl E. Alexander National Award**, 2018
- **BOP Supervisor of the Quarter**, 2018
- **BOP Time Off Award**, 2017, 2016, 2014
- **BOP Letter of Commendation**, 2013
- **U.S. Attorney General's Special Commendation**, 2013
- **BOP Sustained Superior Performance Award**, 2011, 2010

**AUTHORED PROFESSIONAL PUBLICATIONS**

Bickart, W., **McLearen, A. M.,** Grady, M., & Stoler, K. (2019). A Descriptive Study of Psychosocial Characteristics and Offense Patterns in Females with Online Child Pornography Offenses. Psychiatry, Psychology, and Law 26(2), pp. 295-311.

Boyd, A. R., **McLearen, A. M.,** Myer, R., & Denney, R. (2006). Detection of Deception. Sarasota, FL: Professional Resource Press.

Clements, C. B., & **McLearen, A. M.** (2002). Research-Based Practice in Corrections: A Selective Review. T. Fagan and B. Ax (Eds.), Correctional Mental Health Handbook, pp. 273-302. Thousand Oaks, CA: Sage.

Cooper, V. G., **McLearen, A. M.,** & Zapf, P. A. (2004). Dispositional Decisions with the Mentally Ill: Police Perceptions and Characteristics. Police Quarterly, 7(3), pp. 295-310.

Hooper, J. F., **McLearen, A. M.,** & Barnett, M. (2005). The Structured Assessment of Treatment Completion for Insanity Acquittees. International Journal of Law and Psychiatry, 28(6), pp. 604-612.

Magaletta, P. R., Diamond, P. M., **McLearen, A. M.,** & Denney R. (2010). Traumatic Brain Injuries in Correctional Populations: Understanding and Responding to an Important Need. In S. Stojkovik (Ed.) Managing Special Populations in Jails and Prisons, Volume II. Kingston, NJ: Civic Research Institute.

Magaletta, P. R., Faust, E., Bickart, W., & **McLearen, A. M.** (2014). Exploring Clinical and Personality Characteristics of Adult Male Internet Only Child Pornography Offenders. International Journal of Offender Therapy and Comparative Criminology.

Magaletta, P.R., **McLearen, A. M.,** Patry, M. (2008, August). Correctional Psychologists: Uniquely Qualified Professionals. Corrections Today 70(4), pp. 56-57, 60.

Magaletta, P. R., Patry, M. W., Gross, N.R., Butterfield, P.M., **McLearen, A. M.,** Patterson, K. L., & Norcross, J. C. (2011). Clinical Practice in Corrections: Providing Service, Obtaining Experience. Psychological Services, 8(4), 343-355.

**McLearen, A. M.** (2013, March). Invited Article: Psychology and the National Institute of Justice. The Gavel.

**McLearen, A. M.** (2015). A diversified Career in Corrections. In C. and A. Bartol (Eds.). Introduction to Forensic Psychology. Sage: Washington, D.C.

**McLearen, A. M.,** Bazerman, I. B., & Bracken, K. (2014). Sexual Offenders. In C. Pietz & C. Mattison (Eds.). Violent Offenders. Oxford University Press: New York, NY.

**McLearen, A. M.,** Breshears, K., Mowell, D., & Leukefeld, K. (2021) A Room of Their Own: Progressive Prison Programs for Women. Corrections Today, Jan-Feb, 34-39.

**McLearen, A. M.,** & Magaletta, P.R. (2010). The Broad Corrections Environment: Understanding the Need Of Diverse Inmate Populations. In T. Fagan and B. Ax (Eds.). Correctional Mental Health: From Theory to Best Practice.

**McLearen, A. M.,** Pietz, C.A., & Denney, R.L. (2003). Evaluation of Psychological Damages. In W. O'Donoghue & E. Levensky (Eds.). Handbook of Forensic Psychology: A Resource for Mental Health and Legal Professionals (pp. 267-299). San Diego: Academic Press.

**McLearen, A. M.** & Ryba, N. L. (2003). Identification of Severe Mental Illness: Can Small Jails Comply with Detection Standards? Journal of Offender Rehabilitation, 37(1), 25-40.

**McLearen, A. M.** & Zapf, P.A. (2007). The death penalty: A Review of Current and Historical Factors for Mental Health Professionals. In R. Ax & T. Fagan (Eds.). International Correctional Mental Health Handbook. Springfield, IL: Charles C. Thomas.

Silva, M., Carlucci, M., Lyons, H., & **McLearen, A. M.** (under review). Disparities Related to Vulnerability for Recruitment of Adults into Commercial Sexual Exploitation. Journal of Interpersonal Violence.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00286-RCL |
| JANE JONES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00401-RCL |
| MARIA MOE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, *in his official capacity* as President of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00653-RCL |

**PROPOSED TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**THIS MATTER** having been opened to the Court by Lowenstein Sandler LLP, GLBT Legal Advocates Defenders, National Center for LGBT Rights, and Brown Goldstein Levy, counsel for Plaintiffs, by way of an emergency motion for temporary restraining order and preliminary injunctive relief ("Plaintiffs' Motion"), and the Court having considered the accompanying papers and the record in the above-captioned matters and

**WHEREAS**, Plaintiffs seek to preserve the status quo and prevent Defendants from implementing Sections 4(a) and 4(c) of Executive Order 14168 against any Plaintiff and

**WHEREAS**, based on the individuali ed findings set forth on the record and in the Court's accompanying memorandum opinion, Plaintiffs Emily Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, endy Doe, oe Doe, Amy Jones, Barbara Jones, Carla Jones, Donna Jones, Jane Jones, and Maria Moe have established that: (i) they are likely to succeed on the merits of their claims (ii) they are likely to suffer imminent and irreparable harm absent injunctive relief (iii) the balance of equities favors Plaintiffs and (iv) injunctive relief is in the public interest

**IT IS** on this day of 2026, **ORDERED** that:

1. Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction is **GRANTED**

2. Defendants and their officers, employees, servants, agents, appointees, and successors are enjoined from implementing Sections 4(a) and 4(c) of Executive Order 14168 against Emily Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, endy Doe, oe Doe, Amy Jones, Barbara Jones, Carla Jones, Donna Jones, Jane Jones, or Maria Moe for the period from May 21, 2026 to August 19, 2026

3. Defendants shall maintain and continue the housing status in women's facilities, including women's prisons and women's halfway houses, where applicable, of Plaintiffs Emily Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, endy Doe, oe Doe, Amy Jones, Barbara Jones, Carla Jones, Donna Jones, Jane Jones, and Maria Moe, unless or until such time as such Plaintiff is released from the custody of the BOP and

4. Defendants shall continue providing Plaintiffs Emily Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, endy Doe, oe Doe, Amy Jones, Barbara Jones, Carla Jones, Donna Jones, Jane Jones, and Maria Moe medical treatment for gender dysphoria and any medically necessary post-surgical care consistent with the policies in place immediately before January 20, 2025.

As required by the Prison Litigation Reform Act, the Court finds that this preliminary relief is narrowly drawn, extends no further than necessary to correct the harm that the Court finds requires preliminary relief, and is the least intrusive means necessary to correct that harm. 18 U.S.C. § 3626(a)(2). Plaintiffs have shown a substantial likelihood of success on their claims that implementation of Sections 4(a) and 4(c) of Executive Order 14168 would be unlawful as applied to them and would cause them immediate, irreparable harm. Preliminary relief preventing the implementation of those sections as to Plaintiffs is necessary to correct this immediate, irreparable harm.

This Order is narrowly drawn and extends no further than necessary to correct the harm that the Court finds requires preliminary relief. It restrains Defendants from applying only the challenged sections of the Executive Order and BOP's policies implementing those sections, and it restrains Defendants from doing so only as to Plaintiffs. Further, this Order is the least intrusive

action the Court could take that will ensure Plaintiffs are not deprived of their rights or subjected to irreparable harm. The Order does not contemplate ongoing judicial supervision over Defendants' day-to-day management and operations of BOP facilities it simply preserves Defendants' own prior determinations regarding Plaintiffs' housing and medical care while this litigation proceeds, and pauses implementation of sections of an Executive Order that eliminate Defendants' discretion to determine housing and medical care on an individuali ed basis. The Court has considered any adverse impact on public safety or on the operation of the criminal justice system caused by the preliminary relief and has given substantial weight to such impacts. *Id.* The Court finds that no adverse impacts on public safety or the operation of the criminal justice system will result from maintaining the status quo of Plaintiffs' medical care and housing status in women's facilities for 90 days while this litigation proceeds.

**ORDERED** this day of , 2026.

Hon. Royce Lamberth
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br>Defendants. | Civ. A. No. 25-286 (RCL)<br><br>Consolidated with *Jones v. Blanche*, Civ. A. No. 25-401 (RCL); *Moe v. Trump*, Civ. A. No. 25-653 (RCL) |

**DECLARATION OF RICK STOVER,
SPECIAL ASSISTANT TO THE DIRECTOR**

I, Rick Stover, declare and state as follows:

1. I am currently employed by the Federal Bureau of Prisons (Bureau) as Special Assistant to the Director. I have been in this position since August 2025.

2. Prior to becoming Special Assistant to the Director, I worked in positions of increasing responsibility within the Bureau, most recently as Senior Deputy Assistant Director of the Designation and Sentence Computation and the Warden at the Federal Correctional Institution in Danbury, Connecticut.

3. I am familiar with the Bureau's general policies and practices on housing for inmates who identify with the opposite biological sex, including the rationales for those policies. As part of my official duties, I have access to records maintained in the ordinary course of business by the Bureau, including inmate medical and mental health records.

4. The information below is based upon personal knowledge and upon information made available to me in the course of my official duties.

**MATERIAL UNDER SEAL DELETED**

5. There are approximately 1,022 inmates in BOP custody that have a diagnosis of gender dysphoria. About 600 of these inmates are on cross-sex hormones. Of the 1,022 inmates diagnosed with gender dysphoria, 13 are currently housed with inmates of the opposite sex (all are biological males). These 13 inmates were housed in female facilities for several reasons, none of which was because the Bureau found that it could not successfully keep the inmates safe if housed with male inmates.

6. BOP's prior Transgender Executive Council (TEC) had compiled information regarding the medical and psychological care provided to this population, as well as appropriate housing for this population, during the TEC's existence.

7. The Bureau of Prisons designates facilities into five categories, Minimum, Low, Medium, High, and Administrative. In general, non-violent offenders are housed in lower security prisons and the more violent offenders are housed in higher security prisons.

8. Plaintiffs Carla Jones, Emily Doe, Mary Doe, and Zoe Doe are biological males currently housed at the [redacted] is a female administrative security federal medical center.

9. Plaintiff Sara Doe is a biological male currently housed at the [redacted] is a low security federal correctional institution that houses women.

10. Plaintiffs Lois and Olivia Doe are biological male inmates currently housed at the [redacted] is a low security federal correctional institution that houses women.

11. Plaintiff Amy Jones is a biological male currently housed at the [redacted] is an administrative

**MATERIAL UNDER SEAL DELETED**

security federal correctional facility that houses a low security female cadre. Jones is housed with the women.

12. Plaintiff Maria Moe is a biological male currently housed at the [redacted] is a low security federal correctional institution that houses both men and women. Moe is housed with the women.

13. Several Plaintiffs are currently housed in Residential Reentry Management field offices, also known as Halfway Houses or RRCs. To qualify for a halfway house, the inmate must be near the end of his or her sentence and be approved for halfway house placement. BOP considers the nature and circumstances of their offense and the history and characteristics of the offender, among other considerations.

14. Plaintiff Sally Doe is a biological male that is currently housed with females at the [redacted] field office.

15. Plaintiff Wendy Doe is a biological male currently housed with females at the [redacted] field office.

16. Plaintiff Jane Jones is a biological male currently housed with females at the [redacted] field office.

17. Plaintiff Barbara Jones is a biological male currently housed with females at the [redacted] field office.

18. Plaintiff Rachel Doe is a biological male currently in Home Confinement. Rachel Doe's expected release date is [redacted]. BOP currently has no plans to place Rachel Doe in a BOP facility. Rachel Doe would only be placed in a BOP facility if he violates the terms of home confinement.

**MATERIAL UNDER SEAL DELETED**

19. Plaintiff Ellen Doe was housed with female inmates at [redacted], but requested to be transferred to a male facility where he is currently housed. He is currently housed in the [redacted]. Ellen Doe's records do not reflect that he has been sexually assaulted at [redacted]

20. Plaintiff Sophia Doe was housed with female inmates at [redacted] but requested to be transferred to a male facility. He is currently housed at [redacted], a male facility. Sophia Doe's records do not reflect that he has been sexually assaulted at his current facility, [redacted]

21. BOP's Designation and Sentence Computation Center in 2026 (and previously the Transgender Executive Council in 2024 and 2025) performed individual assessments to determine the appropriate housing for each plaintiff. The assessments included an evaluation of each inmate's unique medical record, psychology record, disciplinary record, and security level. In determining the appropriate housing placement for each Plaintiff now, the BOP considers on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

22. Based on these factors, the Bureau found that placement at the Federal Medical Center located in Rochester, Minnesota (FMC Rochester) or the United States Medical Center for Federal Prisoners in Springfield, Missouri (MCFP Springfield) would serve as appropriate locations for the plaintiffs. The Bureau found that placing the plaintiffs at these medical centers would be appropriate because the inmate population at these medical centers are largely non-violent and tend to have only minor infractions in their disciplinary history with the Bureau. Additionally, as Dr. Weidow stated in his declaration, these Medical Centers are appropriate facilities because they are able to provide appropriate treatment to these inmates. FMC Rochester

**MATERIAL UNDER SEAL DELETED**

is a medical center for inmates requiring specialized or long-term medical or mental health care, while MCFP Springfield houses inmates requiring comprehensive medical or mental health care. Plaintiffs Maria Moe, Emily Doe, Mary Doe, Lois Doe, Sara Doe, and Olivia Doe will be housed in either of these two medical centers. The specific designation for the other Plaintiffs will be discussed below, but they too will be placed in either medical center.

23. It is BOP's correctional judgment that housing inmates according to their biological sex ensures bodily privacy and safety for all inmates and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships.

24. FMC Rochester has a population size of approximately 834 total inmates. In 2025, FMC Rochester had a total of 12 guilty findings of assaults on inmates (0.014%) and zero substantiated allegations of sexual assault.

