[NOT YET SCHEDULED FOR ORAL ARGUMENT]

**No. 26-5238**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JANE DOE, et al.,

Plaintiffs-Appellees,

v.

TODD BLANCHE, in his official capacity as Attorney General of the United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH
MCKAYE L. NEUMEISTER
DOMENIC A. CANONICO
*Attorneys, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiffs in district court, and appellees here, are 14 inmates in the custody of the Federal Bureau of Prisons (BOP). With the permission of the district court, those inmates are proceeding pseudonymously in this litigation. *Jones*, Dkts. 14, 47; *Doe*, Dkt. 7; *Moe*, Dkts. 7, 67. Their pseudonyms are Jane Jones, Amy Jones, Barbara Jones, Carla Jones, Maria Moe, Mary Doe, Sara Doe, Emily Doe, Zoe Doe, Olivia Doe, Lois Doe, Sally Doe, Wendy Doe, and Rachel Doe.[1]

In all three consolidated cases, defendants in district court, and appellants here, are Todd Blanche, in his official capacity as Attorney General of the United States; and William K. Marshall, III, in his official capacity as Director of BOP.[2]

---

[1] Six additional individuals (Sophia Doe, Susan Doe, Jane Doe, Ellen Doe, Tori Doe, and Donna Jones) were originally plaintiffs in this action but are no longer part of the case.

[2] These actions were originally brought against defendant James R. McHenry, III, in his official capacity as Acting Attorney General of the United States, and defendant William Lothrop, in his official capacity as Acting Director of BOP. Attorney General Pamela Bondi was automatically substituted as a party, and subsequently Director Marshall and Attorney General Blanche were automatically substituted as parties. *See* Fed. R. Civ. P. 25(d); Fed. R. App. P. 43(c)(2).

In *Moe v. Trump*, defendants in district court, and appellants here, also include Donald J. Trump, in his official capacity as President of the United States. In *Jones v. Bondi*, plaintiffs' original complaint also listed Donald J. Trump, in his official capacity as President of the United States, as a defendant. The *Jones* plaintiffs later omitted President Trump as a defendant in filing their Amended Complaint, and the President is thus no longer a party in that case.

Four female inmates in BOP custody moved to intervene as defendants in this action in district court: Brenda Leigh Kirk, Jasmine Meabon, Jessica Clemencio Morais, and Keisha Williams. Their district court motion has not yet been acted upon. *See* Dkt. 141. On August 14, 2026, these four inmates filed a motion to intervene in this appeal.

There were no additional parties and no *amici curiae* in district court, and none have entered an appearance before this Court in this appeal. In a previous appeal in this case, the list of participating amici consisted of: a group of former corrections officials;[3] Dee Deidre Farmer, Lambda Legal Defense and Education Fund, Advocates for Transgender Equality Education Fund, Transgender Law Center, and The Center for Constitutional Rights;

---

[3] James Austin, Martin F. Horn, Steve J. Martin, Richard Morgan, Dan Pacholke, Emmitt Sparkman, Phil Stanley, and Eldon Vail.

two groups of States;[4] and a group of law professors.[5] There were also two movants whose motions to participate as amicus curiae was denied: Rhonda Fleming and Women's Liberation Front.

**B. Ruling Under Review**

The ruling under review is the district court's memorandum opinion and order granting plaintiffs' motion for a preliminary injunction (Dkts. 147, 148, 150, 160, 161) in *Doe v. Blanche*, No. 1:25-cv-286 (D.D.C.), issued on June 7, 2026, by the Hon. Royce C. Lamberth. The court's opinion is available at *Doe v. Blanche*, No. 1:25-CV-286-RCL, 2026 WL 1642068 (D.D.C. June 7, 2026). *See* JA587-639; JA992-1044.

---

[4] Massachusetts, California, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, New York, Oregon, Rhode Island, Vermont, and the District of Columbia; and Idaho, Indiana, Alabama, Alaska, Arkansas, Florida, Georgia, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, Wyoming, and the Arizona Legislature.

[5] Margo Schlanger, Andrea Armstrong, Paulina D. Arnold, Shirin Bakhshay, W. David Ball, Erin R. Collins, D Dangaran, Sharon Dolovich, Avlana K. Eisenberg, Malcolm M. Feeley, Eric S. Fish, Betsy Ginsberg, Nicole B. Godfrey, Cynthia Godsoe, Danielle C. Jefferis, Issa Kohler-Hausmann, Grace Y. Li, Aaron Littman, Zina Makar, Michael B. Mushlin, Reena Parikh, Judith Resnik, Ira P. Robbins, Laura Rovner, David Rudovksy, Shanda Sibley, Jonathan Simon, Ji Seon Song, and Anna VanCleave.

### C. Related Cases

These three consolidated cases have previously been before this Court in a consolidated appeal from previous preliminary-injunction orders. *See Doe v. Blanche*, No. 25-5099 (D.C. Cir.) (lead case) (member cases: Nos. 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427, 26-5066, 26-5067, 26-5069). The Court issued its decision in that appeal on April 17, 2026. *See Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026) (vacating preliminary injunctions).

Counsel are aware of one related case within the meaning of D.C. Circuit Rule 28(a)(1)(C): *Kingdom v. Trump*, Nos. 26-5181, 26-5236 (D.C. Cir.) (No. 1:25-cv-691 (D.D.C.)).

*/s/ Domenic A. Canonico*
Domenic A. Canonico

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........ v

TABLE OF AUTHORITIES ........ vii

GLOSSARY ........ 1

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF THE ISSUE ........ 4

PERTINENT STATUTES AND REGULATIONS ........ 4

STATEMENT OF THE CASE ........ 4

A. Executive Order 14168 ........ 4

B. BOP's Management of Trans-Identifying Inmates ........ 5

C. Factual Background ........ 8

D. Prior Proceedings ........ 11

SUMMARY OF ARGUMENT ........ 18

STANDARD OF REVIEW ........ 23

ARGUMENT ........ 23

I. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Eighth Amendment Claims. ........ 24

A. The Eighth Amendment Does Not Require Prison Officials to House Male Inmates in Women's Facilities. ........ 25

B. Plaintiffs Cannot Obtain an Injunction Based on Speculation About Hypothetical Future Prison Conditions That BOP Could Mitigate. ........ 32

C. Plaintiffs Have Not Demonstrated Individualized Eighth Amendment Violations Warranting Preliminary-Injunctive Relief. .......... 37

1. The District Court erred in finding Eighth Amendment violations on a categorical, rather than individualized, basis.......... 38

2. Plaintiffs have failed to show that they face objectively intolerable risks to their safety or health from being housed in the designated men's facilities. .....41

3. Plaintiffs have not shown that BOP is deliberately indifferent to the potential risks of transferring them to men's facilities. ..........51

II. Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors.......... 55

III. The Preliminary Injunction Violates The PLRA.......... 59

CONCLUSION .......... 63

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abdullah v. Obama*,
753 F.3d 193 (D.C. Cir. 2014) .................... 23

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) .................... 23

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) .................... 57

*Bell v. Wolfish*,
441 U.S. 520 (1979) .................... 2, 27, 54, 58

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .................... 55

*Citizens for Responsibility & Ethics in Washington v. Federal Election Comm'n*,
904 F.3d 1014 (D.C. Cir. 2018) .................... 57

*City of Grants Pass v. Johnson*,
603 U.S. 520 (2024) .................... 26, 28

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) .................... 12, 13, 37, 38, 39, 41, 46, 47

*Dothard v. Rawlinson*,
433 U.S. 321 (1977) .................... 27

*Farmer v. Brennan*,
511 U.S. 825 (1994) .................... 20, 24, 25, 29, 31 32, 33, 34, 35, 38, 41, 50, 51, 52, 53

*Fleming v. Rule*,
No. 4:25-cv-0157-D (N.D. Tex. June 2, 2026) .................... 18, 58

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .................... 57

*Hatim v. Obama*,
760 F.3d 54 (D.C. Cir. 2014) .................... 58, 59

*Helling v. McKinney*,
509 U.S. 25 (1993) ............................................................ 34, 35, 45

*Hudson v. Palmer*,
468 U.S. 517 (1984) ............................................................ 26

*Irving v. Dormire*,
519 F.3d 441 (8th Cir. 2008) ............................................................ 30

*Kingdom v. Trump*,
No. 26-5181, 2026 WL 1905418 (D.C. Cir. June 17, 2026) ..................... 58

*Lakin v. Barnhart*,
758 F.3d 66 (1st Cir. 2014) ............................................................ 41-42

*McKune v. Lile*,
536 U.S. 24 (2002) ............................................................ 27, 59, 60

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021) ............................................................ 58

*Murphy v. United States*,
653 F.2d 637 (D.C. Cir. 1981) ............................................................ 33, 42

*Public Safety Spectrum All. v. FCC*,
___ F.4th ___, 2026 WL 2093901 (D.C. Cir. July 21, 2026) ..................... 37

*Rhodes v. Chapman*,
452 U.S. 337 (1981) ............................................................ 26

*S.D. v. Rees*,
No. 6:25-cv-01726-CL (D. Or. Apr. 28, 2026) ....................................... 61

*Shrader v. White*,
761 F.2d 975 (4th Cir. 1985) ............................................................ 44

*Tay v. Dennison*,
457 F. Supp. 3d 657 (S.D. Ill. 2020) ....................................................... 61

*Turner v. Safley*,
482 U.S. 78 (1987) ............................................................ 54, 59

*United States v. Skrmetti*,
605 U.S. 495 (2025) ............................................................ 50

*Vandevender v. Sass*,
970 F.3d 972 (8th Cir. 2020) .......................................................... 42, 44

*West Virginia v. B.P.J.*,
146 S. Ct. 2356 (2026) .................................................. 2, 3, 25, 28, 30, 31

*Wilson v. Seiter*,
501 U.S. 294 (1991) ........................................................................ 26

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................................... 24

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
93 F.3d 910 (D.C. Cir. 1996) ............................................................ 27

*Wrenn v. District of Columbia*,
864 F.3d 650 (D.C. Cir. 2017) ........................................................... 55

**Constitution and Statutes:**

U.S. Const. amend. VIII ........................................................................ 19

