[ORAL ARGUMENT NOT YET SCHEDULED]
**No. 26-5238**

# United States Court of Appeals for the District of Columbia Circuit

JANE DOE; MARY DOE; SARA DOE; EMILY DOE; ZOE DOE; TORI DOE; OLIVIA DOE; SUSAN DOE; LOIS DOE; SALLY DOE; WENDY DOE; RACHEL DOE,

*Plaintiffs-Appellees*,

v.

TODD BLANCHE, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES; WILLIAM K. MARSHALL, III, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE FEDERAL BUREAU OF PRISONS,

*Defendants-Appellants*.

Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00286-RCL; Hon. Royce C. Lamberth

**BRIEF OF *AMICAE CURIAE* BRENDA LEIGH KIRK, JASMINE MEABON, JESSICA CLEMENCIO MORAIS, AND KEISHA WILLIAMS IN SUPPORT OF NEITHER PARTY**

BRIAN J. FIELD
JOHN GREIL
*Counsel of Record*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
bfield@schaerr-jaffe.com
jgreil@schaerr-jaffe.com

*Counsel for Amicae Curiae*

SEPTEMBER 2, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned certifies as follows:

### Parties and *Amici*

Except for the following, all parties, intervenors and *amici curiae* appearing before the district court below and this Court are listed in the briefs for the parties:

Brenda Leigh Kirk, *Amicus Curiae*

Jasmine Meabon, *Amicus Curiae*

Jessica Clemencio Morais, *Amicus Curiae*

Keisha Williams, *Amicus Curiae*

### Rulings Under Review

References to the rulings at issue appear in the Appellants' Brief filed August 14, 2026.

### Related Cases

Counsel adopts and incorporates by reference the parties' statements with respect to related cases.

## CORPORATE DISCLOSURE STATEMENT

*Amicae Curiae* Brenda Leigh Kirk, Jasmine Meabon, Jessica Clemencio Morais, and Keisha Williams are natural persons. No corporate disclosure is required under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1.

## STATEMENTS REGARDING AUTHORITY TO FILE AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *Amicae Curiae* Brenda Leigh Kirk, Jasmine Meabon, Jessica Clemencio Morais, and Keisha Williams state that this Court has granted permission to file this brief. *See* Order (Aug. 28, 2026) (per curiam).

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *Amicae* states that a separate brief is necessary as there are no other *amici* appearing in this matter to date. Moreover, these *Amicae* provide a unique perspective on the jurisprudence central to this case as more fully set forth below.[1]

*/s/ John Greil*
John Greil

*Counsel for Amicae Curiae*

[1] Undersigned counsel for *Amicae Curiae* certifies that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *Amicae* and their counsel has contributed money for this brief.

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

STATEMENTS REGARDING AUTHORITY TO FILE AND SEPARATE BRIEFING ......................................................................................... iii

TABLE OF AUTHORITIES ........................................................................ vi

GLOSSARY.........................................................................................x

IDENTITY AND INTEREST OF *AMICAE CURIAE* ............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................2

ARGUMENT ..........................................................................................5

I. The *Fleming* Record Documents the Harms that Male Inmates Cause Women In Women's Prisons. ........................................................5

A. The presence of male inmates in women's intimate spaces violates the constitutional right of bodily privacy. ..........................6

B. Male inmates have subjected women to sexualized, threatening, and aggressive conduct. ...............................................8

C. The harm women suffer from biological males is not limited to intimate spaces. ......................................................................10

II. The Constitution Protects Incarcerated Women from Confinement With Males. ..........................................................................................14

A. The Fifth Amendment protects women's bodily privacy. .............14

B. The Eighth Amendment protects women against the danger, humiliation, and terror of being confined with men. .....................17

III. Any Remedy Must Protect Innocent Third Parties and Must Not Permit Biologically Male Inmates to Be Housed In Women's General Population. ....................20

A. Equity does not permit a court to remedy an asserted constitutional injury to one person by imposing a constitutional injury on another. ....................20

B. Any injunction issued to Plaintiffs must preclude placement in women's general population and intimate or shared spaces. ....................22

C. Secure, segregated housing is constitutional, feasible, and consistent with 28 C.F.R. § 115.42(g). ....................24

CONCLUSION ....................26

CERTIFICATE OF COMPLIANCE ....................28

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) ....................20

*Bucklew v. Precythe*,
587 U.S. 119 (2019) ....................19

*De Veloz v. Miami-Dade County*,
756 F. App'x 869 (11th Cir. 2018) ....................18

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) ....................5, 8

*Doe v. Hill*,
141 F.4th 291 (D.C. Cir. 2025) ....................6

*Doe v. McHenry*,
763 F. Supp. 3d 81 (D.D.C. 2025) ....................5, 8

*Farmer v. Brennan*,
511 U.S. 825 (1994) ....................17

*Fleming v. Rule*,
No. 4:25-cv-00157-D, 2026 WL 1471884 (N.D. Tex. May 26, 2026) ....................2

*Fortner v. Thomas*,
983 F.2d 1024 (11th Cir. 1993) ....................15

*In re Envirodyne Indus., Inc.*,
29 F.3d 301 (7th Cir. 1994) ....................21

*Int'l B'hood of Teamsters v. United States*,
431 U.S. 324 (1977) ....................21

