SCHEDULED FOR ORAL ARGUMENT ON NOVEMBER 20, 2026

**Nos. 26-5238, 26-5311 (consol.)**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JANE DOE, et al.,

Plaintiffs-Appellees,

v.

TODD BLANCHE, in his official capacity as Attorney General of the United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# BRIEF FOR APPELLEES

**PUBLIC COPY – SEALED MATERIAL DELETED**

**LOWENSTEIN SANDLER LLP**
Alexander Shalom
Natalie J. Kraner
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262.6700

**NATIONAL CENTER FOR LGBTQ RIGHTS**
Christopher Stoll
Amy Whelan
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 365-1338

**GLBTQ LEGAL ADVOCATES & DEFENDERS**
Jennifer L. Levi
Sarah Austin
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

**BROWN GOLDSTEIN & LEVY, LLP**
Eve L. Hill
120 East Baltimore Street, Suite 2500
Baltimore, MD 21202
Telephone: (410) 962-1030

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiffs in district court, and appellees here, are 12 people in the custody of the Federal Bureau of Prisons ("BOP").[1] With the permission of the district court, Plaintiffs-Appellees are proceeding pseudonymously in this litigation. *Doe*, No. 1:25-cv-286, Dkt. No. 7; *Moe*, No. 1:25-cv-653, Dkt. No. 7; *Jones*, No. 1:25-cv-401, Dkt. No. 14. Their pseudonyms are Emily Doe, Mary Doe, Olivia Doe, Sally Doe, Sara Doe, Wendy Doe, Zoe Doe, Amy Jones, Barbara Jones, Carla Jones, Jane Jones, and Maria Moe.

Plaintiffs-Appellees initially brought their claims through three separate actions: *Doe v. Blanche*, No. 1:25-cv-286 (D.D.C.), *Jones v. Blanche*, No. 1:25-cv-401 (D.D.C.), and *Moe v. Trump*, No. 1:25-cv-653 (D.D.C.). On May 13, 2026, the District Court consolidated the three cases.

In all three consolidated cases, defendants in district court, and appellants here, are Todd Blanche, in his official capacity as Attorney General of the United States, and William K. Marshall III, in his official capacity as Director of the Federal

[1] The June 7, 2026, Preliminary Injunction that underlies this appeal applied to 14 Plaintiffs who were in BOP's custody. Since then, Plaintiffs Lois Doe and Rachel Doe have been released from BOP custody and are therefore no longer parties to this appeal. Six additional individuals were originally Plaintiffs in this action but are no longer part of this case: Ellen Doe, Jane Doe, Sophia Doe, Susan Doe, Tori Doe, and Donna Jones.

Bureau of Prisons.[2] In *Moe*, defendants in district court, and appellants here, also include Donald Trump, in his official capacity as President of the United States.

On June 5, 2026, four individuals in BOP custody moved to intervene as defendants in the district court action: Brenda Leigh Kirk, Jasmine Meabon, Jessica Clemencio Morais, and Keisha Williams. *Doe*, Dkt. No. 141. On August 21, 2026, the District Court denied their motion to intervene. *Doe*, Dkt. No. 215. There were no additional parties or amici curiae in the district court.

On August 14, 2026, Brenda Leigh Kirk, Jasmine Meabon, Jessica Clemencio Morais, and Keisha Williams filed an emergency motion before this Court for leave to intervene in this appeal. On August 28, 2026, the Court denied their motion to intervene but granted their alternative request to participate as amici curiae in this appeal. These amici filed a brief in support of neither party on September 2, 2026.

In the previous appeal in this case, there were several participating amici curiae, including a group of eight former corrections officials[3]; Dee Deidre Farmer; Lambda Legal Defense and Education Fund; Advocates for Transgender Equality Education Fund; Transgender Law Center; Center for Constitutional Rights; two

---

[2] The actions were originally brought against Director Marshall's and Attorney General Blanche's predecessors. Defendants were automatically substituted as parties pursuant to Fed. R. Civ. P. 25(d) and Fed R. App. P. 43(c)(2).

[3] James Austin, Martin F. Horn, Steve J. Martin, Richard Morgan, Dan Pacholke, Emmitt Sparkman, Phil Stanley, and Eldon Vail.

groups representing 38 states and the District of Columbia[4]; and a group of 29 law professors[5]. Two other movants' motions to participate as amicus curiae were denied: Rhonda Fleming and Women's Liberation Front.

### B. Rulings Under Review

Under review is the district court's June 7, 2026, Order (*Doe*, Dkt. No. 147, amended at Dkt. No. 160) and accompanying Memorandum Opinion (*Doe*, Dkt. No. 148, amended at Dkt. No. 161) entered by the Honorable Royce C. Lamberth in *Doe v. Blanche*, No. 1:25-cv-286-RCL, 2026 WL 1642068 (D.D.C. June 7, 2026), granting Plaintiffs' motion for a preliminary injunction. *See* JA587–639; JA992–1044.

The June 7 preliminary injunction expired after 90 days, and the Plaintiffs filed a new motion for a preliminary injunction, which the district court granted on

---

[4] Massachusetts, California, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, New York, Oregon, Rhode Island, Vermont, and the District of Columbia; and Idaho, Indiana, Alabama, Alaska, Arkansas, Florida, Georgia, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, Wyoming, and the Arizona Legislature.

[5] Margo Schlanger, Andrea Armstrong, Paulina D. Arnold, Shirin Bakhshay, W. David Ball, Erin R. Collins, D Dangaran, Sharon Dolovich, Avlana K. Eisenberg, Malcolm M. Feeley, Eric S. Fish, Betsy Ginsberg, Nicole B. Godfrey, Cynthia Godsoe, Danielle C. Jefferis, Issa Kohler-Hausmann, Grace Y. Li, Aaron Littman, Zina Makar, Michael B. Mushlin, Reena Parikh, Judith Resnik, Ira P. Robbins, Laura Rovner, David Rudovksy, Shanda Sibley, Jonathan Simon, Ji Seon Song, and Anna VanCleave.

August 26, 2026. (*Doe*, Dkt. No. 216). Defendants appealed the August 26 preliminary injunction, which is also under review and before this Court. *See Doe v. Blanche*, No. 26-5311.

**C. Related Cases**

On September 9, 2026, this Court consolidated appeal No. 26-5311 with this appeal, No. 26-5238.

These three consolidated cases have previously been before this Court in a consolidated appeal from prior preliminary injunction orders. *See Doe v. Blanche*, No. 25-5099 (D.C. Cir.) (lead case) (consolidated cases: Nos. 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427, 26-5066, 26-5067, 26-5069). The Court issued its decision in that appeal on April 17, 2026. *See Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026).

Counsel are aware of one related case within the meaning of D.C. Circuit Rule 28(a)(1)(C): *Kingdom v. Trump*, Nos. 26-5181, 26-5236, 26-5310 (D.C. Cir.) (No. 1:25-cv-691 (D.D.C.).

*/s/ Jennifer L. Levi*
Jenner L. Levi

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... viiiiii

GLOSSARY ..................................................................................... xi

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUE ................................................................ 3

PERTINENT STATUTES AND REGULATIONS ........................................ 3

STATEMENT OF THE CASE ................................................................ 4

I. Executive Order 14168 and BOP's Prior Individualized Placements. ........................................................................ 4

II. The Initial Injunctions and this Court's Remand. ................................ 5

III. Proceedings on Remand and the June 7 Injunction. ............................ 6

SUMMARY OF ARGUMENT ................................................................ 9

STANDARD OF REVIEW .................................................................... 12

ARGUMENT ...................................................................................... 13

I. The District Court Did What This Court Directed: It Made Individualized Findings Regarding Each Plaintiff's Likelihood of Establishing an Eighth Amendment Violation ............................... 13

A. This Court's Remand Called for Individualized Factfinding Under *Farmer*. ................................................ 13

B. The District Court Received and Weighed Evidence From Both Sides. ................................................................ 14

C. The District Court Resolved the Common Disputes and Then Made Findings as to Each Plaintiff. .................................. 16

D. The District Court's Factual Findings Are Reviewed for Clear Error, and the Government Challenges None of Them. ................................................................................ 18

II. Each of the Government's Arguments Fails. ...................................... 20

A. The Government's Lead Argument Ignores This Court's Remand and Attacks a Claim Plaintiffs Do Not Make. ............20

1. Plaintiffs Do Not Challenge Sex-Separated Prison Housing, and the Injunction Creates No Categorical Entitlement. ............21

2. *B.P.J.* is an Equal-Protection Decision about Athletics; It Does Not Address the Eighth Amendment's Individualized Protections. ............23

3. The Government's Analogies Confirm that *Farmer's* Individualized Inquiry Controls. ............25

4. *Grants Pass* Did Not Displace Farmer, which the Government Concedes Supplies the Governing Standard. ............26

B. *Farmer* Requires Evaluation of Officials' Present Knowledge and Conduct, Not Prior Exposure to the Challenged Placement. ............28

C. The District Court's Findings Were Individualized, Not Categorical. ............30

D. The District Court Did Not Err in Finding That Each Plaintiff Faces a Substantial Risk of Serious Harm. ............31

1. Facility-Wide Statistics, Aggregate Comparisons, and Attacks on the Expert Evidence Do Not Answer the Individualized Question. ............32

2. The Risk of Severe Psychological Deterioration, Self-Harm, and Suicide is Serious Harm Under the Eighth Amendment. ............37

a. Medical Need and Failure to Protect. ............37

b. The Unrebutted Risk and the Treatment Response. ............38

c. "Comfortable Prisons." ............40

E. The District Court Did Not Err in Finding Deliberate Indifference. ............41

1. The Record Establishes the Government's Knowledge of the Risks. ............41

2. The Government's Response to the Known Risks Was Not Reasonable. ....................................................42

F. Deference Doctrines Do Not Alter the Result. ..........................44

III. The Remaining Preliminary Injunction Factors Favor Plaintiffs........46

A. Plaintiffs Established Irreparable Harm. ..................................46

B. The Balance of the Equities and the Public Interest Favor Plaintiffs. ........................................................................49

IV. The Injunction Satisfies the PLRA. ..................................................51

CONCLUSION ..........................................................................................54

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. Obama*,
753 F.3d 193 (D.C. Cir. 2014)....................12

