**Nos. 26-5238, 26-5311 (consol.)**

IN THE

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**JANE DOE, ET AL.,**

*Plaintiffs-Appellees,*

– v. –

**TODD BLANCHE, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL.,**

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## BRIEF OF *AMICI CURIAE* FORMER CORRECTIONS OFFICIALS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

LAWRENCE S. LUSTBERG
MICHAEL R. NOVECK
FBT GIBBONS LLP
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

RULE 29 CERTIFICATIONS ........ vii

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ viii

STATEMENT OF *AMICI* ........ 1

SUMMARY OF ARGUMENT ........ 4

ARGUMENT ........ 9

I. TRANSGENDER WOMEN ARE AT SUBSTANTIAL RISK OF HARM IN MEN'S PRISONS, AND PLAINTIFFS ARE AMONG THOSE AT GREATEST RISK OF SUCH HARM. ........ 9

II. THE EXECUTIVE ORDER'S MANDATE TO TRANSFER VULNERABLE TRANSGENDER INDIVIDUALS LIKE PLAINTIFFS TO MEN'S FACILITIES IS CONTRARY TO CORRECTIONS OFFICIALS' FUNDAMENTAL RESPONSIBILITY UNDER THE EIGHTH AMENDMENT TO PROTECT PARTICULARLY VULNERABLE PRISONERS. ........ 18

III. NEITHER PROTECTIVE CUSTODY NOR LOWER SECURITY MEN'S PRISONS IS AN APPROPRIATE HOUSING ASSIGNMENT FOR PLAINTIFFS. ........ 22

CONCLUSION ........ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026)....5

*Estelle v. Gamble*,
429 U.S. 97 (1976)....19

*Farmer v. Brennan*,
511 U.S. 825 (1994)....19, 21, 28

*Helling v. McKinney*,
509 U.S. 25 (1993)....21

*Hope v. Pelzer*,
536 U.S. 730 (2002)....21

*Meriwether v. Faulkner*,
821 F.2d 408 (7th Cir. 1987)....27

*Porter v. Clarke*,
923 F.3d 348 (4th Cir. 2019)....27

*Porter v. Pa. Dep't of Corr.*,
974 F.3d 431 (3d Cir. 2020)....27

*Sheley v. Dugger*,
833 F.2d 1420 (11th Cir. 1987)....27

*Williams v. Sec'y Pa. Dep't of Corr.*,
848 F.3d 549 (3d Cir. 2017)....27

**Statutes**

34 U.S.C. § 30301....14

34 U.S.C. § 30301(7)–(15)....14

34 U.S.C. § 30302(1)....14

34 U.S.C. §§ 30302(3), 30306(e)....................................................................14

34 U.S.C. § 30302(4)–(6) ...........................................................................14

Prison Rape Elimination Act of 2003 ...........................................2, 3, 5, 13, 14, 28

Sylvia Rivera Law..........................................................................................12

**Other Authorities**

Am. Corr. Assoc., Off. of Corr. Health Res. Ctr., *A Special Session Webinar, Transgender Care In Corrections: Where We Are And Where We're Going* (2018), https://perma.cc/C8W7-K263...............................16

Benjamin Steiner & John Wooldredge, *Examining the Sources of Correctional Officer Legitimacy*, 105 J. Crim. L. & Criminology 679, 683–84 (2015)...........................................................................22

Bureau of Just. Stats., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, *supra* note 9 at 18 tbl. 8...................................17

Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, at 8–9 (2013), https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf ...........................................12

Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables*, at 2 tbl. 1 (2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.......................................12

David Radziewicz & Carole A. Mattis, *A Best Practice Approach: Providing Support Services to Transgender Inmates*, Am. Corr. Assoc., Corrections Today (July/Aug. 2018), https://perma.cc/D4JW-93VW ....................................................................16

Fed. Bureau of Prisons, *About Our Facilities* (last visited July 5, 2025), https://www.bop.gov/about/facilities/federal_prisons.jsp.......................24

*Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* ¶ 60, 9 Aug. 2013, https://www.hr-dp.org/files/2015/07/23/Interim_report_of_the_Special_Rapporteur,_2013.pdf..................................................................................26

*It's War In Here: A Report On The Treatment Of Transgender And Intersex People In New York State Men's Prisons* 17–33 (2007), https://srlp.org/wp-content/uploads/2007/04/Its-War-In-Here-full-version.pdf ............................12

James Peguese and Robert Koppel, *Managing High-Risk Offenders In Prison Dormitory Settings* Nat'l PREA Res. Ctr, (July 2003), https://www.prearesourcecenter.org/sites/default/files/library/managinghighriskoffendersinprisondormitorysettings.pdf .........................................25

Kelsie Chesnut & Jennifer Peirce, *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars*, Vera Inst. of Just. (Feb. 2024), https://vera-institute.files.svdcdn.com/production/downloads/publications/advancing-transgender-justice.pdf .........................................................................26

Lawrence W. Sherman, *Defiance, Deterrence, and Irrelevance: A Theory of the Criminal Sanction*, 30 J. Res. Crime & Delinq. 445, 460–61 (1993)...............................................................................................22

Maurice Chammah, *Rape in the American Prison*, The Atlantic (Feb. 25, 2015), https://www.theatlantic.com/politics/archive/2015/02/rape-in-the-american-prison/385550; 2009.....................................................................................11

Nat'l Comm'n on Corr. Health Care, *Position Statement: Transgender And Gender Diverse Health Care in Correctional Settings* 4–5 (2020), https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf ..............................................................................................17

Nat'l Ctr. For Transgender Equal., *LGBTQ People Behind Bars: A Guide To Understanding The Issues Facing Transgender Prisoners And Their Legal Rights* 6 (2018), https://transequality.org/sites/default/files/docs/resources/TransgenderPeopleBehindBars.pdf ...................................................................26