25. FMC Rochester currently houses four other inmates who are diagnosed with Gender Dysphoria.

26. MCFP Springfield has a population size of approximately 1,120 inmates. In 2025, MCFP Springfield had a total of 28 guilty findings of assaults on inmates (0.025%) and one substantiated allegation of sexual assault.

27. MCFP Springfield currently houses four other inmates who are diagnosed with Gender Dysphoria and at least one of them is receiving cross-sex hormones

**Zoe Doe**

28. Zoe Doe is currently serving a life sentence in the BOP. Zoe Doe is currently housed at [redacted] has a population size of approximately 1,187 inmates. In 2025, [redacted] had a total of 31 guilty findings of assaults on inmates (0.025%), more than 2.5 times the assaults at FMC Rochester, and one substantiated allegation of sexual assault.

**MATERIAL UNDER SEAL DELETED**

29. The TEC had been tracking Zoe Doe's progress since 2016. Zoe Doe sought to have the BOP provide him with cross sex surgery and was subsequently placed in a female facility as part of the Bureau's previous policy—the now rescinded Transgender Offender Manual—which required that an inmate seeking cross sex surgery be housed with women for at least one year prior to being eligible for cross sex surgery. This requirement afforded both the inmate and the BOP the opportunity to observe whether the inmate would be able to adjust to living with women prior to receiving cross sex surgery. Zoe Doe's placement in a female facility was also the result of a lawsuit that Zoe Doe filed to have the Bureau provide him with cross sex surgery. Zoe Doe underwent cross sex surgery in [redacted] Accordingly, the Bureau's reason for placing Zoe Doe in a female facility is unrelated to any concern about keeping him safe in a male facility.

30. BOP performed an individualized assessment of Zoe Doe and determined after reviewing his security level and mental health needs that FMC Rochester would be an appropriate placement. FMC Rochester is a Medical Referral Center that serves inmates with medical and/or mental health treatment needs. BOP staff in the Designation and Sentence Computation Center consulted with staff in BOP's Psychology Services Branch and with BOP Psychiatrists and determined that FMC Rochester will provide appropriate care to address Zoe Doe's mental and medical needs, including providing Zoe Doe with any post-surgical care that Zoe Doe requires. To the extent that Zoe Doe needs to engage in routine medical maintenance to ensure his surgical vagina remains open, the medical staff at FMC Rochester will be able to provide Zoe Doe with a private setting to do so.

**MATERIAL UNDER SEAL DELETED**

31. I have reviewed Zoe Doe's records. After Zoe Doe entered BOP custody in [redacted], Zoe Doe was housed in men's prisons until [redacted]. During the time he was in the men's prison, Zoe Doe made no reports of rapes or assaults that were substantiated.

32. Zoe Doe also states that he is small in stature and elderly. BOP houses many small, elderly men in their facilities, including Medical Referral Centers like FMC Rochester, and is equipped to keep them safe.

**<u>Carla Jones</u>**

33. Carla Jones is currently serving a life sentence in the BOP and housed at [redacted] BOP has been tracking Carla Jones' progress since 2019. Carla Jones sought to have the BOP provide him with cross sex surgery and was subsequently placed in a female facility as part of the Bureau's previous policy requiring spending at least one year in a female facility to be eligible for such surgery. Carla Jones also filed a lawsuit against the BOP to have the Bureau provide him with cross sex surgery. Similar to Zoe Doe, BOP's reason for placing Carla Jones in a female facility was unrelated to any concern about keeping Carla Jones safe in a male facility; and in fact, there was no such concern.

34. After BOP transferred Carla Jones to a female facility [redacted] in 2023, his TEC records show that he stopped eating his meals, refused his medication, and was put on suicide watch for about five months following the transfer (and then again in September 2024). Carla Jones' mental health care level, which classifies inmates based on their need for mental health services, increased to [redacted] (requiring residential or enhanced outpatient mental health care) because of increased suicidal thoughts after moving to a women's facility.

35. BOP performed an individualized assessment of Carla Jones and determined after reviewing his security level and mental health needs that FMC Rochester would be an appropriate

**MATERIAL UNDER SEAL DELETED**

placement. FMC Rochester is a suitable placement given Jones' Mental Health Care level and previous mental health history and because it is a Medical Referral Center that provides enhanced medical and/or mental health treatment for inmates. BOP staff in the Designation and Sentence Computation Center consulted with staff in BOP's Psychology Services Branch and with BOP psychiatrists and determined that FMC Rochester will provide appropriate care to address Carla Jones' mental and medical needs.

36. I have reviewed Carla Jones' records. He was housed in a men's prison from [redacted] The last time that Carla Jones alleged being assaulted in a men's prison was 16 years ago. The record search reveals that he reported to Health Services that he was "forced" to perform oral sex in 2010 but there is no record substantiating this allegation or any indication that it was because of his trans-identifying status.

37. BOP understands that Carla Jones is [redacted] BOP is able to keep men in this age group safe in men's prison.

**Amy Jones**

38. Amy Jones has a projected release date in [redacted] and is currently housed at [redacted]. The TEC had been tracking Amy Jones' progress since 2022. Amy Jones sought to have the BOP provide him with cross sex surgery and was subsequently placed in a female facility as part of the Bureau's previous policy under the now rescinded Transgender Offender Manual. Amy Jones also brought suit to be placed in a female facility and be provided with cross sex surgery. Similar to Zoe Doe and Carla Jones, the Bureau's reason for placing Amy Jones in a female facility is unrelated to any concern about keeping him safe in a male facility. The placement in a female facility was one part of the process required for inmates seeking cross sex surgery.

**MATERIAL UNDER SEAL DELETED**

39. [redacted] has a population size of approximately 855 inmates. In 2025, [redacted] had a total of 7 guilty findings of assaults on inmates. In 2025, [redacted] had zero substantiated sexual assault allegations.

40. BOP performed an individualized assessment of Amy Jones and determined after reviewing his security level and mental health needs that FMC Rochester would be an appropriate placement. FMC Rochester is a suitable placement given his previous mental health history. BOP staff in the Designation and Sentence Computation Center consulted with staff in BOP's Psychology Services Branch and with BOP psychiatrists and determined that FMC Rochester will provide appropriate care to address Amy Jones' mental and medical needs.

41. Amy Jones states that he was raped in [redacted]. I have reviewed the relevant records. The sexual assault allegation was unsubstantiated. It was determined that Jones was punched after Jones struck the inmate with a [redacted] but there was insufficient evidence of sexual assault.

42. Amy Jones has required at least 20 sexual abuse interventions claiming to be a victim of sexual assaults with several claims made against medical staff. These allegations are unsubstantiated. There are two prior sexual abuse interventions as a perpetrator including one while at [redacted] a women's prison.

**Maria Moe**

43. Maria Moe has a projected release date in [redacted]. Maria Moe is currently housed at [redacted] which has a population size of approximately 1,145 inmates, with a total of 17 guilty findings of assaults on inmates and zero substantiated sexual assault allegations. The TEC had been tracking Maria Moe's progress since 2021. Maria Moe was placed in a female facility due to the BOP's previous practice of placing individuals in facilities consistent with their housing

**MATERIAL UNDER SEAL DELETED**

prior to coming into BOP custody. Maria Moe had been housed with females while in custody prior to entering the BOP.

44. While in female prison, there have been two sexual abuse interventions with Maria Moe as the perpetrator in both – the most recent in 2023. Moreover, in 2022, Maria Moe, while in a women's prison, was found to have engaged in [redacted] The charge was substantiated.

45. BOP performed an individualized assessment of Maria Moe and determined after reviewing his security level and mental health needs that both FMC Rochester or MCFP Springfield are appropriate locations for Maria Doe. BOP staff in the Designation and Computation Center had consulted with BOP staff in the Psychology Services Branch, and with BOP psychiatrists in making that determination.

**Emily Doe**

46. Emily Doe has a projected release date in [redacted] Emily Doe is currently housed at [redacted] The TEC had been tracking Emily Doe's progress since 2022. Similar to plaintiffs Zoe Doe, Carla Jones, and Amy Jones, Emily Doe sought to have the BOP provide him with cross sex surgery and was subsequently placed in a female facility as part of the Bureau's previous policy for inmates seeking such surgery. The Bureau's reason for placing Emily Doe in a female facility is unrelated to any concern about keep him safe in a male facility.

47. I have reviewed the records of Emily Doe. He was incarcerated in a men's prison from [redacted] both before and after he began hormones in 2016—and there were no records of allegations of sexual harassments or assault against him, let alone substantiated reports of him being victimized. While in women's prison at [redacted] there have been two sexual abuse interventions – once as a reported victim and once as a reported perpetrator.

**MATERIAL UNDER SEAL DELETED**

48. BOP performed an individualized assessment of Emily Doe and based on Emily Doe's security level, medical and mental health needs, FMC Rochester and MCFP Springfield are both deemed as appropriate locations to house Emily Doe.

**Mary Doe**

49. Mary Doe is currently serving a life sentence with the BOP. Mary Doe is currently incarcerated at [redacted] The TEC had been tracking Mary Doe's progress since 2023. Similar to plaintiffs Zoe Doe, Carla Jones, Amy Jones, and Emily Doe, Mary Doe sought to have the BOP provide him with cross sex surgery and was subsequently placed in a female facility as part of the Bureau's previous policy requiring at least one year of housing in a female facility to see if he could live among women successfully prior to receiving cross sex surgery. The Bureau's reason for placing Mary Doe in a female facility is thus unrelated to any concern about keeping him safe in a male facility.

50. Mary Doe alleges, between [redacted] being sexually assaulted in men's prisons and raped twice. According to BOP records, these allegations were determined to be unsubstantiated following an investigation.

51. Mary Doe has also been the subject of seven sexual abuse interventions as a perpetrator and all seven occurred while he was housed at female facilities, with the most recent one being in August 2025.

52. BOP performed an individualized assessment of Mary Doe and based on Mary Doe's security level, medical and mental health needs, FMC Rochester and MCFP Springfield are deemed as appropriate locations. BOP made this determination after consulting with BOP staff in the Psychology Services Branch, and with BOP psychiatrists.

**MATERIAL UNDER SEAL DELETED**

53. Given that there have been multiple allegations of sexual aggressiveness from the inmate while housed at a female facility, BOP is also concerned about the continued safety of females housed with the inmate.

**Lois Doe**

54. Lois Doe has a projected release date in [redacted] Lois Doe is currently housed at [redacted] has a total population of approximately 516 inmates. In 2025, [redacted] had 9 guilty findings of assaults on inmates and zero substantiated sexual assault allegations.

55. The TEC had been tracking Lois Doe's progress since 2019. Similar to plaintiffs Zoe Doe, Carla Jones, Amy Jones, Emily Doe, and Mary Doe, Lois Doe sought to have the BOP provide him with cross sex surgery and was subsequently placed in a female facility under the Bureau's previous policy to determine stability and safety in that environment. Accordingly, the Bureau's reason for placing Lois Doe in a female facility is unrelated to any concern about keeping him safe in a male facility.

56. I have reviewed Lois Doe's records. He was an inmate in BOP's men's prisons from [redacted] His records do not reflect any substantiated sexual assaults on him while in a men's prison.

57. BOP performed an individualized assessment of Lois Doe, and based on Lois Doe's security level, medical and mental health needs, both FMC Rochester MCFP Springfield are deemed appropriate locations. In making that determination, BOP staff in the Designation and Computation Center had consulted with BOP staff in the Psychology Services Branch and with BOP psychiatrists.

**MATERIAL UNDER SEAL DELETED**

**Sara Doe**

58. Sara Doe has a projected release date in [redacted] Sara Doe is currently housed at [redacted] (approximately 1,033 inmates, 43 guilty findings of assaults on inmates, and zero substantiated sexual assault allegations). Sara Doe was placed in a female facility upon entering BOP's custody due to the BOP's previous practice of placing individuals in facilities consistent with their housing prior to coming into BOP custody. The Bureau's reason for placing Sara Doe in a female facility is thus unrelated to any concern about keeping him safe in a male facility.

59. BOP performed an individualized assessment of Sara Doe's security level, medical, and mental health needs, and deemed FMC Rochester and MCFP Springfield as appropriate locations.

**Olivia Doe**

60. Olivia Doe has a projected release date in [redacted] Olivia Doe is currently housed at [redacted] As noted above, [redacted] has approximately 516 inmates, and in 2025, [redacted] had 9 guilty findings of assaults on inmates and zero substantiated sexual assault allegations.

61. The TEC had been tracking Olivia Doe's progress since 2019. Olivia Doe was originally housed in a male facility while housed with the BOP. In 2023 Olivia Doe's request to be housed in a female facility for gender affirming reasons was approved. The Bureau's reason for placing Olivia Doe in a female facility is unrelated to any concern about keep him safe in a male facility.

62. Olivia Doe states that he was raped in [redacted] while housed at [redacted] a men's facility. Those allegations were determined to be unfounded.

**MATERIAL UNDER SEAL DELETED**

63. BOP performed an individualized assessment of Olivia Doe's security level, medical, and mental health needs, and deemed both FMC Rochester and MCFP Springfield to be appropriate locations. In making that determination, BOP staff in the Designation and Computation Center had consulted with BOP staff in the Psychology Services Branch and with BOP psychiatrists.

**Halfway House Transfers**

64. Sally Doe is currently housed at the [redacted] field office. Sally Doe has a projected release date in [redacted] The BOP will have Sally Doe transferred to the male side of the Halfway House. This facility reported zero guilty findings for assaults on inmates in 2024 and 2025.

65. Sally Doe was placed in a female facility as part of the progression towards surgical intervention, per the now rescinded Transgender Offender Manual. The Bureau's reason for placing Sally Doe in a female facility is thus unrelated to any concern about keeping him safe in a male facility.

66. Wendy Doe is currently housed at the [redacted] field office. Wendy Doe entered BOP custody after already having a vaginoplasty and was placed in a women's facility pursuant to BOP's prior policy that such inmates be processed as women. In 2025, the [redacted] field office reported zero substantiated sexual assault allegations, and in the last three years, a total of two guilty findings for assaults on inmates. Wendy Doe has a projected release date in [redacted] BOP will have Wendy Doe transferred to the male side of the Halfway House.