18 U.S.C. § 3624(c)(1) .......................................................................... 44

18 U.S.C. § 3621(b) ........................................................................ 5, 27, 60

18 U.S.C. § 3626(a)(2) ................................................ 12, 16, 23, 59, 60, 62

20 U.S.C. § 1681(a)(5)-(7) .................................................................... 26

20 U.S.C. § 1681(a)(9) .......................................................................... 26

20 U.S.C. § 1686 .................................................................................. 26

28 U.S.C. § 1292(a)(1) ............................................................................ 4

28 U.S.C. § 1331 .................................................................................... 4

28 U.S.C. § 2201 .................................................................................... 4

28 U.S.C. § 2202 .................................................................................... 4

**Regulatory Materials:**

28 C.F.R. § 115.41(a) .......................................................................... 6

28 C.F.R. § 115.42(a) .......................................................................... 6

28 C.F.R. § 115.42(g) .......................................................................... 61

28 C.F.R. §§ 542.13-.15 ...................................................................... 7

Exec. Order No. 14168,
*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*,
90 Fed. Reg. 8615 (Jan. 30, 2025) .................................................. 4-5, 5

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................................ 4

**Other Authorities:**

BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification* (Mar. 6, 2025),
https://perma.cc/G43K-8BD8 .......................................................... 6

U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12* (May 2013), https://perma.cc/RLB3-CY8Q .............................. 30

## GLOSSARY

| | |
|---|---|
| BOP | Federal Bureau of Prisons |
| EO | Executive Order |
| FMC | Federal Medical Center |
| JA | Joint Appendix |
| MCFP | Medical Center for Federal Prisoners |
| PLRA | Prison Litigation Reform Act |

## INTRODUCTION

The question in this case is whether the Eighth Amendment's prohibition on cruel and unusual punishments bars the Federal Bureau of Prisons (BOP) from implementing the usual and longstanding practice of segregating based on sex in prison housing. The district court concluded that the Eighth Amendment prohibited placing 14 male trans-identifying inmates in *any* men's facility and entered a preliminary injunction preventing plaintiffs' transfers to such facilities. In other words, the court concluded that the only constitutionally acceptable housing options for these male inmates were women's prisons and halfway houses—no matter how many measures or precautions BOP takes to ensure their reasonable safety in men's facilities.

That is clearly wrong. The Eighth Amendment does not require the federal government to place a male inmate in a women's prison, endangering female inmates' safety, privacy, and dignity. The district court erred in rejecting BOP's expert judgment that the inmates would be reasonably safe in the designated men's facilities. After all, for all male inmates that may face heightened risks of harm in prison—whether they be trans-identifying, government informants, or pedophiles—BOP is perfectly capable of taking reasonable measures to ensure their safety within men's facilities.

Society routinely separates based on sex, especially where there are real biological differences between the sexes that raise safety, privacy, or fairness concerns, and the lawfulness of those practices has repeatedly been upheld. *See, e.g.*, *West Virginia v. B.P.J.*, 146 S. Ct. 2356 (2026) (sports teams divided by sex). It is also well established that individuals have more circumscribed rights in the prison environment than they would in society at large. Inmates are not guaranteed a comfortable experience in prison, nor are they guaranteed perfect safety; the Constitution simply requires that prison administrators employ reasonable measures to keep inmates safe. And it is well established that deference to government officials is at its apex in the correctional environment. *See Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979).

Yet the district court concluded that trans-identifying inmates have *more* rights than they would outside of prison, and that the Eighth Amendment forbids placing male inmates in men's prisons and instead requires endangering female inmates' safety, privacy, and dignity. According to the court, notwithstanding the principles above or BOP's determination that safety, privacy, and prison-administration concerns justified transferring plaintiffs to men's facilities with reasonable safety measures, the Eighth Amendment's prohibition on cruel and unusual punishments

required placing the male inmates in women's facilities. That cannot be right. Nothing in the Eighth Amendment prohibits a categorical policy of housing male inmates in men's facilities; nor does it ever require prison officials to consider housing male inmates alongside female inmates. Rather, such officials are afforded discretion in exercising their expertise to determine how to keep all male inmates reasonably safe within men's facilities. Many characteristics can render certain men especially vulnerable to violence in men's prisons, and the Constitution does not require giving male trans-identifying inmates a special right to be placed in women's prisons instead. *See B.P.J.*, 146 S. Ct. at 2377 n.4.

Moreover, the Eighth Amendment does not contemplate injunctions based upon hypothetical, future conditions of confinement to which inmates have never been subjected, because there is no way for courts to properly assess the severity of those hypothetical conditions or the adequacy of prison officials' future response to them. And even assuming the Eighth Amendment could support injunctive relief in such circumstances, plaintiffs have not shown that their transfer to men's BOP medical facilities housing nonviolent inmates or to the men's side of their current halfway houses would constitute cruel and unusual punishment.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 2201, and 2202. JA131-32; JA90; JA61. On June 7, 2026, the district court issued an order granting plaintiffs' motion for a preliminary injunction. JA583-86. The federal government filed a timely notice of appeal of that order on June 22, 2026. JA640; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in granting a preliminary injunction blocking the transfer of male trans-identifying inmates to men's prison facilities and halfway houses, on the ground that any such transfer violates the Eighth Amendment's prohibition on cruel and unusual punishments.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Executive Order 14168

On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, EO 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) (EO). This order aims to "defend women's rights" and

promote women's "dignity, safety, and well-being" through "policies that recognize women are biologically female, and men are biologically male." EO § 1, 90 Fed. Reg. at 8615. As relevant here, Section 4(a) requires the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers." EO § 4(a), 90 Fed. Reg. at 8616.[6]

### B. BOP's Management of Trans-Identifying Inmates

**1.** Decisions on classification and designation of inmates to a particular prison facility are vested in BOP. *See* 18 U.S.C. § 3621(b). When making decisions regarding "the place of [a] prisoner's imprisonment," BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by [BOP] … that [BOP] determines to be appropriate and suitable." *Id.* Additionally, "[BOP] may at any time … direct the transfer of a prisoner from one penal or correctional facility to another." *Id.*

Previously, BOP used a specialized decision-making body to handle placements of trans-identifying inmates. *See* JA514 (Stover Decl. ¶ 6). Now,

---

[6] Another directive to BOP—Section 4(c), which pertains to medical care—is implicated in separate class-action litigation. *See Kingdom v. Trump*, No. 1:25-cv-691-RCL (D.D.C. filed Mar. 7, 2025), *appeal docketed*, No. 26-5236 (D.C. Cir. June 23, 2026). Plaintiffs originally challenged Section 4(c) in this case as well, but the district court has stayed that challenge. *See* Dkt. 127.

the Designation and Sentence Computation Center makes the initial placement and transfer decisions for all trans-identifying inmates, just as it does for the rest of BOP's inmate population. BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, ch. 1, at 1-3 (Mar. 6, 2025), https://perma.cc/G43K-8BD8. Consistent with the EO, BOP has determined that it is the agency's "correctional judgment that housing inmates according to their biological sex ensures bodily privacy and safety for all inmates and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships." JA517 (Stover Decl. ¶ 23).

When designating inmates to a facility, BOP follows the applicable regulations under the Prison Rape Elimination Act. During intake and upon transfer, BOP screens inmates for "their risk of being sexually abused by other inmates or sexually abusive toward other inmates." 28 C.F.R. § 115.41(a). This information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). BOP thus makes "individualized determinations when making placement decisions to reduce the risk of assaults," taking into consideration various factors including "an inmate's vulnerability to sexual victimization, prior victimization history, physical

stature or presentation, and other factors that make an inmate a target for abuse." JA543 (Roman Decl. ¶ 3).

**2.** Like all other inmates, when trans-identifying inmates wish to raise concerns about their treatment in BOP custody, they can invoke BOP's Administrative Remedy Program. *See* 28 C.F.R. §§ 542.13-.15. Importantly, however, BOP does not merely wait to react to any such complaints. Rather, under its "zero tolerance policy toward sexual abuse and sexual harassment," BOP "provides routine training to all staff to help detect incidents, perpetrators, and inmate victims of sexually abusive behavior," and instructs staff "on how to properly and timely intervene." JA544 (Roman Decl. ¶ 8). Staff "regularly review the files of certain inmates … for the purpose of determining inmates with a history of assaultive behavior or a history of sexual offenses to keep the institution safe and secure." JA544 (Roman Decl. ¶ 13).

In response to concerns from male trans-identifying inmates regarding their safety, BOP has "many options available to provide relief to reduce their risk of harm in the men's prison." JA543 (Roman Decl. ¶ 4). For instance, BOP can "transfer the inmate to a different facility," "change the inmate's cell assignment," or "plac[e] an inmate in a separate housing unit to keep potential threats away from the potential victim." JA544 (Roman Decl. ¶ 5).

Additionally, when staff become aware of a threat to a particular inmate, "they can begin monitoring predatory inmates and issuing separation orders that notify staff to keep certain inmates away from one another, including not placing them in the same programs." JA544 (Roman Decl. ¶ 9). And, in circumstances where a "credible threat" has been identified, BOP can use "both protective custody and restrictive housing" in a non-punitive manner to keep the potential victim safe. JA544 (Roman Decl. ¶ 11).

### C. Factual Background

**1.** As of May 2026, there are "approximately 1,022 inmates in BOP custody that have a diagnosis of gender dysphoria." JA514 (Stover Decl. ¶ 5). Approximately 600 of those inmates are on sex-rejecting hormones. *Id.* Only 13 such inmates, all biologically male, "are currently housed with inmates of the opposite sex." *Id.* The vast majority of male trans-identifying inmates are housed in men's facilities. *See* Dkt. 52-1, at 2 (explaining that, as of February 2025, there were "1,488 biological male inmates who identify as female" in BOP custody and only 22 were "living in female institutions"). The original decisions to house those 13 inmates in women's facilities were made "for several reasons," but those decisions were not based on any finding that BOP "could not successfully keep the inmates safe if housed with

male inmates." JA514 (Stover Decl. ¶ 5); *see* JA518-27 (Stover Decl. ¶¶ 29, 33, 38, 43, 46, 49, 55, 58, 61, 65-67, 69).

**2.** Plaintiffs are 14 male trans-identifying inmates in BOP custody who were housed in women's facilities at the time the EO was issued.[7] They include the 13 male inmates currently housed in women's facilities, as well as one inmate who is on home confinement. *See* JA515 (Stover Decl. ¶ 18). Plaintiffs allege that, although their "birth sex" is male, they identify as female, take sex-rejecting hormones, and have been housed in women's prison facilities, and that several have had sex-rejecting surgeries. *See* JA59-155.