*Lee v. Downs*,
641 F.2d 1117 (4th Cir. 1981) .................... 14, 15

*Martin v. Wilks*,
490 U.S. 755 (1989) ....................21

*McKenzie v. Kennickell*,
825 F.2d 429 (D.C. Cir. 1987) .......... 21

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 20

*Pitts v. Thornburgh*,
866 F.2d 1450 (D.C. Cir. 1989) .......... 15

*Trop v. Dulles*,
356 U.S. 86 (1958) .......... 19

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 25

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... 15

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .......... 20

*West Virginia v. B.P.J. ex rel. Jackson,*
146 S.Ct. 2356 (2026) .......... 5, 24, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 20

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
93 F.3d 910 (D.C. Cir. 1996) .......... 14, 24

**Statutes**

18 U.S.C. § 3626 .......... 23

Mich. Comp. Laws § 801.104 (1986) .......... 16

Mich. Rev. Stat. ch. 148, § 4 (1846) .......... 16

Prisons (Ireland) Act 1826, 7 Geo. 4 (UK) .......... 15

**Regulation**

28 C.F.R. § 115.42 .......... 5, 24, 26

**Rules**

Fed. R. App. P. 26.1 .................... ii

Fed. R. App. P. 29 .................... 1, 28

D.C. Cir. R. 26.1 .................... ii

D.C. Cir. R. 28 .................... i

D.C. Cir. R. 29 .................... iii

D.C. Cir. R. 34 .................... 1

**Other Authorities**

App'x to Intervenor-Pls.' Mot. Prelim. Inj.,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Mar. 30, 2026), ECF 153 .................... 5

Decl. of Brenda Leigh Kirk,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Mar. 30, 2026), ECF 153 .................... 10, 11, 12, 13, 18, 19

Decl. of Elizabeth Ann Hardin,
*Fleming v. Rule,* No. 4:25-cv-00157-D
(N.D. Tex. Mar. 30, 2026), ECF 153 .................... 7, 16, 18

Decl. of Jasmine Meabon,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Mar. 30, 2026), ECF 153 .................... 9, 12, 13, 18

Decl. of Jessica Clemencio Morais,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Mar. 30, 2026), ECF 153 .................... 7, 9, 12, 14, 17, 18, 19

Decl. of Keisha Williams,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Mar. 30, 2026), ECF 153 .................... 7, 9, 10, 13, 14, 17, 18, 19

Decl. of Rhonda Fleming,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Nov. 3, 2025), ECF 59 .................... 6

Intervenor-Pls.' Compl.,
*Fleming v. Rule,* No. 4:25-cv-00157-D
(N.D. Tex. Jan. 8, 2026), ECF 125 ....................................................................8

Jt. Status Rep.,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Jan. 29, 2026), ECF 133 ..................................................................11

Preliminary Injunction,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. June 2, 2026), ECF 199 ............................................... 2, 5, 23, 24, 25

Renewed Preliminary Injunction,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Aug. 29, 2026), ECF 236....................................................................2

Stipulated Order of Permanent Inj. & Final Judgment,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Feb. 2, 2026), ECF 137.....................................................................11

Temp. Restraining Order,
*Fleming v. Rule*, No. 4:25-cv-00157-D
(N.D. Tex. Nov. 19, 2025), ECF 83....................................................................11

## GLOSSARY

| **Abbreviation** | **Full Name** |
|---|---|
| BOP | Federal Bureau of Prisons |
| FMC Carswell | Federal Medical Center-Carswell, Fort Worth, Texas |
| *Fleming* | *Fleming v. Rule*, No. 4:25-cv-00157-D (N.D. Tex.) |

## IDENTITY AND INTEREST OF *AMICAE CURIAE*[2]

Brenda Leigh Kirk, Jasmine Meabon, Jessica Clemencio Morais, and Keisha Williams (collectively, "*Amicae*") are incarcerated women who have been forced to live, shower, change, and use bathrooms with biological males in federal prison. They sought to intervene in this litigation to defend their constitutional rights to bodily privacy and against cruel and unusual punishment. This Court denied their intervention but permitted them to submit this brief as *amicae curiae* under Federal Rule of Appellate Procedure 29.

*Amicae* are currently involved in litigation concerning the same federal prison that the injunction on this appeal has affected—FMC Carswell in Fort Worth, Texas. *See Fleming v. Rule*, No. 4:25-cv-00157-D (N.D. Tex.). *Amicae* have developed a robust factual record showing the harms they suffered as women forced to share bathrooms, living spaces, and the ordinary spaces of prison life with biological male inmates. *See id. Amicae* have obtained a preliminary injunction in the *Fleming* litigation that requires the Federal Bureau of Prisons ("BOP") to separate biological male inmates from female inmates at FMC Carswell. *Id.*, 2026 WL 1471884 (N.D.

---

[2] On August 28, 2026, a panel of this Court denied *Amicae*'s request to participate in oral argument "without prejudice to renewal pursuant to D.C. Circuit Rule 34(e)." *See* Order at 2. *Amicae* intend to submit such a motion in a timely manner. *See* D.C. Cir. R. 34(e) ("A motion by amicus curiae seeking leave to participate in oral argument must be filed at least 14 days prior to the date oral argument is scheduled.").

Tex. May 26, 2026), *entered* Prelim. Inj. (N.D. Tex. June 2, 2026), ECF 199[3] ("*Fleming* Injunction"), *and extended,* Renewed Prelim. Inj. (N.D. Tex. Aug. 29, 2026), ECF 236.