*Alexander v. South Carolina State Conference of the NAACP*,
602 U.S. 1 (2024)....................13

*Anderson v. City of Bessemer*,
470 U.S. 564 (1985)....................13, 19

*Brown v. Plata*,
563 U.S. 493 (2011)....................46

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)....................46, 47

*City of Grants Pass v. Johnson*,
603 U.S. 520 (2024)....................2, 27

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026)... 1, 3, 5, 6, 12, 13, 14, 21, 26, 27, 28, 30, 31, 34, 36, 37, 44, 46, 52

*Dothard v. Rawlinson*,
433 U.S. 321 (1977)....................22

*Farmer v. Brennan*,
511 U.S. 825 (1994).. 2, 14, 19, 22, 23, 24, 25, 27, 28, 29, 32, 37, 40, 41, 42, 43, 44, 45, 46

*Fleming v. Rule*,
No. 4:25-cv-0157-D (N.D. Tex. June 2, 2026)....................49

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)....................50

*Helling v. McKinney*,
509 U.S. 25 (1993).................... 10, 27, 28, 34, 37, 44, 46

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022)....................12

*Hutto v. Finney*,
437 U.S. 678 (1978)....................27

*Ingraham v. Wright*,
430 U.S. 651 (1977)....................24

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)....................46

*Kingdom v. Trump*,
No. 1:25-cv-691-RCL (D.D.C. filed Mar. 7, 2025)....................36

*Kingdom v. Trump*,
No. 26-5181, 2026 WL 1905418 (D.C. Cir. June 17, 2026) ....................45, 50

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021)....................45, 50

*Murphy v. United States*,
653 F.2d 637 (D.C. Cir. 1981)....................32

*United States v. Skrmetti*,
605 U.S. 495 (2025)....................40

*Webster v. Doe*,
486 U.S. 592 (1988)....................53

*West Virginia v. B.P.J.*,
146 S. Ct. 2356 (2026)....................2–3, 23, 24

*Wilson v. Seiter*,
501 U.S. 294 (1991)....................27, 37

*Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia*,
93 F.3d 910 (D.C. Cir. 1996)....................21

**Statutes**

18 U.S.C. § 3626(a)(2)....................3, 8, 51, 53

**Other Authorities**

28 C.F.R. § 115.42(g) ..........52

Exec. Order No. 14,168,
90 Fed. Reg. 8615 (Jan. 30, 2025) ..........4

## GLOSSARY

| | |
|---|---|
| **BOP** | **Federal Bureau of Prisons** |
| **FMC** | **Federal Medical Center** |
| **JA** | **Joint Appendix** |
| **MCFP** | **Medical Center for Federal Prisoners** |
| **PLRA** | **Prison Litigation Reform Act** |
| **PREA** | **Prison Rape Elimination Act** |
| **PTSD** | **Post-Traumatic Stress Disorder** |
| **SHU** | **Special Housing Unit** |

## INTRODUCTION

On remand from this Court's April 17 decision, the district court did precisely what this Court required. This Court vacated the prior injunctions because the record lacked the "individualized findings" needed to determine whether "the distinctive characteristics of these individuals in particular render their transfer to men's facilities unconstitutional under the Eighth Amendment." *Doe v. Blanche*, 172 F.4th 901, 910, 917 (D.C. Cir. 2026). The district court then received and weighed individualized evidence for each Plaintiff based on their medical histories and records from the Federal Bureau of Prisons ("BOP"), including Plaintiffs' declarations and submissions from medical and corrections experts and BOP officials.

The district court explained why the Government's facility-wide assault statistics do not measure the risk to individuals with Plaintiffs' characteristics, and why counting only "substantiated" assaults understates abuse. It explained why the Government's plan to end Plaintiffs' hormone therapy cannot show they will be safe: a federal court has enjoined that plan, and it would not change the characteristics of Plaintiffs who have had surgery. And it explained why the Government cannot respond to a known risk of psychological collapse by causing the collapse and offering to treat it afterward. The court then made findings for each Plaintiff, one by one, across nearly thirty pages. JA1011–41. It concluded that transferring each of

these women to a men's prison would likely violate the Eighth Amendment under *Farmer v. Brennan*, 511 U.S. 825 (1994).

That is factfinding, and the Government does not contend that any of it is clearly erroneous. Its brief does not discuss the findings for a single Plaintiff. It says only that the district court "credited" Plaintiffs' corrections expert, Dr. McLearen, "over BOP's expert assessment of the risks." Brief for Appellants ("Br.") at 47. But weighing competing evidence is what factfinders do; it is not error. And the Government's complaint ignores the individualized evidence on which the district court's decision rests.

In place of a clear-error challenge, the Government repeats what it argued below (and previously to this Court): that the general lawfulness of sex-separated housing forecloses Eighth Amendment scrutiny of these transfers; that the destination men's facilities' low assault rates dispose of the objective prong; that hormone cessation and after-the-fact treatment address the risks; that its response to those risks was reasonable; and that the equities and the Prison Litigation Reform Act ("PLRA") require a different result. The district court rejected each argument on the evidence, and the Government renews each here at the same level of generality. It also advances two theories that no court has accepted and that would unsettle decades of Eighth Amendment law. The first recasts its lead argument in the terms of *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and *West Virginia v.*

*B.P.J.*, 146 S. Ct. 2356 (2026), contending that a sex-based housing policy is immune from individualized Eighth Amendment scrutiny. The second is that no injunction may issue until Plaintiffs have already been transferred and exposed to harm.

BOP itself placed each of the Plaintiffs in a women's facility through "deliberate, individualized determinations rather than happenstance." *Doe*, 172 F.4th at 918. The question presented is the one this Court framed: whether, under *Farmer*, these individuals face a substantial risk of serious harm from transfer to men's facilities, and whether the Government's response to that known risk was reasonable. The district court answered both questions on the evidence. The injunction should be affirmed.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in granting the preliminary injunction, including in its findings that Plaintiffs are likely to succeed on their Eighth Amendment claims, that the remaining preliminary injunction factors favor Plaintiffs, and that the injunction satisfies 18 U.S.C. § 3626(a)(2).

## PERTINENT STATUTES AND REGULATIONS

Except for the following, all applicable statutes and regulations are contained in the Brief for Appellants:

**28 C.F.R. § 115.42(g)**

**§ 115.42 Use of screening information.**

* * *

(g) The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

## STATEMENT OF THE CASE

### I. Executive Order 14168 and BOP's Prior Individualized Placements.

For years before January 2025, BOP made housing placements for transgender incarcerated people through a specialized decision-making body, the Transgender Executive Council, applying criteria that included "an inmate's security level, criminal and behavioral/disciplinary history, current gender expression, programming, medical, and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse." U.S. Dep't of Just., Fed. Bureau of Prisons, Transgender Offender Manual § 5 (Jan. 13, 2022); *see* JA514 ¶ 6 (Stover Decl.). Under that process, BOP placed each Plaintiff in a women's facility and maintained those placements for years. Such placements are exceedingly rare: in January 2025, roughly 1,500 of the approximately 154,000 people in BOP's custody were transgender women, and only about 22 were housed in women's facilities. Dkt.

52-1 ¶ 5 (Stover Decl.). "Given the rarity of such placements within the federal system, it is reasonable to infer that BOP's decisions to house plaintiffs in women's facilities are the product of deliberate, individualized determinations rather than happenstance." *Doe*, 172 F.4th at 918.

On January 20, 2025, the President issued Executive Order 14168 (the "Executive Order"), Section 4(a) of which directs the Attorney General to "ensure that" transgender women "are not detained in women's prisons or housed in women's detention centers." Exec. Order No. 14,168 §§ 2, 4(a), 90 Fed. Reg. 8615, 8615–16 (Jan. 30, 2025). Invoking that Executive Order, BOP immediately moved to transfer to men's facilities—and in some cases did transfer—the small number of transgender women it had previously placed in women's facilities, including Plaintiffs. BOP subsequently rescinded the Transgender Offender Manual, disbanded the Transgender Executive Council, and suspended or rescinded all other policies and practices related to transgender individuals in BOP custody. *See* JA602. It is undisputed that, under BOP's implementation of Section 4(a) of the Executive Order, women's facilities are no longer available placements for any Plaintiff. *See* Br. at 60.

## II. The Initial Injunctions and this Court's Remand.

Plaintiffs sought and obtained preliminary injunctive relief against their transfers on Eighth Amendment grounds beginning in February 2025. The

Government appealed, and on April 17, 2026, this Court vacated the injunctions. *Doe*, 172 F.4th at 906. The Court did not hold that Plaintiffs' claims failed; it held that the record then before it could not sustain relief without individualized findings. The Court acknowledged that the record "contains ample, uncontested evidence" of characteristics that could make Plaintiffs "distinctively vulnerable to harm in men's facilities"—including "longterm hormone therapy and surgeries effecting gendered physical alterations, prior history of sexual assault or self-harm in men's facilities, or a combination of such factors." *Id.* at 916–17. The Court remanded for individualized findings on whether each Plaintiff's distinctive characteristics render her transfer unconstitutional. *Id.* at 911, 917.

## III. Proceedings on Remand and the June 7 Injunction.

On May 13, 2026, Plaintiffs renewed their motion for preliminary relief and submitted the following evidence to enable the district court to make the individualized factual findings required on remand: declarations from each Plaintiff, JA159–273; medical expert declarations evaluating each Plaintiff's medical records while incarcerated in BOP facilities, JA851–924; and the expert declaration of Dr. Alix McLearen, who served as BOP's National Administrator of the Women and Special Populations Branch and as its Acting Assistant Director, JA481–508. Dr. McLearen identified the specific characteristics that most predictably elevate the risk of victimization for a transgender woman in a men's facility, JA487 ¶¶ 19–21

(McLearen Decl.); explained that transfer from a women's facility itself heightens vulnerability to violence, JA488–89 ¶¶ 23–28 (McLearen Decl.), and carries "a high and foreseeable likelihood of causing significant psychological distress," including elevated risk of self-harm and suicidality, JA493–94 ¶¶ 37–42 (McLearen Decl.); and concluded that available protective measures "cannot adequately prevent harm" to such women, JA497 ¶ 50 (McLearen Decl.).