Nat'l Inst. of Corr., *Policy Review and Development Guide: Lesbian, Gay, Bisexual, Transgender, and Intersex Persons In Custody*, 11 (2d ed. 2015), https://www.congress.gov/116/meeting/house/109200/documents/HHRG-116-JU00-20190402-SD036.pdf..........................................................10

Nat'l Int. of Corr., *supra* note 8 at 11; Valerie Jenness, *et al.*, *Violence In California Correctional Facilities: An Empirical Examination Of Sexual Assault*, Center for Evidence-Based Corrections, 27 (Apr. 27 2007), https://bpb-us-e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/Jenness-et-al._PREA-Report.pdf ....................13

Nat'l PREA Res. Ctr., *National PREA Resource Center Fact Sheet* (May 2014), available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/ PRC-FS.pdf ....................15

Nat'l PREA Res. Ctr., *PREA Standards: § 115.42 Use of screening information and Placement of residents*, https://www.prearesourcecenter.org/ standard/115-42 ....................15

Nat'l Prison Rape Elimination Comm'n Report 74 (June 2009), https://www.prearesourcecenter.org/sites/default/files/ ....................10, 11, 18

*Prison*, Vera Inst. of Just. (Nov. 17, 2022), https://www.vera.org/news/violence-torture-and-isolation-what-its-like-to-be-trans-in-prison ....................26

Rebecca Mann, *The Treatment of Transgender Prisoners, Not Just an American Problem – A Comparative Analysis of American, Australian, and Canadian Prison Policies Concerning the Treatment of Transgender Prisoners and a "Universal" Recommendation to Improve Treatment*, 15 Law & Sexuality 91 (2006) ....................11

Sharon Dolovich, *Cruelty, Prison Conditions, and the Eighth Amendment*, 84 N.Y.U. L. Rev. 881, 915 (2009) ....................21

Sharon Dolovich, *Strategic Segregation in the Modern Prison*, 48 Am. Crim. L. Rev. 1, 16 (2011) ....................11, 12, 24

Steve J. Martin & Sheldon Ekland-Olson, *Texas Prisons: The Walls Came Tumbling Down* (1987) ....................3

Valerie Jenness et al., *Sexual victimization against transgender women in prison: Consent and coercion in context*, 57 Criminology 603, 617 (2019), https://www.researchgate.net/publication/335350919_ .....12

**Regulations**

28 C.F.R. § 115 .....14

28 C.F.R. § 115.31 .....14

28 C.F.R. § 115.41(a).....20

28 C.F.R. § 115.41(d)(7).....15

28 C.F.R. § 115.41(d)(7)-(8).....20

28 C.F.R. § 115.41(d)(8), and.....18

28 C.F.R. § 115.42(a).....18

28 C.F.R. § 115.42(a)–(g).....8

28 C.F.R. § 115.42(b) .....6

28 C.F.R. § 115.42(c).....6, 15, 20

28 C.F.R. § 115.42(d) .....7, 15

28 C.F.R. § 115.43(a).....27

28 C.F.R. § 541.1 *et seq.*.....28

90 Fed. Reg. at 8615 .....7

90 Fed. Reg. at 8616 .....7

Executive Order 14168 .....7, 8, 20

**Constitutional Provisions**

Eighth Amendment ..... 4, 8, 18, 19, 21, 26, 27, 28

United States Constitution .....6

## RULE 29 CERTIFICATIONS

All parties have consented to the timely filing of this *amicus* brief.

Pursuant to D.C. Circuit Rule 29(d), a separate *amicus* brief is necessary because *Amici Curiae* former corrections officials are the only parties or *Amici* who offer the unique and firsthand perspective of former corrections officials who have worked extensively in prisons of varying security classifications across the country and are consequently well-versed in the unique considerations involved in making housing determinations for prisoners, including the legal implications of those decisions.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* certify that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *Amici* or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *Amici Curiae* former corrections officials certify as follows:

A. **Parties and *Amici*.** The former corrections officials listed in this brief are participating as *Amici Curiae* before this Court. All parties, intervenors, and *Amici* appearing to date in this Court are contained or referenced in the Brief of Plaintiffs-Appellees, Doc. No. 2194495, filed on September 22, 2026.

B. **Rulings Under Review**. References to the rulings under review appear in the Brief of Plaintiffs-Appellees.

C. **Related Cases**. References to any related cases pending before this Court appear in the Brief of Plaintiffs-Appellees.

## STATEMENT OF *AMICI*

*Amici Curiae* are Patricia Caruso, Martin F. Horn, Steve J. Martin, Richard Morgan, Dan Pacholke, Emmitt Sparkman, Phil Stanley, and Eldon Vail, eight former high-ranking corrections officials with significant combined experience in some of the largest correctional systems in the country. Each has worked at various levels of the prison system, from entry level staff to senior roles, including as final responsible authorities within their respective state systems. *Amici*'s experience spans numerous jurisdictions, working at or overseeing numerous facilities that collectively housed hundreds of thousands of prisoners.

As corrections professionals, *Amici*—identified in further detail below— have an interest in assuring that corrections facilities are managed consistent with sound penological principles. *Amici* thus respectfully submit this brief to inform the Court of common dynamics in corrections facilities that are relevant to this case and bear upon the basic responsibilities of officers working in these facilities to keep prisoners safe.

Patricia L. Caruso was the first woman director of the Michigan Department of Corrections (MDOC). She joined MDOC in 1988 and served in several capacities, including warden, regional prison administrator, and deputy director, before being appointed director in July of 2003. She retired from the MDOC on January 1, 2011. Director Caruso remains active in several professional correctional organizations.

Martin F. Horn served as Commissioner of the New York City Department of Corrections from 2003 to 2009, and as the Secretary of Corrections of Pennsylvania from 1995 to 2000. He has also served as Commissioner of the New York City Department of Probation, and as Executive Director of the New York State Sentencing Commission.