67. Jane Jones is currently housed at the [redacted] field office. Like Wendy Doe, Jane Jones entered BOP custody after already having a vaginoplasty

**MATERIAL UNDER SEAL DELETED**

and was placed in a women's facility pursuant to BOP's prior policy that such inmates be processed as women. In 2025, the [redacted] field office reported one substantiated sexual assault allegation and no guilty findings for assaults on inmates in either 2024 or 2025. Jane Jones has a projected release date in [redacted] BOP will have Jane Jones transferred to the male side of the Halfway House.

68. Barbara Jones is currently housed at the [redacted] field office. In 2025, this facility reported two guilty findings for assaults on inmates. Barbara Jones has a projected release date in [redacted] The BOP will have Barbara Jones transferred to the male side of the Halfway House.

69. Barbara Jones was placed in a female facility as part of the progression towards cross sex surgical intervention, per the now rescinded Transgender Offender Manual. The Bureau's reason for placing Barbara Jones in a female facility is thus unrelated to any concern about keeping him safe in a male facility.

70. During Barbara's time in women's prisons, he has six sexual abuse interventions. Two were from FCI [redacted] in [redacted] when he alleges being sexually propositioned by another inmate, and in [redacted] when he reported having been sexually harassed by staff. The other four sexual abuse interventions were as a perpetrator – two from [redacted] and two from [redacted] (both women's prisons). Given that this inmate has been accused on four occasions of sexual predation, there are significant concerns for continuing to house him with females.

71. Donna Jones was released from BOP custody on [redacted]

72. Attached to this declaration are true and correct copies of BOP's most recent photos of Plaintiffs. Doe Zoe – page 1; Sally Doe – page 2; Emily Doe – page 3; Wendy Doe – page 4; Mary Doe – page 5; Rachel Doe – page 6; Sara Doe – page 7; Lois Doe – page 8; Carla Jones –

page 9; Amy Jones – page 10; Maria Moe – page 11; Olivia Doe – page 12; Jane Jones – page 13; Barbara Jones – page 14.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 28, 2026

RICHARD STOVER
Digitally signed by RICHARD STOVER
Date: 2026.05.28 14:37:04 -05'00'

RICK STOVER

# MATERIAL UNDER SEAL DELETED

**MATERIAL UNDER SEAL DELETED**

**MATERIAL UNDER SEAL DELETED**

MATERIAL UNDER SEAL DELETED

MATERIAL UNDER SEAL DELETED

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

**MATERIAL UNDER SEAL DELETED**

**MATERIAL UNDER SEAL DELETED**

**MATERIAL UNDER SEAL DELETED**

**MATERIAL UNDER SEAL DELETED**

**MATERIAL UNDER SEAL DELETED**

**MATERIAL UNDER SEAL DELETED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JANE DOE, *et al.*,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,

Defendants.

Civ. A. No. 25-286 (RCL)

Consolidated with *Jones v. Blanche*, Civ. A. No. 25-401 (RCL); *Moe v. Trump*, Civ. A. No. 25-653 (RCL)

**DECLARATION OF JOEL ROMAN**

I, Joel Roman, do hereby declare as follows:

1. I am employed by the Federal Bureau of Prisons (BOP) as the Section Chief over Designations, at Designation & Sentence Computation Center (DSCC) since June 18, 2023. As the Section Chief over Designations, I oversee the designations of individuals into BOP facilities.

2. Prior to becoming the Section Chief over Designations at DSCC, I worked as an Operation Manager at DSCC, from August 2020 to June 2023. Prior to working at DSCC, I was a Unit Manager at the Federal Correctional Institution at Terminal Island, California from July 2015 to August 2020. Prior to working at Terminal Island, I worked as a Unit Manager at the Federal Correctional Complex (FCC) in Victorville, California, from March 2013 to July 2015. Prior to being a Unit Manager at FCC Victorville, I worked as a Case Manager from October 2006 to March 2013. Prior to becoming a Case Manager, I worked as a Correctional Officer from April 2005 to October 2006, at FCC Victorville. I started my career as a Correctional Officer at the Metropolitan Detention Center, Los Angeles (MDCLA). I worked as a Correctional Officer at MDCLA from October 2003 to April 2005.

3. The BOP makes individualized determinations when making placement decisions to reduce the risk of assaults. Some of the factors taken into consideration are an inmate's vulnerability to sexual victimization, prior victimization history, physical stature or presentation, and other factors that make an inmate a target for abuse.

4. If a male inmate who trans-identifies as a woman such as Plaintiffs were to file an administrative grievance about their transfer to a men's prison because of concerns about assault or harassment, BOP would have many options available to provide relief to reduce their risk of harm in the men's prison.

5. If an inmate is having difficulty adjusting to a new facility, BOP has discretion to transfer the inmate to a different facility. If an inmate is having issues being housed with a specific cellmate, BOP has the ability to change the inmate's cell assignment. BOP also has the option of placing an inmate in a separate housing unit to keep potential threats away from the potential victim.

6. Also, if that trans-identifying inmate nevertheless experienced unwanted sexual advances or threats made to the inmate's safety and filed a grievance reporting the conduct, BOP has several options at its disposal to assist in mitigating potential threats to the inmate's safety.

7. For complaints regarding sexual assault and harassment, there are numerous ways for inmates to report incidents. An inmate can write directly to the Warden, Regional Director or Director of BOP; file a Request for Administrative Remedy; or contact the U.S. Department of Justice Office of Inspector General directly.

8. BOP has a zero tolerance policy toward sexual abuse and sexual harassment, and provides routine training to all staff to help detect incidents, perpetrators, and inmate victims of sexually abusive behavior as well as instruction on how to properly and timely intervene.

9. At the institutional level, once staff are notified of the threat, they can begin monitoring predatory inmates and issuing separation orders that notify staff to keep certain inmates away from one another, including not placing them in the same programs. BOP Correctional Officers are trained to identify predatory behavior indicators, and act swiftly to minimize the risk of harm to other inmates.

10. There are BOP staff members that have received PREA compliance training and training regarding the management of vulnerable populations.

11. The Bureau utilizes both protective custody and restrictive housing when a credible threat is identified but understands how to use these tools in manner that does not create a punitive condition for the potential victim.

12. Mental health treatment is also available to inmates that may need to speak with a mental health professional. Inmates that experience elevated anxiety, depression, suicidal ideations, and other stressors can have regular visits to a psychologist or utilize crisis intervention services, and other counseling services.

13. Staff at each institution also regularly review the files of certain inmates, including those who present a threat to staff or institutional security, or pose a significant threat to inmate safety. Staff review the file for the purpose of determining inmates with a history of assaultive behavior or a history of sexual offenses to keep the institution safe and secure.

14. Utilizing the administrative remedy process allows BOP to address inmate concerns regarding unwanted sexual advances or threats in an efficient and effective manner.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 28th day of May 2026.

JOEL ROMAN Digitally signed by JOEL ROMAN
Date: 2026.05.28 08:35:40 -05'00'

Joel Roman
Section Chief, Designations
Designations & Sentence Computation Center
Grand Prairie, Texas
Federal Bureau of Prisons

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br>Defendants. | Civ. A. No. 25-286 (RCL)<br><br>Consolidated with *Jones v. Blanche*, Civ. A. No. 25-401 (RCL); *Moe v. Trump*, Civ. A. No. 25-653 (RCL) |

**DECLARATION OF DR. EDWARD WEIDOW**

I, Edward Weidow, do hereby declare as follows:

1. I am employed by the Federal Bureau of Prisons ("BOP") as the Chief of Psychiatry. I have been employed with the BOP since July 24, 2016.

2. I began my career with the BOP as a staff psychiatrist at the Coleman Federal Correctional Complex in Sumterville, Florida. I became the National Telepsychiatry Coordinator on June 7, 2020. I have served as the Chief of Psychiatry since April 5, 2026.

3. I've been involved with transgender clinical care as a physician since 2002, primarily providing treatment for co-morbid psychiatric and psychological conditions. While working for the BOP, I was named to the Transitional Clinical Care Team in 2023 providing assessments, education, and treatment recommendations for patients referred by BOP clinical staff. I was named to the Transgender Utilization Review Advisory Group in 2023 reviewing cases and assessing patients referred for gender affirming surgeries by the Transgender Executive Council (TEC).

4. I have reviewed the medical and psychology files of the plaintiffs in these consolidated cases and I believe that the Bureau can provide the appropriate medical and mental health care to these individuals if they were transferred to either the Federal Medical Center in Rochester, Minnesota (FMC Rochester) or the Medical Center for Federal Prisoners in Springfield, Missouri (MCFP Springfield). FMC Rochester is an appropriate facility for several reasons. FMC Rochester has the most available beds in less restrictive settings and would be able to accommodate more psychological treatment options. MCFP Springfield is also able to provide appropriate psychological treatment to these inmates.

**MATERIAL UNDER SEAL DELETED**

**Carla Jones**

5. Carla Jones is a [redacted] biologically male inmate serving a life sentence. Carla Jones was noted to engage cross-dressing behavior beginning in 2012, however the psychology assessment at the time did not report any psychiatric or psychological symptoms and the inmate openly identified as being homosexual.

6. Carla Jones was seen by a BOP psychologist in May 2016, and Carla Jones declared being transgender. It is important to note that transgender is not a diagnosis and is based solely on self-report.

7. Carla Jones requested an evaluation by a psychologist in August 2016 specifically for the diagnosis of gender dysphoria (GD). However, the psychologist noted that Carla Jones did not meet the criteria for GD at that time given the lack of either history or evidence of affective dysfunction.

8. In January 2017, Carla Jones was seen for a Suicide Risk Assessment (SRA) due to reported frustrations with medical staff. Carla Jones reported to psychology staff that he wrote a letter to get information on self-castration that he planned to send BOP if BOP did not treat him for GD.

9. A Diagnostic and Care Level Formulation (DCLF) was performed in March 2017 when diagnosis of GD was given. In that assessment the psychologist noted that the patient's reported distress was a function of not having received the desired treatment from medical – not specifically from gender incongruence. The note specifically states that Carla Jones reported more feminine than homosexual but does not comment on whether the inmate actually identified as female at that time.

10. The first SRA documented on Carla Jones occurred in January 2017 and was precipitated by the inmate not receiving the desired care from medical.

11. Carla Jones began hormones in 2017 and since that time, Carla Jones has had at least one SRA every year. Below are the number of SRAs in each of the identified year:

2017 – 1,
2018 – 2,
2019 – 1,
2020 – 4,
2021 – 2,
2022 – 2,
2023 – 6,
2024 – 4,
2025 – 5,
2026 – 3.

**MATERIAL UNDER SEAL DELETED**

12. Carla Jones' initiation of hormones led to an increase in suicidal threats. It is also noted that since being at a female facility beginning in [redacted], the inmate has had approximately 18 suicide risk assessments. This indicates that neither hormones nor transfer to a female facility has resulted in any resolution of mental health complaints, which have instead increased during that time as measured by the number of suicide risk assessments.

13. Carla Jones did begin treatment for depression with fluoxetine in 2021. Diagnosis of major depressive disorder (MDD) was given; however, this appears to have been specifically caused by lockdowns associated with the COVID pandemic at that time.

14. [redacted] has continued since 2021 with no improvement in the inmate's depression as measured by the number of SRAs. The most recent, available DCLF (there is one dated [redacted] listed as being "in progress" and is not currently available) from October 2025 no longer lists MDD as a diagnosis but instead lists unspecified depressive disorder although the number of suicidal threats has not decreased. Changes in mood symptoms could appropriately be addressed similarly at either FMC Rochester or MCFP Springfield by increasing psychological interventions and/or medical assessment and adjusting or changing current psychotropic regimen.

**Barbara Jones**

15. Barbara Jones is a [redacted] biologically male inmate incarcerated in the BOP since [redacted]. There is a psychology intake screening from 2008 that noted no history of mental illness. Transgender or other concerns were not mentioned. In April 2017, inmate Barbara Jones reported that he recently (i.e., earlier this month) determined that he wished to begin telling others (i.e., Psychology Services staff, other institution staff, inmates) about his "lifelong" desire to be identified as a woman and his identity as a transgender female.

16. None of Barbara Jones' prior records indicate that he has notified other Psychology Services staff of his status as a transgender inmate. No other significant history or assessment was provided, but the diagnosis of gender dysphoria was made. Hormones were started in July 2017. Barbara Jones was housed in male institutions until [redacted] when he was moved to [redacted] a female facility. He remained at [redacted] until August 2024 when he was moved to yet another female facility, [redacted] He has only two SRAs – one in 2017 and one in 2025.

17. The documentation of the assessment providing the diagnosis of gender dysphoria is insufficient to support that diagnosis. It is possible that subsequent documentation might be more supportive, however it is noted that hormones began following that initial evaluation. Barbara Jones has no other history of psychiatric disorders and has taken no psychotropic medications documented in the medical records.

18. Any gender dysphoria symptoms appear to be stable from available documentation. Should an increase in dysphoric symptoms be noted following a transfer to the men's side of the halfway house where he currently resides, psychological interventions including increased psychotherapeutic contacts could be made and medical interventions such as assessment for and initiation of psychiatric medications would be available to appropriately address them.

**MATERIAL UNDER SEAL DELETED**

**Zoe Doe**

19. Zoe Doe, a biologically male inmate, entered BOP custody in [redacted] and is serving a life sentence. Records from [redacted] indicate that he entered BOP custody with a diagnosis of Gender Identity Disorder, a DSM IV diagnosis that was later changed to Gender Dysphoria with the publication of DSM V. Hormones appear to have been started in [redacted] Zoe Doe was in male facilities from [redacted] when he was transferred to [redacted] He does have a history of reported depression, anxiety symptoms, but these were ultimately attributed to gender dysphoria, and no psychiatric medications are currently prescribed.

20. Zoe Doe has lived as a female on hormones for at least the past 14 years and underwent cross sex surgery in [redacted]. It's unclear that the diagnosis of gender dysphoria should still apply given that there is no reported dysphoria, and any mood symptoms would not be related to the incongruence of the perceived gender. So, while it is possible that this patient's mood might worsen if moved to a male facility, it would not be from gender dysphoria but rather from the possible fear of having female anatomy in a male facility. There are no differences in the available psychological or medical treatments for a worsening of mood symptoms as both male and female facilities would be able to provide increased contact and treatment as needed. Zoe Doe can be properly cared for at FMC Rochester or MCFP Springfield.