**a.** Following the issuance of the EO, BOP officials informed plaintiffs that they would be transferred to men's facilities. JA100-01; JA92-93; JA63. BOP individually reviewed the housing placements for each plaintiff at the time and determined that they should be assigned to low-security men's facilities with nonviolent offenders—which BOP determined, based on its experience and expertise, "would minimize the likelihood that they would be victimized." Dkt. 11-1, at 2-3; *see* Dkt. 52-1, at 4-5; Dkt. 24-1, at 2-3 (*Jones*, No. 25-cv-401); Dkt. 42-1, at 3 (*Jones*, No. 25-cv-401); Dkt. 37-

[7] Six additional individuals were originally plaintiffs in this action but are no longer part of the case because they were released from custody, passed away, or voluntarily chose to be transferred to a men's facility.

1, at 3 (*Moe*, No. 25-cv-653).[8] As a result of the earlier preliminary injunctions in this case, *see infra* p.11-12, plaintiffs were never transferred to these 2025 housing assignments.

**b.** In 2026, the Designation and Sentence Computation Center again undertook individualized assessments of the 13 male inmates currently in opposite-sex facilities to determine their appropriate housing. JA516 (Stover Decl. ¶ 21). "The assessments included an evaluation of each inmate's unique medical record, psychology record, disciplinary record, and security level," and "BOP consider[ed] on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." *Id.*

Based on these assessments, BOP determined that, for the four inmates who were housed in halfway houses, they would be switched to the men's side of those facilities. JA526-27 (Stover Decl. ¶¶ 64-68). In making this determination, BOP noted that those facilities experience very few substantiated sexual assault allegations and guilty findings for assaults on inmates. JA526-27 (Stover Decl. ¶¶ 64, 66-68).

[8] Unless otherwise specified, citations to "Dkt." refer to the docket in *Doe*. These were originally three separate cases but have now been formally consolidated. *See* Dkt. 115.

For the nine inmates then housed in women's BOP institutions, BOP determined that placement was appropriate at Federal Medical Center (FMC) Rochester or Medical Center for Federal Prisoners (MCFP) Springfield. JA516-17 (Stover Decl. ¶ 22). BOP determined that those locations were appropriate "because the inmate population at these medical centers are largely nonviolent and tend to have only minor infractions in their disciplinary history." *Id.* Additionally, the medical centers house inmates requiring "specialized," "long-term," or "comprehensive medical or mental health care," and thus "are able to provide appropriate treatment to these inmates." *Id.* In making this determination, BOP noted that both FMC Rochester and MCFP Springfield currently house other inmates with gender dysphoria. JA517 (Stover Decl. ¶¶ 25, 27). And both have extremely low rates of assault and sexual assault. JA517 (Stover Decl. ¶¶ 24, 26).

### D. Prior Proceedings

**1.** Following the issuance of the EO, plaintiffs brought three lawsuits against the Attorney General and the Director of BOP, challenging the transfer of plaintiffs to men's facilities on statutory and constitutional grounds. *See* JA143-53; JA106-117; JA72-81. Beginning in February 2025, the district court granted plaintiffs' motions for preliminary injunctions and barred BOP from effectuating the transfers, concluding that plaintiffs were

likely to succeed on their Eighth Amendment claims that they would face an unconstitutional risk of harm in men's prisons. *See* Dkts. 23, 44, 55, 68, 83, 89, 94, 101; Dkts. 62, 84, 90, 96, 103 (*Moe*, No. 25-cv-653); Dkts. 28, 46, 69, 75, 81, 88 (*Jones*, No. 25-cv-401).[9] In support of that conclusion, the court relied on "various government reports and regulations recognizing that transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex." Dkt. 23, at 8-9. The court also accepted plaintiffs' general assertions "that placement in a male penitentiary by itself will exacerbate the symptoms of their gender dysphoria." *Id.* at 9 (emphasis omitted).

**2.** The government appealed, and this Court vacated the preliminary injunctions. *See Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026). This Court explained that plaintiffs had "expressly disclaim[ed] the categorical argument that the Eighth Amendment requires every transgender woman to be housed in a women's prison." *Id.* at 916 (quotation marks omitted). Thus, the Court could not "sustain the district court's

[9] Pursuant to the Prison Litigation Reform Act (PLRA), these preliminary injunctions expired 90 days after their entry. *See* 18 U.S.C. § 3626(a)(2). The district court repeatedly issued new injunctions for additional 90-day periods based on the same analysis.

preliminary injunctions on the ground that every transgender woman … in BOP custody has an Eighth Amendment entitlement to not be housed in men's facilities." *Id.* And the district court had not made the individualized factual findings "needed to hold, as plaintiffs urge, that the distinctive characteristics of these individuals in particular render their transfer to men's facilities unconstitutional under the Eighth Amendment." *Id.* at 917. Accordingly, the Court concluded that plaintiffs had not demonstrated a likelihood of success on their Eighth Amendment claims or irreparable harm. *Id.* at 918-19.

This Court thus "vacate[d] the preliminary injunctions still in effect and remand[ed] for further proceedings." *Doe*, 172 F.4th at 919.[10] The Court's mandate was set to issue on June 8, 2026. *See* Order, *Doe v. Blanche*, No. 25-5099 (Apr. 17, 2026).

**3.** Following this Court's decision, plaintiffs moved for a new preliminary injunction based on their Eighth Amendment claims. Dkt. 117. Given that the parties would not have sufficient time to fully brief the new

[10] Judge Randolph dissented on two grounds. He would have held that plaintiffs failed to exhaust their administrative remedies because BOP could have provided "some relief" to mitigate the purported Eighth Amendment injuries arising from their transfers. *Doe*, 172 F.4th at 920-26. He also dissented on the ground that successive preliminary injunctions are not authorized under the PLRA. *Id.* at 926-30.

motion before the existing preliminary injunction expired on May 20, 2026, the district court issued an order purporting to "renew the existing preliminary injunction through the time that it is formally vacated by the Circuit's mandate issuing on June 8, 2026." Dkt. 125, at 3.

**4.** On June 7, 2026, the day before this Court's mandate issued in the prior appeal, the district court granted plaintiffs' motion for a new preliminary injunction based on their Eighth Amendment claims. Prior to providing any individualized discussion of plaintiffs' circumstances, the court concluded that plaintiffs were likely to succeed in showing that they would face objectively intolerable risks of harm in men's facilities and that BOP's transfer of them to men's facilities would reflect deliberate indifference to those risks. JA600, 606; JA1005, 1011.

As to plaintiffs' asserted risks of physical harm, the district court dismissed the government's evidence of the vanishingly low rates of assault and sexual assault at the facilities to which most plaintiffs would be moved, reasoning that that evidence was "of limited value" because plaintiffs "are outliers." JA595. The court instead credited plaintiffs' declarant Dr. Alix McLearen, a former BOP official, who asserted that, given "the severely elevated risks of sexual abuse that transgender women face in men's prisons," BOP "cannot adequately prevent harm to transgender women who

are reassigned from female to male facilities based on a categorical housing policy unrelated to any individual circumstances." JA597-98 (quotation marks omitted). The court thus determined that the risks plaintiffs would likely face in men's facilities were intolerable under the Eighth Amendment. JA600.

As to asserted risks to their health, the district court again agreed with plaintiffs that the transfers risked "caus[ing] a substantial risk of exacerbated symptoms of gender dysphoria." JA599. The court asserted that, "even among the broader transgender female population" already living in men's facilities, plaintiffs' symptoms would be uniquely exacerbated by living with men because they "have lived in women's facilities" and gone to "great lengths to accord their lives with their [trans] identities." JA599.

On the subjective prong, the district court concluded that BOP's plans for mitigating risks to plaintiffs after their transfers, and BOP's prior placement of plaintiffs in women's facilities, proved that BOP was aware of the asserted risks that plaintiffs would face in men's facilities. JA602-04. And the court asserted that BOP was deliberately indifferent to those risks because it created those risks itself by pursuing an "unreasonable" policy of refusing to consider housing male inmates in women's facilities. JA605.

After making these general findings that plaintiffs had satisfied both the objective and subjective prongs of their Eighth Amendment claims, and thus demonstrated a likelihood of success on the merits, JA600, 606, the district court proceeded to make findings with respect to each of the plaintiffs. *See* JA606-36; JA1011-41. Without acknowledging any potential variation in risk levels between differently situated plaintiffs, the court found that each and every plaintiff would face a substantial risk of serious harm if transferred to one of the designated facilities and that BOP was aware of, and indifferent to, those purported risks. *See* JA606-36; JA1011-41.

Finally, the district court briefly discussed the other preliminary-injunction factors, finding that these favored plaintiffs. JA636-37. The court also briefly asserted that its injunction satisfied the needs-narrowness-intrusiveness requirements of the PLRA. JA584-85; *see* 18 U.S.C. § 3626(a)(2). The court rejected the government's contention that, if the court were to find an injunction warranted, it should simply require BOP to undertake additional safety measures for plaintiffs upon their transfer to men's facilities, such as housing them in a special unit, which would be "the least intrusive means necessary to correct that harm." JA637-38 (quotation marks omitted). Instead, the court opined that "[m]aintaining" plaintiffs' "current housing status is obviously less intrusive than ordering [BOP] to

undertake additional safety measures or to establish and operationalize special facilities to house transgender female inmates in men's prisons while litigation proceeds." JA637.

The district court thus barred the government from transferring plaintiffs to men's facilities. The court enjoined the government "from implementing Section 4(a) of Executive Order 14168 against" the 14 plaintiffs, and ordered the government to "maintain and continue [plaintiffs'] housing status in … women's prisons and women's halfway houses." JA584.

**5.** The district court also expressly clarified that its "injunction merely enjoins Defendants from transferring Plaintiffs to men's prisons" but "does not, at this juncture, require that Plaintiffs be housed alongside … female inmates or share common spaces." JA586. That caveat regarding the scope of relief was required in light of a potentially conflicting preliminary injunction that had been issued in a separate case, *Fleming v. Rule*, No. 4:25-cv-0157-D (N.D. Tex. filed Feb. 19, 2025), brought by female inmates at FMC Carswell who objected to being housed alongside male trans-identifying inmates (who are some of the plaintiffs in this action). JA638. In *Fleming*, a district court issued a preliminary injunction on June 2, 2026, ordering BOP to house male trans-identifying inmates at FMC Carswell "in a secure,

segregated area," and to use "separate movement, routing, scheduling, or other measures as necessary to prevent overlap between male inmates and female inmates in housing and shared spaces." JA638 (quoting Preliminary Injunction at 3, *Fleming*, No. 4:25-cv-0157-D (June 2, 2026), Dkt. 199). The district court here explained that because its injunction "merely enjoins the government from transferring Plaintiffs to men's prisons," it does not conflict with the *Fleming* court's injunction. JA639.