*Amicae* take no position on Plaintiffs' medical-care arguments or whether transfer to an open male general-population prison would harm any particular Plaintiff. This brief addresses only the housing relief at issue—which may include housing biological males in women's general population facilities—and why the rights of the incarcerated women would be violated by any such order.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amicae* are women who have been forced to live, shower, change, and use bathrooms with biological male inmates in federal prison. This arrangement has caused them serious psychological unrest, fear, indignity, and humiliation. They do not want to suffer such harm again. Through this brief, *amicae* demonstrate that the outcome of this litigation will have a substantial impact on whether they are again subjected to such harm.

Plaintiffs in this case originally requested an order that would prevent them from being housed in men's prisons. Since then, their requested relief has shifted to affirmatively seeking housing in women's general population units. Equity does not

[3] Citations to "Dkt." refer to case documents in the underlying district court matter. Citations to "ECF" refer to case documents filed in the matter of *Fleming v. Rule*, No. 4:25-CV-0157-D (N.D. Tex.).

countenance such a remedy. Plaintiffs do not have a constitutional right to shower with women, change in front of women, use women's restrooms, live in women's dormitories, or move through women's daily prison spaces. Biological females, on the other hand, do have constitutional Fifth and Eighth Amendment rights that protect them from being forced to shower, toilet, and live with biological males in prison.

First, the factual record *Amicae* developed in the *Fleming* litigation shows numerous harms caused by biological males being housed in women's prisons. Those harms include the general indignity of being forced to shower or change where males can view women, as well as specific incidents of male inmates' threatening and sexual behavior directed at *Amicae* and other female inmates. For instance, a male inmate looked over a restroom stall at a female inmate and asked if she needed help wiping her vagina. A female inmate changed her daily routine to avoid seeing a male shaving in a women's bathroom with a visible erection. Male inmates positioned themselves where they could watch women shower, made sexual propositions, stalked women through common spaces, and acted aggressively. The harms extended beyond intimate spaces like showers and cells: the same male inmates continued to threaten women in elevators, food service, recreation, the mailroom, and other shared spaces. And women who complained describe retaliation by prison staff. Any relief in this appeal that requires or permits Plaintiffs to be

housed in women's general population may subject *Amicae* and other female inmates to the same indignities.

Second, the Fifth and Eighth Amendments provide constitutional protection for female prisoners' bodily privacy, especially against forced exposure of unclothed bodies and intimate bodily functions to members of the opposite sex. The Eighth Amendment also requires prison officials to protect inmates from substantial risks of serious harm, including violence and sexual abuse by other prisoners. And forcing women to urinate or shower in front of men is the type of "superadded" disgrace the Eighth Amendment was enacted to prohibit. The sworn declarations submitted in the *Fleming* litigation show direct bodily-privacy violations and objectively serious risks of voyeurism, intimidation, harassment, and assault. They also establish BOP's notice of those risks and its inadequate response.

Third, equity does not permit an injunction that shifts constitutional injury onto innocent third parties. Any relief in this appeal must therefore specify that Plaintiffs may not be placed in women's general population or allowed to overlap with female inmates in showers, restrooms, changing areas, dormitory spaces, elevators, dining areas, recreation areas, mailrooms, or other shared prison spaces.

That limitation leaves a lawful, workable alternative if this Court finds that Plaintiffs are entitled to an injunction. The *Fleming* Injunction requires secure, segregated housing at FMC Carswell with separate movement, routing, and

scheduling. *Fleming* Inj. at 3. Sex-based separation is constitutional. *West Virginia v. B.P.J. ex rel. Jackson,* 146 S.Ct. 2356, 2378 (2026), confirms that a rule classifying on biological sex does not become a transgender-status classification merely because it applies to biological males who identify as women. And 28 C.F.R. § 115.42(g) does not apply because the classification is based on biological sex, not transgender status. The Court can protect any right it recognizes for Plaintiffs without sacrificing the rights of incarcerated women.

## ARGUMENT

### I. The *Fleming* Record Documents the Harms that Male Inmates Cause Women In Women's Prisons.

In a prior appeal in this litigation, this Court noted that the Government failed to create a factual record demonstrating threats to female-inmate safety because Defendants had not even alleged, much less presented argument, that any plaintiff posed a threat to female inmates. *See Doe v. Blanche*, 172 F.4th 901, 910 (D.C. Cir. 2026), *vacating and remanding Doe v. McHenry*, 763 F. Supp. 3d 81, 89–90 (D.D.C. 2025). Although the Government has still failed to establish that factual record here, it exists: in the *Fleming* litigation.

*Amicae* and other women at FMC Carswell submitted sworn, specific evidence of the privacy, safety, and dignity harms caused by housing biological males in women's spaces. *See* App'x to Intervenor-Pls.' Mot. Prelim. Inj., *Fleming*, ECF 153. Their declarations identify specific inmates, incidents, locations, reports

to staff, and consequences. In compliance with this district court's protective order granting Plaintiffs pseudonymity, this brief refers to specific biological males as "Inmate A," "Inmate B," and so forth, without naming them.[4]