The Government offered declarations from three BOP officials. Rick Stover, Special Assistant to BOP's Director, described BOP's review of each Plaintiff's records, its selection of FMC Rochester and MCFP Springfield as destination facilities for the Plaintiffs then housed in women's prisons, those facilities' overall assault rates, and BOP's proposal to reassign the four Plaintiffs then residing in halfway houses to the men's side of those facilities. JA513–28 ¶¶ 21–22, 26, 64–68 (Stover Decl.). A second declarant described BOP's general PREA screening and protective-measure options. JA543–44 (Roman Decl.). BOP's Chief of Psychiatry described the treatment capabilities of the destination medical centers. JA546–54 (Weidow Decl.). The Government offered no expert declaration addressing the risk of victimization or psychological harm to individuals with Plaintiffs' characteristics. On reply, Plaintiffs also submitted a supplemental declaration by Dr. Randi Ettner, an expert in treating gender dysphoria. JA555–61 (Ettner Supp. Decl.).

On June 7, 2026, the district court granted a preliminary injunction. It first resolved the factual and legal disputes common to all twelve Plaintiffs[1], including the probative force of facility-wide assault statistics, the Government's reliance on its hormone-cessation policy, its offer to treat psychological deterioration after transfer, and BOP's knowledge of the risk and the reasonableness of its response. JA594–606. It then made findings for each Plaintiff, addressing each woman's medical and psychiatric history, physical characteristics, custodial history, and history of victimization or self-harm, and concluded that each is likely to succeed on her Eighth Amendment claim. JA1011–41. The court found the remaining preliminary injunction factors satisfied, JA636–37, and made the findings required by 18 U.S.C. § 3626(a)(2), JA584–85, 637–38. It entered a ninety-day injunction (June 8 through September 6, 2026) barring implementation of Section 4(a) against Plaintiffs and directing BOP to maintain their existing placements in women's prisons and women's halfway houses. JA583–86. On August 26, 2026, the court entered a second ninety-day injunction on the same record, which remains in effect. The Government's consolidated appeals from both injunctions (Nos. 26-5311 and 26-5238) are before the Court.

---

[1] The district court issued an injunction as to fourteen individuals. Since the filing of that Order, Plaintiffs Lois Doe and Rachel Doe have been released from BOP custody and are therefore no longer parties to this appeal.

## SUMMARY OF ARGUMENT

The district court did exactly what this Court directed. This Court remanded for individualized findings on whether each Plaintiff's distinctive characteristics render her transfer to a men's facility unconstitutional under *Farmer*. The district court received evidence from both sides: factual and expert medical evidence for each Plaintiff, expert testimony from one of BOP's own former senior executives, and declarations from three BOP officials. It weighed that evidence and made findings for each Plaintiff. Those findings are reviewed for clear error, and the Government does not contend that any of them is clearly erroneous. An appellant who accepts the governing legal standard and leaves every Plaintiff-specific finding unchallenged cannot show an abuse of discretion.

Rather than engage those findings, the Government repackages generalities that were rejected below and fail here.

The Government's lead argument attacks a claim Plaintiffs do not make. No one disputes the general lawfulness of sex-separated prison housing. The question is whether a general housing policy immunizes particular placements from scrutiny under *Farmer*. It does not. *B.P.J.* is an equal-protection decision about athletic eligibility and says nothing about the Eighth Amendment duties of custodians. The Government's analogies to informants and other vulnerable incarcerated men confirm that the proper inquiry is *Farmer*'s individualized one. And *Grants Pass*

addressed what conduct may be punished; it did not disturb the conditions-of-confinement framework the Government's own brief invokes.

The theory that no injunction may issue until Plaintiffs have been transferred and exposed to harm is irreconcilable with this Court's remand, which would have been pointless if pre-transfer relief were categorically unavailable, and with *Farmer* and *Helling v. McKinney*, 509 U.S. 25 (1993). The risks here are concrete: the transfers are mandated, the destinations are designated, and the findings address those facilities and these individuals.

The district court's findings were individualized, not categorical. Resolving common disputes of fact and law before applying the governing standards to each Plaintiff is ordinary judicial process. The Government's charge of "window-dressing" is unaccompanied by any challenge to the individualized findings. Br. at 40.

On the objective prong, the Government's arguments from aggregate statistics were rejected below on the evidence and fail on their own terms. The district court did not clearly err in finding that facility-wide averages measure the risk to the average incarcerated person, not to a particular transgender woman transferred to a men's prison from a women's one; that counting only "substantiated" assaults understates abuse; that the general population of transgender incarcerated people is not a valid comparison group; and that the hormone-cessation theory rests on an

enjoined policy and, in any event, does not account for Plaintiffs whose feminine characteristics are surgical or irreversible. JA595–97. Nor did it err in holding that the risk of severe psychological deterioration, self-harm, and suicide is serious harm. *See* JA591, 598–600, 602–03.

On the subjective prong, the Government no longer disputes knowledge of a risk, Br. at 53, and its own declarations supply the evidence. BOP reviewed each Plaintiff's medical and psychological records, JA516 ¶ 21 (Stover Decl.), and its Chief of Psychiatry did not dispute that transfer to men's facilities could seriously worsen Plaintiffs' mental health and trigger self-harm and suicidality, JA546–54 (Weidow Decl.). The Government's central defense—that the destination medical centers can treat Plaintiffs after they deteriorate, Br. at 52–53—presupposes the very risk the Government now minimizes.

Knowingly creating a substantial risk of psychological collapse, self-harm, and suicide, and then offering treatment once the harm occurs, is not a reasonable response under *Farmer*. Nor can the Government satisfy *Farmer* by categorically eliminating the women's placements BOP itself had selected, without ever asking whether transfer to any men's facility would be safe for these Plaintiffs despite their documented vulnerabilities. The district court did not err in finding deliberate indifference: the Government knew the risks, chose a policy that created them, and offered only after-the-fact treatment.

The remaining preliminary injunction factors follow. A likely constitutional violation is irreparable harm under settled circuit law, and the specific harms found are beyond remediation. The district court weighed the Government's asserted interests and found them outweighed by the specific harms Plaintiffs would face. JA636–37. The Government's disagreement with that weighing does not establish an abuse of discretion.

Finally, the preliminary injunction satisfies the PLRA. The district court made the required findings. The Government's proposed alternatives—court-ordered units, court-ordered monitoring, and court-ordered treatment, Br. at 61—would not correct the harm, because the transfer itself creates it. This Court has already held that the Government's analogous Special Housing Unit ("SHU") proposal is a "stop-gap" that cannot relieve the ongoing risk. *Doe*, 172 F.4th at 915. And the alternatives would entangle the court in prison administration far more than an order preserving BOP's own placements.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion, reviewing legal conclusions de novo and factual findings for clear error. *Abdullah v. Obama*, 753 F.3d 193, 197–98 (D.C. Cir. 2014); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022). Under clear-error review, this Court may not reverse merely because it "would have decided the case differently"; it must

be left "with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. The Government invokes *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1, 18 (2024), for the point that clear-error review does not protect findings that rest on legal error. Br. at 23. That adds nothing here. As shown below, the district court applied the legal standards the Government itself quotes from *Farmer*.

## ARGUMENT

### I. The District Court Did What This Court Directed: It Made Individualized Findings Regarding Each Plaintiff's Likelihood of Establishing an Eighth Amendment Violation.

#### A. This Court's Remand Called for Individualized Factfinding Under *Farmer*.

This Court's prior opinion identified with precision what the earlier injunctions lacked. The district court had "generally identified" characteristics that could make a transgender woman distinctively vulnerable in a men's facility but had not "identif[ied] characteristics of each individual, such as effects of sex reassignment medical treatment or prior experience of assault or self-harm in men's prisons, [or] ma[d]e a corresponding finding that the plaintiff therefore likely faces a risk of harm rising to the level of an Eighth Amendment violation." *Doe*, 172 F.4th at 910. The Court therefore remanded "to allow the district court to exercise its

judgment whether to make the factual determinations needed to hold, as plaintiffs urge, that the distinctive characteristics of these individuals in particular render their transfer to men's facilities unconstitutional under the Eighth Amendment." *Id.* at 917.

The Court also settled the legal framework for those determinations. An Eighth Amendment claimant must show a "substantial risk of serious harm" and "deliberate indifference" to that risk. *Farmer*, 511 U.S. at 834. The Government accepts those standards as controlling. Br. at 20, 24. A claimant may rely on risks "personal to" her. *Farmer*, 511 U.S. at 843. And the Court held that the Government's principal protective proposal—placement in the SHU in men's prisons—is "a temporary, stop-gap measure that lacks any capacity to relieve plaintiffs from the ongoing risk of harm." *Doe*, 172 F.4th at 915.

**B. The District Court Received and Weighed Evidence from Both Sides.**

On remand, Plaintiffs submitted what this Court's opinion called for: declarations from each Plaintiff, JA159–273; expert declarations from clinicians who evaluated Plaintiffs' BOP medical records, JA851–924; and an expert declaration from Dr. McLearen, who administered BOP's own programs for women and special populations and served as its Acting Assistant Director, JA481–99.

Dr. McLearen did not offer a generalized opinion that all transgender women are unsafe in men's prisons. She identified the specific characteristics that

predictably make certain transgender women especially susceptible to violence in men's facilities: vaginoplasty, other feminizing surgeries, "breasts and a female physique as a result of consistent hormone therapy," and past sexual abuse and harassment in men's correctional facilities. JA487 ¶¶ 19–21 (McLearen Decl.). She explained that individuals "perceived as female" in custodial environments "are more likely to be approached, pressured, exploited, and treated as potential targets." *Id.* ¶ 19. She explained why transfer from a women's facility carries distinct risks. JA488–89, 493–94 ¶¶ 25–28, 37–38, 40–42 (McLearen Decl.). And she explained why, from her experience administering BOP's protective options, those options "cannot adequately prevent harm" to women with these characteristics. JA495–97 ¶¶ 43–50 (McLearen Decl.).