Steve J. Martin is the former General Counsel and Chief of Staff of the Texas prison system and has been appointed by the Governor of Texas to both a sentencing commission and a council for offenders with mental impairments. He also has served as an expert with the U.S. Department of Justice's Civil Rights Division where he worked on the development of standards for the enforcement of the Prison Rape Elimination Act ("PREA"). Mr. Martin was in the first class of certified PREA Auditors, and provided the Department of Justice with feedback on the certification process. He coauthored a book on the history of prison reform in Texas,[1] and has written numerous articles on criminal justice issues.

Richard Morgan served as Secretary of the Washington State Department of Corrections from 2016 to 2017. He also was appointed twice to Washington State's Parole Board and elected to the Walla Walla City Council, and he has served on the Board for the Washington State Coalition to Abolish the Death Penalty since 2012.

---

[1] Steve J. Martin & Sheldon Ekland-Olson, *Texas Prisons: The Walls Came Tumbling Down* (1987).

Dan Pacholke served as Secretary of the Washington State Department of Corrections from 2015 to 2016, working his way to the senior-most position for the department after a 33-year career as a Correctional Officer. He also held a prior administrative role in the Department, as the Director of the Prisons Division, during which he led the system-wide effort to implement PREA in prisons, community corrections, and work release facilities.

Emmitt Sparkman served as the Deputy Commissioner of Institutions for the Mississippi Department of Corrections from 2002 until 2013. In this role, he was responsible for managing the custody, control, and treatment of individuals in long term segregation. He implemented major reforms to improve conditions of confinement for these individuals, and later assisted other states' corrections departments with implementing similar reforms. He has also served in both line and management positions in adult and juvenile facilities in Texas, Kentucky, and Mississippi. In total, he has over 50 years of experience working in the field of corrections.

Phil Stanley served as Commissioner of the New Hampshire Department of Corrections from 2000 to 2003. He has also served in several positions in the Washington State Department of Corrections, including Superintendent of three prisons, Regional Administrator, and Probation Officer. He is currently a consultant

for prison and jail operations. He has approximately 49 years of experience in the field of corrections.

Eldon Vail served as Secretary of the State Department of Corrections of Washington from 2007 until 2011, after serving as Deputy Secretary of that Department from 1999 to 2006. As Secretary, he successfully reduced violence in the state prison system and implemented a wide array of evidence-based programs, including an intensive treatment program for people in prison with a mental illness and a step-down program for people held for long terms in solitary confinement.

## SUMMARY OF ARGUMENT

In a prior appeal in this case, this Court acknowledged that "[t]he record . . . contains ample, uncontested evidence of plaintiffs' characteristics that, according to plaintiffs, make them distinctively vulnerable to harm in men's facilities." *Doe v. Blanche*, 172 F.4th 901, 917 (D.C. Cir. 2026). It then remanded solely "to allow the district court to exercise its judgment whether to make the factual determinations" necessary to conclude that transferring plaintiffs to men's facilities would be "unconstitutional under the Eighth Amendment" for purposes of entering an injunction. *Id.*

The district court then made those findings, "addressing each woman's" individual characteristics, and "conclud[ing] that each is likely to succeed on her Eighth Amendment claim." Appellees' Br. 8 (citing JA1011–41). Although the

specific findings remain under seal, the conclusions are consistent with *Amici*'s understanding and experience. That is because it is widely known within the corrections profession that transgender women in men's prisons face an extremely high risk of sexual violence and harassment. These risks are even greater for those who have previously been victimized, as many Plaintiffs in this appeal have. *See* Appellees' Br. 19–20. Given the vulnerability of transgender women in prisons, regulations, training standards, and screening procedures—including some mandated by the Prison Rape Elimination Act ("PREA")—have been implemented throughout the past two decades to address the safety of transgender women in prisons.

Sound correctional practices, as well as the United States Constitution and federal statutes and regulations, require corrections officials to take appropriate and proactive measures to protect vulnerable prisoners from harm, including serious risks of sexual violence and harassment. Accordingly, Bureau of Prisons ("BOP") corrections officials are vested with the discretion to "make individualized determinations about how to ensure the safety of each inmate." 28 C.F.R. § 115.42(b). Specifically, by regulation, officials have the discretion to decide "whether to assign a transgender or intersex inmate to a facility for male or female inmates" and must do so "on a case-by-case basis," considering the "inmate's health and safety." *Id.* § 115.42(c). Thus, corrections officials regularly determine that

transgender women should be housed in women's facilities based upon an assessment of the serious risks of sexual violence and other harms they face in men's prisons and the overall safety and security of institutions. Indeed, in the cases at issue, BOP officials undertook the requisite individualized assessment of risk factors and determined that Plaintiffs should be placed in women's facilities, where Plaintiffs resided for months or years.

The unique vulnerabilities of the Plaintiffs in this case made this housing determination particularly appropriate. Nearly all of the Plaintiffs have faced prior sexual victimization in men's prisons. *See* Appellees' Br. 19–20. Plaintiffs have undergone extensive medical treatment, including hormone therapy and surgeries, resulting in "feminized bodies." *Id.* at 19. And Plaintiffs "have histories of self-harm or suicidality." *Id.* at 20. Accordingly, corrections officials properly determined that the safest and most appropriate housing for Plaintiffs was in women's facilities. Indeed, corrections officials reaffirmed these determinations repeatedly during the reassessments they must undertake twice a year. 28 C.F.R. § 115.42(d).

Contrary to this sound practice and in defiance of statutory, regulatory, and constitutional mandates, on January 20, 2025, President Trump issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, which requires corrections officials to reverse their previous determinations of the safest housing assignments for Plaintiffs

in this case and strips them of their discretion to place Plaintiffs in women's prisons. EO 14168, 90 Fed. Reg. 8615. The Executive Order thus declares that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2, 90 Fed. Reg. at 8615. In relevant part, the Executive Order requires the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers[.]" *Id.* § 4(a), 90 Fed. Reg. at 8616.