**Sally Doe**

21. Sally Doe is a [redacted] biologically male inmate who entered BOP custody in [redacted] Initial psychological and medical assessments noted a history of various psychiatric and psychological diagnoses including both mood and personality disorders. It appears that Sally Doe either came to BOP with a prescription for [redacted] or had one started at intake. In [redacted] he began taking [redacted] and declared himself transgender. In [redacted] he was evaluated by a psychologist and diagnosed with GD and hormones were started in that same month.

22. The history supporting GD diagnosis is not documented clearly. He had one SRA while at [redacted] in February 2025 after being told that a transfer to a male facility would be necessary. However, a SRA note indicates that this was precautionary. Sally Doe denied suicidality and indicated that although worried about a potential move, he was motivated to continue pursuing his personal goals.

23. It appears that Sally Doe is psychiatrically stable. However, should an increase in mood symptoms occur following a transfer to the men's side of the halfway house where he currently resides, psychological and medical interventions and treatments are available at the halfway house to appropriately address them.

**Lois Doe**

24. Lois Doe is a [redacted] biologically male inmate in BOP custody since [redacted]. He arrived with the diagnosis of gender dysphoria and reported having been on cross-sex hormones since 2008. He also arrived with a reported diagnosis of unspecified depression for which

**MATERIAL UNDER SEAL DELETED**

[redacted] has been prescribed since 2019 with reported good effect. He has two previous SRAs, however, during the first one in 2021, he reported that his suicidal thoughts had occurred prior to incarceration and denied suicidality while in BOP custody. The second, in 2025, was reportedly precautionary following the issuing of the executive order mandating biologically male inmates be moved to male facilities, and Lois Doe denied suicidality at that time. He appears to be psychiatrically stable, and any worsening of dysphoric symptoms would be able to be addressed by psychological interventions and/or medical interventions. These interventions are available at FMC Rochester and MCFP Springfield.

**Wendy Doe**

25. Wendy Doe is a [redacted] biologically male inmate who has been in BOP custody since December 2021. He arrived having already undergone cross sex surgery and on hormones. Records indicate transition began in 2012. He has always been housed in a female institution. He has a diagnosis of PTSD but left for a halfway house on no psychotropic medications and he is considered to be psychologically stable.

26. Given that he has had cross sex surgery and expressed no dysphoria at the time of his release to a halfway house, gender dysphoria does not seem to be an accurate diagnosis for this patient. While in BOP custody, he demonstrated no self-harming behaviors nor did he make threats of same. There may be legitimate concerns regarding moving an individual with female genitalia into a male facility, but changes in mood may appropriately be addressed through increased psychological and medical interventions which would be available at any institution, including the halfway house where Jones currently resides.

**Olivia Doe**

27. Olivia Doe is a [redacted] biologically male inmate who has been in BOP custody since [redacted]. The initial psychological assessment in [redacted] made diagnoses of persistent depression and unspecified trauma and stressor-related disorder. In March of 2018, Olivia Doe reported being transgender, and DCLF completed two weeks later made diagnosis of gender dysphoria. Hormones appear to have been started later that year. He has lived in various male facilities since 2016 until the end of [redacted] when he was moved to [redacted] a female facility.

28. Olivia Doe has a history of 14 previous SRAs between 2019 and February 2025, all occurring after he began receiving cross-sex hormones, including two while at SFF Hazelton. He also received the diagnosis of borderline personality disorder in April 2022 following assessment by a psychologist. His current psychiatric management consists of [redacted] for the diagnosis of PTSD.

29. It is noted that Olivia Doe has had no SRAs now in more than a year and appears to be stable. Changes in mood symptoms could appropriately be addressed similarly at either male or female institutions by increasing psychological interventions and/or medical assessment and adjusting or changing current psychotropic regimen. This treatment is available at FMC Rochester and MCFP Springfield.

**MATERIAL UNDER SEAL DELETED**

**Emily Doe**

30. Emily Doe is a [redacted] biologically male inmate who entered BOP custody in [redacted] He has a reported history of bipolar disorder and was taking [redacted] at intake. Records appear to demonstrate psychological and psychiatric stability. In April 2016, his diagnosis was changed to PTSD following assessment by a psychologist, and in June 2016, he reported being transgender and was subsequently diagnosed with gender dysphoria. Hormones appear to have started in December of that year. He continued to be housed in various male facilities until September 2024 when he was transferred to [redacted] a female facility. He has had three SRAs – one at [redacted], a male facility, and two at [redacted] which occurred in less than two years. Although the inmate appears to voice suicidal thoughts at times, no self-harming behaviors were noted.

31. To address any worsening of mood symptoms should transfer to a male facility occur, psychological interventions in the form of increased therapeutic contacts could be made and medical interventions in the form of assessment for and initiation of new psychiatric medications or changing of current medications could be made to appropriately address these symptoms. This treatment is available at FMC Rochester and MCFP Springfield.

**Amy Jones**

32. Amy Jones is a [redacted] biologically male inmate who has been in BOP custody since 2[redacted]. He has had multiple medical and psychology encounters between [redacted] with multiple different diagnoses given. The most recent psychiatric diagnoses include multiple substance use disorders, PTSD, borderline personality disorder, and other specified personality disorders with narcissistic and antisocial traits. There was no mention of transgender status or gender dysphoria until 2019 when the diagnosis was given based on the following assessment: "Inmate [Amy Jones] reported feelings of distress related to his current gender. He stated he has been struggling with feelings of anxiety, depression, anger, frustration, and confusion because although he is biologically male he has felt as if he is female from as early 'as I can remember.' He stated he has been struggling with this issue for most of his life and that he believes it has led to many of his behavioral and psychological issues, including eventually his criminal behaviors. Inmate [Amy Jones] stated he has now decided he would like to begin the transition process to become the gender in which he identifies himself as being, a female." There is no other history or assessment given.

33. Hormones appear to have begun in December of 2019. The inmate was moved to [redacted] Amy Jones is noted to have at least 61 SRAs, 59 of which occurred after he was diagnosed with GD and prescribed cross-sex hormones. 10 SRAs occurred during a 5-month period while housed at [redacted] (a female facility).

34. Amy Jones has been housed at male institutions for most of his incarceration. Although he was moved to [redacted] in April 2022, records indicate that in September of that year the Transgender Executive Council (TEC) ordered redesignation to a male facility. No transfer to a male facility occurred however.

**MATERIAL UNDER SEAL DELETED**

35. The diagnosis of GD as originally given is not supported by the history or assessment documented. In any event, the treatment and accommodations made to address the diagnosis have shown no benefit.

36. The inmate's primary pathology appears to be a primary severe personality disorder, and not addressing this as the primary concern has likely reinforced this patient's behaviors and dysfunction. I would not have recommended moving this patient into a female facility, and it is my opinion that the mood instability and suicidal thinking and threats will continue regardless of patient's housing. Also, the same psychological and medical interventions will be available at both male or female facilities to appropriately address the inmate's conditions. All necessary treatments are available at FMC Rochester and MCFP Springfield.

**Maria Moe**

37. Maria Moe is a [redacted] biologically male inmate who has been in BOP custody since [redacted] Maria Moe presented to the BOP with the diagnosis of gender dysphoria reportedly made in 2014 by an outside physician. Maria Moe also presented already on hormones. Maria Moe was housed in male facilities until [redacted] when he was moved to a female facility in [redacted] Although there was a reported history of depression symptoms and treatment with an antidepressant medication, records indicate that his major depressive disorder is in full remission, and no psychotropics are currently prescribed. Maria Moe has no SRAs while in BOP custody.

38. Maria Moe has apparently lived as a female outside the institutional setting for several years. The records indicate that Maria Moe is psychiatrically stable and is not currently on psychotropic medications. Should Maria Moe experience worsening symptoms once transferred to FMC Rochester or MCFP Springfield, both psychological and medical interventions will be available to appropriately treat his symptoms.

**Jane Jones**

39. Jane Jones is a [redacted] biologically male inmate who has been in BOP custody since [redacted] He arrived with a previous diagnosis of gender dysphoria. He was on cross-sex hormones therapy and underwent cross-sex surgery in 2015. He has no other history of psychiatric disorders or history of having taken psychotropic medications. Initially designated to [redacted] inmate moved to [redacted] (female side) in [redacted] Throughout the inmate's stay at [redacted] there is no record of psychological instability. It is unclear that gender dysphoria should remain a valid diagnosis given that the inmate is not dysphoric and has undergone gender affirming surgery. The inmate appears to be psychologically stable. Should worsening mood symptoms occur following a transfer to the men's side of the halfway house where he currently resides, both psychological and medical interventions will be available to appropriately address the symptoms.

**MATERIAL UNDER SEAL DELETED**

**Sara Doe**

40. Sara Doe is a [redacted] biologically male inmate who has been in BOP custody since 2023 and is housed at [redacted] Sara Doe reported to BOP with a previous diagnosis of gender dysphoria. He was on hormones and underwent cross-sex surgery in 2019. Sara Doe has been housed at various female facilities since incarceration. He reportedly has prior psychiatric diagnoses of bipolar disorder and Obsessive-Compulsive Disorder, for which he is currently prescribed low-doses of [redacted] however these were reportedly "in remission." Since incarceration, Sara Doe has had no suicidal threats or behaviors, only mild expressions of mood instability. Sara Doe appears to be generally psychologically stable. Should a worsening of symptoms occur once he is transferred to either FMC Rochester or MCFP Springfield, such a facility can provide both psychological and medical assessment and interventions at least equal to those at FCI Aliceville.

**Mary Doe**

41. Mary Doe is a [redacted] biologically male inmate who has been in BOP custody since 2007. Mary Doe presented to BOP with a psychiatric diagnosis of major depressive disorder and was prescribed [redacted] with reportedly good control of symptoms. Reports of his multiple encounters with medical staff and with psychology staff did not note any transgender status or gender dysphoria until [redacted] when he began discussing this with psychologists. A diagnosis of gender dysphoria was given in [redacted] Hormones appear to have begun in 2017. Mary Doe was housed in various male facilities until [redacted] when he was moved to [redacted] a female facility. Mary Doe has reported various psychiatric symptoms throughout his BOP incarceration, but these often appear to be responses to various stressors and not indicative of some undiagnosed condition.

42. Mary Doe has had 14 SRAs while in BOP custody, all except for one occurred after he started hormones. It is noted that seven of those occurred while at female facilities, and the last occurred in June 2025.

43. Assuming the diagnosis of Gender Dysphoria is correct, there has been a worsening of suicidal thoughts/threats with the initiation of treatment and accommodations for the diagnosis. Although he has a diagnosis of major depressive disorder, the likelihood of significant personality traits affecting his emotional lability and suicidal thinking/threats is high. These will remain regardless of medical interventions. Both psychological and medical resources are available at FMC Rochester and MCFP Springfield, that will address any changes in mood warranting intervention.

**Rachel Doe**

44. Rachel Doe is a [redacted] biologically male inmate that entered BOP custody in [redacted] having had cross-sex surgery in 2018 and a history of gender dysphoria and hormones. The records indicate that Rachel Doe denied having had a history of psychiatric diagnoses or treatment, but it is noted that buspirone was started soon after his arrival, and subsequent psychological assessment in June 2025 made diagnosis of MDD with anxious distress.

**MATERIAL UNDER SEAL DELETED**

45. Rachel Doe initially was housed in a male institution briefly. He was transferred to a female institution in [redacted] and remained there until [redacted] when he was released to home confinement.

46. Although two SRAs were performed, both were performed primarily as precautionary measures on the inmate's presentation to a male unit/facility. The inmate denied suicidality in those assessments, and there's no documentation to indicate problems with behavior, suicidal thinking, or similar concerns. Inmate was considered psychologically stable and able to access appropriate resources as needed.

Executed this 28th day of May 2026.

EDWARD WEIDOW Digitally signed by EDWARD WEIDOW
Date: 2026.05.28 13:31:28 -05'00'

Dr. Edward Weidow
Chief of Psychiatry
Federal Bureau of Prisons

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00286-RCL |
| JANE JONES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00401-RCL |
| MARIA MOE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, *in his official capacity* as President of the United States, et al.,<br><br>Defendants. | Case No. 1:25-cv-00653-RCL |

**SUPPLEMENTAL DECLARATION OF RANDI ETTNER, PH.D.**

I, Randi Ettner, Ph.D., state as follows;

1. I submit this declaration to supplement the opinions provided in my original declaration dated May 11, 2026.

2. I have reviewed the declarations of Dr. Edward Weidow and Rick Stover submitted by the defendants. Neither declaration meaningfully engages with the substantial body of evidence demonstrating that forced hormone withdrawal and transfer to male facilities will cause serious and foreseeable harm to the plaintiffs.

3. Dr. Weidow is employed by the Bureau of Prisons (BOP) as Chief of Psychiatry, a position he has held since April 5, 2026. His experience with transgender clinical care is described as primarily involving treatment of "co-morbid psychiatric and psychological conditions," not gender dysphoria itself. He does not demonstrate specialized expertise in the diagnosis and treatment of gender dysphoria as a primary clinical focus. Dr. Weidow's declaration reflects neither familiarity with the current peer-reviewed literature on gender dysphoria treatment nor adherence to the medical standard of care.

4. Mr. Stover is not a medical or mental health clinician, yet his declaration addresses the clinical appropriateness of hormone withdrawal and the medical adequacy of proposed alternatives. He holds no medical degree or clinical license and has no documented training in the diagnosis or treatment of gender dysphoria, psychiatric disorders, or endocrinology. He indicates no professional qualifications to opine on those matters.

5. Although Dr. Weidow stops short of asserting that any Plaintiff's gender dysphoria diagnosis is incorrect, he questions the documentation or adequacy of the diagnosis of gender dysphoria for a small number of plaintiffs. There is no indication that his assertions regarding the insufficiency of those diagnoses are based on his own clinical evaluation of any inmate. Further, he disregards the clinical reality that BOP itself has diagnosed and treated plaintiffs for gender

dysphoria, some for nearly a decade or more, and has consistently prescribed hormone therapy and monitored those individuals for clinical response throughout that timeframe. In other words, Dr. Weidow fails to account for the ongoing clinical work of BOP clinicians. The adequacy of initial documentation is irrelevant to the medical necessity of continuing established, effective treatment.