Given the district court's explanation regarding the scope of its order, BOP filed a notice on July 15 alerting the court that it would be transferring other plaintiffs in this action from the facilities they were then housed in to the unit in FMC Carswell that was created pursuant to the *Fleming* injunction. Dkt. 168. Plaintiffs filed a motion to enforce the preliminary injunction or, in the alternative, for a new preliminary injunction seeking to block the housing of any plaintiffs in this segregated unit. Dkt. 183. The court denied that motion on August 12, finding that plaintiffs' requested relief was not encompassed either within the June 7 preliminary injunction or within plaintiffs' complaints. Dkt. 212.

## SUMMARY OF ARGUMENT

**I.** The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Plaintiffs contend that

transferring them to men's prison facilities and housing them alongside other male inmates is cruel and unusual because it would subject them to unacceptable risks of harm from their fellow inmates and increase their symptoms of gender dysphoria. This challenge is unlikely to succeed on the merits because there is nothing cruel or unusual about BOP adopting a policy of placing male inmates in men's prisons in order to protect the safety, privacy, and dignity of female inmates in BOP custody.

**A.** The Eighth Amendment does not prohibit prison officials from adopting a categorical policy whereby male inmates may be housed only in men's facilities. Although the Eighth Amendment requires prison officials to make reasonable efforts to keep all inmates safe, it does not require BOP to compromise the safety, bodily privacy, and well-being of the female inmates in its custody by assigning male inmates to women's prisons. For all male inmates who may face heightened risks of harm in prison—whether they be trans-identifying, government informants, or pedophiles—BOP can and does take reasonable measures to ensure their safety within men's facilities. The Eighth Amendment does not require BOP to take the extraordinary step of housing inmates in any of these groups in opposite-sex facilities.

**B.** Moreover, the Eighth Amendment permits challenges to existing prison conditions and the failure of prison officials to adequately address the

risks of such conditions. It does not countenance wholly prospective claims for injunctive relief against hypothetical conditions to which inmates have not yet been subjected, or speculative future risks that prison officials have not yet had any opportunity to address. In this speculative posture, plaintiffs cannot satisfy either the objective or subjective elements of an Eighth Amendment claim, particularly given the hundreds of male trans-identifying inmates that BOP has for years safely housed in men's facilities.

**C.** Plaintiffs' Eighth Amendment claims fail in any event. To state a claim that the Eighth Amendment prohibits their transfer to men's facilities, plaintiffs must show that the conditions in the prospective men's facilities pose "a substantial risk of serious harm" and that BOP officials acted with "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Plaintiffs failed to establish either of those elements here. And the district court again erred in finding that plaintiffs had demonstrated a likelihood of success on these elements based on broad predictions about hypothetical future risks and speculation about BOP's categorical inability or unwillingness to address those risks, rather than the individualized findings this Court previously made clear would be essential to the success of plaintiffs' individual Eighth Amendment claims.

Plaintiffs' attempt to demonstrate that transferring them to men's prison facilities will expose them to objectively intolerable risks of harm is based on speculation and generalizations that ignore BOP's expert judgments and its prior experience. Over 1,000 trans-identifying inmates in BOP custody are currently housed in facilities consistent with their sex. Plaintiffs have not established that male trans-identifying inmates face a pervasive threat of violence and sexual assault in any men's facility, let alone in the low-risk medical facilities to which plaintiffs have been designated. To the contrary, BOP specifically chose these facilities—which are populated by nonviolent offenders receiving medical care, and which have a low incidence of assault—to ensure plaintiffs' health and safety. JA516-17 (Stover Decl. ¶¶ 21-27).

Moreover, even assuming that plaintiffs would face an objectively substantial risk of harm in men's facilities, BOP has not been deliberately indifferent to any such risks; rather, it has comprehensive procedures designed to identify and handle any specific risks of assault to an inmate, and its officials are trained to reasonably respond to any known risk. And BOP has considered and responded reasonably to possible safety concerns here by selecting particular men's facilities with low rates of violence as destination facilities for plaintiffs. The mere fact that BOP has adopted a

policy whereby all inmates must be housed in facilities consistent with their sex does not demonstrate deliberate indifference to plaintiffs' safety, just as it does not establish deliberate indifference to the safety of the hundreds of other male trans-identifying inmates currently housed safely in men's prisons.

**II.** Nor have plaintiffs demonstrated that the remaining preliminary-injunction factors are satisfied. Although plaintiffs fear becoming possible victims of violence in men's facilities, the record does not establish that any such victimization is certain or imminent at the particular medical facilities and halfway houses to which they will be transferred. Moreover, the preliminary injunction disrupts important Executive Branch policy judgments, disregards BOP's exercise of its expertise in the difficult and sensitive task of managing the federal prison system, and ignores the harms to female inmates' safety, privacy, and dignity from male inmates being housed in women's prisons—harms the district court in *Fleming* deemed sufficient to justify an injunction compelling the removal of male trans-identifying inmates from the general population at a particular women's facility. The district court thus abused its discretion in concluding that the irreparable-harm prong or the public interest and balance of the equities support blocking these transfers.

**III.** Finally, the injunction violates the PLRA's stringent requirements for preliminary-injunctive relief. In issuing such relief, courts must determine that it is narrowly drawn and the least-intrusive means necessary to remedy the identified harm. 18 U.S.C. § 3626(a)(2). The district court improperly overruled BOP's expert judgment that there are less intrusive ways of ensuring plaintiffs' safety than barring their transfer to men's facilities.

## STANDARD OF REVIEW

This Court "review[s] the district court's balancing of the preliminary injunction factors for abuse of discretion and review[s] questions of law underlying the district court's decision *de novo*." *Abdullah v. Obama*, 753 F.3d 193, 197-98 (D.C. Cir. 2014). Although "factual findings" are generally reviewed "for clear error," where findings are based "'upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard.'" *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18 (2024).

## ARGUMENT

To obtain a preliminary injunction, plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

their favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction cannot issue if plaintiffs fail to satisfy any of these factors. *See id.* at 32. None of these factors favors plaintiffs.

## I. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Eighth Amendment Claims.

The district court issued a preliminary injunction based on its conclusion that plaintiffs were likely to succeed in demonstrating that BOP's planned housing for plaintiffs in men's facilities violated the Eighth Amendment, and it accordingly ordered BOP to continue housing plaintiffs in women's facilities. This Court should vacate the injunction.

The Eighth Amendment's prohibition of "cruel and unusual punishments" requires prison officials to "take reasonable measures to guarantee the safety of the inmates," which includes "protect[ing] prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 832-33 (quotation marks omitted). To establish a failure-to-protect claim, an "inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" to his health or safety and that prison officials acted with "'deliberate indifference'" to that risk. *Id.* at 834. However, the Eighth Amendment does not require BOP to house male inmates in women's correctional facilities. Nor does it contemplate

prospective relief against speculative prison conditions that plaintiffs have not experienced. In any event, plaintiffs have not demonstrated that they would each face a substantial and pervasive threat of harm in men's facilities, or that BOP would act unreasonably in the face of any such threat.

### A. The Eighth Amendment Does Not Require Prison Officials to House Male Inmates in Women's Facilities.

The district court's actions in this case have been premised on a fundamental misunderstanding of the Constitution: the court has wrongly assumed that the Eighth Amendment prohibits prison officials from adopting a "categorical policy" of housing male inmates in men's facilities. *See* JA605. That is incorrect. *Cf. West Virginia v. B.P.J.*, 146 S. Ct. 2356, 2376-77 (2026) (the government "is not *constitutionally* required to grant individualized exemptions" from categorical policy of sex-segregated sports teams). The Eighth Amendment bars the imposition of "cruel and unusual punishments." Punishments are "cruel" if they are "calculated to superadd terror, pain, or disgrace," and they are "unusual" if they have "long fallen out of use." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (citation modified). Plaintiffs' Eighth Amendment claims fail for the simple reason that there is nothing cruel or unusual about prisons housing inmates exclusively with members of the same sex.

**1.** Neither the district court nor anyone else disputes the permissibility of segregating prisons by sex. Indeed, society routinely (and lawfully) separates based on sex when, as here, there are real biological differences between the sexes that present safety, privacy, and dignity concerns. *See, e.g.*, *B. P. J.*, 146 S. Ct. 2356 (sports teams); 20 U.S.C. § 1686 (school living facilities); *id.* § 1681(a)(5)-(7), (9) (undergraduate admissions policies, fraternities, youth organizations, conferences, pageants). No different rule applies to the correctional environment.

To the contrary, individuals' rights are *more* circumscribed in the prison environment than in society at large. *See Hudson v. Palmer*, 468 U.S. 517, 524 (1984). Inmates are guaranteed "'the minimal civilized measure of life's necessities,'" not a "'comfortable'" experience. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Conditions in prison may thus permissibly be "restrictive and even harsh." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Inmates can hardly be considered to have more rights against sex separation in prison than in society generally.

Moreover, deference to government officials is at its apex in the correctional environment. *See Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979). And "the decision where to house inmates," in particular, "is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002).

Prison administrators have long exercised that expertise to adopt policies of housing inmates exclusively in prison facilities that correspond with their sex. Far from "unusual," such policies are well established, nearly universal, and hardly controversial. *See Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996) ("the segregation of inmates by sex is unquestionably constitutional"); *Dothard v. Rawlinson*, 433 U.S. 321, 326 (1977) (observing that "most correctional facilities in the United States ... are segregated on the basis of sex").

**2.** Against this backdrop, BOP's policy of housing inmates exclusively with inmates of the same sex is reasonable both as a general matter and with respect to plaintiffs here. BOP possesses broad statutory discretion to designate inmates' places of imprisonment. 18 U.S.C. § 3621(b). And it has made the expert "correctional judgment" that "housing inmates according to their biological sex" is necessary to "ensure[] bodily privacy and safety for all inmates and limit[] the risk of sexual abuse, disciplinary problems, and illicit intimate relationships." JA517 (Stover Decl. ¶ 23). The resulting housing policy has not "long fallen out of use," nor is it "calculated to superadd terror, pain, or disgrace." *Grants Pass*, 603 U.S. at 542 (citation modified).