**A. The presence of male inmates in women's intimate spaces violates the constitutional right of bodily privacy.**

Incarcerated women have very little privacy. Women must sleep, change clothes, and bathe in full view of one another, and the showers and restrooms are communal. Decl. of Rhonda Fleming ¶ 3, *Fleming*, ECF 59 at APP.100–105 ("Fleming Decl."). Yet biological males have been housed in the same units, have used the same showers and restrooms, and have entered enclosed spaces like elevators with women. *Id.* ¶ 4. Ms. Fleming described male inmates "undressing and showering alongside women," entering restrooms while women were using them, and staring at women while they were naked or changing clothes. *Id.* ¶ 6. Those incidents, she stated, were "deeply distressing" and violated her "most basic sense of modesty and dignity." *Id.*

[4] Plaintiffs in this case are proceeding under pseudonyms. *Amicae* believe Plaintiffs have not overcome the "strong presumption against pseudonymous litigation." *See Doe v. Hill*, 141 F.4th 291, 292 (D.C. Cir. 2025). Moreover, as many of the operative documents in the district court are sealed or redacted, counsel for *Amicae* do not know the identities of the Plaintiffs in this litigation. Nevertheless, out of an abundance of caution, *Amicae* do not use the names of any biologically male inmates in this filing.

Ms. Williams experienced the same conditions. In her housing unit, male inmates were housed with women and "shared the same showers, restrooms, and living areas with us." Decl. of Keisha Williams ¶ 3, *Fleming*, ECF 153 at APP.13–16 ("*Fleming* Williams Decl."). "There was no meaningful separation." *Id.* Ms. Williams "personally saw that men could see into the showers and bathrooms," and she "personally caught [Inmate B] watching" her. *Id.*

Ms. Morais similarly declared that male inmates would "wink at women, blow kisses, come too close to women in the phone and computer lines, and be in places where they could see women in the showers." Decl. of Jessica Clemencio Morais ¶ 3, *Fleming*, ECF 153 at APP.10–12 ("*Fleming* Morais Decl.").

Elizabeth Ann Hardin, a *Fleming* declarant formerly at FMC Carswell, described a particularly harrowing encounter. She saw a male inmate, "Inmate D," in the women's bathroom around 4:00 a.m. shaving "with a visible erection." Decl. of Elizabeth Ann Hardin ¶ 3, *Fleming*, ECF 153 at APP.1–2 ("*Fleming* Hardin Decl."). Because male inmates were present in the bathroom and shower area, she changed her daily routine: "I no longer came out of the shower in a towel. Instead, I got fully dressed inside the shower so I would not be seen. I also stopped changing shirts openly in the bathroom and avoided bathrooms with broken or non-locking doors." *Id.* ¶ 4.

These declarations describe the direct loss of privacy that follows when biological males have access to women's shower, restroom, changing, and living areas. That injury exists even without a verbal threat or physical assault.

This Court previously noted that the Government failed to even "allege[] that the plaintiffs in this particular suit present any threat to the female inmates housed with them." *Doe v. Blanche*, 172 F.4th at 910 (quoting *Doe v. McHenry*, 763 F. Supp. 3d at 89–90). They almost certainly do: Although neither *Amicae* nor their counsel know the identities of the pseudonymous plaintiffs in this case, the *Fleming* litigation shows that *Amicae* have been housed with biologically male inmates serving time for rape and sex offenses. *See* Intervenor-Pls.' Compl. ¶ 75, *Fleming*, ECF 125.

But women who are forced to change, shower, and urinate in front of biological males are harmed even if the males are not serving time for sex offenses. Forced cross-sex exposure inflicts degrading humiliation and strips incarcerated women of the last measure of privacy available in a women's prison.

### B. Male inmates have subjected women to sexualized, threatening, and aggressive conduct.

The declarations in *Fleming* also document specific incidents of threatening and sexual conduct.

Ms. Meabon was using the recreation-yard restroom when a male inmate, "Inmate B," entered while she was in a stall. Decl. of Jasmine Meabon ¶ 3, *Fleming*,

ECF 153 at APP.7–9 ("*Fleming* Meabon Decl."). Inmate B "looked over the stall and asked me if I needed help wiping my vagina." *Id.* A sign on the restroom stated that only one inmate was allowed in at a time, and staff told Ms. Meabon that camera footage showed Inmate B entering while she was inside. *Id.* ¶ 4. She reported what happened to prison staff but "do[es] not believe staff took the matter seriously." *Id.* What happened "affected me deeply," she explained: "I have previously been the victim of rape, and this incident caused flashbacks and set me back mentally." *Id.* ¶ 5.

Ms. Morais witnessed Inmate B entering the restroom with Ms. Meabon inside. *Fleming* Morais Decl. ¶ 4. After he came out, he asked Ms. Morais "a sexual question about having sex in exchange for commissary." *Id.* On another occasion, he called Ms. Morais closer "in a sexual way." *Id.* She reported the restroom incident, asked that camera footage be preserved, and emailed the warden and psychology staff. *Id.* ¶ 5. Even after those reports, she does not believe staff took the incident seriously or meaningfully protected her. *Id.*

Inmate B also acted aggressively toward Ms. Williams in common areas. He would bump her, use hostile language, and make her feel unsafe. *Fleming* Williams Decl. ¶ 4. She reported his conduct but did not see staff take meaningful action to protect her. *Id.* Another male inmate, "Inmate C," tried to antagonize Ms. Williams, placed himself wherever she was, and filed a false Prison Rape Elimination Act

allegation against her. *Id.* ¶ 5. Around the same time, she reported that Inmate C had threatened "to blow up the place when he leaves" and harm people with whom he had conflicts. *Id.*