The Government answered with declarations from three BOP officials. Mr. Stover attested that BOP had reviewed each Plaintiff's "unique medical record, psychology record, disciplinary record, and security level," JA516 ¶ 21 (Stover Decl.); that it selected FMC Rochester and MCFP Springfield because their populations are "largely non-violent" and because the facilities can "provide appropriate treatment," JA516–17 ¶ 22 (Stover Decl.); that those facilities have low assault rates and few substantiated sexual assaults, JA517 ¶¶ 24, 26 (Stover Decl.); and that they house eight incarcerated people with gender dysphoria, one of whom receives hormone therapy, *id.* ¶¶ 25, 27. BOP's designations official described the

protective measures available in men's facilities: cell changes, unit changes, separation orders, protective custody, and restrictive housing. JA543–44 ¶¶ 4–11 (Roman Decl.). Its Chief of Psychiatry described the destination facilities' capacity to treat worsening symptoms through "interventions" such as "increased psychotherapeutic contacts" and "psychiatric medications." *See, e.g.*, JA546–49 ¶¶ 4, 14, 18, 23 (Weidow Decl.).

The district court thus had a full, contested record before it.

### C. The District Court Resolved the Common Disputes and Then Made Findings as to Each Plaintiff.

The district court began by resolving the evidentiary disputes common to all Plaintiffs, explaining each time why it weighed the evidence as it did. JA594–606.

On the risk of violence, the court accepted the Government's assault statistics as accurate but found them "of limited value" because they measure the risk to the average incarcerated person in each facility. JA595. "[T]he relevant question under the objective prong," it explained, "is whether Plaintiffs face a substantial risk of violence by virtue of their distinctive characteristics"—that is, the risk "that each Plaintiff—as a newly arrived, visibly feminized transgender woman coming from a women's prison—would face there." *Id.* The court also found that the Government's exclusive reliance on "substantiated" assaults understated the risk, relying on unrebutted expert testimony that "sexual assault in men's prisons is significantly underreported, and official substantiation rates do not capture the universe of abusive

and violent conduct that actually occurs." JA595–96 (citing JA490–91 ¶¶ 29, 33 (McLearen Decl.)). It declined to rely on the Government's theory that ending Plaintiffs' hormone therapy would make them safer, both because a federal court had enjoined the hormone-cessation policy and because the theory did not address the risk to Plaintiffs who have undergone irreversible feminizing surgeries. JA596–97. And it credited Dr. McLearen's testimony, which "[t]he government provides no evidence to counter," on four points: the elevated risk to transgender women in men's prisons is "not meaningfully disputed" among corrections practitioners; transfer from a women's facility carries distinct risks; specific physical characteristics and personal histories of sexual abuse predictably elevate risk; and BOP's protective measures cannot adequately protect the most vulnerable such women. JA597–98.

On the risk of psychological harm, the court found that the Government "does not seem to contest" that transfer would cause severe psychological distress. JA599. The Government's only answer was that the destination medical centers "could adequately treat any worsening of symptoms, therapeutically and with psychotropic medications." *Id.* That answer, the court found, did not explain "why therapy and psychotropic medication would alleviate the distress of living in a men's prison" when the transfer itself is the source of the distress. *Id.*

On the subjective prong, the court found knowledge from the Government's own submissions: BOP reviewed each Plaintiff's psychological records before selecting destination facilities, JA516 ¶ 21 (Stover Decl.); its Chief of Psychiatry did not dispute that transfer may worsen Plaintiffs' conditions or trigger self-harm and suicidality, JA546–54 (Weidow Decl.); and its central defense—that the destination facilities are equipped to manage the anticipated deterioration, *e.g.*, JA516–17 (Stover Decl.)—itself acknowledged the risk. JA602–04. The court also found, on Plaintiffs' evidence, that BOP originally placed Plaintiffs in women's facilities out of concern for their safety and mental health, which supported an inference of ongoing awareness. JA604.

The court then held the Government's response unreasonable for two reasons. First, it is "fundamentally unreasonable for prison officials to respond to serious risks such as mental health deterioration, self-harm, and suicidality by intentionally creating those risks and offering to treat them after they predictably occur." JA605. Second, BOP adopted a categorical transfer directive and "fail[ed] to consider whether transferring Plaintiffs to *any* men's prison was safe despite Plaintiffs['] documented vulnerabilities." JA605.

### D. The District Court's Factual Findings Are Reviewed for Clear Error, and the Government Challenges None of Them.

Each determination just described is a finding of fact or a weighing of evidence. Whether facility-wide statistics measure the risk to an individual with

particular characteristics, whether expert testimony about underreporting is credible, whether eight differently situated individuals establish a facility's experience with a population, what a declarant's silence means, whether officials perceived a risk—these are questions for the factfinder, reviewed for clear error. *Anderson*, 470 U.S. at 573–74; *Farmer*, 511 U.S. at 842. And because the Government offered no expert testimony to contradict Dr. McLearen, the district court's decision to credit her cannot be clearly erroneous. *See Anderson*, 470 U.S. at 574.

The Government does not attempt to show otherwise. Nowhere in its brief does it identify any Plaintiff whose findings it contends are wrong. It does not argue that any of the court's findings on surgical history, physical characteristics, victimization history, or self-harm history is unsupported by the record, or that the court misread any declarant's testimony.

Those findings are extensive. The court found that six Plaintiffs have had feminizing surgeries. JA1012, 1014, 1021, 1027, 1032, 1034 ([redacted]). It found that thirteen have feminized bodies as a result of hormones, surgery, or both. JA1012, 1013–14, 1017, 1019, 1021, 1023, 1026, 1027, 1029, 1032, 1034, 1038, 1040 (Sara Doe, Amy Jones, Emily Doe, Mary Doe, Wendy Doe, Olivia Doe, Maria Moe, Jane Jones, Carla Jones, Rachel Doe, Zoe Doe, Lois Doe, and Barbara Jones). It found that eight have histories of victimization in men's prisons. JA1014, 1017, 1019–20, 1024, 1030,

1032, 1034, 1038 (Amy Jones, Emily Doe, Mary Doe, Olivia Doe, Carla Jones, Rachel Doe, Zoe Doe, and Lois Doe). And it found that twelve have histories of self-harm or suicidality. JA1012, 1015, 1017, 1019, 1021, 1024, 1026, 1029, 1035, 1036, 1039, 1040 (Sara Doe, Amy Jones, Emily Doe, Mary Doe, Wendy Doe, Olivia Doe, Maria Moe, Carla Jones, Zoe Doe, Sally Doe, Lois Doe, and Barbara Jones). The Government challenges none of it.

Instead, the Government describes the court's weighing of the evidence—the court "credited" Plaintiffs' expert "over BOP's expert assessment," Br. at 47—and argues that the court should have weighed it differently. An appellant challenging a preliminary injunction that rests on factual findings must grapple with those findings. A brief that accepts the governing standard, concedes that the court weighed competing evidence, and leaves every Plaintiff-specific finding unchallenged does not show an abuse of discretion. That alone is enough to affirm.

## II. Each of the Government's Arguments Fails.

### A. The Government's Lead Argument Ignores This Court's Remand and Attacks a Claim Plaintiffs Do Not Make.

The Government's position—that the permissibility of sex-segregated prisons resolves this case, Br. at 25–32—cannot be squared with this Court's remand. The Court remanded so that the district court could decide whether to make "the factual determinations needed to hold . . . that the distinctive characteristics of these individuals in particular render their transfer to men's facilities unconstitutional

under the Eighth Amendment." *Doe*, 172 F.4th at 917. If, as the Government argues, no findings could ever support that holding, there would have been nothing to remand. The argument also fails on its own terms.

**1. Plaintiffs Do Not Challenge Sex-Separated Prison Housing, and the Injunction Creates No Categorical Entitlement.**

The Government opens by defending the proposition that "the segregation of inmates by sex is unquestionably constitutional." Br. at 27 (quoting *Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996)). No one in this case has challenged sex-separated housing. BOP maintained sex-separated facilities throughout the years it housed Plaintiffs in women's facilities, and the injunction leaves that system intact. Nor do Plaintiffs press any categorical claim. This Court recognized that they expressly disclaimed "the categorical argument that the Eighth Amendment requires every transgender woman to be housed in a women's prison." *Doe*, 172 F.4th at 916 (quotation marks omitted). And the district court did not hold that sex-separated housing is unconstitutional or that any group of incarcerated people is categorically entitled to a particular kind of facility. Its holding was far narrower: a group of individuals are likely to prove, with individualized evidence, that transfer would expose them to a substantial risk of serious harm and that the Government has been deliberately indifferent to that risk. JA1011–41.

The Government made the same argument below: that its categorical policy is a lawful exercise of correctional judgment. The district court rejected it, holding that the general lawfulness of a housing policy does not answer whether officials responded reasonably to known, individualized risks. JA605–06. *Farmer* supports that holding. The plaintiff there, a transgender woman who "projects feminine characteristics," challenged her placement in a penitentiary's general population. *Farmer*, 511 U.S. at 829–31. The Supreme Court held that her claim must be evaluated under the deliberate-indifference standard, recognized that a claimant may rely on risks "personal to" her, *id.* at 843, and remanded for application of that standard, *id*. at 848. Under *Farmer*, then, the question is whether officials responded reasonably to a known risk to a particular person in a particular placement. That is the question the district court answered, and the general lawfulness of the Government's housing policy does not answer it.

The Government's other authorities do not help it. Neither *Women Prisoners* nor *Dothard v. Rawlinson*, 433 U.S. 321 (1977), addressed an individual's failure-to-protect claim in the language quoted by the Government. Br. at 27. Nor does the general principle that prisoners' rights are "circumscribed," Br. at 26 (citing *Hudson v. Palmer*, 468 U.S. 517, 524 (1984)), advance the Government's position. Plaintiffs do not seek to extend civilian entitlements into prison. They invoke a guarantee that arises from custody itself: officials may not consciously subject an incarcerated

person to known, substantial risks of grave harm. *Farmer*, 511 U.S. at 832–33. As *Farmer* put it, "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 834 (quotation marks omitted).

#### 2. ***B.P.J.*** **is an Equal-Protection Decision about Athletics; It Does Not Address the Eighth Amendment's Individualized Protections.**

The Government leans heavily on *B.P.J.* for the proposition that the government "is not constitutionally required to grant individualized exemptions" from a policy that "reasonably classifies based on sex." Br. at 28 (first quoting 146 S. Ct. 2356 at 2376–77). *B.P.J.* rejected an equal-protection challenge to state laws excluding transgender girls from school sports. It did not address the Eighth Amendment; it did not address prisons; and it did not consider the constitutional duties that arise when the government takes a person into custody.