Executive Order 14168 accordingly removes all discretion from corrections officials to determine the safest housing assignments for transgender women, contrary to existing, binding federal regulations. *See* 28 C.F.R. § 115.42(a)–(g). In forbidding necessary measures to protect the safety of transgender women—including requiring corrections officials to undo the BOP's own prior housing assignments despite the much greater risks of harm that will result—Executive Order 14168 puts corrections officials in the untenable position of violating not only the fundamental duties of their job but also the minimum requirements for the care of prisoners imposed on them by the Constitution and the law. The result of stripping correctional officers of their discretion to make appropriate housing determinations for transgender women will be prisons that are less safe for both officers and prisoners.

The Government, as it did in the previous appeal, proposes utilizing low-security medical centers (Appellants' Br. 42–43) or "protective custody or restrictive housing" (*id.* at 53) as substitute housing assignments for Plaintiffs. But either alternative violates the Eighth Amendment, in essence mandating the Government's deliberate indifference to the substantial risk of serious harm that Plaintiffs face. As confirmed by the National Prison Rape Elimination Commission's research, and as *Amici* know from their own experience, men's prisons are inherently unsafe housing for transgender women like Plaintiffs, regardless of security classification. And placing transgender women in protective custody as a long-term housing assignment—amounting to solitary confinement—is not only unfair but also presents constitutional problems as it may cause lasting psychological harm, exacerbating their punishment for no legitimate purpose.

In sum, Executive Order 14168 impermissibly interferes with the ability of corrections officials to properly fulfill their job duties and to comply with the law. As applied to this case, the district court correctly held that the Executive Order's mandate violates the Eighth Amendment by forcing corrections officials to place Plaintiffs at a serious risk of the known harms they would face in men's facilities. This Court should affirm the judgments below.

## ARGUMENT

### I. TRANSGENDER WOMEN ARE AT SUBSTANTIAL RISK OF HARM IN MEN'S PRISONS, AND PLAINTIFFS ARE AMONG THOSE AT GREATEST RISK OF SUCH HARM.

Prisons are generally dangerous environments, but the danger is especially severe for transgender women who are housed in men's prisons, and even more severe for those who have been previously victimized, including the Plaintiffs in this case.

The danger that men's prisons pose to transgender women has been repeatedly documented by government bodies. Most notably, the National Prison Rape Elimination Commission, created by Congress to study sexual abuse in prison and develop national standards on the subject, produced an extensive report in 2009 which found that "most male-to-female transgender individuals who are incarcerated are placed in men's prisons . . . [which] puts them at extremely high risk for abuse."[2] Likewise, a 2015 policy report issued by the National Institute of Corrections (NIC), an agency within the Bureau of Prisons responsible for providing assistance to corrections institutions, concluded that "transgender women and girls are highly vulnerable to sexual abuse, especially when housed in facilities for men or boys."[3]

---

[2] Nat'l Prison Rape Elimination Comm'n Report 74 (June 2009) ("2009 Commission Report"), https://www.prearesourcecenter.org/sites/default/files/library/NPREC-Final-Report.PDF.

[3] Nat'l Inst. of Corr., *Policy Review and Development Guide: Lesbian, Gay, Bisexual, Transgender, and Intersex Persons In Custody* 11 (2d ed. 2015),

This vulnerability results, at least in part, from the culture of men's facilities, which create conditions in which transgender women are at particularly high risk of violence.[4] "[M]ale facilities have more documented cases of prison sexual assault, and male facilities rely more heavily on the power structures that fuel sexual assaults in prison."[5] That power dynamic in men's prisons rewards hypermasculinity, which is perpetuated through the sexual domination of "anyone who can be perceived as at all feminine."[6] Transgender women "are regarded as female . . . and are thus automatic targets for sexual assault."[7] Thus viewed, violence against transgender women in men's prisons is a problem that arises, as *Amici* know, from the usual social and power dynamics at play in men's facilities.

---

https://www.congress.gov/116/meeting/house/109200/documents/HHRG-116-JU00-20190402-SD036.pdf.

[4] *See, e.g.*, 2009 Commission Report, *supra* note 2, at 73–74 (finding that male-to-female transgender individuals are at "extremely high risk" of sexual abuse in men's prisons); *id*. at 148 (finding that "[t]ransgender girls are especially vulnerable" to sexual abuse in juvenile facilities).

[5] Maurice Chammah, *Rape in the American Prison*, The Atlantic (Feb. 25, 2015), https://www.theatlantic.com/politics/archive/2015/02/rape-in-the-american-prison/385550; 2009 Commission Report, *supra* note 2, at 73.

[6] Sharon Dolovich, *Strategic Segregation in the Modern Prison*, 48 Am. Crim. L. Rev. 1, 16 (2011).

[7] *Id.* at 18.

Certainly, in men's prisons, characterized as they are by the prevalence of aggressive behaviors designed to control other prisoners,[8] transgender prisoners are often subjected to derogatory slurs due to their perceived effeminacy.[9] But this harassment is not limited to verbal abuse; "[i]n the prison context . . . verbal sexual harassment is often used in a strategic way, to alert the target that [she] has been singled out for more serious sexual victimization and may soon face a forcible rape."[10] These behavioral patterns reflect the prison power dynamic discussed above,

---

[8] *See, e.g.*, 2009 Commission Report, *supra* note 2, at 73 ("Men's correctional facilities tend to have very rigid cultures that reward extreme masculinity and aggression and perpetuate negative stereotypes about men who act or appear different. In this environment, gay, bisexual, and gender-nonconforming individuals are often the targets of sexual abuse precisely because the dominant 'straight' males expect and demand submission."); Rebecca Mann, *The Treatment of Transgender Prisoners, Not Just an American Problem – A Comparative Analysis of American, Australian, and Canadian Prison Policies Concerning the Treatment of Transgender Prisoners and a "Universal" Recommendation to Improve Treatment*, 15 Law & Sexuality 91, 105 (2006) (explaining how "[t]he nature of the prison hierarchy in a male facility ranks prisoners based on their fighting ability and manliness," and "male-to-female transgender inmates [are] at special risk for physical injury, sexual harassment, sexual battery, rape, and death" (quotation marks omitted)).