6. There is no basis for Dr. Weidow to question whether a person's gender dysphoria diagnosis is valid if that person has no reported current dysphoria and/or has undergone surgery. The criteria for gender dysphoria in the Diagnostic and Statistical Manual of Mental Disorders (Section 302.85) address this very issue. The diagnostic criteria contain a "post-transition specifier" which provides that a person who has transitioned and lives full-time in their gender and has undergone medical treatment for gender transition still has a valid diagnosis of gender dysphoria. The purpose of the specifier is to reflect that the person has fully transitioned and they are no longer symptomatic. This provision nevertheless recognizes the appropriateness and necessity of on-going medical care for gender dysphoria, such as hormone therapy, for individuals who have completed gender transition.

7. As I explained in my first declaration, Dr. Weidow relies on a model of care that lacks any support in clinical research or experience and that the major professional medical organizations have rejected. His suggestion that increased "therapeutic contacts" and new or adjusted psychiatric medications can substitute for hormone therapy is directly contradicted by the current evidence base. There is no support in the guidelines of major medical organizations or the peer-reviewed medical literature for the proposition that withdrawal of hormones can be clinically managed with psychotherapy and medication adjustments. And Dr. Weidow cites none.

8. Dr. Weidow's assertion that worsening dysphoric symptoms following the discontinuation of hormones can be managed with psychological or medical interventions fails to

grapple with the specific mechanisms of harm. The degree of physiological feminization that results from long-standing hormone therapy is substantial. The consequences of withdrawal under such circumstances would be severe. Estrogen withdrawal in long-term hormone users produces rapid physiological destabilization: declining bone density, cardiovascular risk changes, metabolic disruption, mood dysregulation mediated by hormonal fluctuation, and re-emergence of testosterone-driven physical characteristics that are directly distressing to a person with gender dysphoria. None of these sequelae are addressable by psychotherapy or psychotropic medication. These severe risks are even greater for individuals with co-morbidities such as type 2 diabetes mellitus, hypertension, or diabetic retinopathy. Dr. Weidow is silent as to these risks.

9. Dr. Weidow's suggestion that co-occurring mental health diagnoses might rule out gender dysphoria treatment has no basis in clinical practice or even common sense. This is like saying that someone who has both diabetes and cancer should be treated for one serious medical condition, but not the other. While clinicians should be aware of co-occurring mental health conditions for a variety of reasons related to patient care, those conditions would only warrant the denial or even delay of care for gender dysphoria if they were so severe or uncontrolled that they interfered with a person's ability to consent to treatment, such as the presence of acute psychosis.

10. Mr. Stover's statements regarding the absence of documented, substantiated sexual assault during prior periods of incarceration in a male facility do not address the current risk of assault if the plaintiffs are transferred to a male facility. First, the absence of documented reports of sexual assault do not indicate the absence of victimization. Research consistently demonstrates the profound underreporting of sexual violence in prison settings, particularly by transgender women who may fear retaliation, may distrust institutional reporting mechanisms, or may have been coerced into silence. Second, as I explained in my first declaration, if an inmate

has been housed in a female correctional setting and has substantial physiological feminization, her risk profile has changed. The absence of documented victimization in a male facility prior to transition is not probative of current risk.

11. Both Dr. Weidow and Mr. Stover assert that FMC Rochester and MCFP Springfield are capable of providing "appropriate" care to the plaintiffs following transfer. This assertion does not address the central clinical question in this matter. The issue is not whether a federal medical center can provide psychiatric services generally. The issue is whether a forced discontinuation of hormone therapy and transfer to a male facility causes serious and foreseeable harm to these women. A male facility with access to a psychiatrist does not resolve the physiological consequences of hormone withdrawal, the re-emergence of gender dysphoria, the trauma-related harm of placement among male inmates, or the substantially elevated risk of victimization that feminized transgender women face in male facilities. These harms are not amendable to mitigation by increased therapeutic contacts or psychotropic medication, and neither Dr. Weider nor Mr. Stover provides any evidence-based support for the proposition that they are.

12. The defendants' brief incorrectly states that the forced termination of hormone therapy will "lessen Plaintiffs' feminine characteristics" and that accordingly, "the very characteristics that Plaintiffs say put them at risk in men's prisons will largely resolve once they are tapered off cross-sex hormones." ECF No. 129 at 2. Defendants appear to assume that once hormone therapy is stopped, transgender women will revert to a typical male body, eliminating the physical characteristics that place them at elevated risk of sexual victimization in a male facility. This assumption is incorrect. Feminizing hormone therapy produces a spectrum of physical changes, some of which are reversible and others of which reverse only slowly over a period of months to years, if at all. Changes that persist or reverse slowly after hormone

withdrawal include: breast tissue development and changes in nipple morphology, which do not fully resolve upon estrogen withdrawal and may be permanent; redistribution of subcutaneous adipose tissue to the hips, thighs and buttocks, which reverses gradually over an extended period; decreased skeletal muscle mass and upper body strength, which returns only slowly; changes in skin texture and decreased body hair density, which recover incompletely. The degree of residual feminization following hormone therapy is directly proportional to the duration and completeness of prior treatment. Transgender women who have been on longstanding hormone therapy will not present as typically male upon transfer to a male facility if their hormones have been discontinued. They will retain visible feminizing characteristics, including breast tissue, that will be immediately apparent to other inmates and that will mark them as targets for sexual harassment, exploitation, and assault.

13. Defendants' brief (ECF No. 129 at 21) cites and misunderstands my statement at paragraph 25 of my first declaration regarding the physical changes that transgender women will experience with the termination of hormone therapy. My point was that any physical changes or diminution of feminization, processes that are partial or occur over time, will have devastating psychological consequences. A transgender woman's sense of bodily integrity depends on the maintenance of gender congruence. The harm is not contingent on full physical reversion, which will not occur. Rather, the harm comes from any erosion of the feminized body that these plaintiffs have lived in, in some cases for years or decades. As explained above, I did not state that transgender women will return to male appearing after the termination of hormone therapy. As explained above, that is not true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2 day of June, 2026.

Randi Ettner PhD

Randi Ettner, PhD

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JANE DOE, *et al.*,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,

Defendants.

Civ. A. No. 25-286 (RCL)

Consolidated with *Jones v. Blanche*, Civ. A. No. 25-401 (RCL); *Moe v. Trump*, Civ. A. No. 25-653 (RCL)

NOTICE OF ILLUSTRATIVE AID

For the convenience of the Court, Defendants respectfully provide notice of the attached illustrative aid to be used by Defendants at the hearing on June 8, 2026. All information included in this chart was obtained from the Stover Declaration (ECF No. 130-1), Weidow Declaration (ECF No. 130-3), and Plaintiffs' Declarations (ECF Nos. 130-3–130-17). Defendants will also distribute hard copies of the aid at the hearing.

Dated: June 5, 2026

Respectfully submitted,
BRETT A. SHUMATE
Assistant Attorney General

JEAN LIN
Special Litigation Counsel

*/s/ M. Jared Littman*

M. JARED LITTMAN
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Jared.littman2@usdoj.gov

*Doe v. Blanche*, Civ. A. No. 25-286 (RCL)

Defendants' Illustrative Aid: Summary of Plaintiffs' Circumstances*

**MATERIAL UNDER SEAL DELETED**

| Plaintiffs' Pseudonym | Photograph | Vagino-plasty | Breast augmentation surgery | Men's facility: lower/similar assault rate than women's facility | Placed in women's facility for safety reasons | Substantiated assault victim in BOP men's facility since hormones? | Substantial suicidality increase in men's facility since hormones? |
|---|---|---|---|---|---|---|---|
| Emily Doe | [redacted] | | | | | | |
| Lois Doe | | | | | | | |
| Mary Doe | | | | | | | |
| Olivia Doe | | | | | | | |

* All information included in this chart was obtained from the Stover Declaration (ECF No. 130-1), Weidow Declaration (ECF No. 130-3), and Plaintiffs' Declarations (ECF Nos. 130-3–130-17).

*Doe v. Blanche*, Civ. A. No. 25-286 (RCL)

Defendants' Illustrative Aid: Summary of Plaintiffs' Circumstances*

**MATERIAL UNDER SEAL DELETED**

| Plaintiffs' Pseudonym | Photograph | Vagino-plasty | Breast augmentation surgery | Men's facility: lower/similar assault rate than women's facility | Placed in women's facility for safety reasons | Substantiated assault victim in BOP men's facility since hormones? | Substantial suicidality increase in men's facility since hormones? |
|---|---|---|---|---|---|---|---|
| Rachel Doe | [redacted] | | | | | | |
| Sally Doe | [redacted] | | | | | | |
| Sara Doe | [redacted] | | | | | | |
| Wendy Doe | [redacted] | | | | | | |

* All information included in this chart was obtained from the Stover Declaration (ECF No. 130-1), Weidow Declaration (ECF No. 130-3), and Plaintiffs' Declarations (ECF Nos. 130-3–130-17).

*Doe v. Blanche*, Civ. A. No. 25-286 (RCL)

Defendants' Illustrative Aid: Summary of Plaintiffs' Circumstances*

**MATERIAL UNDER SEAL DELETED**

| Plaintiffs' Pseudonym | Photograph | Vagino-plasty | Breast augmentation surgery | Men's facility: lower/similar assault rate than women's facility | Placed in women's facility for safety reasons | Substantiated assault victim in BOP men's facility since hormones? | Substantial suicidality increase in men's facility since hormones? |
|---|---|---|---|---|---|---|---|
| Zoe Doe (photo > 3 years old) | [redacted] | | | | | | |
| Amy Jones | [redacted] | | | | | | |
| Barbara Jones | [redacted] | | | | | | |
| Carla Jones | [redacted] | | | | | | |

* All information included in this chart was obtained from the Stover Declaration (ECF No. 130-1), Weidow Declaration (ECF No. 130-3), and Plaintiffs' Declarations (ECF Nos. 130-3–130-17).

*Doe v. Blanche*, Civ. A. No. 25-286 (RCL)

Defendants' Illustrative Aid: Summary of Plaintiffs' Circumstances*

**MATERIAL UNDER SEAL DELETED**

| Plaintiffs' Pseudonym | Photograph | Vagino-plasty | Breast augmentation surgery | Men's facility: lower/similar assault rate than women's facility | Placed in women's facility for safety reasons | Substantiated assault victim in BOP men's facility since hormones? | Substantial suicidality increase in men's facility since hormones? |
|---|---|---|---|---|---|---|---|
| Jane Jones | [redacted] | | | | | | |
| Maria Moe | | | | | | | |

* All information included in this chart was obtained from the Stover Declaration (ECF No. 130-1), Weidow Declaration (ECF No. 130-3), and Plaintiffs' Declarations (ECF Nos. 130-3–130-17).

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JANE DOE, et al.,

Plaintiffs,

v.

TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al.,

Defendants.

Case No. 1:25-cv-00286-RCL

JANE JONES, et al.,

Plaintiffs,

v.

TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al.,

Defendants.

Case No. 1:25-cv-00401-RCL

MARIA MOE, et al.,

Plaintiffs,

v.

DONALD TRUMP, *in his official capacity* as President of the United States, et al.,

Defendants.

Case No. 1:25-cv-00653-RCL

**NOTICE OF ILLUSTRATIVE AID**

For the convenience of the Court, Plaintiffs respectfully provide notice of the attached illustrative aid to be used by Plaintiffs at the hearing on June 8, 2026. All information included in this aid was obtained from the Gorton Declaration (ECF No. 116-19), Karasic Declaration (ECF No. 116-21), Ettner Declaration (ECF No. 116-26), McLearen Declaration (ECF No. 116-28), Weidow Declaration (ECF No. 130-3), and Plaintiffs' Declarations (ECF Nos. 116-3–116-17). Plaintiffs will also distribute hard copies of the aid at the hearing.

Dated: June 6, 2026

Respectfully submitted,

/s/ *Jennifer Fiorica Delgado*

Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom (Bar No. 66195)
Natalie J. Kraner (Bar No. 66202)
Wayne Fang (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
(862) 926-2029
(973) 422-6722
jdelgado@lowenstein.com
ashalom@lowenstein.com
nkraner@lowenstein.com
wfang@lowenstein.com

Eve L. Hill (Bar No. 424896)
**BROWN GOLDSTEIN & LEVY, LLP**
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
(410) 962-1030
(410) 385-0869
ehill@browngold.com

Jennifer L. Levi (Bar. No. MA0056)
Sarah Austin (admitted *pro hac vice*)
**GLBTQ LEGAL ADVOCATES & DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

Christopher F. Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
**NATIONAL CENTER FOR LGBTQ RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org
awhelan@nclrights.org

*Pro Bono Counsel for Plaintiffs*

# MATERIAL UNDER SEAL DELETED

**Amy Jones**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Barbara Jones**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Carla Jones**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Emily Doe**

[redacted]

**MATERIAL UNDER SEAL DELETED**

**Jane Jones**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Lois Doe**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Maria Moe**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Mary Doe**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Olivia Doe**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Rachel Doe**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Sally Doe**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Sara Doe**

[redacted]

**MATERIAL UNDER SEAL DELETED**

**Wendy Doe**

[redacted]

# MATERIAL UNDER SEAL DELETED

**Zoe Doe**

[redacted]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JANE DOE**, *et al.*,

*Plaintiffs,*

**v.**

**TODD BLANCHE**, *in his official capacity* as Acting Attorney General of the United States, *et al.*,

*Defendants.*

**Case No. 1:25-cv-286-RCL**
**Case No. 1:25-cv-401-RCL (consolidated)**
**Case No. 1:25-cv-653-RCL (consolidated)**

**ORDER**

This matter having been opened to the Court by Lowenstein Sandler LLP, GLBTQ Legal Advocates & Defenders, National Center for LGBTQ Rights, and Brown Goldstein & Levy, counsel for Plaintiffs, by way of an emergency motion for preliminary injunctive relief ("Plaintiffs' Motion"), and the Court having considered the accompanying papers and the record in the above-captioned matters; and

**WHEREAS**, Plaintiffs seek to preserve the status quo and prevent Defendants from implementing Section 4(a) of Executive Order 14168 against any Plaintiff; and

**WHEREAS**, based on the individualized findings set forth on the record and in the Court's accompanying memorandum opinion, Plaintiffs Emily Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Wendy Doe, Zoe Doe, Amy Jones, Barbara Jones, Carla Jones, Jane Jones, and Maria Moe have established that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer imminent and irreparable harm absent injunctive relief; (3) the balance of equities favors Plaintiffs; and (4) injunctive relief is in the public interest;

**IT IS ORDERED** that:

1. Plaintiffs' Motion for Preliminary Injunction is **GRANTED**;
2. Defendants and their officers, employees, servants, agents, appointees, and successors are enjoined from implementing Section 4(a) of Executive Order 14168 against Emily Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Wendy Doe, Zoe Doe, Amy Jones, Barbara Jones, Carla Jones, Jane Jones, or Maria Moe for the period from June 8, 2026 to September 6, 2026;
3. Defendants shall maintain and continue the housing status in women's facilities, including women's prisons and women's halfway houses, where applicable, of Plaintiffs Emily Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Wendy Doe, Zoe Doe, Amy Jones, Barbara Jones, Carla Jones, Jane Jones, and Maria Moe, unless or until such time as such Plaintiff is released from the custody of the BOP; and

As required by the Prison Litigation Reform Act, the Court finds that this preliminary relief is narrowly drawn, extends no further than necessary to correct the harm that the Court finds requires preliminary relief, and is the least intrusive means necessary to correct that harm. 18 U.S.C. § 3626(a)(2). Plaintiffs have shown a substantial likelihood of success on their claims that implementation of Section 4(a) of Executive Order 14168 would be unlawful as applied to them and would cause them immediate, irreparable harm. Preliminary relief preventing the implementation of that section as to Plaintiffs is necessary to correct this immediate, irreparable harm.