The notion that men who identify as women are entitled to a special exemption from the general rule that sex-segregated prisons are permissible is plainly wrong. Where, as here, a policy reasonably classifies based on sex, the Supreme Court has made clear that the government "is not *constitutionally* required to grant individualized exemptions" to specific plaintiffs who object to that policy. *B.P.J.*, 146 S. Ct. at 2376-77. Although the Court made that observation in rejecting an equal-protection challenge to state laws maintaining women's and girls' sports teams exclusively for female athletes, that reasoning applies equally to plaintiffs' argument that the Eighth Amendment entitles them to exemptions from BOP's facially reasonable policy of placing inmates exclusively in prison facilities that correspond to their sex. As in the sports context, in the prison context the government "may treat all biological males the same and treat all biological females the same, given the inherent physical differences between biological males and biological females." *See B.P.J.*, 146 S. Ct. at 2377. Indeed, it is even clearer that plaintiffs are not entitled to special treatment under the Eighth Amendment, given its limited application to cruel and unusual punishments, not the mere refusal to provide preferential accommodations. The Eighth Amendment protects inmates from exposure to objectively

intolerable risks of harm; it does not require prison officials to house male inmates in women's facilities.

**3.** The district court's view that the Eighth Amendment entitles plaintiffs to an exemption from BOP's reasonable policy of housing inmates based on their sex thus cannot be squared with the substance of the Eighth Amendment's prohibition, the circumscribed nature of inmates' rights, or the deference owed to prison officials. The Eighth Amendment does not require prison officials to disregard obvious and serious safety risks to female inmates in order to serve the interests of a specific group of male inmates. Rather, it only requires officials to make reasonable efforts to keep male inmates reasonably safe, *Farmer*, 511 U.S. at 844, and BOP has reasonably determined that it can satisfy this important obligation by housing plaintiffs in men's facilities.

In overriding BOP's expert judgments on this score based on little more than speculation about the risks plaintiffs would face in men's facilities and prejudgments about the adequacy of measures BOP might take in response, the district court relied on logic that leads to absurd results. Even if plaintiffs may face some elevated risks of sexual or other assault in men's facilities, that is equally true for many *non*-trans-identifying males who face similarly heightened risks based on identifiable characteristics, such as, for example,

their offense of conviction, their sexual orientation, their status as government informants, or their mental health. *See* U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-12, at 18, 19-20, 24-26 (May 2013), https://perma.cc/RLB3-CY8Q (non-heterosexual inmates, violent sex offenders, and inmates with severe psychological distress); *Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (informants).

The risks to such inmates would likely decrease if they were transferred to women's prisons. But even if there were no other way to eliminate those risks, no one could plausibly argue that BOP would violate the Eighth Amendment by declining to house such inmates in women's prisons. The same is true for plaintiffs here: the Constitution does not force BOP to privilege their interests by exempting them from a general policy of housing inmates based on their sex, particularly where such special treatment, as both BOP and the district court in *Fleming* determined, compromises the safety and privacy of female inmates in BOP's custody. The Constitution does not require treating plaintiffs *better* than other male inmates, simply because plaintiffs identify as female. *See B.P.J.*, 146 S. Ct. at 2377 n.4.

On the district court's theory, there is no basis for distinguishing other higher-risk individuals from plaintiffs—the Eighth Amendment does not

distinguish among the *reasons* a particular inmate is at risk. *Farmer*, 511 U.S. at 843; *cf. B.P.J.*, 146 S. Ct. at 2377 n.4. Thus, on the court's theory, it would be "unreasonable" under the Eighth Amendment "for [BOP] to adopt a categorical policy" of placing *any* higher-risk male inmates in men's prisons "without first considering whether it would be safer to house [them] in women's facilities." JA605. But the Eighth Amendment does not compel such absurd results. The mere fact that BOP places such individuals in facilities consistent with their sex in no way suggests that BOP has failed to respond reasonably to the risks that those individuals face, and thus acted with deliberate indifference to those risks. There is nothing unreasonable about housing male inmates in men's facilities.

Of course, that conclusion does not imply that the Eighth Amendment has nothing to say about BOP's housing determinations. No matter where an inmate is housed, "[a] prison official's duty under the Eighth Amendment is to ensure '"reasonable safety,"'" which requires that the official "respond[] reasonably" to known risks. *Farmer*, 511 U.S. at 844. For male inmates who face an above-average risk of assault based on their individual characteristics, prison officials can reasonably address those risks by, for instance, adjusting their housing or programming within or between men's

facilities. But the Eighth Amendment never requires a male inmate to be housed in a women's prison.

### B. Plaintiffs Cannot Obtain an Injunction Based on Speculation About Hypothetical Future Prison Conditions That BOP Could Mitigate.

Even apart from the district court's fundamental error in concluding that the Eighth Amendment can ever compel BOP to house male inmates in women's facilities, the district court also erred in finding that plaintiffs had demonstrated a likelihood of success on the merits of their Eighth Amendment claims based exclusively on speculation about hypothetical prison conditions that plaintiffs might experience in their new facilities, and improper prejudgments about the adequacy of mitigation measures BOP could take to address any risks that materialized. The Eighth Amendment does not permit this broad intrusion on the Executive Branch's management of the federal prison system based on nothing more than conjecture about future prison conditions.

**1.** The standards under the Eighth Amendment are limited in crucial ways to "incorporate[] due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Farmer*, 511 U.S. at 845. Accordingly, "[a] prison official's duty under the Eighth Amendment is to ensure '"reasonable safety."'" *Id.* at 844. As this

Court has recognized, "a prisoner has no right to demand the level of protection necessary to render an institution assault-free." *Murphy v. United States*, 653 F.2d 637, 644 (D.C. Cir. 1981). And prison officials have not acted with "deliberate indifference to a substantial risk of serious harm" "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 836, 844.

It is particularly important for those limits to be respected where inmates seek prospective relief. The Supreme Court has warned that courts must "approach issuance of injunctive orders with the usual caution" in the failure-to-protect context, noting the danger of "becoming 'enmeshed in the minutiae of prison operations.'" *Farmer*, 511 U.S. at 846-47 (citation omitted). Plaintiffs seeking injunctive relief must thus demonstrate that officials are "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Id.* at 846. And crucially, an inmate seeking injunctive relief "must show that he *is incarcerated* under conditions posing a substantial risk of serious harm." *Id.* at 834 (emphasis added). The Supreme Court's use of the present tense in this context is critical; it is consistent with the Court's discussion elsewhere about the availability of injunctive relief for "inmates who plainly proved an

unsafe, life-threatening condition in their prison." *Id.* at 845 (quotation marks omitted).

To be clear, an inmate who has not yet "suffer[ed] physical injury" can in some circumstances "seek[] injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm." *Farmer*, 511 U.S. at 845; *see Helling v. McKinney*, 509 U.S. 25, 32-33 (1993). But the Supreme Court contemplated that such a "substantial risk" could exist only where the inmate was in fact currently subject to "objectively inhumane prison conditions," *Farmer*, 511 U.S. at 845, not merely subject to the speculative possibility of experiencing such conditions in the future. In other words, the harm on which inmates base their claim to standing can be a sufficiently imminent future injury, but they must have already experienced conditions that violate the Eighth Amendment to obtain an injunction.

**2.** Under *Farmer*, the Eighth Amendment permits injunctive relief for failure-to-protect claims only where inmates have already been subjected to allegedly inhumane challenged conditions and can thus demonstrate a *current* violation of the Eighth Amendment—not where inmates merely hypothesize a future violation. This limitation is necessary to the proper application of both prongs of the analysis. On the objective prong, an inmate must "show that he is incarcerated under conditions posing a substantial risk

of serious harm." *Farmer*, 511 U.S. at 834. If an inmate has not been subjected to the challenged conditions, he has suffered no Eighth Amendment violation; his lawsuit is premature, and allegations would be improperly based on speculation rather than evidence about existing conditions. *See id.* at 845-47; *Helling*, 509 U.S. at 35-36.

As to the subjective prong, an inmate cannot show that prison officials have been or are deliberately indifferent where the inmate has not been subjected to an objectively intolerable risk. In *Farmer*, the Supreme Court explained that deliberate indifference for purposes of a claim for injunctive relief "should be determined in light of the prison authorities' … attitudes and conduct at the time suit is brought and persisting thereafter." 511 U.S. at 845 (citation modified). And "to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Id.* at 846. But when inmates have not yet experienced the allegedly inhumane conditions, it is impossible to assess whether prison officials "knowingly and unreasonably disregard[] an objectively intolerable risk of harm" caused by those conditions, or took "reasonable measures to abate" that risk. *Id.* at 846, 847. Where a risk does not yet exist, officials have had no opportunity to

reasonably react to it. Inmates thus have no ability to furnish concrete factual evidence that could satisfy the deliberate-indifference prong.

The failure-to-protect cases cited by the district court and plaintiffs are in accord. *See* JA590-91; Dkt.117-1, at 9 n.8; Dkt. 135, at 14 n.8. Many involve claims directed at past incidents and do not discuss prospective relief. And the cases presenting requests for prospective relief typically involve circumstances where plaintiffs were already subjected to the allegedly deficient conditions and sought relief from the continuance of those conditions.

**3.** Because plaintiffs seek injunctive relief premised on hypothetical conditions in men's prisons that they have not yet experienced, they cannot satisfy either prong of the Eighth Amendment analysis. Their allegations about the severity of conditions in men's facilities are based solely on speculation about what they expect those conditions to be, rather than facts about the specific facilities to which they would be transferred. Plaintiffs similarly can only speculate that BOP's response to any risks that do arise will be inadequate, much less rise to the level of deliberate indifference. Neither plaintiffs nor the district court have identified any plausible basis for denying BOP the "presumption of regularity" that the agency would take appropriate measures to identify and mitigate any risks that might arise. *See*

*Public Safety Spectrum All. v. FCC*, __ F.4th __, 2026 WL 2093901, at *9 (D.C. Cir. July 21, 2026).

To find a likely Eighth Amendment violation and enjoin BOP from implementing important policy decisions governing the housing of federal inmates based on such prejudgment and speculation flies in the face of the careful approach that the Supreme Court mandates in this context.