Ms. Kirk encountered still another male inmate, "Inmate A," in elevators, food service, and other shared areas. Decl. of Brenda Leigh Kirk ¶ 3, *Fleming*, ECF 153 at APP.3–6 ("*Fleming* Kirk Decl."). Inmate A had become "loud, hostile, and threatening." *Id.* ¶ 4. In shared spaces, including the elevator, he made hostile comments blaming women for restrictions placed on him and "mutter[ed] violent things." *Id.* His behavior made Ms. Kirk fear "that he might snap and hurt someone." *Id.* Yet she still had to ride the elevator with him because "[t]here's only one elevator for the top floor," where her cell was. *Id.*

These episodes confirm that the risks of voyeurism, assault, intimidation, and sexualized misconduct are documented realities when men are placed in women's prisons. They also show why a court cannot evaluate Plaintiffs' preferred placement (women's general population) by looking only at Plaintiffs. The women required to live alongside them have bodies, histories, vulnerabilities, and constitutional rights of their own.

### C. The harm women suffer from biological males is not limited to intimate spaces.

Women's bodily privacy rights are infringed when they have to shower or toilet in the presence of males. But female inmates also use elevators, food service,

recreation areas, mailroom, medical areas, and other shared spaces. And at Carswell, those areas have also been sites of harassment.

On November 19, 2025, Plaintiffs Rhonda Fleming and Miriam Crystal Herrera obtained a temporary restraining order in the *Fleming* litigation. *See* Temp. Restraining Order, *Fleming,* ECF 83. That order restrained the government "from housing any male inmate within the general female population in any housing unit where either plaintiff is currently or will be housed during the pendency of this TRO." *Id.* at 1. That relief was later entered as a permanent injunction and final judgment. *See* Stipulated Order of Permanent Inj. & Final Judgment, *Fleming* (N.D. Tex. Feb. 2, 2026), ECF 137. The Government responded to these court orders by moving Ms. Fleming to another prison and moving Ms. Herrera to a housing unit without males. *See* Jt. Status Rep. at 3, *Fleming*, (N.D. Tex. Jan. 29, 2026), ECF 133 ("The government believes that the preliminary injunction currently in effect in *Doe v. Bondi* prohibits it from housing the male inmates in a 'secure, segregated area' at FMC Carswell . . . ."). Thus, hundreds of women continued to live in housing units with males and had to continue using common showers and restrooms with males.

The result was harm to women.

Ms. Kirk saw male inmates "in the elevator and in food service every day, often several times a day." *Fleming* Kirk Decl. ¶ 3. "Moving a male inmate to another hallway, or moving women to another hallway, would not solve this problem

for me," she explained, because "I still have to encounter male inmates in the elevator, food service, and other shared spaces." *Id.* ¶ 10.

After BOP moved Inmate B out of Ms. Meabon's housing unit, she continued to see him outside and in the main line for food. *Fleming* Meabon Decl. ¶ 6. By March 2026, she still sometimes saw him, "and when [she] did, he would be laughing." *Id.* She stated, "Because we still share common areas, moving male inmates from one women's unit to another does not solve the problem for me." *Id.* She added: "It is not enough to move male inmates to another hallway or move women somewhere else while the same men still use the same restrooms, main line, and other shared spaces." *Id.* ¶ 9.

Even after Ms. Morais was moved to a housing unit that contained no males, Inmate B stood directly behind the bench where she sat with another woman in the recreation area, stared at them, and listened to their conversation. *Fleming* Morais Decl. ¶ 9. She explained, "That made me scared and very uncomfortable because I did not know what he was going to do." *Id.* In her experience, "it is not enough to move a woman to a different hallway or move a man to another hallway while we still overlap in recreation and other shared areas." *Id.* ¶ 11.

Moving Ms. Williams to the FMC Carswell camp also did not solve the problem. "Even at the camp, male inmates are still present in common areas, including the mail room." *Fleming* Williams Decl. ¶ 6. Ms. Williams stated, "In my

experience, that means the same basic problem continues even after a transfer, because women still have to encounter men in shared spaces." *Id.* Plaintiff-specific shuffling "only shifts the danger and leaves women exposed to the same men, the same threats, and the same retaliation in shared spaces." *Id.* ¶ 12.

The women also describe retaliation when they objected. Ms. Kirk reported harassment connected to the *Fleming* case, but a lieutenant "did not want to hear my complaint." *Fleming* Kirk Decl. ¶ 7. Shortly afterward, prison staff took the job she had held for three and a half years and revoked her acceptance into an office-management training program. *Id.* ¶¶ 8–12.

Ms. Meabon declared that she was "afraid of retaliation if I complain" from both male inmates and staff, including aggressive treatment, locker searches, or placement in the Special Housing Unit. *Fleming* Meabon Decl. ¶ 8. After she and Ms. Morais were taken to the SHU while other women present in the same restroom were not, Warden Rule spoke to them aggressively and threatened to ship Ms. Meabon out if she got into more trouble. *Id.* ¶ 12. "No one knew who I was before the lawsuit," she stated, "and since the lawsuit staff and leadership has had a target on me." *Id.*

Ms. Morais described continuing retaliation after her move, including comments about her body and confiscation of her clothes that caused "a mental breakdown" and made her afraid to leave her room or wear her clothes. *Fleming*

Morais Decl. ¶¶ 8, 10. Ms. Williams reported that staff told her "to stop filing emails and grievances because it made them look bad." *Fleming* Williams Decl. ¶ 7. She explained, "Staff retaliation has tried to make me stop fighting and stop speaking up, but I will continue to speak up because I am a fighter, and I won't quit." *Id.* ¶ 13.