The Government's reliance on *B.P.J.* fails because the two provisions ask different questions. The Equal Protection Clause asks whether a legislative classification is adequately justified. The Eighth Amendment asks whether officials are knowingly disregarding a substantial risk of serious harm to a person in their custody. That inquiry is individualized by design: *Farmer* expressly contemplates claims resting on risks "personal to" the claimant. 511 U.S. at 843. And it applies to whatever policy produces the risk. The Government's argument collapses that

distinction. It recasts Plaintiffs' individualized-risk claim as a request for an "exemption" from a sex-based classification, Br. at 28, so that it can import *B.P.J.*'s permission to "treat all biological males the same," *id.* (quoting 146 S. Ct. at 2377), into a provision that asks a different question. But Plaintiffs do not ask this Court to decide whether BOP's sex-based housing classification is adequately justified. That question is not presented, and the district court did not decide it.

Nor does *B.P.J.*'s reasoning carry over to custody. *B.P.J.* tolerated the uniform treatment of a class in the sports-eligibility context, where no student faces anything like the risks present here. An incarcerated person has nowhere to go and no means of self-protection. That dependence is why the Eighth Amendment imposes duties on custodians that have no analog in the schoolhouse. *See Farmer*, 511 U.S. at 833. The Supreme Court has drawn the same line elsewhere. The Eighth Amendment does not reach school discipline, but "[p]rison brutality . . . is 'part of the total punishment to which the individual is being subjected for his crime and, as such, is a proper subject for Eighth Amendment scrutiny.'" *Ingraham v. Wright*, 430 U.S. 651, 669 (1977) (quoting *Ingraham v. Wright*, 525 F.2d 909, 915 (5th Cir. 1976)).

The Government also invokes a footnote in *B.P.J.* observing that the Constitution does not require different treatment for transgender persons. Br. at 30 (citing 146 S. Ct. at 2377 n.4). But Plaintiffs seek no special treatment. They seek what *Farmer* guarantees every incarcerated person: a reasonable official response to

a known, substantial risk of serious harm. The district court found they did not receive it.

### 3. The Government's Analogies Confirm that *Farmer*'s Individualized Inquiry Controls.

The Government argues that many incarcerated people—informants, certain offenders, and others with distinctive vulnerabilities—face elevated risks in men's facilities, yet no one supposes the Eighth Amendment requires their transfer to women's prisons, and that Plaintiffs' theory would entitle all of them to that relief. Br. at 29–32. The premise is true, but the conclusion does not follow, because *Farmer*'s inquiry is individualized. For virtually all such men, protective measures within men's facilities—separation orders, unit changes, transfers among institutions, and protective custody—are a reasonable response to the risk, and *Farmer* requires nothing more. *See* 511 U.S. at 844–45. The analysis is not categorical in either direction. It asks, for each incarcerated person, whether officials' response to the known risk is reasonable. That is why the Government's parade of horribles has not materialized in thirty years of *Farmer* litigation.

The district court asked exactly that question: whether BOP's response to the known risk to each Plaintiff is reasonable. It found that it is not. Relying on the unrebutted testimony of BOP's own former National Administrator for Women and Special Populations, the court determined that the protective measures available in BOP facilities "cannot adequately prevent harm" to transgender women like

Plaintiffs. JA597–98; *see also* JA497 ¶ 50 (McLearen Decl.). It also credited her testimony that the historical experience of the most vulnerable transgender women in men's facilities has been "physical and sexual violence; long-term or frequent placements in the SHU or protective custody, leading to deterioration in mental health or overall functioning; or both." JA497 ¶ 49 (McLearen Decl.); *see also* JA597–98. And this Court has itself held that the Government's principal protective option is an inadequate "stop-gap." *Doe*, 172 F.4th at 915.

Nor are Plaintiffs like the Government's hypothetical informant. Br. at 29–31. BOP itself selected or affirmed a women's facility as each Plaintiff's appropriate placement and maintained that placement for years. The analogy would be apt only if BOP had individually assessed particular informants, placed them in a distinct setting for their protection, kept them there for years, and then categorically removed that setting from consideration in the face of unrebutted expert evidence that no available alternative would adequately protect them. The decision below rests on *Farmer*'s individualized inquiry, faithfully applied to this record, not on any categorical rule.

#### 4. ***Grants Pass* Did Not Displace *Farmer*, which the Government Concedes Supplies the Governing Standard.**

Finally, the Government argues that Plaintiffs' claims fail at the threshold because a sex-based housing policy is neither "cruel" nor "unusual" as *Grants Pass* defined those terms: it is not "calculated to superadd terror, pain, or disgrace," and

it has not "long fallen out of use." Br. at 25 (quoting *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024)). That argument misreads *Grants Pass*.

*Grants Pass* addressed what conduct may be punished: whether public-camping ordinances punished the "status" of homelessness. 603 U.S. at 545–47. The language the Government quotes describes the historical meaning of the Cruel and Unusual Punishments Clause as applied to legislatively prescribed methods and kinds of punishment. *Id.* at 542. It does not address how the government must treat people it has already convicted and confined. *Grants Pass* did not involve a conditions-of-confinement or failure-to-protect claim, and it did not purport to disturb the long line of decisions requiring prison officials to protect inmates from violence and from grave risks to health and safety. *See Farmer*, 511 U.S. at 842–48; *Helling*, 509 U.S. at 32–34; *Wilson v. Seiter*, 501 U.S. 294, 302–06 (1991); *Hutto v. Finney*, 437 U.S. 678, 685 (1978).

The Government's own brief confirms as much. It frames the merits under *Farmer*'s substantial-risk and deliberate-indifference standards, Br. at 20, 24, the same test this Court applied in the prior appeal. *See Doe*, 172 F.4th at 921–22. The Government cannot invoke *Farmer* as the test and, in the same brief, ask this Court to hold that conditions claims fail unless the challenged policy was "calculated to superadd terror." No court of appeals has read *Grants Pass* to narrow *Farmer*.

### B. *Farmer* Requires Evaluation of Officials' Present Knowledge and Conduct, Not Prior Exposure to the Challenged Placement.

The Government does not contend that Plaintiffs must suffer physical injury before seeking relief. It argues instead that Plaintiffs "must have already experienced conditions that violate the Eighth Amendment" before they may obtain an injunction, and that they cannot make that showing because they have not yet been transferred. Br. at 34. That rule cannot be reconciled with this Court's remand or with *Farmer*.

In the prior appeal, this Court did not hold Plaintiffs' claims premature because they remained in women's facilities. It remanded for individualized findings on whether "the distinctive characteristics of these individuals in particular render their transfer to men's facilities unconstitutional under the Eighth Amendment." *Doe*, 172 F.4th at 917. That remand would have served no purpose unless Plaintiffs' claims could be decided before any transfer.

*Farmer* and *Helling* point the same way, because both look forward. *Farmer* directed courts considering prospective relief to examine officials' "current attitudes and conduct," and held that a person need not "await a tragic event" before obtaining an injunction against unsafe conditions. 511 U.S. at 845. *Helling* explained that the Eighth Amendment protects against future harm, and that it would be anomalous to deny relief from a plainly established, life-threatening condition merely because the threatened injury had not yet occurred. 509 U.S. at 33. Although the plaintiffs in

both cases had been exposed to the challenged conditions, neither decision treats exposure as a prerequisite to relief; both ask whether the risk is concrete and whether officials are presently and unreasonably disregarding it.

The Government's contrary reading rests on *Farmer*'s statement that an inmate "must show that he is incarcerated under conditions posing a substantial risk of serious harm," with emphasis on the word "is." Br. at 33 (quoting 511 U.S. at 834). But that sentence merely states the objective element of the claim: the conditions must pose a substantial risk of serious harm. It does not say that a plaintiff must currently be living under those conditions before a court may enjoin them. By the time the case reached the Supreme Court, the *Farmer* plaintiff was no longer housed in the penitentiary whose conditions she challenged, and the government argued that there was "no present threat" of her return. *Id.* at 850–51. The Court nonetheless held that her claim for an injunction turned on the "likelihood of a transfer," a factual question for remand. *Id.* at 851. What mattered was the likelihood of future exposure, not her current placement. Here, transfer is not merely likely; the Government has ordered it.

Nor are these risks "hypothetical." The destinations are known. BOP reviewed each Plaintiff's psychological and medical records before selecting them, JA516 (Stover Decl. ¶ 21), and the district court made findings on how conditions at those facilities would affect each Plaintiff given her documented characteristics. *See*

JA602–04, 606–36. BOP's knowledge, its transfer decisions, and its proposed response are present facts established in the record, not speculation about how officials might act after transfer. *Farmer* does not require Plaintiffs to undergo the transfers before a court may evaluate evidence that already exists.

The "presumption of regularity" does not help the Government either. Br. at 36. The district court did not presume that BOP officials would act irregularly. It agreed that the protective measures BOP says it will employ "'cannot adequately prevent harm'" to Plaintiffs. JA598 (quoting JA497 ¶ 50 (McLearen Decl.)). This Court has likewise held BOP's principal protective measure is an inadequate "stop-gap." *Doe*, 172 F.4th at 915. A presumption that officials will follow their procedures does not answer evidence that the procedures themselves are inadequate.

### C. The District Court's Findings Were Individualized, Not Categorical.

The Government argues that the district court's individualized findings were "little more than window-dressing" appended to categorical conclusions. Br. at 40. The opinion refutes the charge on its face. The court first resolved the parties' common factual and legal disputes. JA591–606. It then applied the governing standards to each Plaintiff across nearly thirty pages, addressing for each the categories of distinctive characteristics this Court identified. JA594–636; *see also Doe*, 172 F.4th at 910, 916–17. That is ordinary judicial practice, not categorical reasoning.

Common questions do not become forbidden "categorical" analysis because a court declines to repeat the same discussion twelve times. And the Government's suggestion that the court had "already concluded" the merits before reaching the individualized findings, Br. at 40, misreads the opinion. The court's general discussion resolved the parties' "overarching arguments," JA594, and its order states that relief rests on "the individualized findings set forth on the record and in the Court's accompanying memorandum opinion." JA583.