[9] *See, e.g.*, Valerie Jenness et al., *Sexual victimization against transgender women in prison: Consent and coercion in context*, 57 Criminology 603, 617 (2019), https://www.researchgate.net/publication/335350919_ (detailing that transgender prisoners "report[ed] routinely being called a 'faggot,' 'punk,' and 'bitch.'"); Sylvia Rivera Law Project, *It's War In Here: A Report On The Treatment Of Transgender And Intersex People In New York State Men's Prisons* 17–33 (2007), https://srlp.org/wp-content/uploads/2007/04/Its-War-In-Here-full-version.pdf (detailing through personal stories the humiliation, harassment and violence transgender women in men's prisons face on a daily basis).

[10] Dolovich, *supra* note 6, 48 Am. Crim. L. Rev. at 12.

which make transgender women particularly vulnerable to victimization by virtue of being seen as female.[11]

Government statistics confirm this reality. The most recent data available on inmate-reported sexual assaults in prisons from the Department of Justice's Bureau of Justice Statistics indicates that a transgender prisoner is about ten times more likely to be sexually assaulted than is the average adult prisoner.[12] Another study from the University of California, Irvine's Center for Evidence-Based Corrections, cited in the NIC policy report, found that fifty-nine percent of transgender prisoners surveyed reported having experienced sexual assault during their time in prison, a staggering number that is thirteen times greater than the general population sample.[13]

---

[11] *See generally id.*

[12] *See* Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables*, at 2 tbl. 1 (2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf (stating that in a 2011–2012 survey of transgender adult inmates housed in state and federal prisons, 39.9% were victims of sexual assault); Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, at 8–9 (2013), https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf (finding that the overall rate of sexual assault for the adult prison population during the same year was 4.0%).

[13] *See* Nat'l Inst. of Corr., *supra* note 3, at 11; Valerie Jenness, *et al.*, *Violence In California Correctional Facilities: An Empirical Examination Of Sexual Assault*, Center for Evidence-Based Corrections 27 (Apr. 27 2007), https://bpb-us-e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/Jenness-et-al._PREA-Report.pdf.

These statistics make clear that "[e]ven when compared to other relatively vulnerable populations, transgender people are perilously situated."[14]

Particularly relevant to this case, it is common knowledge within the corrections profession that transgender women are at a substantial risk of harm in men's prisons. As the NIC has specifically recognized, "[c]orrections officials are aware" of the particular vulnerabilities faced by transgender prisoners, including that "transgender women housed with men are at extremely high risk for abuse."[15] In particular, the corrections community has specifically been made aware of the elevated risk of sexual assault for transgender prisoners through the Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. § 30301 *et seq.*, and its implementing regulations. PREA was passed unanimously after Congress found that prison rape had reached "epidemic" levels, causing grave and lasting harm to its victims and endangering the safety of other prisoners, staff, and the general public. *See* 34 U.S.C. § 30301(7)–(15). Among other goals, the statute sought to "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States," 34 U.S.C. § 30302(1); mandate significant research of the issue, 34 U.S.C. § 30302(4)–(6); and require that the National Prison Rape Elimination Commission

---

[14] Nat'l Inst. of Corr., *supra* note 3, at 11 (quotation marks omitted).

[15] *Id*. at 12 (quotation marks omitted).

draft standards to prevent and eliminate prison rape, 34 U.S.C. §§ 30302(3), 30306(e).

Since PREA's passage two decades ago, the national standards that Congress mandated the National Prison Rape Elimination Commission to develop after extensive study have been implemented as regulations. *See* 28 C.F.R. Part 115. These include standards regarding the training of corrections staff and screening of prisoners for risk of victimization or abuse. Thus, PREA's implementing regulations ("PREA National Standards") state that "[t]he agency shall train all employees who may have contact with inmates on . . . [t]he dynamics of sexual abuse and sexual harassment in confinement." 28 C.F.R. § 115.31. The trainings developed by the National PREA Resource Center, which is managed through a cooperative arrangement with the Bureau of Justice Assistance within the Department of Justice, are designed to fulfill this requirement.[16] And, relevant here, the National PREA Resource Center notes that the purpose of the PREA National Standards is to "reduce the risk of inmate-on-inmate sexual abuse and sexual harassment," including by

---

[16] Nat'l PREA Res. Ctr., *National PREA Resource Center Fact Sheet* (May 2014), available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/PRC-FS.pdf.

"[p]roviding additional protections for transgender . . . inmates, based on the unique risks these populations face[.]"[17]

Thus, the PREA National Standards specifically recognize the dangers to transgender prisoners. When screening individuals for their risk status upon entering a facility, officers must determine "[w]hether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming." 28 C.F.R. § 115.41(d)(7). Further, with respect to housing assignments, the PREA National Standards require that the decision "whether to assign a transgender . . . inmate to a facility for male or female inmates" be made on a "case-by-case basis" to "ensure the inmate's health and safety," 28 C.F.R. § 115.42(c). This housing placement must be reassessed at least twice a year "to review any threats to safety experienced by the inmate." *Id.* § 115.42(d). Critically, the PREA National Standards also require that a "transgender or intersex inmate's own views with respect to his or her safety shall be given serious consideration." *Id.* § 115.42(e).

In addition to these federal regulations, publications of professional corrections organizations also reflect the consensus among corrections officials that incarcerated transgender individuals face an elevated risk of harm. For example, the

[17] Nat'l PREA Res. Ctr., *PREA Standards: § 115.42 Use of screening information and Placement of residents*, https://www.prearesourcecenter.org/standard/115-42.