This Order is narrowly drawn and extends no further than necessary to correct the harm that the Court finds requires preliminary relief. It restrains Defendants from applying only the

**MATERIAL UNDER SEAL DELETED**

challenged section of the Executive Order and BOP's policies implementing that section, and it restrains Defendants from doing so only as to Plaintiffs. Further, this Order is the least intrusive action the Court could take that will ensure Plaintiffs are not deprived of their rights or subjected to irreparable harm. The Order does not contemplate ongoing judicial supervision over Defendants' day-to-day management and operations of BOP facilities; it simply preserves Defendants' own prior determinations regarding Plaintiff's housing while this litigation proceeds, and pauses implementation of the section of an Executive Order that eliminates Defendants' discretion to determine housing on an individualized basis. The Court has considered any adverse impact on public safety or on the operation of the criminal justice system caused by the preliminary relief and has given substantial weight to such impacts. *Id.* The Court finds that no adverse impacts on public safety or the operation of the criminal justice system will result from maintaining the status quo of Plaintiffs' housing status in women's facilities for 90 days while this litigation proceeds.

Finally, on June 2, 2026, a court in the Northern District of Texas issued a preliminary injunction in *Fleming v. Rule*, No. 4:25-cv-0157-D (N.D. Tex.), a case brought by several cisgender female inmates at [redacted] against the United States, the Attorney General, and the Bureau of Prisons, challenging the Bureau's practice of housing transgender female inmates in women's prisons. The June 2 preliminary injunction was granted at the request of plaintiff-intervenors in that case—a group of cisgender female inmates at [redacted]—and ordered the defendants to house transgender female inmates at that facility "in a secure, segregated area," and to use "separate movement, routing, scheduling, or other measures as necessary to prevent overlap between male inmates and female inmates in housing and shared spaces." *Fleming*, June 2, 2026 Prelim. Inj., ECF No. 133, at 3. Defendants in this case have since filed notice of the *Fleming*

**MATERIAL UNDER SEAL DELETED**

court's preliminary injunction, noting that [redacted] of the transgender female inmates housed at [redacted] that are subject to the *Fleming* preliminary injunction are also plaintiffs in this matter [redacted]

Nothing in the preliminary injunction this Court issues today conflicts with the *Fleming* court's June 2 injunction. Today's injunction merely enjoins Defendants from transferring Plaintiffs to men's prisons. It does not, at this juncture, require that Plaintiffs be housed alongside cisgender female inmates or share common spaces.

**IT IS SO ORDERED.**

Date: 6/7/26

Royce C. Lamberth
Royce C. Lamberth
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE DOE**, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>**TODD BLANCHE**, in his official capacity as Acting Attorney General of the United States, *et. al.*,<br><br>*Defendants.* | **Case No. 1:25-cv-286-RCL**<br>**Case No. 1:25-cv-401-RCL (consolidated)**<br>**Case No. 1:25-cv-653-RCL (consolidated)** |

# MEMORANDUM OPINION

In these consolidated cases, fourteen Plaintiffs challenge the Bureau of Prison's implementation of the President's Executive Order 14168, directing the Attorney General to ensure that transgender women are not detained in women's prisons or detention facilities. These Plaintiffs, transgender women who the Bureau itself had previously determined should be housed in women's facilities, have previously sought and received injunctive relief on Eighth Amendment grounds against the Bureau's implementation of the Executive Order to prevent their transfer to men's facilities.

These cases now return from the Circuit on remand for the Court to make individualized findings to assess whether each Plaintiff possesses certain characteristics (such as the effects of gender-affirming care or history of surviving assault or self-harm in men's prisons) that make them likely to face a substantial risk of serious harm rising to the level of an Eighth Amendment violation if they are transferred to a men's facility. For the reasons stated below, the Court finds that each Plaintiff has provided evidence demonstrating that they are likely to prevail on their Eighth Amendment claim.

## I. BACKGROUND

The Court presumes familiarity with the underlying facts of this case, which are detailed in several opinions. On January 20, 2025, the President issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." In relevant part, the Executive Order directed the Attorney General to "ensure that males"—defined as "person[s] belonging, at conception, to the sex that produces the small reproductive cell"—"are not detained in women's prisons or housed in women's detention centers." Exec. Order 14168, § 4(a), 90 Fed. Reg. 8615, 8615–16 (Jan. 30, 2025).

To effectuate this Order, the Bureau of Prisons began transferring to men's facilities the small minority of transgender women it had previously decided should be housed in women's facilities. These women, the plaintiffs in the consolidated cases before the Court, sought and received preliminary injunctive relief against the Bureau's enforcement of the Executive Order.[1] *See Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025); *Jones v. Blanche*, No. 1:25-cv-401-RCL, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Moe v. Trump*, No. 1:25-cv-653, ECF No. 62 at 1–2 (D.D.C. Mar. 10, 2025).

The government appealed the Court's housing placement decision. *Doe v. Blanche*, 172 F.4th 901, 905–06 (D.C. Cir. 2026). In its opinion, issued April 17, 2026, the Circuit recognized that Plaintiffs are a "are a very small subset of the thousands of transgender women in the Bureau's

[1] The Executive Order also directed the Bureau to cease providing any medical procedure, treatment, or drug to transgender women for treatment of gender dysphoria, Exec. Order 14168, § 4(c), 90 Fed. Reg. 8615, 8617 (Jan. 30, 2025), and the plaintiffs likewise sought injunctive relief to prevent the implementation of this section, which this Court preliminarily granted. However, the Bureau's implementation of the Executive Order's ban on transgender healthcare in federal prisons has subsequently become the subject of ongoing class action litigation in *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C.), ECF No. 67, in which this Court has enjoined the Bureau's implementation of § 4(c) as to "a class consisting of all persons who are currently or will be incarcerated in BOP facilities with a current diagnosis of gender dysphoria or who receive such a diagnosis in the future." Because the *Doe* plaintiffs' status as transgender women in the custody of the Bureau places them within the *Kingdom* class, this Court recently stayed their challenge to § 4(c), pending final adjudication of the *Kingdom* class claims. ECF No. 127.

custody" and posited that, "[g]iven the rarity of such placements within the federal system, it is reasonable to infer that [the Bureau's] decisions to house plaintiffs in women's facilities are the product of deliberate, individualized determinations rather than happenstance." *Id.* at 918. On appeal, Plaintiffs argued that they had "particular vulnerabilities" that distinguish them from other transgender women in the Bureau's custody—including "long-term hormone therapy and surgeries effecting gendered physical alterations, prior history of sexual assault or self-harm in men's facilities, or a combination of such factors." *Id.* at 916.

While acknowledging that the record "contains ample, uncontested evidence" of characteristics that could make Plaintiffs "distinctively vulnerable to harm in men's facilities," the Circuit held that it could not conclude that the Bureau had been deliberately indifferent to such harm without individualized findings as to each Plaintiffs' particular vulnerabilities. *Id.* at 917. Although this Court had "generally identified" certain "distinctive characteristics" that could cause a transgender woman to face "substantial risks of serious harm" upon transfer to a men's prison, the Circuit directed the Court on remand to make factual determinations as to the features of the *Doe* Plaintiffs "in particular" that "render their transfer to men's facilities unconstitutional under the Eighth Amendment." *Id.* at 910, 917.

On May 13, 2026, Plaintiffs moved again for a temporary restraining order and preliminary injunction, this time submitting individualized evidence of the substantial risk transfer would pose to each plaintiff. ECF Nos. 117-1 to 117-28. This motion became ripe on June 6, 2026, *see* Opp'n, ECF No. 129, Reply, ECF No. 135, and the Circuit's mandate will issue June 8, 2026.[2]

[2] The injunction on appeal was renewed on February 19, 2026, and was set to automatically expire on May 20, 2026. ECF No. 101; *see* 18 U.S.C. § 3626(a)(2). Although the Circuit released its opinion on April 17, 2026, the mandate will not issue until June 8, 2026, per Rule 40(d)(1) and Rule 41(b) of the Federal Rules of Appellate Procedure. That meant that the operative preliminary injunction would have expired by its own terms before it was formally vacated by the Circuit. The Court therefore renewed the existing preliminary injunction for the limited period of May 21, 2026, to June 8, 2026. ECF No. 125.

## II. LEGAL STANDARDS

### A. Preliminary Injunction

A preliminary injunction should be granted if the movant meets its burden to show that 1) the movant is likely to succeed on the merits; 2) the movant is likely to suffer irreparable harm unless preliminary relief is granted; 3) the balance of the equities favors a preliminary injunction; and 4) a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have adopted a sliding scale approach to the preliminary injunction analysis, whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Where, as here, the government is a party, the latter two factors of the preliminary analysis merge into one because the interest of the government is taken to be identical to the interest of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### B. Eighth Amendment

The Eighth Amendment prohibits cruel and unusual punishment—limiting the conditions under which a prisoner can be confined. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official violates the Eighth Amendment by acting with "deliberate indifference to a substantial risk of serious harm" to an incarcerated person. *Id.* at 836; *see also Doe*, 172 F.4th at 906, 910, 918. This standard contains both an objective component as to whether the individual faces a sufficiently serious risk of harm and a subjective component as to whether the official knew of and disregarded that risk. *Farmer*, 511 U.S. at 834, 837. A plaintiff can establish deliberate indifference based on risks "personal to him" as well as risks shared by "all prisoners in his situation." *Id.* at 843.

In the context of conditions of confinement, the Eighth Amendment requires that prison officials protect incarcerated people from violence and other serious harms. *Doe*, 172 F.4th at 906; *see also Farmer*, 511 U.S. at 834 ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." (cleaned up)); *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021) (recognizing that the risk of suicide and self-harm, and the failure to prevent it, constitutes a serious harm to implicate the Eighth Amendment); *Est. of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012) (same); *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1098 (9th Cir. 2019) (same); *Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*, 30 F.4th 1181, 1186 (10th Cir. 2022) (same).

## III. DISCUSSION

The Court begins with the government's threshold arguments regarding whether administrative exhaustion precludes review. The Court then provides an overview of the parties' arguments as to the merits, framing the principal disputes and relief sought. Finally, the Court turns to the Circuit's assignment—making individualized factual findings as to each Plaintiff.

### A. Administrative Exhaustion

In arguing that Plaintiffs' suit should be dismissed for failure to exhaust administrative remedies, the government spends much of its brief rehashing an argument it squarely lost on at the Circuit. As the Circuit held, "Defendants have failed to carry their burden to show that administrative remedies were available to plaintiffs." *Doe*, 172 F.4th at 914.

The PLRA requires the exhaustion of only "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is "available" if it is capable of providing some relief for the action complained of, and it is conversely not available "where the relevant administrative procedure lacks authority to provide any relief" such that it operates as "a simple dead end." *Ross v. Blake*,

578 U.S. 632, 642–43 (2016) (quotation omitted). While acknowledging that "[n]o one disputes that [the Bureau] has a grievance procedure open to [all] inmates," the Circuit held that the government had failed to show that, for Plaintiffs, any relief was available. *Doe*, 172 F.4th at 914.

The Circuit recognized that Plaintiffs assert two distinct theories of Eighth Amendment violations: (1) "the mere fact of their transfer to a men's facility would subject them to an intolerable risk of harm by exacerbating their gender dysphoria"; and (2) "the substantially elevated risk of physical or sexual violence they would face in men's facilities." *Id.* The Circuit then pointed out that, as to the first asserted injury, the government acknowledges that the Bureau's "grievance procedure cannot stop or reverse the challenged transfers because they are mandated by the Executive Order"—meaning the government essentially concedes that the Bureau has no discretion to remedy "the concrete action the [P]laintiffs challenge." *Id.* On remand, the government provides no explanation as to why this holding no longer stands. At most, it simply denies this theory of injury, but that puts the cart before the horse by conflating a merits argument with a threshold objection.

Regarding the second asserted injury, Plaintiff's "failure-to-protect claim," the Circuit held that Defendants "have failed to carry their burden to identify an administrative remedy 'capable' of providing plaintiffs 'some relief.'" *Id.* at 914–15 (quoting *Ross*, 578 U.S. at 642 (internal quotation marks omitted)). The Circuit expressly rejected the government's proposal to take "additional safety measures" for Plaintiffs who complain of physical and sexual violence by placing them "in the Special Housing Unit (SHU)"—a short-term segregated housing option in which inmates are unable to leave their cell for most of the day. *Id.* at 914–15. In the Circuit's view, this is a "temporary, stop-gap measure that lacks any capacity to relieve [P]laintiffs from the ongoing risk of harm in men's prisons." *Id.* at 915.