### C. Plaintiffs Have Not Demonstrated Individualized Eighth Amendment Violations Warranting Preliminary-Injunctive Relief.

Even assuming it were ever appropriate to prohibit BOP from transferring prisoners to facilities consistent with their biological sex based on speculation about hypothetical future risks in the new facilities and unfounded skepticism about the adequacy of BOP's likely responses to such risks, plaintiffs have not demonstrated any entitlement to relief on the specific allegations here.

In the prior appeal in this case, this Court explained that plaintiffs had "expressly disclaim[ed] the categorical argument" that "every transgender woman … in BOP custody has an Eighth Amendment entitlement to not be housed in men's facilities." *Doe v. Blanche*, 172 F.4th 901, 916 (D.C. Cir. 2026). Accordingly, the Court held that plaintiffs had the burden of demonstrating on an individualized basis "that the distinctive characteristics

of these individuals in particular render their transfer to men's facilities unconstitutional." *Id.* at 917. In other words, with respect to each of the 14 individuals, plaintiffs must "show that [they are] incarcerated under conditions posing a substantial risk of serious harm" to their health or safety and that prison officials acted with "'deliberate indifference'" to that risk. *Farmer*, 511 U.S. at 834. The district court erred in concluding that plaintiffs satisfied that high burden.

#### 1. The District Court erred in finding Eighth Amendment violations on a categorical, rather than individualized, basis.

In vacating the initial preliminary injunctions in this case, this Court issued a clear directive to the district court: it was not acceptable to grant preliminary-injunctive relief on the general "ground that transgender women face an unconstitutional risk of harm in men's prisons." *Doe*, 172 F.4th at 905. Plaintiffs did not defend that broad reasoning on appeal and, as the Court explained, the record did not establish whether injunctions would be appropriate on the "narrower" ground urged by plaintiffs: that they had "'particular vulnerabilities'" that "render their housing in men's facilities unconstitutional." *Id.* at 905-06, 916. Specifically, the district court had not made "individualized findings" that could support the conclusion that each plaintiff had demonstrated an Eighth Amendment violation with respect to

the transfers. *Id.* at 910 (observing that the district court had not "identif[ied] characteristics of each individual, such as effects of sex reassignment medical treatment or prior experience of assault or self-harm in men's prisons, and ma[d]e a corresponding finding that the plaintiff therefore likely faces a risk of harm rising to the level of an Eighth Amendment violation"). The Court thus "remand[ed] to allow the district court to exercise its judgment whether to make the factual determinations needed to hold, as plaintiffs urge, that the distinctive characteristics of these individuals in particular render their transfer to men's facilities unconstitutional under the Eighth Amendment." *Id.* at 917.

The district court failed to heed this directive. As an initial matter, the court misleadingly characterized *Doe* as an instruction from this Court to reissue the prior injunction, but with additional factual findings. *See* JA589 (stating that "the Circuit directed the Court on remand to make factual determinations as to the features" of plaintiffs that make their transfers unconstitutional). But this Court did no such thing; it simply concluded that it could not "sustain" the injunctions, and directed the district court to proceed "as it deem[ed] appropriate" on remand. *Doe*, 172 F.4th at 918, 919. This Court plainly did not direct the district court to arrive at the same conclusions.

Unsurprisingly, then, although the district court recited factual findings about each plaintiff, *see* JA606-36; JA1011-41, those findings in the latter part of the court's opinion are little more than window-dressing to support the court's broad conclusions that *all* plaintiffs had demonstrated a likelihood of success on the merits of their Eighth Amendment claims. There is no indication in the court's opinion that these purported findings had any bearing on the outcome. Before even mentioning the individual findings, the court had already concluded, based on the general analysis at the beginning of its opinion, that "Plaintiffs have the better argument as to their theories of injury under the objective prong of the Eighth Amendment analysis" and that "Plaintiffs have satisfied the subjective prong of the Eighth Amendment." JA600, 606; *see* JA594-606. And as part of that analysis, the court relied on the sort of assertions underlying its prior injunctions, which reflect a categorical theory that plaintiffs have abandoned.

Tellingly, the district court did not draw any apparent distinctions among plaintiffs' individual risk levels, even though plaintiffs present a wide range of characteristics and circumstances. *See* JA929-39; JA956-63; JA965-68. For instance, plaintiffs vary in the duration of their hormone use, whether they have had vaginoplasties or breast augmentations, whether they have alleged past sexual victimization, and whether they would be

transferred to a BOP medical facility or moved within a halfway house. Even if the court could properly conclude that all plaintiffs are entitled to a preliminary injunction, one would expect the court to acknowledge that, presumably, a plaintiff who has had a vaginoplasty and breast augmentation and has long received sex-rejecting hormones would be differently situated from plaintiffs who have not had such extensive interventions.

In short, the district court employed the same broad and categorical reasoning in assessing plaintiffs' likelihood of success that this Court expressly rejected in vacating the earlier preliminary injunctions. *See Doe*, 172 F.4th at 915-18. That alone provides a sufficient basis for vacating the court's latest injunction.

**2. Plaintiffs have not shown that they face objectively intolerable risks to their safety or health from being housed in the designated men's facilities.**

Plaintiffs have not demonstrated that placing them in the men's facilities to which they have been assigned will likely subject them to a substantial risk of serious harm.

For the level of risk to satisfy the first prong of the Eighth Amendment inquiry, it must be "'sufficiently serious'" and "objectively intolerable." *Farmer*, 511 U.S. at 834, 846. "[N]ot every risk carries an inherent threat at a substantial level, or of severity beyond the norms … ." *Lakin v. Barnhart*,

758 F.3d 66, 72 (1st Cir. 2014) (Souter, J.). To qualify as "substantial," the risk must be "pervasive": "violence and sexual assaults [must] occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures." *Vandevender v. Sass*, 970 F.3d 972, 977 (8th Cir. 2020) (quotation marks omitted); *see Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985) (similar); *Murphy*, 653 F.2d at 644-45 (similar). With respect to fears regarding both their safety and health, plaintiffs have not demonstrated that being housed in a men's facility, much less the specific facilities BOP has designated for each of them, would subject them to a substantial risk of serious harm.

**a.** The district court erred in accepting plaintiffs' speculation that they would face a pervasive risk of assault in the facilities to which they have been designated.

**i.** The record shows that BOP has taken great care to identify facilities that are safe and appropriate for each plaintiff. BOP considered each plaintiff's "unique medical record, psychology record, disciplinary record, and security level" and identified placements that "would ensure the [plaintiff]'s health and safety" and that would not "present management or security problems." JA516 (Stover Decl. ¶ 21). Based on those assessments,

BOP determined that the two selected medical centers (FMC Rochester or MCFP Springfield) would be appropriate placements, both "because the inmate population[s] at these medical centers are largely nonviolent and tend to have only minor infractions in their disciplinary history," and "because [the medical centers] are able to provide appropriate treatment" to plaintiffs. JA516-17 (Stover Decl. ¶ 22). Those facilities, which already house trans-identifying inmates, have extremely low rates of assault. JA517 (Stover Decl. ¶¶ 24-27). BOP will also regularly reassess plaintiffs' safety in those facilities and respond to any specific threats that may arise. *See* JA543-44 (Roman Decl. ¶¶ 4-13). BOP also reasonably decided to move the four plaintiffs residing in halfway houses to the men's side of the same houses, all of which had extremely rare instances of violence. JA526-27 (Stover Decl. ¶¶ 64, 66, 67, 68).

BOP's prior experience with trans-identifying inmates supports these expert judgments about the low level of risk to plaintiffs. There are over 1,000 trans-identifying inmates in BOP custody whom BOP has been able to safely house in facilities consistent with their sex, and approximately 600 of them have been taking sex-rejecting hormones. JA514 (Stover Decl. ¶ 5). That includes two former plaintiffs in this action, Sophia Doe and Ellen Doe, who requested to be transferred to men's facilities and whose records do not

reflect having experienced any sexual assault at their current men's facilities. JA516 (Stover Decl. ¶¶ 19-20).[11] There is no reason to think plaintiffs would face a uniquely severe threat in medical facilities from "nonviolent" inmates requiring "comprehensive," "specialized or long-term medical or mental health care." JA516-17 (Stover Decl. ¶ 22). Nor is such a uniquely severe threat apparent in halfway houses from inmates "near the end of [their] sentence[s]" who are spending those final months preparing for reintegration into the community. JA515 (Stover Decl. ¶ 13); *see* 18 U.S.C. § 3624(c)(1).

Given the specific circumstances of those placements, plaintiffs have not demonstrated that they would face the kind of "substantial," "pervasive" threat of assault required under the Eighth Amendment, regardless of plaintiffs' personal characteristics. *See Vandevender*, 970 F.3d at 977.

**ii.** The district court's conclusion that plaintiffs nonetheless satisfied the high bar of demonstrating a severe and pervasive risk of assault is based on an uncritical acceptance of plaintiffs' speculative fears.

*First*, the district court discounted the government's evidence regarding the safety of the chosen transfer facilities on the ground that

[11] A current plaintiff, Mary Doe, has also recently expressed a desire to be transferred to a men's facility, but has not sought voluntary dismissal from this case. Dkt. 190, at 22-23.

plaintiffs were "outliers" who would necessarily face a higher risk as "newly arrived, visibly feminized transgender wom[e]n coming from a women's prison." JA595. Relatedly, the court relied on a declaration from Dr. Alix McLearen, a former BOP official, who asserted that plaintiffs would have even more elevated risks precisely because they would be transferees from women's facilities. JA597 (citing JA488-89, 493-94 (McLearen Decl. ¶¶ 25-28, 37-42)). But that unsupported speculation says nothing about the level of risk plaintiffs would actually face, or whether that risk would be objectively intolerable. Nor does it account for plaintiffs' more than 40 years of cumulative experience in men's BOP facilities following hormone interventions without having experienced any substantiated sexual assaults. *See* JA517-27 (Stover Decl. ¶¶ 28-70); JA929-39 (Stover Decl. ¶¶ 28-70); JA965-68.

Moreover, if plaintiffs' purported "outlier" status alone were enough to justify the district court's conclusion, that would mean that BOP could never put forth evidence sufficient to rebut an asserted risk of harm with respect to an inmate whose risk profile is in some way unique. In effect, the court demanded that BOP prove a precise level of risk by pointing to identically situated inmates; but under the Eight Amendment, it is *plaintiffs'* burden to

present evidence "that [they] will be exposed to unreasonable risk" and "that [they are] now entitled to an injunction." *Helling*, 509 U.S. at 36.