The *Fleming* record establishes harm far beyond showers and restrooms. The prison has compelled women to encounter male inmates throughout daily life, failed to respond meaningfully to specific misconduct, and retaliated against women who objected. A remedy in this case that requires or facilitates the same conditions would reproduce those harms.

## II. The Constitution Protects Incarcerated Women from Confinement With Males.

### A. The Fifth Amendment protects women's bodily privacy.

This Court recognizes that the Constitution protects prisoners' bodily privacy, especially against forced exposure of unclothed bodies and intimate bodily functions to members of the opposite sex. *See Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 929 (D.C. Cir. 1996) (Eighth Amendment protects against "invasions of the [female] inmates' privacy"); *accord Lee v. Downs*, 641 F.2d 1117, 1119–20 (4th Cir. 1981) ("Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.").

The Fifth Amendment's Due Process Clause protects the fundamental right to bodily privacy and personal security. Courts have consistently held that female inmates possess a constitutional right not to be observed by male officers or inmates while nude. As those courts recognize, "most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (quoting *Lee*, 641 F.2d at 1119).

The right to bodily privacy in intimate spaces is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (cleaned up). From the inception of women's penal institutions in this country, the American tradition has recognized and enforced sex segregation. *See Pitts v. Thornburgh*, 866 F.2d 1450, 1458 (D.C. Cir. 1989) (noting "a pervasive characteristic of American prisons, namely, the separation of inmates on the basis of gender").

Indeed, this right has been recognized in the Anglo-American legal tradition. Anglo-American custody rules long treated sex separation in confinement as a structural requirement. Early prison law required male and female prisoners to be housed in separate parts of a prison, with separate common halls, yards, and privies designed to prevent contact between the sexes. *See* Prisons (Ireland) Act 1826, 7 Geo. 4, c. 74, § 6 (UK) (requiring "two separate parts, one for male and one for

female prisoners, with a complete division between them, so as to prevent any intercourse," and providing that "it shall be considered as a primary and invariable rule that the male prisoners shall in all cases be separated from the female"), https://tinyurl.com/yc7x7ury; *see also* Mich. Comp. Laws § 801.104 (1986) ("Male and female prisoners, unless they are husband and wife, shall not be put, kept, or confined in the same room in any jail, lock-up, holding center, or holding cell.").[5]

Forcing women in a federal women's prison to share living and common spaces with male inmates sharply breaks from that settled practice. By housing biological males in women's general-population units and permitting them to overlap with women in showers, restrooms, dormitory areas, elevators, dining areas, recreation areas, medical areas, and other shared spaces, BOP compels female inmates to endure intimate exposure to men and constant threats of physical and verbal harm in the ordinary course of prison life.

The *Fleming* record shows how male invasion of women's prisons harms women. Ms. Hardin changed how she showered and dressed because male inmates were present in women's bathroom and shower areas. *Fleming* Hardin Decl. ¶ 4. Ms. Morais saw male inmates positioned where they could see women in showers.

[5] The Michigan history is especially telling: the operative provision was enacted in 1846 (*see* Mich. Rev. Stat. ch. 148, § 4 (1846)), has been carried forward through over 150 years of codifications of Michigan law (*viz.* the compiled laws of 1857, 1871, 1897, 1915, 1929, 1948, and 1970), was revised in 1986 to redefine the relevant houses of correction, and remains in effect today.

*Fleming* Morais Decl. ¶ 3. Ms. Williams states that male inmates shared the same showers, restrooms, and living areas with women and that there was "no meaningful separation." *Fleming* Williams Decl. ¶ 3. An injunction requiring that arrangement to continue would compel the very forced cross-sex exposure the Constitution protects against.

### B. The Eighth Amendment protects women against the danger, humiliation, and terror of being confined with men.

The Eighth Amendment requires prison officials to take reasonable measures to protect inmates from substantial risks of serious harm, including violence and sexual abuse by other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832–34, 837 (1994). The objective element requires incarceration "under conditions posing a substantial risk of serious harm." *Id.* at 834. Physical and sexual violence are objectively serious deprivations. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (citation omitted). The subjective element of the Eighth Amendment requires that officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837.

Housing women with male inmates creates clear risks of violence, voyeurism, rape, sexual assault, and harassment. As the Eleventh Circuit explained, "female and male inmates are not housed together in prisons because this risk is not only self-evident, but serious and real." *De Veloz v. Miami-Dade County*, 756 F. App'x 869,

877 (11th Cir. 2018). The specific declarations submitted in *Fleming* depict those dangers: a male inmate entered a restroom, looked over the stall, and addressed a female inmate's genitals; male inmates watched women in showers and bathrooms; they made sexual propositions; and they stalked, bumped, threatened, and intimidated women in common areas.

Those conditions inflict fear and psychological harm. Ms. Meabon experienced rape flashbacks. *Fleming* Meabon Decl. ¶ 5. Ms. Hardin changed her daily routine to protect her privacy. *Fleming* Hardin Decl. ¶ 4. Ms. Morais describes fear, humiliation, and a mental breakdown. *Fleming* Morais Decl. ¶¶ 8–10. Ms. Kirk describes fear that a hostile male inmate might "snap and hurt someone." *Fleming* Kirk Decl. ¶ 4. Ms. Williams describes ongoing fear and retaliation after she complained. *Fleming* Williams Decl. ¶¶ 4–7, 9–14. These conditions easily satisfy the objective component of an Eighth Amendment violation.