The Government also observes that the district court did not "draw any apparent distinctions among plaintiffs' individual risk levels." Br. at 40. But the court's task was not to rank Plaintiffs against one another. It was to determine whether each crosses the constitutional threshold, and the court did so on each Plaintiff's own facts. That all of them cross it is unsurprising. As this Court explained, this group was not self-selected. It was selected by BOP, whose "deliberate, individualized determinations" placed these rare few in women's facilities and kept them there for years. *Doe*, 172 F.4th at 918. Uniform outcomes for a group BOP itself selected for its distinctive circumstances are evidence of that distinctiveness, not of shortcut reasoning.

### D. The District Court Did Not Err in Finding That Each Plaintiff Faces a Substantial Risk of Serious Harm.

On the objective prong, the Government's arguments share two flaws. They substitute aggregate generalities—facility-wide averages, population-wide totals,

and cumulative years in custody—for the individualized inquiry this Court called for. And they ask this Court to reweigh evidence the district court already weighed, on a record the Government left without expert rebuttal. Each argument was made below and rejected on the evidence.

**1. Facility-Wide Statistics, Aggregate Comparisons, and Attacks on the Expert Evidence Do Not Answer the Individualized Question.**

The Government first contends that Plaintiffs were required to show that violence at the destination facilities is "pervasive." Br. at 42 (citing *Vandevender v. Sass*, 970 F.3d 972, 977 (8th Cir. 2020); *Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985); *Murphy v. United States*, 653 F.2d 637, 644–45 (D.C. Cir. 1981)). Those cases address generalized-danger theories—claims that a facility as a whole is so violent that every incarcerated person faces a substantial risk. They do not govern claims like these, which rest on risks arising from an individual's own characteristics. *Farmer* recognizes that a prisoner may face an excessive risk "for reasons personal to him." 511 U.S. at 843. *Murphy*'s observation that no incarcerated person may "demand the level of protection necessary to render an institution assault-free," is common ground. 653 F.2d at 644. Plaintiffs demand only that officials not consciously disregard the substantial, particularized risks created by their transfer from women's to men's prisons.

For the same reason, the low facility-wide assault rates at FMC Rochester and MCFP Springfield do not answer the relevant question. Br. at 42–43. That question—the one this Court remanded for the district court to answer—is what risk faces "a newly arrived, visibly feminized transgender woman coming from a women's prison." JA595. A facility-wide average does not measure that. The district court credited expert testimony that individuals "'perceived as female'" in men's custodial environments "'are more likely to be approached, pressured, exploited, and treated as potential targets,'" and that the elevated risk such women face in men's facilities "is 'well understood within the field of corrections and is not meaningfully disputed among practitioners.'" JA597–98 (quoting JA485, 487 ¶¶ 13, 19 (McLearen Decl.)). It also explained why counting only "substantiated" sexual assaults understates the risk: BOP's own program statement distinguishes "substantiated" allegations from merely inconclusive ones, and the record shows that sexual abuse in men's facilities is significantly underreported. JA595–96. The court then applied those conclusions to each Plaintiff's own characteristics and history. JA606–36. Weighing statistics against expert testimony is the paradigmatic task of a factfinder, and the court's resolution is not clearly erroneous.

The Government objects that this reasoning would make it impossible for BOP ever to rebut a claimed risk. Br. at 45. Not so. BOP could have offered expert testimony contradicting Dr. McLearen's opinions, evidence explaining why the

aggregate statistics apply to Plaintiffs despite their distinctive characteristics, or evidence undermining the underreporting testimony. It offered none. The district court did not demand proof from identically situated comparators. It held that statistics measuring the wrong population do not answer the right question, and it weighed the evidence the parties actually submitted. JA595–98. Plaintiffs carried their burden under *Helling* to show that they "will be exposed to unreasonable risk," 509 U.S. at 36, with credited expert evidence specific to each of them.

The Government's population-wide comparisons fail for a related reason: the comparison groups are not comparable. Br. at 42–44. The general population of transgender people in men's facilities was never selected by BOP's own individualized process for placement in women's facilities; Plaintiffs were. And the claim that Plaintiffs have spent "more than 40 years" in men's facilities without a substantiated assault, Br. at 45, carries the same "substantiated" qualifier, Br. at 45, and it ignores what this Court has already recognized: the record contains "ample, uncontested evidence" of "prior history of sexual assault or self-harm in men's facilities." *Doe*, 172 F.4th at 917.

The Government's remaining statistical points share the same defects. It points to two former Plaintiffs who requested transfer to men's facilities and whose records reflect no substantiated assault, and to one current Plaintiff who expressed a desire to transfer. Br. at 43–44, 44 n.11. But one person's choice to accept a risk

does not reduce the risk to others who are transferred against their will, and two individuals' records say nothing about differently situated Plaintiffs whose characteristics the court examined one by one. If any Plaintiff now prefers transfer, the district court can modify the injunction; that is no ground for vacating relief for the rest. The Government also argues that the Plaintiffs in halfway houses may simply be reassigned to "the men's side." Br. at 43; *see also* JA526–27 ¶¶ 64–68 (Stover Decl.). The court's findings addressed each of those Plaintiffs, JA606–36, and the Government engages with none of them. Reassignment to the men's side of the same building is still an involuntary move from a women's placement BOP itself selected into housing among men.

The Government next contends that the district court's reliance on Dr. McLearen's testimony that transgender women face elevated risk in men's prisons "cannot be squared with this Court's prior opinion" and with Plaintiffs' disclaimer of a categorical theory. Br. at 46. But the district court did not rest on that general testimony alone. It used it as background in assessing the Government's statistics and then applied Dr. McLearen's testimony about the specific characteristics that elevate risk—surgery, physical transformation from hormone therapy, and transfer from a women's facility to a men's—to each Plaintiff individually. JA597–98, 606–36. This Court's prior opinion faulted the absence of individualized findings; it did not hold the baseline risk irrelevant. To the contrary, it identified the very

characteristics Dr. McLearen described as ones that could make a Plaintiff "distinctively vulnerable." *Doe*, 172 F.4th at 917.

The Government also calls Dr. McLearen's opinion that protective measures "cannot adequately prevent harm" "sheer speculation" refuted by BOP's own "individualized assessments." Br. at 46–47. Her opinion rests on her experience administering BOP's own protective options and on the documented experience of the most vulnerable transgender women in men's facilities. JA483, 495–97 ¶¶ 5, 43–50 (McLearen Decl.). And BOP's "individualized assessments," JA516 ¶ 21 (Stover Decl.), were assessments of which men's facility to select after the Government "took one category of housing—women's facilities—off the table." Br. at 47. An assessment that predetermines the answer to the only question that matters for these Plaintiffs is not the individualized consideration *Farmer* requires.

Finally, the Government renews in a footnote its contention that any victimization risk will diminish because BOP's new policy will end Plaintiffs' hormone therapy, and it calls the district court's contrary reasoning "circular" because the same judge enjoined that policy in *Kingdom v. Trump*, No. 1:25-cv-691-RCL (D.D.C. filed Mar. 7, 2025). Br. at 47 n.12. There is nothing circular about declining to rely on a policy that is enjoined and not in effect. If the *Kingdom* injunction is dissolved on appeal, *see* Nos. 26-5181, 26-5236 (D.C. Cir.), the Government may seek modification below. More fundamentally, the theory ignores

unrebutted evidence that some hormone-induced changes are irreversible, that certain risk factors do not depend on hormone status, and that surgical characteristics persist regardless. JA559–60 ¶¶ 12–13 (Ettner Supp. Decl.); JA596–97. For Plaintiffs with those characteristics, the asserted risk reduction never arrives.

### 2. The Risk of Severe Psychological Deterioration, Self-Harm, and Suicide is Serious Harm Under the Eighth Amendment.

#### a. *Medical Need and Failure to Protect.*

The Government contends that harm from exacerbated gender dysphoria "is inapposite to the nature of the claims actually at issue" because such harm sounds in the medical-needs doctrine while Plaintiffs plead failure-to-protect claims. Br. at 48. The Eighth Amendment does not run on such labels. *See Helling*, 509 U.S. at 32 ("[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard" (quoting *Wilson*, 501 U.S. at 303)); *Farmer*, 511 U.S. at 834, 837 (stating the duty in terms of "inmate health or safety"). Plaintiffs' theory is not that BOP is providing deficient treatment. It is that a condition of confinement the Government proposes to impose—the transfer itself—creates a substantial risk of serious harm, including psychological collapse, self-harm, and suicide. That is a conditions claim whatever label one attaches. This Court has already described it as one of Plaintiffs' two theories in this case. *Doe*, 172 F.4th at 914 (describing Plaintiffs' claim that "the

mere fact of their transfer to a men's facility would subject them to an intolerable risk of harm by exacerbating their gender dysphoria").

The courts of appeals uniformly treat the risk of suicide and serious self-harm—predictable consequences of exacerbated gender dysphoria—as serious harm within the meaning of *Farmer*, as the district court recognized. JA591 (collecting cases from the Fifth, Seventh, Ninth, and Tenth Circuits). And because the harm-creating condition is the transfer, an order preventing the transfer is not, as the Government has it, improper "relief for a medical-needs claim." Br. at 48. It is relief calibrated to the condition that creates the risk.