American Correctional Association, the oldest and largest trade association and accrediting body for the corrections industry, has published articles and made presentations highlighting the vulnerability of transgender prisoners. These presentations note that transgender prisoners are "statistically at an increased risk of sexual victimization"[18] and describe strategies for officers to keep transgender prisoners safe in their housing.[19] Similarly, the National Commission on Correctional Health Care has issued a position statement on transgender and gender non-conforming prisoners acknowledging that members of this group are "common targets for violence" and that staff should therefore "periodically assess the safety of transgender patients," including by taking "appropriate safety measures regarding housing[.]"[20]

There is no question, then, that, in the setting of men's prisons, transgender women experience daily harassment, abuse, and a statistically documented, serious risk of physical and sexual harm. But beyond that reality, those like Plaintiffs in this

[18] David Radziewicz & Carole A. Mattis, *A Best Practice Approach: Providing Support Services to Transgender Inmates*, Am. Corr. Assoc., Corrections Today (July/Aug. 2018), bit.ly/46LMoAr.

[19] Am. Corr. Assoc., Off. of Corr. Health Res. Ctr., *A Special Session Webinar, Transgender Care In Corrections: Where We Are And Where We're Going* (2018), https://perma.cc/C8W7-K263.

[20] Nat'l Comm'n on Corr. Health Care, *Position Statement: Transgender And Gender Diverse Health Care in Correctional Settings* 4–5 (2020), https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf.

case stand out as among the most vulnerable even in that group. As government statistics, regulations, and reports make clear, transgender women who have previously been victimized, as Plaintiffs have, are at a significantly heightened risk of harm. Thus, the most recent Bureau of Justice Statistics data reflects that prisoners who were sexually assaulted before entering their current facility were sexually assaulted by another inmate at their current facility at a rate twenty (20) times higher than those who had not been previously victimized.[21] That, of course, is the case here, where the district court found that multiple Plaintiffs in this matter have been previously assaulted and/or raped in BOP men's facilities. *See* Appellees' Br. 19–20. This is not unusual: the National Prison Rape Elimination Commission also highlighted past victimization as a key risk factor for sexual abuse in prison, and thus recommended that "prior sexual victimization" be among the criteria used to screen inmates for risk of sexual abuse.[22] Accordingly, the PREA National Standards require corrections officials to screen all inmates for prior experiences of sexual abuse as part of their assessment of the inmate's risk of sexual victimization, 28

---

[21] Bureau of Just. Stats., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, *supra* note 12, at 18 tbl. 8 (finding that 12.0% of prisoners who had been victims of sexual assault prior to coming to their current facility reported being sexually assaulted by another inmate at the current facility, while only 0.6% of the population that had not previously been victimized reported sexual assault by another inmate at the current facility).

[22] 2009 Commission Report, *supra* note 2, at 75.

C.F.R. § 115.41(d)(8), and to consider this information when determining appropriately safe housing for that inmate, 28 C.F.R. § 115.42(a).

In this way too, *Amici*'s experience and expertise teaches that diligent individualized evaluation and discretion is necessary to determine the housing placement that will protect transgender women from the known risk of serious harm. This determination of whether to house transgender women in women's facilities should, then, be left to prison officials' sound discretion, as opposed to being mandated by a sweeping order that removes that discretion and runs the risk of not only constitutional violations, as discussed below, but of real, horrific harm to Plaintiffs and those similarly situated.

## II. THE EXECUTIVE ORDER'S MANDATE TO TRANSFER VULNERABLE TRANSGENDER INDIVIDUALS LIKE PLAINTIFFS TO MEN'S FACILITIES IS CONTRARY TO CORRECTIONS OFFICIALS' FUNDAMENTAL RESPONSIBILITY UNDER THE EIGHTH AMENDMENT TO PROTECT PARTICULARLY VULNERABLE PRISONERS.

Corrections officials have the responsibility to take precautions to protect prisoners whom they know are vulnerable to significant risks of harm. Protecting particularly vulnerable groups from significant risks of harm is not merely a matter of best practices—it is a fundamental and constitutionally mandated requirement of the job. And, significantly, it is critical to the safety of prisoners and correctional officers more generally.

First, the Supreme Court has long made clear that where corrections officials are aware of the risk of harm to a particular prisoner but act in a way that is deliberately indifferent to such risk of harm, they violate the constitutional rights of that individual under the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994) ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." (citation omitted)); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976) ("Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action."). This includes preventing transgender individuals from the risk of sexual assault. *Farmer*, 511 U.S. at 848–49 (describing evidence of prison officials' knowledge that transgender woman was at risk of sexual assault in a men's prison).

In the context of housing assignments, the PREA National Standards likewise require corrections officials to protect prisoners who may be vulnerable to sexual abuse: officials must select a transgender prisoner's housing placement based not upon sex assigned at birth, but upon which placement would effectively protect the prisoner's "health and safety." 28 C.F.R. § 115.42(c). That decision must take into account the person's "risk of being sexually abused," 28 C.F.R. § 115.41(a), which requires consideration of factors including gender identity, "physical build," one's "own perception of vulnerability," whether the person has "previously experienced sexual victimization," and the person's "own views with respect to his or her own

safety." 28 C.F.R. §§ 115.41(d)(3)–(9), 115.42(e). Given the widely known, extremely high risks of sexual abuse that transgender women face in men's prisons, corrections officials must therefore have discretion to place such individuals in women's prisons—as they did, before Executive Order 14168, with regard to each of the Plaintiffs in this case, Appellees' Br. 4—if they are to fulfill these obligations to protect prisoners facing a known risk of harm.

The Executive Order strips this discretion from Bureau of Prisons corrections officials and, in doing so, violates statutory, regulatory, and constitutional mandates. That is, the Executive Order not only forces corrections officials to reverse their prior decisions to house Plaintiffs in women's prisons—made after careful consideration of unique threats to Plaintiffs' safety—it also strictly cabins their discretion going forward, requiring them to house all transgender women in men's facilities, without regard to the factors they must consider under the law, including the PREA National Standards, when making housing determinations. Most significantly, Executive Order 14168 requires them to do that which the Constitution specifically prohibits: to "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *see also Hope v. Pelzer*, 536 U.S. 730 (2002) (holding that an official violated the rights of a prisoner by acting with deliberate indifference to a substantial risk of physical harm); *Helling v. McKinney*, 509 U.S. 25 (1993)

(establishing that contemporary standards of decency require that the State provide for a person's reasonable safety when it has incarcerated them); Sharon Dolovich, *Cruelty, Prison Conditions, and the Eighth Amendment*, 84 N.Y.U. L. Rev. 881, 915 (2009) ("To force prisoners to live in constant fear of violent assault, under conditions in which many of the most vulnerable among them can expect that fear to be realized, is to inflict a form of physical and psychological suffering akin to torture." (citations omitted)).