On remand, the government asserts for the first time that *other* "additional safety measures"—beyond those described in the record on appeal—exist and that Plaintiffs have failed to exhaust these available administrative remedies. Specifically, the government suggests the Bureau can "lessen the risk of harm" to an aggrieved Plaintiff by "transferring the inmate to a different men's facility with different risk factors, changing the inmate's cell assignment if the risk of harm involved his cellmate, or placing the inmate in a [SHU] to keep potential threats away from the potential victim, among other remedial measures." Opp'n at 2. But the Court will not assess what, if anything, the government has added to the list of remedial possibilities since they had every opportunity to present these options previously to this Court and the Circuit but failed to do so.[3]

The government reads the Circuit's opinion as inviting it to relitigate the issue of exhaustion. On the contrary, the Circuit squarely decided that the government had failed to prove that administrative remedies were available. *Doe*, 172 F.4th at 914. The government now puts forward new reasons as to why such remedies are meaningfully available to Plaintiffs, but the Court will not consider such arguments as they are forfeited. *See, e.g.*, *Keepseagle v. Perdue*, 856 F.3d 1039, 1054 (D.C. Cir. 2017) ("[U]nder well-established law, a party forfeits a claim by failing to raise it [previously] when the party 'knew, or should have known,' that the claim could be raised." (quoting *Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071, 1091 (D.C. Cir. 1984))); *Harmon v. Thornburgh*, 878 F.2d 484, 496 n.23 (D.C. Cir. 1989) ("If DOJ seeks on remand to attack the

[3] Even if the Court were to consider the waived arguments, the government's newfound asserted reliance on regulations promulgated under the Prison Rape Elimination Act as an available remedy is especially unpersuasive given that the Department of Justice has directed facilities not to follow PREA provisions that conflict with Executive Order 14168. *Compare* Opp. Br. at 5, 12, 18, 35–36 (citing 28 C.F.R. § 115.42(c)-(g)), *with Poe v. Dep't of Justice*, No. 1:26-cv-1552 (D.D.C. 2026), ECF No. 1-1 (Department of Justice memorandum stating that facilities should "disregard" PREA regulations that refer to transgender people), and BOP Program Statement 5333.01, Sexually Abusive Behavior Prevention and Intervention Manual, 33–34 (Mar. 19, 2026) (sexual abuse policy revision removing references to 28 C.F.R. § 115.42(c)-(g))) [https://perma.cc/2BAB-FD9T].

injunction on this basis, it must rebut the presumption that an argument not raised on an initial appeal will thereafter be deemed waived.").

### B. Overview of Eighth Amendment Merits

Having resolved the government's threshold objection, the Court turns to the merits of Plaintiffs' Eighth Amendment claim. But before making individualized findings as to each Plaintiff, the Court begins by laying out the foundation of their Eighth Amendment claim and Defendants' overarching arguments against it.

#### 1. Objective Prong

Plaintiffs assert that their transfer to men's facilities would create two objectively intolerable risks: (1) the risk of physical and sexual violence from fellow inmates, and (2) the risk of severely exacerbated gender dysphoria. In response to the former, the government on remand assures the Court that it intends to transfer all Plaintiffs who are not in half-way houses to either Federal Medical Center (FMC) Rochester or Medical Center for Federal Prisoners (MCFP) Springfield—two prisons where the rates of assault are generally lower than those at the facilities where Plaintiffs are currently housed. Opp'n at 8. Specifically, the government states, and Plaintiffs do not contest, that FMC Rochester has an assault rate of 0.014%, with 12 assaults in 2025 and zero substantiated sexual assaults in 2025, and MCFP Springfield similarly has a low assault rate of 0.025%, with 28 assaults in 2025 and only one substantiated sexual assault in 2025. *Id.* at 2–3, 14–15. As to Plaintiffs' later theory of injury, the government obliquely suggests that an exacerbation of Plaintiffs' gender dysphoria is mitigated by the fact that these prisons are also "medical centers," meaning that they "are able to provide appropriate treatment to these inmates." *Id.* at 8 (quoting Stover Decl. ¶ 22).

The Court finds these responses wanting in several respects. Because the government's assault-rate evidence appears to be the backbone of its opposition on the objective prong, the Court begins with this argument. The Court then turns to the government's response to Plaintiffs' claim that their transfer will severely exacerbate their gender dysphoria symptoms.

*i. Risk of Violence*

As mentioned, the government asserts that the documented assault rates at FMC Rochester and MCFP Springfield demonstrate that Plaintiffs can be safely housed at these men's facilities without facing a substantial risk of violence. The statistics the government provides, however, are of limited value in this context precisely because, as the Circuit recognized, these Plaintiffs are outliers. The government's cited rates of assault are calculated across the entire population of each facility, but the relevant question under the objective prong is whether Plaintiffs face a substantial risk of violence *by virtue of their distinctive characteristics*. Plaintiffs represent less than one percent of the transgender population in the Bureau's custody (14 individuals out of approximately 1,500)—and transgender inmates as a group already account for only a small minority group among federal inmates (approximately 1,500 out of 154,000). Opp'n at 14–15; BUREAU OF PRISONS, Population Statistics, https://www.bop.gov/about/statistics/population_statistics.jsp [https://perma.cc/35J7-XXDG].

While it is reassuring that these prisons have notably low incidents of reported violence, there is evidence in the record indicating that these Plaintiffs stand a much higher likelihood of being one of the few who are victimized. Therefore, the relevant question is not the baseline rate of assault at the destination facility but the elevated risk that each Plaintiff—as a newly arrived, visibly feminized transgender woman coming from a women's prison—would face there. Moreover, the government relies only on "substantiated" sexual assault rates, reporting zero at

FMC Rochester and one at MCFP Springfield in 2025. *See* Opp'n at 8, 17. But Plaintiffs' expert explains that sexual assault in men's prisons is significantly underreported, and official substantiation rates do not capture the universe of abusive and violent conduct that actually occurs. *See* McLearen Decl. ¶¶ 29, 33.

It's important to note that an "unsubstantiated" allegation is one that the Bureau has determined to be inconclusive because there was "insufficient evidence to make a final determination." *See* BOP, Program Statement 5333.01, Sexually Abusive Behavior Prevention and Intervention Manual, at 8–9 (Mar. 19, 2026) [https://perma.cc/2BAB-FD9T]. This is distinct from term "unfounded allegation," which "means an allegation that was investigated and determined not to have occurred." *Id.* Thus, the delta between the number of substantiated sexual assaults at these facilities and the total number of reported sexual assaults may be a relevant consideration if they have a significant number of unsubstantiated, but not unfounded, allegations.

The government next points to inmates with gender dysphoria already housed at FMC Rochester and MCFP Springfield as evidence that staff are experienced in protecting this population. Opp'n at 8. What the government does not draw attention to is the fact that the destination facilities house eight total inmates across both facilities combined, and only one of those eights is on hormones. Reply at 8 (citing Stover Decl. ¶¶ 25, 27). As Plaintiffs' evidence establishes, a diagnosis of gender dysphoria encompasses a wide range of presentations and the government makes no suggestion that any of these individuals present similarly to Plaintiffs, who have undergone years of hormone therapy and, in several cases, extensive feminizing surgeries.

The government also insists that, to the extent Plaintiffs face a risk of sexual violence because of their feminine features, this risk will be eliminated by the Bureau's new policy terminating hormone therapy, "under which Plaintiffs will receive an individualized hormone

tapering plan that will eventually lessen Plaintiffs' feminine characteristics." Opp'n at 15 (citing Program Statement 5260.01). That new policy has not yet been implemented because of an injunction this Court issued in *Kingdom v. Trump*, No. 1:25-cv-691-RCL (D.D.C.). Because the policy has not taken effect, the Bureau cannot rely on that position in these proceedings. What's more, the government make no effort to address the particular safety concerns faced by Plaintiffs who have undergone gender-affirming surgeries, whose feminine characteristics will not "largely resolve once they are tapered off cross-sex hormones." Opp'n at 15.

Despite the government's assurances that Plaintiffs will be transferred to low-risk facilities, Plaintiffs have established facts that suggest they will continue to face significant safety concerns if they are transferred. To establish facts relating to the unique vulnerabilities of transgender women in the Bureau of Prisons system, Plaintiffs rely heavily on the declaration of a former senior Bureau of Prisons executive, Dr. Alix McLearen, who has previously served both as the Bureau's National Administrator of the Women and Special Populations Branch and as its Acting Assistant Director. McLearen Decl. ¶ 1, ECF No. 117-27. Dr. McLearen asserts that the "severely elevated risks of sexual abuse" that transgender women face in men's prisons is "well understood within the field of corrections and is not meaningfully disputed among practitioners responsible for classification, housing, or PREA compliance." *Id.* at ¶¶ 11–13. The government provides no evidence to counter that assertion. Moreover, Dr. McLearen also asserts that distinct harms flow specifically from transferring transgender women from women's to men's prisons. The experience of such transfers is categorically different from the baseline experience of transgender women who have never left men's prisons because the transfer increases vulnerability to victimization by marking the transferee as a target and causes severe disorientation for transgender women accustomed to the norms of women's facilities. *Id.* ¶¶ 25–28, 37–42.

Dr. McLearen identifies the specific characteristics that would predictably make certain transgender women especially susceptible to violence if transferred to men's facilities. These include: "if she has had a vaginoplasty; if she has had other feminizing surgeries; or if she has breasts and a female physique as a result of consistent hormone therapy." *Id.* ¶ 19. More generally, "[w]ithin custodial environments, individuals who are perceived as female are more likely to be approached, pressured, exploited, and treated as potential targets." *Id.* Dr. McLearen also explains that the most vulnerable transgender women cannot be adequately protected in men's facilities. *See id.* ¶¶ 43–50; ¶ 49 ("The most vulnerable transgender women have historically been subjected to serious harms in male facilities, including physical and sexual violence; long-term or frequent placements in the SHU or protective custody, leading to deterioration in mental health or overall functioning; or both."). In Dr. McLearen's professional opinion, "the protective measures available in BOP facilities cannot adequately prevent harm to transgender women who are reassigned from female to male facilities based on a categorical housing policy unrelated to any individual circumstances." *Id.* ¶ 50.

Based on this evidence, the Court is inclined to agree with Plaintiffs that even if the statistical rate of reported violence at FMC Rochester and MCFP Springfield is low, individuals with a particular constellation of characteristics—such as Plaintiffs—stand a much higher chance of being one of the few who are victimized.

*ii. Severe Exacerbation of Gender Dysphoria*

Plaintiffs also claim they would face a substantial risk of harm from exacerbated gender dysphoria if they were transferred to men's prisons. According to Dr. McLearen, that harm could entail severe psychological distress and increased risk of self-harm or suicidality, especially for those who have been victims of sexual assault or who have no prior experience in men's facilities.

*Id.* ¶ 38 ("As a result of such a reassignment, a transgender woman would lose continuity in healthcare, mental health provider relationships, social supports and relationships, and programming—in addition to facing an unfamiliar and dangerous institutional and social environment that is dramatically different from the women's correctional environment."). Because Plaintiffs have lived as women in women's facilities (sometimes for many years), being moved to men's facilities would be predictably severely psychologically distressing. *See id.* ("In my professional judgment, such a change has a high and foreseeable likelihood of causing significant psychological distress.").

In response, the government says that FMC Rochester and MCFP Springfield are medical centers specializing in comprehensive medical care and therefore "are able to provide appropriate treatment to these inmates." Opp'n at 17 (citing Stover Decl. ¶ 22). But this retort does not meaningfully engage with the argument that because these particular Plaintiffs have lived in women's facilities for so long and have taken great lengths to accord their lives with their gender identities—such as by undergoing surgery, taking hormones, and wearing women's clothing—their circumstances are unique even among the broader transgender female population. The government does not seem to contest Plaintiffs' assertion that a transition from a women's prison to a men's prison *would* cause severe psychological distress; they offer only the consolation that if a transfer *does* cause psychological distress, "the selected facilities could adequately treat any worsening of symptoms, therapeutically and with psychotropic medications." *Id.* at 18. Moreover, the government fails to explain why therapy and psychotropic medication would alleviate the distress of living in a men's prison. Since the government does not actually argue that a transfer would *not* cause a substantial risk of exacerbated symptoms of gender dysphoria, the Court is inclined at this to agree with Plaintiffs that it would.

Because Plaintiffs have put forward specific expert evidence of two distinct intolerable risks—the risk of increased physical violence against them and the risk of severely exacerbated gender dysphoria—and because the government has not sufficiently rebutted those showings, the Court finds that Plaintiffs have the better argument as to their theories of injury under the objective prong of the Eighth Amendment analysis.

**2. Subjective Prong**

Turning to the subjective prong, Plaintiffs must demonstrate that Defendants acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. A "sufficiently culpable state of mind" is one that shows "deliberate indifference" to either of the serious risks Plaintiffs presented under the objective prong. *Id.* When a plaintiff seeks prospective relief, as is the case here, deliberate indifference should be determined in light of prison officials' attitudes and conduct when the lawsuit was initiated and "persisting thereafter." *Id.* at 827.

Deliberate indifference means something more than negligence or lack of due care. *Id.* at 835. Indeed, the government must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. This means that they "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* In other words, the government must "consciously disregard a substantial risk of serious harm." *Id.* at 839 (internal quotation marks omitted). And the question of "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence" indicating "that the risk was obvious." *Id.* at 842.

That said, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm

ultimately was not averted." *Id.* at 844. This is so because prison officials' Eighth Amendment duty is "to ensure reasonable safety," which "incorporates due regard for prison officials' unenviable task of keeping dangerous [people] in safe custody under humane conditions." *Id.* at 844–45 (internal quotation marks omitted).

With the foregoing in mind, the Court considers the parties' arguments over whether the government knew of a serious risk to Plaintiffs and were deliberately indifferent to that risk. The crux of the parties' disagreement concerns whether, under the prior policy, the Bureau decided to house Plaintiffs in women's facilities out of concern for their health and safety, and whether the Bureau's subsequent decision to transfer Plaintiffs to male facilities exhibits conscious disregard for the same sorts of risks that resulted in Plaintiffs placement in women's facilities in the first place. To assess this disagreement, and to see that it ultimately misses the point, it is helpful to begin by describing the legal regime dictating the Bureau's placement decisions.