*Second*, the district court relied on Dr. McLearen's assertion that "the 'severely elevated risks of sexual abuse' that transgender women face in men's prisons is 'well understood within the field of corrections.'" JA597 (quoting JA485 (McLearen Decl. ¶ 13)). Even if male trans-identifying inmates generally face an "elevated" risk of sexual abuse in prisons, however, that says nothing about whether that risk is severe enough to be objectively intolerable, let alone whether plaintiffs' risks would be sufficiently severe at the *specific* facilities designated by BOP. Moreover, this Court rejected precisely this sort of general prediction about elevated risks in vacating the previous preliminary injunctions in this case. The district court's reliance on this general opinion about risks cannot be squared with this Court's prior opinion, and is in significant tension with plaintiffs' express concession in the prior appeal that the Eighth Amendment does not "'require[] every transgender woman to be housed in a women's prison.'" *Doe*, 172 F.4th at 916.

*Third*, the district court relied on Dr. McLearen's blanket assertion that BOP "cannot adequately prevent harm" to plaintiffs who have been transferred "based on a categorical housing policy unrelated to any

individual circumstances." JA598 (quoting JA497 (McLearen Decl. ¶ 50)). This is sheer speculation and, again, rests on the same sort of categorical reasoning that plaintiffs already disclaimed before this Court. *See Doe*, 172 F.4th at 916. It cannot support the court's factual findings. In any event, BOP's reasonable policy of housing inmates consistent with their sex is fully consistent with BOP's assertion that it "performed individualized assessments to determine the appropriate housing for each plaintiff." JA516 (Stover Decl. ¶ 21). BOP simply took one category of housing—women's facilities—off the table.[12]

In sum, the district court's findings that plaintiffs face an objectively intolerable risk of violence are based on no more than speculation and conjecture by plaintiffs' experts which the court credited over BOP's expert assessment of the risks.

**b.** The district court also erred in accepting plaintiffs' claim that they would face an objectively intolerable risk to their health, through the

[12] The district court also rejected the government's argument that, to the extent plaintiffs feared their "feminized features" would contribute to their risk, "this risk will be eliminated by [BOP]'s new policy terminating hormone therapy," resulting in the disappearance of many of their feminine characteristics. JA596. The court rejected this argument on the ground that in *Kingdom*, it had enjoined BOP from implementing the hormone-tapering policy. JA596-97. This circular reasoning only underscores the many ways in which this district court is preventing BOP from taking a whole constellation of actions it deems most appropriate to implement the EO.

exacerbation of gender-dysphoria symptoms, from being housed in the men's facilities to which they have been designated.

As an initial matter, concerns about the exacerbation of symptoms are relevant to Eighth Amendment medical-needs claims. *See* JA591 (citing cases addressing medical-needs claims). But here plaintiffs' challenges to their transfers raise *failure-to-protect* claims, a different category. *See* JA74-76; JA109-110; JA145-47. This type of harm is thus inapposite to the nature of the claims actually at issue. Nor is an injunction against an inmate's housing designation—which is not an aspect of medical treatment—acceptable relief for a medical-needs claim.

Moreover, in making its designation decisions, BOP specifically considered each plaintiff's "unique medical record[ and] psychology record." JA516 (Stover Decl. ¶ 21). BOP selected two medical centers as appropriate placements in part "because [the medical centers] are able to provide appropriate treatment" to plaintiffs. JA516-17 (Stover Decl. ¶ 22); JA546 (Weidow Decl. ¶ 4). Moreover, BOP is currently providing adequate treatment for gender dysphoria to over 1,000 trans-identifying inmates who are already housed in facilities matching their sex. *See* JA514 (Stover Decl. ¶ 5).

As BOP has explained, if transfer occasions an increase in gender-dysphoria symptoms, "psychological interventions including increased psychotherapeutic contacts could be made and medical interventions such as assessment for and initiation of" or alterations to "psychiatric medications would be available to appropriately address them." JA548 (Weidow Decl. ¶ 18); *see* JA544 (Roman Decl. ¶ 12) ("Inmates that experience elevated anxiety, depression, suicidal ideations, and other stressors can have regular visits to a psychologist or utilize crisis intervention services, and other counseling services."). Accordingly, if plaintiffs experience any elevated symptoms following their transfer, BOP's provision of medical care to address those changes will ensure that plaintiffs do not experience an objectively intolerable risk to their health.

In concluding that plaintiffs would face "a substantial risk of exacerbated symptoms of gender dysphoria" from living in men's prisons, JA599, the district court again impermissibly relied on speculation and wholly discounted BOP's experience in managing the needs of its inmate population. The court again emphasized that plaintiffs are "unique" because they have now "lived in women's facilities" and "taken great lengths to accord their lives with their gender identities." JA599. But the actual effect that any given transfer will have on any particular plaintiff remains highly

speculative, as is the preemptive conclusion that BOP could not adequately mitigate these risks.

The district court also improperly discounted the additional treatment that BOP would offer to address any changes in plaintiffs' symptoms. The court inexplicably faulted the government for "fail[ing] to explain why therapy and psychotropic medication would alleviate the distress of living in a men's prison," JA599, when those are treatments that BOP employs to address the symptoms of the medical condition at issue (gender dysphoria). *See* JA548 (Weidow Decl. ¶ 18). To the extent the court was suggesting that those treatments would be inadequate, that is incorrect, and in any event the court's own views on the efficacy of such treatments are entitled to little weight. *See, e.g.*, *United States v. Skrmetti*, 605 U.S. 495, 524 (2025) (noting that courts afford policymakers "wide discretion … in areas where there is medical and scientific uncertainty," since such matters are not suited to "judicial[] consideration" (quotation marks omitted)). To the extent the court was suggesting that the Eighth Amendment is only satisfied if any increased distress is fully alleviated, that is also incorrect. "The Constitution 'does not mandate comfortable prisons.'" *Farmer*, 511 U.S. at 832. An increase in the severity of symptoms only rises to the level of an Eighth Amendment violation if the change alone is objectively intolerable. And the

court has not explained why any change in the severity of symptoms here would reflect a "denial of 'the minimal civilized measures of life's necessities,'" and thus rise to the level of an Eighth Amendment violation. *Id.* at 834.

Because plaintiffs have not demonstrated an objectively intolerable risk under either of their theories of harm, they are unlikely to succeed on the merits of their Eighth Amendment claims.

#### 3. Plaintiffs have not shown that BOP is deliberately indifferent to the potential risks of transferring them to men's facilities.

Plaintiffs independently failed to satisfy the subjective prong of the deliberate-indifference test. That prong requires that prison officials "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Prison officials are not deliberately indifferent "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. The requirement that officials ensure "reasonable safety" for inmates "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* at 844-45 (quotation marks omitted).

**a.** Prison officials cannot be found deliberately indifferent if they show "that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. BOP reasonably assessed the hypothetical future risks of transferring plaintiffs to the specific men's facilities it selected and concluded that plaintiffs will not face an objectively severe risk of physical harm in those new facilities. *See generally* JA513-28 (Stover Decl.). Indeed, BOP has carefully selected new placements for plaintiffs after considering "on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." JA516 (Stover Decl. ¶ 21); JA543 (Roman Decl. ¶ 3); JA546, 548-53 (Weidow Decl. ¶¶ 4, 14, 18, 20, 23-24, 26, 29, 31, 36, 38-40, 43). Accordingly, BOP has not unconstitutionally disregarded any risks to plaintiffs in directing the transfers.

Moreover, BOP has explained that it would undertake additional efforts to keep plaintiffs safe if any risks in fact materialized in the new facilities. In such circumstances, "BOP would have many options available to provide relief to reduce their risk of harm in the men's prison," including transfer to a new facility, changing cell assignments or housing units, "monitoring predatory inmates and issuing separation orders," or, where

necessary, using protective custody or restrictive housing. JA543-44 (Roman Decl. ¶¶ 4-11). And if plaintiffs' gender-dysphoria symptoms worsened following the transfer, plaintiffs would be evaluated to determine whether additional treatment is necessary to address any changes. *E.g.*, JA548 (Weidow Decl. ¶ 14); *see* JA544 (Roman Decl. ¶ 12). BOP's commitment to pursue such options demonstrates that, if the agency indeed becomes aware of a "substantial risk to inmate health or safety" following transfer, it will "respond[] reasonably to the risk." *Farmer*, 511 U.S. at 844.

**b.** The district court erred in concluding that BOP was knowingly disregarding unacceptable risks to plaintiffs.

*First*, the district court emphasized at length that "the government has evidenced a subjective awareness of the objectively serious risks" to plaintiffs. JA602-04. To be clear, the government disputes the legal conclusion that any such risks would rise to the level that would render them cognizable under the Eighth Amendment. *See supra* Part I.C.2. But the government does not dispute that there is a potential risk from any transfer; hence BOP's consideration of and attempts to mitigate any such risk. *See supra* Part I.C.3.a. Subjective awareness of a risk is only half of the deliberate-indifference prong, however; it does not establish that officials failed to reasonably respond to the risk. *Farmer*, 511 U.S. at 844-45.

*Second*, the district court concluded that BOP did not "respond[] reasonably to the risk[s]" presented by the transfers, *Farmer*, 511 U.S. at 844, because BOP itself had "intentionally creat[ed] those risks" by adopting an "unreasonable" "categorical policy" of transferring plaintiffs to men's facilities. JA605. But this impermissibly conflates a policy decision that gave rise to a condition of confinement with prison officials' actions to address the risks caused by that condition. In other words, in the court's view, the only way to reasonably respond to the risk of housing certain male inmates in men's facilities is to disregard BOP's categorical housing policy and house them in women's facilities.

This conclusion is not only hopelessly circular; it is also just another way of saying that the district court disagrees with BOP's policy determination to prioritize female inmates' privacy, well-being, and security. And it would have the effect of preventing prison officials from ever changing any decision—from a broad system-wide policy all the way down to the programming for an individual inmate—if that change alone could conceivably increase a risk to inmates, regardless of officials' efforts to mitigate that new risk. That result is untenable. "[P]rison administrators, and not the courts, are to make the difficult judgments concerning institutional operations" of prisons. *Turner v. Safley*, 482 U.S. 78, 89 (1987)

(citation modified); *see Bell*, 441 U.S. at 547 (noting the "wide-ranging deference" accorded to prison officials "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). The Eighth Amendment does not foreclose the reasonable judgment that male inmates should not be housed alongside female inmates. *See supra* Part I.A.