As to the subjective element of the Eighth Amendment, the BOP has received repeated complaints, grievances, and reports from *Amicae* detailing harassment, sexual misconduct, threats, voyeurism, and retaliation by male inmates at FMC Carswell. Ms. Meabon reported Inmate B's restroom misconduct but does not believe staff took the matter seriously. *Fleming* Meabon Decl. ¶¶ 4, 7, 10. Ms. Morais reported the same incident, asked that camera footage be preserved, and emailed the warden and psychology staff, but says staff did not meaningfully protect

her. *Fleming* Morais Decl. ¶ 5. Ms. Williams reported Inmate B's aggressive conduct and Inmate C's threats yet saw no meaningful action. *Fleming* Williams Decl. ¶¶ 4–5. Ms. Kirk reported harassment tied to the *Fleming* litigation, but staff brushed her off and focused instead on her job. *Fleming* Kirk Decl. ¶¶ 6–8.

The BOP therefore knew from *Amicae*'s complaints and the Fleming litigation that housing biological males with women at FMC Carswell creates serious safety, privacy, and retaliation concerns. The BOP's persistent refusal to segregate male inmates or prevent overlap in shared spaces is a conscious disregard for safety that constitutes deliberate indifference within the meaning of *Farmer*.

Moreover, placing biological males into female inmates' intimate and common spaces itself constitutes cruel and unusual punishment—even if violence and threats did not accompany it. The Eighth Amendment does not permit the government to "superadd" terror, pain, or disgrace to an otherwise lawful sentence. *Bucklew v. Precythe*, 587 U.S. 119, 133 (2019) (citation omitted). By compelling women in a federal women's prison to bathe, change clothes, use restroom facilities, and navigate daily prison life in the presence of male inmates, the government imposes a form of confinement that is degrading, terrorizing, and sexualized. Whether viewed through the Nation's evolving standards of decency, *see Trop v. Dulles*, 356 U.S. 86, 101 (1958), or through its history and tradition, the law has long treated sex-separated confinement as a requirement of justice.

The Eighth Amendment protects incarcerated women from forced cross-sex housing.

### III. Any Remedy Must Protect Innocent Third Parties and Must Not Permit Biologically Male Inmates to Be Housed In Women's General Population.

#### A. Equity does not permit a court to remedy an asserted constitutional injury to one person by imposing a constitutional injury on another.

The final two preliminary-injunction factors (balance of the equities and public interest) generally merge when the federal government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

But the factors are doctrinally distinct. The balance of the equities focuses on the parties: "[A] court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). The public interest asks the court to look beyond the parties: "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

The third and fourth factors can suffice to require denial of an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).

"[W]hen immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must 'look to the

practical realities and necessities'" to determine "what is necessary, what is fair, and what is workable." *McKenzie v. Kennickell*, 825 F.2d 429, 435 (D.C. Cir. 1987) (quoting *Int'l B'hood of Teamsters v. United States*, 431 U.S. 324, 374–75 (1977) (cleaned up)). And it is an "age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties." *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994) (Posner, C.J.).

*Amicae* were not parties to this litigation when the injunction on appeal issued, and their constitutional rights were not adjudicated. Accordingly, that injunction "d[id] not conclude the rights of strangers to those proceedings." *Martin v. Wilks*, 490 U.S. 755, 762 (1989).

An injunction requiring BOP to keep biological males in women's general population, housing units, restrooms, showers, changing areas, or shared spaces would protect Plaintiffs from one purported constitutional injury by imposing another certain injury on incarcerated women. Equity does not countenance that result.

The public interest is also not served by an injunction that shifts constitutional injury from Plaintiffs to incarcerated women. And the equities cannot favor an order that protects Plaintiffs while exposing Ms. Kirk, Ms. Meabon, Ms. Morais, Ms. Williams, and other women to violations of their bodily privacy, threats to their safety, and the humiliation documented in *Fleming*.

### B. Any injunction issued to Plaintiffs must preclude placement in women's general population and intimate or shared spaces.

At times, Plaintiffs frame the case as a choice between remaining in women's facilities and being transferred to male general-population prisons. *See* Pls.' Mem. In Supp. of Mot. TRO/Prelim. Inj. at 1, Dkt. 117-1 (framing this Court's remand as a "singular directive" to decide whether "transfer from the women's prisons where they have been housed to men's prisons" violates the Eighth Amendment). But Plaintiffs' requested remedy has since changed; now Plaintiffs are requesting "restoration of general-population placement in women's facilities." Pls.' Reply In Supp. of Mot. to Enforce at 19, Dkt. 192.

The latter remedy—placing biological males in women's general population—must be rejected. If this Court finds that Plaintiffs cannot be transferred to a male prison, there are other constitutionally permissible alternatives. This Court should opt for alternatives that do not inflict harms on women, including segregated units, hospital units, or nonintegrated placement at camps or other arrangements.

Plaintiffs' evidence may bear on the effect of immediate transfer to male facilities. But it cannot establish that using women's showers leaves women unharmed. And it does not establish a right to live in women's dormitories, use women's bathrooms, or share women's daily prison spaces.