**b. *The Unrebutted Risk and the Treatment Response.***

Labels aside, the evidence all points one way. Dr. McLearen explained that removing Plaintiffs from the women's facilities where they have lived would strip them of "continuity in healthcare, mental health provider relationships, social supports and relationships, and programming" and thrust them into "an unfamiliar and dangerous institutional and social environment," with "a high and foreseeable likelihood of causing significant psychological distress," including heightened risk of self-harm and suicidality. JA493 ¶ 38 (McLearen Decl.). Plaintiffs' medical experts reviewed each Plaintiff's BOP medical records and reached the same

conclusion Plaintiff by Plaintiff: transfer would cause severe distress or psychiatric deterioration and, for many, an increased risk of self-harm or suicide.[2]

BOP's Chief of Psychiatry did not dispute that transfer may worsen Plaintiffs' conditions, increase psychological distress, or trigger self-harm and suicidal ideation. JA546–54 (Weidow Decl.). The Government's answer, below and here, is that the destination medical centers can treat symptoms after they emerge, through

[2] *See* JA855 ¶ 18 (Gorton Decl.) (Mary Doe: severe distress and increased suicidality); JA858–59 ¶¶ 30–31 (Gorton Decl.) (Olivia Doe: severe distress, increased suicidality, and recurrent risk of sexual assault); JA861–62 ¶ 41 (Gorton Decl.) (Sally Doe: severe distress, increased suicidality, and increased targeting for sexual assault); JA864–65 ¶¶ 51–52 (Gorton Decl.) (Sara Doe: deterioration in gender dysphoria, [redacted] and [redacted] and increased risk of physical and sexual assault); JA868 ¶¶ 66–67 (Gorton Decl.) (Zoe Doe: increased suicidality, debilitating [redacted] symptoms, and increased risk of sexual assault); JA871 ¶¶ 77–78 (Gorton Decl.) (Amy Jones: severe distress related to gender dysphoria and increased risk of non-suicidal self-injury, suicidality, and sexual victimization); JA873 ¶¶ 85, 88 (Gorton Decl.) (Maria Moe: severe distress and increased risk of non-suicidal self-injury, suicidality, and sexual assault); JA883–84 ¶¶ 36–37 (Karasic Decl.) (Jane Jones: severe resurgence of gender dysphoria, with substantially increased risk of severe anxiety, hopelessness, and mental anguish, and serious risks of violence, harassment, and sexual assault); JA887–88 ¶¶ 52, 54 (Karasic Decl.) (Rachel Doe: same); JA892–93 ¶¶ 67, 71 (Karasic Decl.) (Wendy Doe: risks of [redacted] resurgence, [redacted] exacerbation, suicidality, and self-harm); JA897–98 ¶¶ 87–90 (Karasic Decl.) (Carla Jones: worsening gender dysphoria, heightened risk of self-harm, and serious risks of violence, harassment, and sexual assault); JA917–18 ¶ 48 (Ettner Decl.) (Emily Doe: recurrence of clinically significant gender dysphoria, high likelihood of [redacted] relapse, exacerbated [redacted] symptoms, and substantially increased risk of suicidal ideation and suicide attempts); JA919–20 ¶¶ 58–59 (Ettner Decl.) (Lois Doe: worsening gender dysphoria, psychiatric deterioration, and increased risk of victimization); JA921 ¶¶ 66–67 (Ettner Decl.) (Barbara Jones: exacerbated psychological distress and gender dysphoria, increased vulnerability to harassment, abuse, and victimization).

"increased psychotherapeutic contacts" and "psychiatric medications." JA548 ¶ 18 (Weidow Decl.); Br. at 49. As the district court found, that response concedes the objective premise. It does not deny the substantial risk of severe deterioration; it plans for it. JA599, 602–04.

Nor does *United States v. Skrmetti*, 605 U.S. 495, 524–25 (2025), change the analysis. *Contra* Br. at 50. *Skrmetti* addressed the standard of review for legislative classifications under the Equal Protection Clause amid what the Court characterized as scientific debate. It did not address the factfinding role of a district court applying *Farmer* to a preliminary injunction record. And the predicate on which *Skrmetti*'s outcome rests—supposed scientific uncertainty—is absent on the point that matters here. The Government's own declarant did not contest that transfer creates the risk, and the Government identified no evidence that psychotherapy or psychotropic medication treats the underlying condition rather than the symptoms of harm already inflicted. Dr. Ettner's unrebutted reply declaration confirms the absence of any such evidence. JA557–58 ¶¶ 7–8 (Ettner Supp. Decl.).

**c. *"Comfortable Prisons."***

Lastly, the Government protests that the Constitution "'does not mandate comfortable prisons'" and that the district court never explained why a change in symptom severity would deny "'the minimal civilized measure of life's necessities.'" Br. at 50–51 (quoting *Farmer*, 511 U.S. at 832, 834). But the district

court found a substantial risk of sexual assault, severe psychological distress, self-harm, and suicide. JA600. Those are not matters of mere comfort.

### E. The District Court Did Not Err in Finding Deliberate Indifference.

#### 1. The Record Establishes the Government's Knowledge of the Risks.

The subjective prong asks whether officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and drew the inference. *Farmer*, 511 U.S. at 837. That is a question of fact, provable "in the usual ways, including inference from circumstantial evidence." *Id.* at 842. On appeal, the Government concedes awareness of the risk: it "does not dispute that there is a potential risk from any transfer; hence BOP's consideration of and attempts to mitigate any such risk." Br. at 53.

The record compelled that concession. The district court's knowledge finding rests on the Government's own submissions: BOP reviewed each Plaintiff's medical and psychological records before designating destination facilities, *see* JA516 ¶ 21 (Stover Decl.); its Chief of Psychiatry did not dispute that transfer may worsen Plaintiffs' conditions or trigger self-harm and suicidality, *see* JA546–54 (Weidow Decl.); and its central defense—that the destination facilities are medical centers equipped to manage anticipated deterioration—presupposes the very risks at issue, *see* JA602–04. One does not select specialized medical facilities to manage a risk one has not perceived. Ongoing awareness is further supported by the court's finding

that BOP's original placements were "probabl[y]" motivated by safety and mental health concerns, and by the reports of prior assaults in men's facilities, some of them substantiated, in Plaintiffs' own BOP records. *See* JA603–04.

The Government's remaining argument—that officials who "believed (albeit unsoundly) that the risk . . . was insubstantial" are not liable, Br. at 52 (quoting *Farmer*, 511 U.S. at 844)—states a factual defense that the district court considered and rejected on this record. *See* JA602–04. A defense that depends on officials' genuine belief that a risk is insubstantial cannot succeed where the officials' own declarations describe their plans to manage that risk's consequences.

**2. The Government's Response to the Known Risks Was Not Reasonable.**

*Farmer* provides that officials who know of a substantial risk avoid liability if they "responded reasonably to the risk." 511 U.S. at 844. The Government argued below that it responded reasonably because it selected destination facilities "populated by nonviolent offenders receiving medical care" with "a low incidence of assault," Br. at 21 (citing JA516–17 ¶¶ 21–27 (Stover Decl.)), and because it stands ready to deploy protective measures and treat worsening symptoms, *id.* at 60–61. The district court rejected that argument based on two independent factual findings that the Government does not challenge for clear error.

First, the court found that the Government "does not seem to contest" that transferring Plaintiffs from women's to men's facilities would cause severe

psychological distress, and that it offers only the "consolation" that the destination facilities "could adequately treat any worsening of symptoms, therapeutically and with psychotropic medications." JA599 (quoting Opp'n at 18). The Government's response to a known risk of self-harm and suicide, in other words, is to create the risk and treat the consequences. *Farmer* requires officials to respond reasonably to the risk itself. 511 U.S. at 844. A policy that manufactures the risk is not a reasonable response to it.

Second, the court found that BOP adopted a categorical transfer directive and "fail[ed] to consider whether transferring Plaintiffs to *any* men's prison was safe despite Plaintiffs['] documented vulnerabilities." JA605–06 (emphasis in original). BOP's selection of particular men's facilities does not fill that gap. It rests on facility-wide assault statistics that "do not capture" the risk to "a newly arrived, visibly feminized transgender woman coming from a women's prison." JA595–96. And BOP had reviewed each Plaintiff's psychological records before selecting those destinations. *See* JA516 ¶ 21 (Stover Decl.). It had the individualized information needed to ask the right question, and it asked the wrong one.

The Government does not dispute either finding. Instead, it recasts them as legal error. It argues that the district court "conflates a policy decision that gave rise to a condition of confinement with prison officials' actions to address the risks

caused by that condition," and that on the district court's logic, no policy could ever change if the change increased any risk. Br. at 54.

The first argument has no basis in *Farmer*. The reasonableness inquiry asks whether officials, knowing of a substantial risk, acted reasonably. When the action under review is the one that creates the risk, that action is what the inquiry examines. *Farmer*, 511 U.S. at 843. Labeling it a "policy" only describes the form the conduct took. *Helling* confirms that the inquiry addresses the exposure itself, not only what officials do afterward. 509 U.S. at 33–35. Confining scrutiny to post-exposure mitigation would hollow out *Farmer* for every systemically created risk.

The second argument misstates the holding. Policy changes that increase some risk are permissible when the response to the known risk is reasonable, which is why prison policies change constantly without Eighth Amendment consequence. What the district court found unreasonable was not change but conscious disregard. BOP proceeded without asking whether transfer was safe for any Plaintiff, and despite unrebutted evidence that available protective measures, including the SHU, cannot adequately protect them. *See* JA598, 605; JA495–98 ¶¶ 43–50 (McLearen Decl.); *Doe*, 172 F.4th at 914–15.

**F. Deference Doctrines Do Not Alter the Result.**

Throughout its brief, the Government invokes the deference owed to prison administrators. *See* Br. at 26–27, 54–55, 57–59 (citing *Bell v. Wolfish*, 441 U.S. 520,

547–48 (1979); *Turner v. Safley*, 482 U.S. 78, 89 (1987); *McKune v. Lile*, 536 U.S. 24, 39 (2002); *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014); *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021); *Kingdom v. Trump*, No. 26-5181, 2026 WL 1905418, at *2 (D.C. Cir. June 17, 2026)). Plaintiffs do not dispute the principle: judgments about classification, security, and housing belong in the first instance to correctional professionals. But deference does not warrant reversal here, for two reasons.

First, the individualized professional judgments are BOP's own. BOP placed each Plaintiff in a women's facility and has maintained that placement, in many cases for years. JA587. The directive Plaintiffs challenge did not reach a different individualized judgment about them. It categorically reassigned them without regard to the risk factors BOP's own process had identified. That does not mean BOP may never revise its housing policy. It means that when a policy change knowingly creates a substantial risk to specific individuals, *Farmer*'s duty to respond reasonably to that risk survives the change. Deference to the policy decision does not excuse indifference to its consequences for the people it puts at risk. *See Farmer*, 511 U.S. at 844–45.

Second, deference has never meant abdication. *Farmer* itself concerned a placement decision—the subject the Government calls the "core of prison administrators' expertise," Br. at 26–27 (quoting *McKune*, 536 U.S. at 39)—and the

Supreme Court still held that the deliberate-indifference standard governs. This Court's remand for further proceedings under that standard, when it could have ended the case on deference grounds, confirms that deference does not control the outcome here. *See Doe*, 172 F.4th at 918–19. Nor may deference excuse ongoing violations: "courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

## III. The Remaining Preliminary Injunction Factors Favor Plaintiffs.

### A. Plaintiffs Established Irreparable Harm.

In this Circuit, "a prospective violation of a constitutional right constitutes irreparable injury." *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (cleaned up). The Government's principal response, that Plaintiffs are unlikely to succeed on the merits, Br. at 56, fails for the reasons given in Parts I and II.