Moreover, Executive Order 14168—and the Government's position that the Eighth Amendment permits it to house transgender inmates in men's facilities without exception—is likely to make prisons more unsafe generally, even as it further exacerbates the substantial risk of harm to transgender women in prisons. This is so because, as *Amici* know from their extensive experience working in prisons, when corrections officials listen to the concerns of vulnerable groups and take precautions to protect them, such as monitoring their safety, they increase their legitimacy as authority figures. *See* Benjamin Steiner & John Wooldredge, *Examining the Sources of Correctional Officer Legitimacy*, 105 J. Crim. L. & Criminology 679, 683–84 (2015) (explaining that "correctional officer legitimacy [is] a multidimensional concept involving . . . inmates' general perceptions of officers' procedural fairness, distributive fairness, and effectiveness."). On the other hand, when corrections officials do not protect vulnerable groups in their care, they

lose some of their legitimacy as authority figures. *Id.* at 701 ("Inmates who felt more vulnerable as a result of experiencing victimization may have lost faith in the correctional officers' abilities and/or willingness to keep them safe."). And as *Amici* also know, where correctional officers' legitimacy in a prison is questioned, prisons are less safe for prisoners and officers alike. *Id.* at 684 (noting that correctional officer legitimacy is linked to increased order and safety, as well as increased likelihood of reform); *see also* Lawrence W. Sherman, *Defiance, Deterrence, and Irrelevance: A Theory of the Criminal Sanction*, 30 J. Res. Crime & Delinq. 445, 460–61 (1993) (describing that a perceived lack of legitimacy of a sanctioning agent, such as a prison official, is likely to inspire defiance of the law).

In sum, Executive Order 14168 harms not only Plaintiffs but everyone in the prison settings where it is enforced, because it undermines corrections officers' discretion and legitimacy, and prevents them from fulfilling all of their responsibilities, including but not limited to their constitutional mandate to protect vulnerable prisoners.

## III. NEITHER PROTECTIVE CUSTODY NOR LOWER SECURITY MEN'S PRISONS IS AN APPROPRIATE HOUSING ASSIGNMENT FOR PLAINTIFFS.

Implicitly conceding the vulnerability of transgender women—and, in particular, Plaintiffs—in men's prisons, the Government suggests that it has complied with the Constitution through "consideration of and attempts to mitigate

any such risk." Appellants' Br. 53. This includes assigning Plaintiffs to "low-risk medical facilities," *id.* at 21, and "where necessary, using protective custody or restrictive housing," *id.* at 53. The Government further argues that the "extremely low rates of assault" at these men's facilities justifies its decision-making. *Id.* at 43.

But this argument does not address Plaintiffs' unique situation. Whatever the *overall* rates of physical and sexual assault at lower security men's prisons, they do not reflect the risks that transgender women, specifically, experience in such prisons, much less these particular Plaintiffs. As explained above, the National Prison Rape Elimination Commission and others who have researched the issue have consistently found that transgender women experience significantly greater rates of victimization than the general population does in men's prisons—and the Commission did not note any exception to this finding for lower security men's prisons. *See supra* at Section I. In this regard, the district court was correct in rejecting the Government's statistics-based argument because "the relevant question is not the baseline rate of assault at the destination facility but the elevated risk that each Plaintiff—as a newly arrived, visibly transgender woman coming from a woman's prison—would face there." JA595.

Lower security men's prisons do not alleviate the serious risks to Plaintiffs because it is ultimately the reality of life in men's prisons that risks the safety of transgender women, regardless of security classification. Moreover, lower security

men's prisons often have dormitory-style housing where individuals sleep in bunk beds, in the open, without any partitions, and within feet of other individuals.[23] In this setting, transgender women are "automatic targets" for harassment and violence.[24] Indeed, resources from the National PREA Resource Center have highlighted the risks of violence in dormitory-style housing because of the increased exposure between incarcerated individuals, noting that there is "an extensive history of violence in dormitories" that causes some individuals to choose to sleep fully dressed, including in shoes, to protect against assaults while others join gangs for protection, and that gang activity is problematic, "particularly in the dormitory setting where there are approximately 100 inmates to provide support to one another."[25] Moreover, there are often fewer corrections officers in lower security men's facilities, and parts of dormitories that go unmonitored by staff, reducing the

---

[23] *See* Fed. Bureau of Prisons, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp (stating that minimum-security Bureau of Prisons facilities have "dormitory housing" and "a relatively low staff-to-inmate ratio"; low-security facilities have "mostly dormitory or cubicle housing" and a higher staff-to-inmate ratio; medium-security prisons have "mostly cell-type housing" and an "even higher staff-to-inmate ratio than low security FCIs"; and high-security facilities have "multiple- and single-occupant cell housing" with "the highest staff-to-inmate ratio."

[24] Dolovich, *supra* note 6, 48 Am. Crim. L. Rev. at 18.

[25] James Peguese and Robert Koppel, *Managing High-Risk Offenders In Prison Dormitory Settings* Nat'l PREA Res. Ctr, (July 2003), https://www.prearesourcecenter.org/sites/default/files/library/managinghighriskoffendersinprisondormitorysettings.pdf.

possibility that acts of violence can be prevented or quickly interrupted by corrections officials and thus increasing the risk of harm to transgender women in these prisons.[26] The district court thus correctly credited Plaintiffs' expert, whose uncontroverted testimony explained "that the 'severely elevated risks of sexual abuse' that transgender women face in men's prisons is 'well understood within the field of corrections and is not meaningfully disputed among practitioners responsible for classification, housing, or PREA compliance.'" JA597 (quoting declaration of Dr. Alix McLearen).