By statute, the Bureau may choose "any available penal or correctional facility" when deciding where to place an inmate and has discretion to "direct the transfer of a prisoner from one penal or correctional facility to another" so long as the placement "meets minimum standards of health and habitability established by" regulation. 18 U.S.C. § 3621(b). Along with the constitutional constraints on conditions of confinement, the Bureau must also take into account the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301 et seq., when making housing decisions. *Doe*, 172 F.4th at 907. The Bureau's regulations implementing PREA require that the Bureau screen inmates upon intake and transfer for "their risk of being sexually abused by other inmates or sexually abusive towards other inmates." 28 C.F.R. § 115.41(a). This information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate

those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a)

Regarding the housing assignments of transgender inmates, the Bureau had for the past several years used a specialized decision-making body—the Transgender Executive Council—to make initial facility designations of transgender inmates, and to review and approve transfers of transgender inmates. Jan. 13, 2022, Transgender Offender Manual, at 4–6, ECF No. 11-3. From January 2022 until January 2025, when the Executive Order issued, the Council considered the inmate's "current gender expression" when deciding the facility assignment for a transgender inmate. *Id.* at 6. Pursuant to the Executive Order, however, the Bureau has rescinded this guidance and disbanded the Transgender Executive Council. BUREAU OF PRISONS, PROGRAM STATEMENT 5100.08, INMATE SEC. DESIGNATION AND CUSTODY CLASSIFICATION, ch. 1, at 1–3 (Mar. 6, 2025).

*i. Defendants Knew of the Serious Risk to Plaintiffs*

Plaintiffs argue that the evidence found in their BOP medical records demonstrates the Bureau's subjective awareness of the risks that Plaintiffs would face if transferred to men's prisons. Reply at 15. Specifically, Plaintiffs argue that the Bureau's own Chief of Psychiatry, Dr. Weidow, does not actually "dispute that transfer may worsen Plaintiffs' gender dysphoria, increase psychological distress, or trigger self-harm and suicidal ideation." *Id.* Moreover, the Bureau's Special Assistant to the Director, Rick Stover, admits in his declaration that the Bureau reviewed each of Plaintiffs' psychological records before selecting FMC Rochester and MCFP Springfield as the destination for their transfers. *Id.* (citing Stover Decl. ¶ 21).

The government argues that those facilities are equipped to manage the deterioration in mental and physical wellbeing that Plaintiffs argue will predictably occur. In Plaintiffs' words, "[t]hat argument concedes the critical point: BOP's response did not determine whether transfer

would expose Plaintiffs to a substantial risk of serious harm, but merely identified facilities purportedly capable of treating the foreseeable and avoidable consequences of that harm after it occurs." *Id.* The Court agrees: the government has evidenced a subjective awareness of the objectively serious risks to Plaintiffs by presenting specific (though inadequate) plans to mitigate them.

Plaintiffs also argue that the Bureau's previous determination—prior to the Executive Order—that Plaintiffs should be housed in women's prisons shows subjective awareness of the serious risks Plaintiffs would face in men's prisons. The D.C. Circuit itself noted that "[g]iven the rarity of such placements within the federal system, it is reasonable to infer that BOP's decisions to house plaintiffs in women's facilities are the product of deliberate, individualized determinations rather than happenstance." *Doe*, 172 F.4th at 918. That said, the Circuit ultimately concluded that "the record [did] not definitively establish whether safety concerns motivated each plaintiff's placement." *Id.*

The government insists on remand that safety concerns did *not* motivate Plaintiffs' original placements. Opp'n at 19–20 ("BOP's prior decisions to house Plaintiffs in female facilities were not made because Plaintiffs were uniquely vulnerable and incapable of being safely housed in any male facilities."). Instead, the government states that in granting requests to transfer transgender women to women's prisons, the Bureau considered "a number of factors, including: 'an inmate's security level, criminal and behavioral/disciplinary history, current gender expression, programming, medical, and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse.'" *Id.* at 19 (quoting Jan. 13, 2022, Transgender Offender Manual § 5). Defendants state that Plaintiffs were placed in a women's facilities for a variety of reasons. Those include: the Bureau's previous practice of placing individuals in facilities

consistent with their housing prior to coming into BOP custody, Stover Decl. ¶¶ 43, 58; the Bureau's previous policy of transferring transgender women to a women's facility for at least a year before they were eligible for cross sex surgery, *id.* ¶¶ 29, 33, 38, 46, 49, 55, 65, 69; and a prior Bureau policy to process post-vaginoplasty transgender women as women, *id.* ¶¶ 66, 67.

To begin, these policies do not dissuade the Court that safety and health concerns motivated the Bureau's placement of Plaintiffs in women's facilities because the Bureau offers no explanation as to what motivated these policies. For example, the government does not state *why* the Bureau chose to house pre- and post-surgery transgender women in women's facilities—leaving open the possibility that safety and mental health concerns underpinned this policy. And Plaintiffs put forward evidence in their declarations that make this possibility probable.

But the bigger issue is that the government's argument misses the point. The operative question is not whether the government was subjectively aware of the serious risks Plaintiffs would face in men's prisons at the time they were originally placed in women's prisons. It is whether the government was aware of the serious risk Plaintiffs faced when it made the categorical decision to transfer them to men's facilities, and whether the government is *still* aware of this risk, such that the Court may award preliminary prospective relief.

Of course, the government's subjective state of mind at the time of original placement might bear on whether it was aware in January 2025 of the serious risks Plaintiffs face. This Court believes Plaintiffs have submitted sufficient evidence to conclude that Plaintiffs' original placements in women's facilities *were* motivated by safety and mental health concerns, and that conclusion supports finding that the government has an ongoing awareness of the risks. Because the evidence the government's declarants put forward acknowledges the objectively serious risk faced by Plaintiffs, this Court concludes that the government was aware of that risk.

*ii. Mandated Transfer to Men's Prisons Was Not a Reasonable Response*

As noted above, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. This is so because prison officials' Eighth Amendment duty is "to ensure reasonable safety," which "incorporates due regard for prison officials' unenviable task of keeping dangerous [people] in safe custody under humane conditions." *Id.* at 844–45 (internal quotation marks omitted). Here, the government argues that it reacted reasonably to the serious risks Plaintiffs would face in men's prisons by assigning Plaintiffs to FMC Rochester and MCFP Springfield. Opp'n at 17. Though both facilities are men's prisons, the government argues that "the inmate population at these medical centers are largely non-violent and tend to have only minor infractions in their disciplinary history." Stover Decl. ¶ 22. The government notes that both facilities have experience housing some transgender female inmates and if Plaintiffs suffer from exacerbated gender dysphoria as a result of their transfers, these facilities "are able to provide appropriate treatment." *Id.*

This response fails for two reasons. First, because it is fundamentally unreasonable for prison officials to respond to serious risks such as mental health deterioration, self-harm, and suicidality by intentionally creating those risks and offering to treat them after they predictably occur. Second, because it is unreasonable, given the known risks, for the Bureau to adopt a categorical policy of transferring all transgender female inmates to men's prisons without first considering whether it would be safer to house Plaintiffs in women's facilities. The government does not make the argument that FMC Rochester and MCFP Springfield are safer housing options for Plaintiffs than any female facilities would be. Instead, the Bureau's categorical policy derives entirely from Executive Order 14168, notwithstanding its direct conflict with PREA's requirement

**MATERIAL UNDER SEAL DELETED**

of individualized placement decisions, 28 C.F.R. § 115.42(c), and the Bureau's own prior policy. Failing to consider whether transferring Plaintiffs to *any* men's prison was safe despite Plaintiffs documented vulnerabilities is not a reasonable response to a serious risk.

Because Plaintiffs have established that the government knew of the serious risks of harm that Plaintiffs faced if they were transferred to men's prisons, and because the government did not respond reasonably to those known risks, Plaintiffs have satisfied the subjective prong of the Eighth Amendment.

### C. Individual Findings

[redacted]

[redacted]

---

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

[redacted]

[redacted]

[redacted]

**MATERIAL UNDER SEAL DELETED**

[redacted]

**D. Remaining Preliminary Injunction Factors**

Plaintiffs have demonstrated that irreparable harm will follow if their request for a preliminary injunction is denied. This is so because "a prospective violation of a constitutional right constitutes irreparable injury." *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998); *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) ("[A] prospective violation of a constitutional right constitutes irreparable injury for purposes of seeking equitable relief." (cleaned up)). As detailed above, Plaintiffs have established a likelihood of success on their Eighth Amendment claims and have therefore established that they will face irreparable harm in the absence of preliminary relief.

Moreover, the balance of the equities and the public interest favor the plaintiffs. The government cites concerns about the safety, privacy, and dignity of cisgender women incarcerated with Plaintiffs. *See* Opp'n at 33–34. The government also claims that a preliminary injunction would "impermissibly interfere with the government's administration of its federal prisons and the execution of Executive Branch policy." *Id.* at 34. But as detailed elsewhere in this opinion, nothing in this preliminary injunction prevents the government from separating Plaintiffs from cisgender female inmates within the women's facilities where they are currently housed if it is necessary to do so. This injunction only prevents the government from transferring Plaintiffs to

men's prisons. As such, any public interest in seeing Plaintiffs relocated immediately to male facilities is slight at best. The government's mitigable concerns are therefore outweighed by the specific harms Plaintiffs would face if transferred to men's prisons—including a heightened risk of sexual violence, as well as self-harm and suicide. The balance of the equities therefore favors a preliminary injunction so that the litigation may run its course.

**E. Narrow Tailoring Under the PLRA**

Plaintiffs seek an order enjoining Defendants "from implementing Section[] 4(a) . . . of Executive Order 14168" against them and requiring Defendants to "maintain and continue [Plaintiffs'] housing status in women's facilities." Proposed Order ¶¶ 2–3, ECF No 117–29. The government argues this injunction violates the PLRA's command that "preliminary injunctive relief" "with respect to prison conditions" must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." Opp'n at 35 (quoting 18 U.S.C. § 3626(a)(2)). Specifically, the government asserts that there are less intrusive means of addressing the harms Plaintiffs would face in men's prisons than ordering the Bureau to keep Plaintiffs in female institutions. *Id.* The government suggests, for instance, that the Court could "order BOP to undertake additional safety measures to protect Plaintiffs in men's facilities, such as housing Plaintiffs 'in a dedicated facility, unit, or wing.'" *Id.* (quoting 28 C.F.R. § 115.42(g)).

Plaintiffs, by contrast, argue that the least intrusive relief "is to preserve the housing placements BOP itself established and has maintained for years." Reply at 17. The Court agrees with Plaintiffs. Maintaining Plaintiffs current housing status is obviously less intrusive than ordering Defendants to undertake additional safety measures or to establish and operationalize special facilities to house transgender female inmates in men's prisons while litigation proceeds.

**MATERIAL UNDER SEAL DELETED**

Finally, the preliminary relief is narrowly tailored because, as stated elsewhere in this opinion, nothing in this injunction prevents the government from separating transgender female inmates from cisgender female inmates within women's prisons if it becomes necessary to do so.

### F. The *Fleming v. Rule* Preliminary Injunction

On June 2, 2026, a court in the Northern District of Texas issued a preliminary injunction in *Fleming v. Rule*, No. 4:25-cv-0157-D (N.D. Tex.), a case brought by several cisgender female inmates at [redacted] against the United States, the Attorney General, and the Bureau of Prisons, challenging the Bureau's practice of housing transgender female inmates in women's prisons. The June 2 preliminary injunction was granted at the request of Plaintiff-Intervenors in that case—a group of cisgender female inmates at [redacted]—and ordered the government to house transgender female inmates at that facility "in a secure, segregated area," and to use "separate movement, routing, scheduling, or other measures as necessary to prevent overlap between male inmates and female inmates in housing and shared spaces." Prelim. Inj., *Fleming* (N.D. Tex. June 2, 2026), ECF No. 133, at 3. The government in this case has since filed notice of the *Fleming* court's preliminary injunction and the *Fleming* Plaintiff-Intervenors have since moved to intervene in this matter, noting that [redacted] of the transgender female inmates housed at [redacted] that are subject to the *Fleming* preliminary injunction are also plaintiffs in this matter [redacted] Mot. to Intervene at 1, ECF No. 141.

Putative Plaintiff-Intervenors argue that their intervention is necessary because "the Government Defendants in this case have failed to document and present" the ways female inmates have been harmed by the presence of transgender females at [redacted] *Id.* The claimed harms include transgender female inmates' presence in women's bathrooms and other shared spaces, sexual propositions, and retaliation against cisgender female inmates who complain,

**MATERIAL UNDER SEAL DELETED**

among other things. *Id.* at 1–2. Because these purported harms are temporarily addressed by the *Fleming* court's June 2 preliminary injunction—separating transgender female inmates from cisgender female inmates at [redacted]—this Court finds that it is not necessary to decide the motion to intervene before ruling on Plaintiffs' pending motion for a preliminary injunction.

Nothing in the preliminary injunction this Court issues today conflicts with the *Fleming* court's June 2 injunction. Today's injunction merely enjoins the government from transferring Plaintiffs to men's prisons. It does not, at this juncture, require that Plaintiffs be housed alongside cisgender female inmates or share common spaces.

## IV. CONCLUSION

For the forgoing reasons, the Court will **GRANT** Plaintiffs' motion for a preliminary injunction. A separate Order consistent with this Memorandum Opinion shall issue.

Date: 6/17/26

Royce C. Lamberth
Royce C. Lamberth
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br>Defendants. | Civ. A. No. 25-286 (RCL)<br><br>Consolidated with *Jones v. Blanche*, Civ. A. No. 25-401 (RCL); *Moe v. Trump*, Civ. A. No. 25-653 (RCL) |

**NOTICE OF APPEAL**

Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the June 7, 2026 Order granting Plaintiffs' Motion for Preliminary Injunction (ECF No. 147, amended at ECF No. 160), and the accompanying Memorandum Opinion (ECF No. 148, amended at ECF No. 161).

Dated: June 22, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JEAN LIN
Special Litigation Counsel

*/s/ M. Jared Littman*
M. JARED LITTMAN
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Jared.littman2@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2026, I electronically filed the foregoing Volume of the Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

/s/ *McKaye L. Neumeister*
MCKAYE L. NEUMEISTER
*Attorney, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*McKaye.L.Neumeister@usdoj.gov*

*Counsel for Defendants-Appellants*