## II. Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors.

In seeking a preliminary injunction, plaintiffs also have "the burden to show … that they are likely to suffer irreparable harm in the absence of preliminary relief, and that the balance of equities, including the public interest, tips in their favor." *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017) (citation modified). Plaintiffs have failed to establish those factors.

**A.** Plaintiffs have not demonstrated that they will likely suffer irreparable harm from any transfer to men's facilities, much less to the specific facilities BOP has designated here. This Court has "set a high standard for irreparable injury": an injury must be "both certain and great," "actual and not theoretical," "imminen[t]," and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (citation modified).

The district court concluded that plaintiffs had demonstrated irreparable harm solely on the basis of a supposed "'prospective violation of a constitutional right.'" JA636. As discussed, *supra* Part I, plaintiffs are not likely to succeed in showing any such violation.

Nor have plaintiffs demonstrated irreparable injury premised on their fear that they will be the victims of violence and sexual abuse, or suffer harm to their health, if transferred to men's facilities. *See* Dkt. 117-1, at 61-62. They have not shown that any such harm is likely, much less certain. And facing a greater *risk* of such violence or exacerbated symptoms in men's facilities, alone, is not sufficient. The cases plaintiffs cite (*id.*) do not stand for the proposition that merely being housed in men's facilities and *potentially* being exposed to a greater risk of violence, or *potentially* needing (and receiving) treatment for increased symptoms of a medical condition, are *per se* irreparable injuries.

Likewise, plaintiffs cannot demonstrate that the tangible injury they fear is sufficiently imminent and certain, given that the vast majority of male trans-identifying inmates are currently housed in men's facilities and BOP will take steps to minimize any risk to plaintiffs by, among other things, transferring them to medical facilities with nonviolent offenders and providing treatment for any changes in their gender-dysphoria symptoms.

The possibility that these specific plaintiffs will be victimized in the facilities that BOP has identified for their housing, or experience serious harm to their health, thus "fail[s] to rise beyond the speculative level." *Citizens for Responsibility & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam); *see Hanson v. District of Columbia*, 120 F.4th 223, 245 (D.C. Cir. 2024) (per curiam) ("'[S]imply showing some *possibility* of irreparable injury' is not sufficient to make the irreparable harm showing needed to obtain preliminary relief.").

Plaintiffs' failure to establish that they will likely suffer irreparable injury alone requires vacatur of the preliminary injunction. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1336 (D.C. Cir. 2024).

**B.** The district court further erred in briefly concluding that the balance of the equities and public interest favor this injunction. JA636-37.

The President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has deemed it important to protect the safety, well-being, and privacy of female inmates in intimate spaces when they are in federal custody. Consistent with these interests, and as a matter of its "correctional judgment," BOP has concluded that "housing inmates according to their biological sex" is the correct policy decision because it "ensures bodily privacy and safety for all inmates and limits the

risk of sexual abuse, disciplinary problems, and illicit intimate relationships." JA517 (Stover Decl. ¶ 23). This is the kind of determination over which prison administrators receive "'wide-ranging deference.'" *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) (quoting *Bell*, 441 U.S. at 547). The government has compelling interests in being able to effectuate this policy promptly, without micromanagement by a district court.[13] Regardless of the public debate over these issues, there is a public interest in deferring to the Executive Branch's determination as to the operations of the federal prisons. And as this Court has recognized, "the Government is irreparably harmed by" this "improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Kingdom v. Trump*, No. 26-5181, 2026 WL 1905418, at *2 (D.C. Cir. June 17, 2026) (per curiam) (citation modified). By contrast, forcing BOP to effectively "keep in place a [former housing policy] that no longer reflects its current … thinking … is not in the public interest." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

---

[13] Indeed, the harms from this intrusion are more than theoretical: the government finds itself subject to potentially conflicting preliminary injunctions regarding the housing of trans-identifying prisoners due to BOPs inability to implement the President's policy, further complicating BOP's difficult task of prison administration. *See* Preliminary Injunction, *Fleming*, No. 4:25-cv-0157-D (N.D. Tex. June 2, 2026), Dkt. 199.

The preliminary injunction impermissibly interferes with the government's administration of federal prisons and the execution of Executive Branch policy. "[P]rison administrators, and not the courts, are to make the difficult judgments concerning institutional operations." *Turner*, 482 U.S. at 89 (citation modified). And "the decision where to house inmates," in particular, "is at the core of prison administrators' expertise." *McKune*, 536 U.S. at 39. This Court has accordingly recognized the need to "accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hatim*, 760 F.3d at 59 (citation modified). The district court failed to do so here.

The Executive Branch interests at stake clearly outweigh the speculative risks that plaintiffs fear from being housed in men's medical facilities and halfway houses. In nevertheless granting this broad injunction, the district court abused its discretion.

## III. The Preliminary Injunction Violates The PLRA.

At a minimum, this Court should vacate the preliminary injunction for failure to comply with the PLRA's relief provisions. The PLRA contains specific restrictions on "preliminary injunctive relief" "with respect to prison

conditions." 18 U.S.C. § 3626(a)(2). Any such relief must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.*

Here, the district court enjoined BOP "from implementing Section 4(a) of Executive Order 14168" against plaintiffs and required BOP to "maintain and continue [plaintiffs'] housing status in … women's prisons and women's halfway houses." JA584. Even if the court had properly found that plaintiffs demonstrated a sufficient threat of harm in men's facilities to warrant preliminary relief (*but see supra* Part I), there are "le[ss] intrusive means" of addressing that harm than ordering BOP to keep plaintiffs in women's institutions, 18 U.S.C. § 3626(a)(2).

The government has made clear that it will no longer permit housing any male inmates in women's facilities, consistent with its important policy interests in protecting the safety, privacy, and dignity of female inmates in its custody. JA517 (Stover Decl. ¶ 23). There are other protective measures that are better targeted specifically to protecting plaintiffs in men's facilities which do not require completely negating BOP's broader housing-policy determination, which is "at the core" of its "expertise." *McKune*, 536 U.S. at

39; *see* 18 U.S.C. § 3621(b) (providing that housing designations are "not reviewable by any court").

For instance, the district court could direct BOP to house plaintiffs "in a dedicated facility, unit, or wing" of a men's facility for their safety. *See* 28 C.F.R. § 115.42(g). Or it could address concerns with any particular male inmates housed alongside plaintiffs, or the level of monitoring and frequency of security checks that they receive. Where less intrusive options are available, the PLRA requires courts to adopt them, as other district courts have done when faced with failure-to-protect claims from trans-identifying inmates in men's facilities. *See, e.g.*, *Tay v. Dennison*, 457 F. Supp. 3d 657, 684 (S.D. Ill. 2020); Opinion and Order, *S.D. v. Rees*, No. 6:25-cv-01726-CL (D. Or. Apr. 28, 2026), Dkt. 45. The same is true with respect to gender-dysphoria symptoms: if BOP's medical treatment of worsening side effects was constitutionally inadequate, an order directing additional *medical* treatment would address any harms in a narrower, more targeted way than barring BOP's implementation of non-medical prison-administration decisions.

The district court rejected the government's argument that the PLRA required narrower relief, instead summarily declaring that "[m]aintaining Plaintiffs['] current housing status is obviously less intrusive than ordering

[BOP] to undertake additional safety measures … in men's prisons while litigation proceeds." JA637. By rejecting BOP's view of the least-intrusive means to address the asserted Eighth Amendment injuries, the district court again failed to afford BOP the deference it is owed in matters of prison administration. If the court was not prepared to accept the government's alternative proposal, it needed to base that decision on a finding that the government's approach would not "correct the harm the court finds requires preliminary relief." 18 U.S.C. § 3626(a)(2). It was improper for the court instead to substitute its judgment for the agency's regarding BOP's own interests.

**CONCLUSION**

For the foregoing reasons, the district court's preliminary-injunction order should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH
MCKAYE L. NEUMEISTER
*/s/ Domenic A. Canonico*
DOMENIC A. CANONICO
*Attorneys, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,999 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Georgia, a proportionally spaced typeface.

*/s/ Domenic A. Canonico*
Domenic A. Canonico

# ADDENDUM

## TABLE OF CONTENTS

U.S. Const. amend. VIII ........ A1

18 U.S.C. § 3621(b) ........ A1

18 U.S.C. § 3626(a) ........ A2

**U.S. Const. amend. VIII**

**Amendment VIII. Excessive Bail, Fines, Punishments**

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

**18 U.S.C. § 3621**

**§ 3621. Imprisonment of a convicted person**

* * *

**(b) Place of imprisonment.**--The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. The Bureau shall, subject to consideration of the factors described in the preceding sentence and the prisoner's preference for staying at his or her current facility or being transferred, transfer prisoners to facilities that are closer to the prisoner's primary residence even if the prisoner is already in a facility within 500 driving miles of that residence. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--

**(1)** the resources of the facility contemplated;

**(2)** the nature and circumstances of the offense;

**(3)** the history and characteristics of the prisoner;

**(4)** any statement by the court that imposed the sentence--

**(A)** concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

**(B)** recommending a type of penal or correctional facility as appropriate; and

**(5)** any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person. Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.

* * * *

**18 U.S.C. § 3626**

**§ 3626. Appropriate remedies with respect to prison conditions**

**(a) Requirements for relief.--**

**(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

**(B)** The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless--

**(i)** Federal law requires such relief to be ordered in violation of State or local law;

**(ii)** the relief is necessary to correct the violation of a Federal right; and

**(iii)** no other relief will correct the violation of the Federal right.

**(C)** Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts.

**(2) Preliminary injunctive relief.--**In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

**(3) Prisoner release order.--(A)** In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless--

**(i)** a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and

**(ii)** the defendant has had a reasonable amount of time to comply with the previous court orders.

**(B)** In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court in accordance with section 2284 of title 28, if the requirements of subparagraph (E) have been met.

**(C)** A party seeking a prisoner release order in Federal court shall file with any request for such relief, a request for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met.

**(D)** If the requirements under subparagraph (A) have been met, a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered.

**(E)** The three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that--

**(i)** crowding is the primary cause of the violation of a Federal right; and

**(ii)** no other relief will remedy the violation of the Federal right.

**(F)** Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief.

* * * *