If the Court concludes that Plaintiffs have a right not to be transferred to male prisons, any injunction must expressly state that it does not require or authorize the

BOP to place Plaintiffs in women's general-population housing or to permit overlap with female inmates in showers, restrooms, changing areas, dormitory spaces, elevators, dining areas, recreation areas, mailrooms, medical spaces, or the ordinary shared spaces of prison life.

The Prison Litigation Reform Act also requires that limitation. Preliminary relief concerning prison conditions must be "narrowly drawn," "extend no further than necessary to correct the harm," and be "the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The court must also give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.* An order keeping Plaintiffs out of male prisons need not extend further by placing them among women. Nor can women's constitutional rights be treated as acceptable collateral damage to Plaintiffs' preferred placement.

The *Fleming* Injunction demonstrates one permissible option. It bars BOP from housing any biological male in the general population of a housing unit at FMC Carswell where biological females are present. *Fleming* Inj. at 2. It bars male inmates from spaces where female inmates are present, including showers, restrooms, changing areas, dormitory spaces, elevators, dining areas, recreation areas, and the mailroom. *Id.* And it requires BOP to use "separate movement, routing, scheduling,

or other measures as necessary to prevent overlap between male inmates and female inmates in housing and shared spaces." *Id.* at 3.

That relief protects women without requiring the transfer of Plaintiffs to male general population. It should define the minimum protection for third parties in any relief entered here.

### C. Secure, segregated housing is constitutional, feasible, and consistent with 28 C.F.R. § 115.42(g).

Secure, segregated placement is constitutional. "[T]he segregation of inmates by sex is unquestionably constitutional." *Women Prisoners*, 93 F.3d at 926. *Amicae* agree with BOP that "there is nothing cruel or unusual about prisons housing inmates exclusively with members of the same sex." Appellants' Br. 25. *Amicae*, in fact, go farther: the Constitution *requires* that women be housed free from male inmates.

*West Virginia v. B.P.J.* clarifies how to understand a sex-based classification. There, the Supreme Court explained that "when analyzing the relationship between the classification based on biological sex and the asserted interests, the sports context is again crucial." 146 S.Ct. at 2376. Here, it is the prison context that is crucial.

There, the Supreme Court held that the Equal Protection Clause permits government to draw biological-sex lines to protect safety and fairness, including as to biological males who identify as women. *B.P.J.*, 146 S.Ct. at 2376–77. Here, the Equal Protection Clause permits BOP (and the Fifth and Eighth Amendments require

it) to assign housing by biological sex to protect the safety, privacy, and dignity of the women in its custody.

The *Fleming* Injunction draws such a biological-sex line. It defines "male inmate" as "a person who is biologically male, regardless of gender identity." *Fleming* Inj. at 1. It applies to every biological male at FMC Carswell, regardless of whether the inmate identifies as male, female, transgender, or otherwise. It does not apply to biological females who identify as male, transgender, or otherwise.

Plaintiffs therefore err when arguing below that "[t]he *Fleming* [I]njunction contemplated segregation of transgender women solely because they are transgender." Pls.' Reply In Supp. of Mot. Enforce Prelim. Inj. at 14, Dkt. 192. *B.P.J.* rejected that characterization of a biological-sex rule: the challenged rules there "do not classify based on gender identity or transgender status" but "classify on the basis of biological sex." *B.P.J.*, 146 S.Ct. 2356, 2378 (2026) (citing *United States v. Skrmetti*, 605 U.S. 495, 517 (2025)). "By contrast, if a school had a co-ed sports team but prohibited all transgender individuals from participating on the team, that would be a distinct transgender classification." *Id.* Here, if all transgender inmates at FMC Carswell (including biologically female ones) were placed in segregated housing, that would be a transgender classification. Instead, the injunction does not even contemplate asking the gender identity of an inmate: all one needs to know is whether an inmate is biologically male.

That same understanding informs the proper interpretation of Prison Rape Elimination Act regulations. Section 115.42(g) provides:

> The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

28 C.F.R. § 115.42(g).

Secure, segregated housing at FMC Carswell does not violate that rule because biological males are not placed there because of their transgender status. They are placed there because of their biological sex as males.

This injunction has proved safe, workable, and protective of the female population incarcerated at FMC Carswell. If this Court concludes that any Plaintiff may not be housed in a male prison, it should require a secure placement that preserves appropriate programming and services while preventing overlap with women in intimate and shared spaces.

## CONCLUSION

If this Court concludes that Plaintiffs may not be placed in men's prisons, it should clarify the injunction below to expressly provide that Plaintiffs may not be housed in women's general population or permitted to overlap with female inmates in housing, showers, restrooms, changing areas, dormitory spaces, elevators, dining areas, recreation areas, mailrooms, medical spaces, or other shared prison spaces.

Respectfully submitted,

*/s/ John Greil*

Brian J. Field
John Greil
*Counsel of Record*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Tel: (202) 787-1060
bfield@schaerr-jaffe.com
jgreil@schaerr-jaffe.com

*Counsel for Amicae Curiae*

September 2, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief of *Amicae Curiae* complies with the type-face requirements of Fed. R. App. P. 32(a)(5) & (6) and the type-volume limitation of Fed. R. App. P. 29(a)(5) in that it uses Times New Roman 14-point type and contains 6,236 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). The number of words was determined through the word-count function of Microsoft Word.

*/s/ John Greil*
John Greil