The Government's fallback argument is that risk-based injuries are not irreparable unless the feared harm is "certain and great." Br. at 55–57 (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006)). It fares no better. Under *Helling* and *Farmer*, the constitutional injury is exposure to a substantial risk of serious harm, not the harm's eventual occurrence, and incarcerated people facing such risks need not "await a tragic event" before obtaining relief. *Farmer*, 511 U.S. at 845 (quoting *Helling*, 509 U.S. at 33–34). That

exposure exists here: the district court found, on individualized evidence, that the transfers themselves would subject each Plaintiff to a substantial risk of violence, serious psychological harm, and suicidality. JA587, 636–37. Nothing in *Chaplaincy* requires more. Even if it did, harms of this kind are "beyond remediation" once they occur. *See Chaplaincy*, 454 F.3d at 297.

The Government recasts this as "merely" a greater risk of violence, not a *per se* irreparable injury; argues that the harm remains only "potential[]"; and contends that the risk is insufficiently imminent given the number of transgender women currently housed in men's facilities. Br. at 55–57. None of that describes what the district court found. The district court made findings, Plaintiff by Plaintiff, that each of these women faces a concrete and substantial risk based on her own documented history of victimization, physical vulnerabilities, or clinical records. A sampling of those findings follows.

Amy Jones was assaulted in every men's facility in which she was previously housed, a history BOP had no evidence to rebut. JA1013–14. Zoe Doe was raped and repeatedly assaulted in a men's prison, and she was stalked once other incarcerated people learned she is transgender. JA1033–35. Emily Doe was sexually assaulted in both a men's [redacted] jail and a men's federal prison, and BOP took no position on the truth of her account. JA1016–18. Mary Doe was raped and sexually assaulted on numerous occasions in men's prisons, including while housed in

protective custody. JA1019–21. Carla Jones has a long history of assault and harassment by men housed with her in multiple facilities. JA1029–31. Lois Doe was raped in a men's [redacted] prison and sexually harassed and threatened in a men's federal prison. JA1038–39.

Others face heightened vulnerability that BOP's facility-wide statistics do not capture. [redacted] have each undergone vaginoplasty, and the district court found each especially susceptible on that basis to serious physical injury and sexual targeting. JA1012, 1021, 1027, 1032, 1034. The court also found [redacted] especially vulnerable to sexual victimization because she has never been housed in a men's facility and because of how long ago she transitioned. JA1013. Nor is the risk only physical. BOP's own clinicians concluded that transferring [redacted] would cause serious psychological harm and a potential acute increase in suicide risk, and the Government separately acknowledged that [redacted] would face a substantially increased risk of suicide if transferred. JA1022, 1016.

The district court weighed this evidence against the Government's and resolved the conflict in Plaintiffs' favor. That other transgender women are housed in men's facilities says nothing about the risk to these Plaintiffs, and the harm is imminent because, absent the injunction, the transfers will proceed. The record amply establishes irreparable harm.

### B. The Balance of the Equities and the Public Interest Favor Plaintiffs.

The Government identifies three interests on its side of the balance: the safety, privacy, and dignity of other incarcerated women; the burden of navigating potentially conflicting injunctions; and the Executive Branch's interest in implementing its policies and administering its prisons without judicial interference. Br. at 57–59. The district court weighed each and found them outweighed by the specific harms Plaintiffs would face. JA636–37. That balancing is reviewed for abuse of discretion, and the Government shows none.

Plaintiffs do not minimize the interests of other women in custody. But the Government offered no record evidence that any Plaintiff has endangered the safety, privacy, or dignity of any of them. Its primary evidence on this point is Mr. Stover's statement of BOP's general "correctional judgment" that sex-based housing "limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships." JA517 ¶ 23 (Stover Decl.). That is a statement of policy, not evidence about Plaintiffs, and the district court was entitled to weigh it as such against specific, unrebutted evidence of the grave harms Plaintiffs face. The Government's reliance on *Fleming v. Rule*, No. 4:25-cv-0157-D (N.D. Tex. June 2, 2026) (Dkt. 199), does not fill the gap. *See* Br. at 30, 58 n.13. In that case, brought by women incarcerated at FMC Carswell, a district court ordered BOP to house transgender women at that facility "in a secure, segregated area." JA638. *Fleming* involved different plaintiffs,

a different record, and a different facility-specific dispute. The *Fleming* court made no findings at all, much less a finding that any Plaintiff here has endangered anyone. And Plaintiffs, who are not parties to *Fleming*, had no opportunity to be heard on that preliminary record.

Nor does this injunction conflict with the one in *Fleming*. *Contra* Br. at 58 n.13. This injunction governs whether Plaintiffs may be transferred out of women's facilities, while *Fleming* governs housing arrangements within FMC Carswell. JA639.

The Government's institutional interests likewise do not tip the balance. It invokes this Court's observation in *Kingdom* that the Government is irreparably harmed by "*improper* intrusion by a federal court into the workings of a coordinate branch." Br. at 58 (quoting *Kingdom*, 2026 WL 1905418, at *2) (emphasis added). An injunction is an "improper" intrusion only if the underlying merits showing fails. Where, as here, Plaintiffs establish a likelihood that government action violates the Constitution, this Court's cases point the other way: "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), and "[t]here is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). *MediNatura, Inc.*, 998 F.3d at 945, on which the Government relies, involved no likely constitutional violation, and it does not

license the Government to carry one out in the name of policy. And the deference cases the Government cites, Br. at 58–59, address the weight owed to correctional judgments on the merits, *supra* Part II. F; they establish no rule that the equities favor the Government whenever it invokes prison administration.

The injunction preserves Plaintiffs' existing placements pending litigation; it does not bar the Government from implementing Section 4(a) of the Executive Order elsewhere. The district court weighed the Government's interest in applying its policy to these Plaintiffs now, rather than after final judgment, against risks of sexual violence, psychological collapse, self-harm, and suicide that no later judgment could repair. It found that "any public interest in seeing Plaintiffs relocated immediately to male facilities is slight at best" when measured against those harms. JA637. That was not an abuse of discretion.

## IV. The Injunction Satisfies the PLRA.

Finally, the Government renews its PLRA argument that the injunction is not "narrowly drawn," extends further than necessary, and is not the "least intrusive means" of correcting the harm. 18 U.S.C. § 3626(a)(2); Br. at 59–62. The district court rejected this argument below, making each finding the statute requires. *See* JA584–85, 637–38. Those findings are correct.

First, the Government's proposed alternatives do not "correct the harm the court finds requires preliminary relief." 18 U.S.C. § 3626(a)(2). Its principal

alternative—a “dedicated facility, unit, or wing” within a men’s facility, Br. at 61—is protective segregation, and the regulation the Government cites forbids BOP from adopting it without a “consent decree, legal settlement, or legal judgment.” 28 C.F.R. § 115.42(g). The Government’s alternative thus requires exactly the judicial establishment and supervision the PLRA disfavors. Nor would it correct the harm. This Court has already rejected an analogous SHU proposal as an inadequate “stop-gap,” *Doe*, 172 F.4th at 915, and the record shows that the experience of the most vulnerable transgender women in men’s facilities has been violence, prolonged protective isolation with resulting psychological deterioration, or both. JA497 ¶ 49 (McLearen Decl.).

The Government’s remaining alternatives—adjusting which men are housed near Plaintiffs and increasing monitoring, Br. at 61—are the same reactive measures Dr. McLearen found inadequate, in testimony the district court credited. JA495–97 ¶¶ 43–60 (McLearen Decl.); JA597–98. And after-the-fact medical treatment corrects nothing. Imposing foreseeable harm and treating it later is the violation the district court found, not a remedy for it. *Supra* Part II.E.2. The PLRA asks for the least intrusive means that corrects the harm, not a means that leaves it uncorrected.

Second, the district court found the alternatives more intrusive, not less. JA637. Each would have a federal court direct BOP’s housing architecture, staffing, security protocols, and clinical decisions, and then supervise compliance. By

contrast, "[m]aintaining Plaintiffs' current housing status is obviously less intrusive." *Id.* That finding is reviewed only for abuse of discretion and is sound. The Government's claim that the court owed deference to "BOP's view of the least-intrusive means," Br. at 62, inverts the statute. Section 3626(a)(2) requires the court itself to determine what relief is narrowly drawn and least intrusive, not to defer to the agency's view of those questions. The district court decisions the Government cites show only that relief must match the harm found on each record. *See* Br. at 61 (citing *Tay v. Dennison*, 457 F. Supp. 3d 657 (S.D. Ill. 2020); *S.D. v. Reese*, No. 6:25-cv-01726-CL (D. Or. Apr. 28, 2026), *vacated*, No. 26-4872, 2026 U.S. App. LEXIS 28452 (9th Cir. Sept. 17, 2026)). Neither involved a finding, as here, that the transfer itself creates the harm and that intra-facility measures cannot abate it.

The Government's last point, that § 3621(b) makes housing designations "not reviewable by any court," Br. at 61, proves too much. That provision bars review of BOP's exercise of its designation discretion. It does not, and constitutionally could not, immunize Eighth Amendment violations from judicial review. Courts read statutes to avoid the "serious constitutional question" that would follow from denying any forum for a colorable constitutional claim. *Webster v. Doe*, 486 U.S. 592, 603 (1988). This Court reviewed Plaintiffs' Eighth Amendment claims on the merits in the prior appeal without any such bar, and § 3621(b) gives no reason to disturb the injunction here.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunctions should be affirmed.

Dated: September 22, 2026

Respectfully submitted,

GLBTQ LEGAL ADVOCATES & DEFENDERS
NATIONAL CENTER FOR LGBTQ RIGHTS
BROWN GOLDSTEIN & LEVY LLP
LOWENSTEIN SANDLER LLP

By: */s/ Jennifer L. Levi*
Jennifer L. Levi

Attorneys for Plaintiffs-Appellees

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32 (a)(7)(B) because it contains 12,343 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Jennifer L. Levi*
Jennifer L. Levi

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Jennifer L. Levi*
Jennifer L. Levi