The Government's argument that corrections officials can ensure the safety of transgender women in men's prisons by removing them from general population and placing them in protective custody fares no better. As set forth above, the risks to transgender women in men's prisons are ongoing and constant, not episodic. Thus, in effect, this solution amounts to the use of protective custody as a long-term housing solution for Plaintiffs.[27] This is highly problematic: prolonged solitary

---

[26] Fed. Bureau of Prisons, *supra* note 23; Peguese & Koppel, *supra* note 25 (noting that dormitory-style housing is often patrolled by an officer on a catwalk overlooking the dorm, but that "dorms have blind spots, such as bathrooms and showers, that obstruct an officer's view").

[27] Indeed, this practice is all too common: a Vera Institute of Justice report found that nearly ninety percent of surveyed transgender prisoners had experienced extended solitary confinement while incarcerated. Kelsie Chesnut & Jennifer Peirce, *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars*, Vera Inst. of Just. (Feb. 2024), https://vera-

confinement can cause harm equivalent to that of torture—and in fact, *is* considered torture by human rights experts[28]—particularly for vulnerable individuals, such as transgender women, who have already been victimized in other ways.[29] Moreover, the PREA National Standards explicitly prohibit the involuntary segregation of transgender prisoners "unless an assessment of all available alternatives has been made." 28 C.F.R. § 115.43(a).

Indeed, courts throughout the country have identified significant constitutional concerns with the prolonged use of solitary confinement. In *Porter v. Pa. Dep't of Corr.*, for example, the Third Circuit concluded that prolonged solitary confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage" and thus "poses a substantial risk of psychological and physical harm" needed to prove an Eighth Amendment violation. 974 F.3d 431, 441–42 (3d Cir. 2020) (quoting

---

institute.files.svdcdn.com/production/downloads/publications/advancing-transgender-justice.pdf.

[28] *See Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* ¶ 60, 9 Aug. 2013, https://www.hr-dp.org/files/2015/07/23/Interim_report_of_the_Special_Rapporteur,_2013.pdf.

[29] *See* Nat'l Ctr. For Transgender Equal., *LGBTQ People Behind Bars: A Guide To Understanding The Issues Facing Transgender Prisoners And Their Legal Rights* 6 (2018), https://transequality.org/sites/default/files/docs/resources/TransgenderPeopleBehindBars.pdf; *see generally* Erica Bryant, *Violence, Torture, and Isolation: What It's Like to Be Trans in Prison*, Vera Inst. of Just. (Nov. 17, 2022), https://www.vera.org/news/violence-torture-and-isolation-what-its-like-to-be-trans-in-prison.

*Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017)). Other Courts of Appeals are in accord. *See, e.g.*, *Porter v. Clarke*, 923 F.3d 348, 353 (4th Cir. 2019) (affirming district court holding that "death row inmates' long-term detention in conditions amounting to solitary confinement" violated Eighth Amendment); *Meriwether v. Faulkner*, 821 F.2d 408, 416–17 (7th Cir. 1987) (holding that solitary confinement may violate the Constitution, particularly when "feasible alternatives" to solitary confinement exist); *Sheley v. Dugger*, 833 F.2d 1420, 1429 (11th Cir. 1987) (noting that punitive solitary confinement may violate the Eighth Amendment if it shocks the conscience, is grossly disproportionate to the offense, or is totally without penological justification).[30]

In sum, the Government's proposed alternatives to housing Plaintiffs in women's facilities do not demonstrate that it has "responded reasonably to the risk" that Plaintiffs face, as the Eighth Amendment requires. *Farmer*, 511 U.S. at 844. In *Amici*'s view, it has not.

---

[30] This does not mean that prison officials could not use appropriate individualized discipline, separation orders, and temporary restrictive housing, if Plaintiffs or other transgender women commit misconduct while in women's prisons. *See generally* 28 C.F.R. § 541.1 *et seq.* (setting forth BOP's inmate discipline program). The Government therefore cannot credibly complain that the district court opinion deprives it of the tools it needs to combat any action that "compromises the safety and privacy of female inmates in BOP's custody." Appellants' Br. 30. These tools can also address the concerns raised in the *Amici* brief of Brenda Leigh Kirk, et al., about specific acts of misconduct purportedly engaged in by incarcerated transgender women.

## CONCLUSION

The Eighth Amendment, the Prison Rape Elimination Act and its implementing regulations, and sound correctional practice all require corrections officials to protect vulnerable prisoners, including transgender women, from sexual abuse and other harm. *Amici*'s training and experience teaches that corrections officials must have discretion to house transgender women in women's prisons to protect them from sexual abuse and other harm. Executive Order 14168 forbids corrections officials from exercising such discretion, in violation of both the requirements of their jobs and their basic obligations under the Constitution. For all of these reasons, and those set forth by Plaintiffs-Appellees, this Court should affirm the judgments below, which would in turn enable corrections officials to continue protecting the most vulnerable prisoners in their care and maintain the integrity of *Amici*'s profession.

Dated: September 29, 2026

Respectfully submitted,
s/ Lawrence S. Lustberg

Lawrence S. Lustberg
Michael R. Noveck
FBT GIBBONS LLP
One Gateway Center
Newark, NJ 07102-5310
Phone: 973-596-4500
llustberg@fbtgibbons.com

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5), because it contains 6,364 words, calculated by the word processing system used in its preparation (Microsoft Word), and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: September 29, 2026

s/ Lawrence S. Lustberg

Lawrence S. Lustberg

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2026, I caused a true copy of the foregoing to be filed through the Court's CM/ECF system, which will automatically serve all counsel of record.

Dated: September 29, 2026 s/ Lawrence S. Lustberg

Lawrence S. Lustberg