**SCHEDULED FOR ORAL ARGUMENT ON NOVEMBER 20, 2026**

**Nos. 26-5238, 26-5311 (consol.)**

# In the United States Court of Appeals for the District of Columbia Circuit

JANE DOE, et al.,
Plaintiffs-Appellees,
*v.*
TODD BLANCHE, in his official capacity as Attorney General of the United States, And WILLIAM K. MARSHALL, III, in his official capacity as director of the Federal Bureau of Prisons,
Defendants-Appellants,

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA*

## AMICUS BRIEF OF DEE DEIDRE FARMER, LAMBDA LEGAL DEFENSE & EDUCATION FUND, ADVOCATES FOR TRANSGENDER EQUALITY EDUCATION FUND, THE TRANSGENDER LAW CENTER, AND THE CENTER FOR CONSTITUTIONAL RIGHTS IN SUPPORT OF APPELLEES

RICHARD SAENZ
WHIT WASHINGTON
LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC.
*120 Wall Street, 19th Floor*
*New York, NY 10005*
*(212) 809-8585*

SASHA BUCHERT
LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC.
*815 16th St. NW, Suite 4140*
*Washington, DC 20006*
*(202) 804-6245*

JAMES N. SASSO
RHOCHELLE T. KRAWETZ
WILLIAMS & CONNOLLY LLP
*680 Maine Ave SW*
*Washington, DC 20024*
*(202) 434-5000*
*jsasso@wc.com*
*rkrawetz@wc.com*

## DISCLOSURE STATEMENT AND RULE 29 DISCLOSURES

No *amicus* has any parent corporation, nor any publicly held corporations owning more than 10% of its stock.

Pursuant to Federal Rule of Appellate Procedure 29, counsel for *amici* represent that all parties have consented to the filing of this *amicus* brief. Counsel further certifies that none of the parties or their counsel authored the brief in whole or in part, nor did any other person or entity other than *amici* or their counsel make any monetary contribution intended to fund the preparation or submission of this brief.

*Amici* listed on this brief respectfully submit that a separate *amicus* brief is necessary under D.C. Circuit Rule 29(d) because *amici* have unique expertise in the dangerous conditions that incarcerated transgender women face in prisons—especially men's prisons—and how the courts, Congress, and the Department of Justice ("DOJ") have previously evaluated or addressed those risks. Ms. Farmer was the plaintiff in *Farmer v. Brennan*, and *amici* organizations on this brief all have experience litigating to protect the rights of transgender and incarcerated people. *Amici* are unaware of others intending to participate as *amici* in this matter who will address the same issues.

**TABLE OF CONTENTS**

Page

INTEREST OF *AMICI* CURIAE ............................................................... 1

INTRODUCTION ..................................................................................... 4

ARGUMENT ............................................................................................ 6

I. The Eighth Amendment Protects Incarcerated People from Officials' Deliberate Indifference to the Risk of Sexual Violence............................ 6

II. There Is an Obvious and Substantial Risk of Sexual Violence Against Incarcerated Transgender Women in Men's Facilities. ........................... 8

A. Courts have found that transgender women face a substantial risk of sexual assault, rape, and violence in men's facilities........... 8

B. Congress found that transgender people are particularly vulnerable to sexual violence in prison in enacting the Prison Rape Elimination Act. ...................................................... 11

C. The Department of Justice has repeatedly found that transgender women face a heightened risk of sexual assault in male prisons. ........................................................................... 14

CONCLUSION........................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026) .......... 19

*Doe v. District of Columbia*, 215 F. Supp. 3d 62 (D.D.C. 2016) .......... 8, 9

*Doe v. Wash. State Dep't of Corr.*,
2021 WL 2453099 (E.D. Wash. May 17, 2021), *appeal dismissed,* No. 21-35453 (9th Cir. Feb. 4, 2022) .......... 9

*Farmer v. Brennan*, 511 U.S. 825 (1994) .......... 4, 6, 7, 8, 11

*Gilliam v. Dep't of Pub. Safety & Corr. Servs.*,
2024 WL 5186706 (D. Md. Dec. 20, 2024) .......... 9, 10

*Helling v. McKinney*, 509 U.S. 25 (1993) .......... 8, 20

*Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999) .......... 10

*Tay v. Dennison*, 457 F. Supp. 3d 657 (S.D. Ill. 2020) .......... 10

*Unique v. Claybaugh*, 712 F. Supp. 3d 1265 (N.D. Cal. 2024) .......... 10

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) .......... 7

*Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*,
93 F.3d 910 (D.C. Cir. 1996) .......... 8

*Zollicoffer v. Livingston*, 169 F. Supp. 3d 687 (S.D. Tex. 2016) .......... 10

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. amend. VIII .......... 4, 5, 6, 7, 8, 9, 11

Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301 *et seq.*
§ 30301 .......... 11
§ 30302 .......... 11, 14
§ 30303 .......... 14
§ 30306 .......... 14
§ 30307 .......... 13

28 C.F.R.
§ 115.15 .......... 13
§ 115.31 .......... 13, 14
§ 115.41 .......... 12
§ 115.42 .......... 12
§ 115.86 .......... 13

77 Fed. Reg. 37,106 (June 20, 2012) .......... 12

## OTHER AUTHORITIES

Allen J. Beck et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12* (Bureau of Just. Stats. 2013) .......... 5, 17

Allen J. Beck, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12: Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates* (Bureau of Just. Stats. 2014) .......... 5

Amanda Graham, *Built Binary: Rethinking the Incarceration of Transgender Individuals Within a Dual-Gendered Prison System*, 58 Ga. L. Rev. 1307 (2024) .......... 18

Emily D. Buehler & Shelby Kottke-Weaver, *Sexual Victimization Reported by Adult Correctional Authorities, 2019–2020 – Statistical Tables*, U.S. Dep't of Just. (2024) .......... 16

Fed. Bureau of Prisons, U.S. Dep't of Just., *Federal Bureau of Prisons Annual PREA Report: Calendar Year 2018* (2019) .......... 16

Fed. Bureau of Prisons, U.S. Dep't of Just., *Sexually Abusive Behavior Prevention and Intervention Program Manual* (Mar. 19, 2026), https://www.bop.gov/policy/progstat/5324_012.pdf .......... 13

Fed. Bureau of Prisons, U.S. Dep't of Just., *Statistics*, https://www.bop.gov/about/statistics/population_statistics.jsp#old_pops ........ 16

Federica Coppola, *Gender Identity in the Era of Mass Incarceration: The Cruel and Unusual Segregation of Trans People in the United States*, 21 Int'l J. Const. Law 649 (2023) ........ 18

Ilan H. Meyer et al., *Erasure of Anti-Trans Violence Data in the United States*, 13 LGBT Health 69 (2026) ........ 17

Just Det. Int'l, *Targets for Abuse: Transgender Inmates and Prison Rape* (2013), https://web.archive.org/web/20240123102952/https://justdetention.org/wp-content/uploads/2015/10/FS-Targets-For-Abuse-Transgender-Inmates-And-Prisoner-Rape.pdf. ........ 18

Memorandum from Tammie M. Gregg, Principal Deputy Dir., Bureau of Justice Assistance, U.S. Dep't of Just., to All DOJ-Certified PREA Auditors, re: National PREA Standards Alignment with Executive Order 14168 (Dec. 2, 2025), filed as Ex. A to Compl., *Poe v. DOJ*, No. 1:26-cv-01552 (D.D.C. May 6, 2026), ECF No. 1-1 ........ 17

Nat'l Ctr. For Transgender Equality, *2015 U.S. Transgender Survey* (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ........ 18

Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* (2009), https://www.prearesourcecenter.org/sites/default/files/library/NPREC-Final-Report.PDF ........ 14, 15

Off. for Victims of Crime, Off. of Just. Progs., U.S. Dep't of Just., *Responding to Transgender Victims of Sexual Assault* (June 2014), https://web.archive.org/web/20250117162658/https://ovc.ojp.gov/sites/g/files/xyckuh226/files/pubs/forge/sexual_numbers.html#victims ........ 15

Press Release, U.S. Dep't of Just., *Justice Department Releases Final Rule to Prevent, Detect and Respond to Prison Rape* (May 17, 2012), http://www.justice.gov/opa/pr/2012/May/12-ag-635.html ........ 12

Statement of Interest of the United States, *Diamond v. Ward*, No. 5:20-cv-00453 (M.D. Ga. Apr. 22, 2021), ECF No. 65 ....................................15

Vera Inst. of Just., *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars* (Feb. 2024), https://justdetention.org/wp-content/uploads/2015/10/FS-Targets-For-Abuse-Transgender-Inmates-And-Prisoner-Rape.pdf. .......................19

## INTEREST OF *AMICI* CURIAE

**Dee Deidre Farmer** is the first openly transgender plaintiff to bring a case before the United States Supreme Court in the landmark case *Farmer v. Brennan*, 511 U.S. 825 (1994). Her case has been relied on in thousands of cases concerning liability of prison officials who acted with deliberate indifference to a substantial risk of serious harm to an incarcerated person and was a major catalyst for the federal Prison Rape Elimination Act, which was signed into law in 2003. Ms. Farmer continues to advocate for incarcerated people and her interest in this case is to ensure the proper application of *Farmer v. Brennan* by the courts.

**Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal")** is the oldest and largest national legal organization committed to achieving full recognition of the civil rights of LGBTQ+ people and everyone living with HIV through impact litigation, education, and public policy work. Lambda Legal works to identify and address the particular vulnerabilities of and disparities experienced by LGBTQ+ people in carceral settings and the criminal legal system more broadly. This work includes conducting and authoring Protected and Served?, a 2022 community survey and report on the high rates of discrimination and bias experienced by LGBTQ+ people and people living with HIV throughout the criminal legal system, and having appeared as counsel or *amicus curiae* in numerous cases involving the rights of

incarcerated transgender people to medically necessary health care, equal treatment, and protection from harm. *See, e.g.*, *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687 (S.D. Tex. 2016) (transgender woman validly alleged that defendants knew of and disregarded a substantial risk of sexual assault based on their knowledge of prison sexual assault statistics, including the particular vulnerability of gay and transgender people); *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) (striking down Wisconsin statute barring medical treatment for incarcerated people with gender dysphoria including hormone therapy and surgery); *Edmo v. Corizon, Inc.*, 949 F.3d 489 (9th Cir. 2020) (prison's failure to provide medically necessary gender affirming surgery was unconstitutional deliberate indifference).

**Advocates for Transgender Equality Education Fund ("A4TE")** is a nonprofit organization dedicated to advocating for the rights of transgender and nonbinary individuals across the United States. A4TE, through its predecessor organizations the National Center for Transgender Equality and the Transgender Legal Defense and Education Fund, has appeared as an *amicus* in cases regarding transgender rights in a wide range of state and federal courts at all levels. A4TE seeks to achieve full lived equality for the transgender and nonbinary community through impact litigation, policy advocacy, and education. A4TE's efforts focus on critical areas such as employ-

ment, health care, housing, conditions of confinement, education, identity documents, and public accommodations.

**Transgender Law Center ("TLC")** is the largest national trans-led organization advocating self-determination for all people. Since 2002, TLC has been organizing, assisting, informing, and empowering thousands of individual community members toward a long-term, national, trans-led movement for liberation. It also pursues impact litigation and policy advocacy to defend and advance the rights of transgender and gender nonconforming people, transform the legal system, minimize immediate threats and harms, and educate the public about issues impacting our communities. TLC has been counsel in groundbreaking transgender prisoners' rights cases addressing the very issues raised in this brief.

**The Center for Constitutional Rights ("CCR")** is a national, not-for-profit legal, educational and advocacy organization dedicated to protecting and advancing rights guaranteed by the United States Constitution and international law. Founded in 1966 to represent civil rights activists in the South, CCR has litigated landmark civil and human rights cases challenging arbitrary and discriminatory state policies, including policies that disproportionately impact incarcerated LGBTQIA+ people.

## INTRODUCTION

The Eighth Amendment to the U.S. Constitution prohibits the government from inflicting "cruel and unusual punishment." U.S. Const. amend. VIII. As the Supreme Court has recognized, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted).

In the decision below, the district court credited Plaintiffs' expert Dr. Alix McLearen's "assert[ion] that the 'severely elevated risks of sexual abuse' that transgender women face in men's prisons is 'well understood within the field of corrections and is not meaningfully disputed among practitioners responsible for classification, housing, or [Prison Rape Elimination Act] compliance,'" JA597, and based on an individualized assessment concluded that the individual Plaintiffs here had shown individual histories, circumstances, and characteristics that make them especially vulnerable. The district court's findings were consistent with decades of facts and law confirming that incarcerated transgender women who are housed in men's facilities are at a substantial risk of rape, sexual assault, and other violence. The pervasiveness of violence against transgender women in custody is clearly and widely recognized, and the risk of physical and psychological harm is obvious.

Federal laws and the Eighth Amendment prohibit the government's indifference to the sexual violence transgender people are likely to face in custody, and require officials to conduct individualized assessments to protect them from this well-known threat. Indeed, the U.S. Department of Justice ("DOJ") itself has long recognized that nearly 40% of incarcerated transgender people housed in state and federal prisons reported experiencing sexual victimization—a rate *ten times higher* than that reported by other incarcerated people. Allen J. Beck, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates* tbl. 1 (Bureau of Just. Stats. 2014) ("Beck 2014"); Allen J. Beck et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, at 8 (Bureau of Just. Stats. 2013) ("Beck 2013").

The district court did not err in concluding that Plaintiffs were likely to succeed on their Eighth Amendment claims. The Plaintiffs were individually assessed and assigned to women's facilities based on an extensive review of their distinctive circumstances. Each has resided successfully in a women's facility for a long period of time; some have *only* ever been housed in women's facilities. The Constitution requires officials to consider the specific risks these women face based on their individual circumstances, especially in light of the obvious and substantial baseline risk of sexual violence against

transgender women who are housed in men's prisons. Indeed, every branch of our government has for years recognized that transgender women housed in men's prisons face special and serious risks and are at substantial risk of sexual victimization. The district court correctly applied that conclusion given Plaintiffs' individualized circumstances.

## ARGUMENT

### I. The Eighth Amendment Protects Incarcerated People from Officials' Deliberate Indifference to the Risk of Sexual Violence.

More than thirty years ago, in a foundational case involving a transgender woman who was assaulted in a Federal Bureau of Prisons ("BOP") men's facility in Indiana, the Supreme Court made clear that the Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to protect people in their custody from sexual and other violent assaults by other incarcerated people. *Farmer*, 511 U.S. at 834.

In 1989, the BOP incarcerated Dee Farmer, a Black transgender woman, in a men's penitentiary in Terre Haute, Indiana, despite Ms. Farmer's well-known vulnerability to violence and sexual abuse. *Id.* at 829-31. After she was brutally raped and beaten while housed in the prison's general population, Ms. Farmer sued to vindicate her rights.

On June 6, 1994, the Supreme Court held that people who are denied humane conditions while incarcerated due to the "deliberate indifference" of

prison officials suffer cruel and unusual punishment under the Eighth Amendment. *Id.* at 832-33. While "[p]rison conditions may be 'restrictive and even harsh,' . . . gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objective.'" *Id.* at 833 (citation omitted).

In the words of Justice Blackmun, *Farmer* sent "a clear message to prison officials that their affirmative duty under the Constitution to provide for the safety of [incarcerated people] is not to be taken lightly" and made plain that, when vulnerable populations in carceral settings face an obvious and substantial risk of violence, "prison officials must fulfill their affirmative duty under the Constitution to prevent inmate assault including prison rape, or otherwise face a serious risk of being held liable for damages." *Id.* at 852, 858 (Blackmun, J., concurring).

Under this well-settled standard, prison officials violate the Eighth Amendment when they demonstrate deliberate indifference to a substantial risk of serious harm—that is, when they "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Id.* at 837. This deliberate-indifference standard is "an objective standard": "It simply means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the [government] may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (citing *Farmer*, 511 U.S. at 841). It is sufficient

that prison conditions "pose an unreasonable risk of serious damage" to an inmate's future health. *Helling v. McKinney*, 509 U.S. 25, 35 (1993). In the wake of *Farmer*, courts have concluded that the substantial risk of sexual assault in prison is "without question a deprivation of rights 'sufficiently serious' to violate the Eighth Amendment." *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 74 (D.D.C. 2016) (citing *Farmer*, 511 U.S. at 852-53); *see also Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 93 F.3d 910, 929 (D.C. Cir. 1996) (affirming district court finding that a pattern of sexual assault "rose to the level of objective cruelty that violated the Eighth Amendment").

## II. There Is an Obvious and Substantial Risk of Sexual Violence Against Incarcerated Transgender Women in Men's Facilities.

As a result of the *Farmer* decision, the public dialogue about prison rape and the legal landscape for prison assault cases transformed dramatically. In the years that followed, courts, Congress, and the DOJ itself acknowledged and documented the well-known and pervasive risk that incarcerated transgender women face in men's prisons.

### A. Courts have found that transgender women face a substantial risk of sexual assault, rape, and violence in men's facilities.

Courts have consistently recognized that transgender people are "an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." *Farmer*, 511 U.S. at 843. This is particularly the case when transgender women are housed in men's facilities—as many of Plaintiffs'

own experiences tragically attest. Indeed, in assessing Eighth Amendment claims similar to those at issue here, "[c]ourts have routinely found that transgender prisoners are at increased vulnerability to abuse in the prison systems." *Doe v. Wash. State Dep't of Corr.*, 2021 WL 2453099, at *4 (E.D. Wash. May 17, 2021), *appeal dismissed,* No. 21-35453 (9th Cir. Feb. 4, 2022).

For example, in *Doe v. District of Columbia,* the U.S. District Court for the District of Columbia held that a jury could find that the plaintiff was at identifiable risk of harm because she was a "young, small, feminine transgender inmate with breasts." 215 F. Supp. 3d at 75. Those specific features, taken cumulatively with "evidence that transgender women as a class face a heightened risk of prison rape," provided sufficient evidence for a reasonable jury to find that the plaintiff was at substantial risk of rape. *Id.*

In *Gilliam v. Department of Public Safety & Correctional Services*, the court held that plaintiffs, three transgender women housed in men's facilities, had adequately alleged that "an unjustifiably high risk of harm to each [transgender] Plaintiff either was known or should have been obvious to the DPSCS officials involved in her housing placement and responsible for her safety." 2024 WL 5186706, at *12 (D. Md. Dec. 20, 2024). In so holding, the court considered each plaintiff's experience of sexual violence while housed with male inmates, each plaintiff's "feminine gender presentation," and the baseline fact of the "vulnerability of transgender prisoners to sexual abuse."

*Id.* at *11-12 (citation omitted).

In *Tay v. Dennison*, the court observed that the defendant officials knew that the plaintiff was "a transgender woman and was therefore particularly vulnerable in a men's facility" and noted that "Plaintiff ha[d] already been sexually abused at several men's prisons." 457 F. Supp. 3d 657, 684 (S.D. Ill. 2020). Indeed, it has been "obvious" for decades that "under certain circumstances the disclosure of an inmate's . . . transsexualism could place that inmate in harm's way." *Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999).

This is by no means an exhaustive list of cases, and it omits many others recognizing that transgender people face a dramatically heightened risk of victimization in general.[1] As the district court below correctly found, however, that risk of harm is most profound when transgender women are moved to men's facilities, as the government proposes to do here. Further, as the record below demonstrates, these Plaintiffs face additional obvious and substantial harms that would result from transfer to men's facilities, including severe psychological deterioration, an increased risk of self-harm and suicide, and a resurgence of gender dysphoria. JA493 (McLearen Decl.).

---

[1] *See, e.g.*, *Unique v. Claybaugh*, 712 F. Supp. 3d 1265, 1273 (N.D. Cal. 2024) (citing defendants' "knowledge that transgender individuals suffer disproportionately from sexual assault during incarceration"); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 696 (S.D. Tex. 2016) (noting government statistics, trainings, and recommendations acknowledging transgender persons' susceptibility to sexual assaults in prison).

### B. Congress found that transgender people are particularly vulnerable to sexual violence in prison in enacting the Prison Rape Elimination Act.

In 2003, nine years after the *Farmer* decision, a bipartisan Congress unanimously passed the Prison Rape Elimination Act ("PREA") to combat the "epidemic character of prison rape and the day-to-day horror experienced by victimized [prisoners]." 34 U.S.C. § 30301(12). In passing PREA, Congress took steps to ensure that prison officials adopt measures to protect vulnerable people, such as Plaintiffs here, from unnecessary risks of sexual violence. PREA illuminated the pressing national importance of preventing prison rape, and specifically recognized, consistent with court rulings, that sexual assault in prisons can constitute an Eighth Amendment violation. Indeed, one of the stated purposes of PREA is to "protect the Eighth Amendment rights of Federal, State, and local prisoners." 34 U.S.C. § 30302(7). Congress underscored the significance of *Farmer* by expressly acknowledging in the statute that "the Supreme Court ruled that deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the . . . Eighth Amendment." *See* 34 U.S.C. § 30301(13) (internal citation omitted).

PREA and its implementing regulations (the "PREA Standards") acknowledge the serious threat of sexual victimization that transgender people face while incarcerated. After nine years of study and commentary by experts, the DOJ promulgated a comprehensive set of regulations implementing

PREA in May 2012. *See* Press Release, U.S. Dep't of Just., *Justice Department Releases Final Rule to Prevent, Detect and Respond to Prison Rape* (May 17, 2012).[2]

The PREA Standards recognize that transgender people have "particular vulnerabilities" to sexual abuse and sexual harassment. National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37,106, 37,109 (June 20, 2012) (explanatory text). They accordingly impose a mandatory obligation on the BOP to protect incarcerated transgender people who are especially vulnerable to sexual assault, including by screening incarcerated individuals at intake and upon any transfer to another facility to assess their risk of being sexually abused by other prisoners. 28 C.F.R. § 115.41(a). Among the criteria that prison officials must use to assess an incarcerated person's risk of sexual victimization is "[w]hether the inmate is or is perceived to be . . . transgender." 28 C.F.R. § 115.41(d). Officials must also consider "[w]hether the inmate has previously experienced sexual victimization," and "[t]he inmate's own perception of vulnerability." *Id.* Under the PREA Standards, an agency "shall make *individualized* determinations about how to ensure the safety of each inmate," and, "[i]n deciding whether to assign a transgender . . . inmate to a facility" must consider "on a *case-by-case basis* whether a placement would ensure the inmate's health and safety." 28 C.F.R.

[2] Available at http://www.justice.gov/opa/pr/2012/May/12-ag-635.html.

§ 115.42(b), (c) (emphases added).

The careful use of these classification and screening processes ensures that each person receives an individualized determination as to their risk of victimization. Here, as the district court acknowledged, all the Plaintiffs were classified and screened to determine their housing placements, based on a host of individualized factors. As a result of that process, the government, "motivated by health and safety concerns," concluded that housing each Plaintiff in a women's facility was the most appropriate and safest option. JA604.

In addition to the individualized screening and classification procedures, several other aspects of PREA and the PREA Standards reflect Congress's conclusion that transgender people are especially vulnerable to abuse in prisons.[3] In passing PREA, Congress also created the National Prison Rape Elimination Commission ("Commission"), which reached the same conclusion. The

[3] For example, prisons and jails must train staff specifically on searching and communicating with transgender people and assess during incident reviews whether a person was targeted based on transgender status. 28 C.F.R. §§ 115.15, 115.31, 115.86. They must also ensure that transgender people are given safe opportunities to shower separately from other inmates and may perform cross-gender searches only under specific circumstances. 28 C.F.R. § 115.15(d). These standards are binding on the BOP, *see* 34 U.S.C. § 30307(b), despite the BOP's recent efforts to ignore them, *see, e.g.* Fed. Bureau of Prisons, U.S. Dep't of Just., *Sexually Abusive Behavior Prevention and Intervention Program Manual* 25 (Mar. 19, 2026), https://www.bop.gov/policy/progstat/5324_012.pdf (excising 28 C.F.R. § 115.31(a)(9) ("[h]ow to communicate effectively and professionally with inmates, including lesbian, gay, bisexual, transgender, intersex, or gender nonconforming inmates") from its

Commission was charged with investigating prison rape and recommending "national standards for the detection, prevention, reduction, and punishment of rape." 34 U.S.C. § 30306. The Commission found that "the discrimination, hostility, and violence [that LGBT people] often face in American society are amplified in correctional environments and may be expressed by staff as well as other incarcerated persons." Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* 73 (2009) ("*Commission Report*").[4] The Commission noted that being transgender places individuals "at special risk" for sexual abuse in prisons and jails. *Id.*

### C. The Department of Justice has repeatedly found that transgender women face a heightened risk of sexual assault in men's prisons.

Congress mandated that the DOJ undertake research and data collection regarding the "incidence and effects" of sexual violence in prison, including identifying the "common characteristics" of victims. 34 U.S.C. § 30303(a)(1) (directing the Bureau of Justice Statistics to conduct, "for each calendar year, a comprehensive statistical review and analysis of the incidence and effects of prison rape," including "identification of the common characteristics of . . . victims"). *Id.* § 30302(4). In doing so, the DOJ has documented

---

otherwise complete quotation of 28 C.F.R. § 115.31(a) (discussing employee training)).

[4] Available at https://www.prearesourcecenter.org/sites/default/files/library/NPREC-Final-Report.PDF.

the particular risk to incarcerated transgender people, mirroring the PREA Commission's conclusions that "[r]esearch on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with non-heterosexual orientations and transgender individuals." *Commission Report*, *supra*, *at* 7. Ample data across almost fifteen years of federal research demonstrate the disproportionate and increased risk of sexual violence that transgender people face while incarcerated.

Reflecting these data, the DOJ has described the levels of sexual abuse and assault experienced by incarcerated transgender people as "shockingly high." Off. for Victims of Crime, Off. of Just. Progs., U.S. Dep't of Just., *Responding to Transgender Victims of Sexual Assault* (June 2014).[5] Accordingly, the DOJ has previously taken the position that categorical refusals to transfer incarcerated transgender people to housing that corresponds to their gender identity without due consideration of the risks identified by screenings and assessments violate the Eighth Amendment's prohibition on cruel and unusual punishment. Statement of Interest of the United States at 9, *Diamond v. Ward*, No. 5:20-cv-00453 (M.D. Ga. Apr. 22, 2021), ECF No. 65.

The BOP, too, has acknowledged that incarcerated transgender people

[5] Available at https://web.archive.org/web/20250117162658/https://ovc.ojp.gov/sites/g/files/xyckuh226/files/pubs/forge/sexual_numbers.html#victims. Following President Trump's inauguration, the DOJ removed this page from its website.

are specifically targeted for abuse, identifying "transgender status" as a "risk factor" and "motivating factor" that increases the likelihood of sexual assault. Fed. Bureau of Prisons, U.S. Dep't of Just., *Federal Bureau of Prisons Annual PREA Report: Calendar Year 2018*, at 12, 13, 15 (2019).[6] Indeed, although the government now seeks to disavow or deny the substantial risk of sexual violence that incarcerated transgender people face, the government's own numbers do not lie. Only 1.4% of the federal prison population is transgender—and fewer than 1% are transgender women. *See* JA514 (Stover Decl.) (noting that as of February 2025, 2,198 incarcerated transgender people, including 1,488 transgender women, were housed in BOP facilities); Fed. Bureau of Prisons, U.S. Dep't of Just., *Statistics*, https://www.bop.gov/about/statistics/population_statistics.jsp#old_pops (noting there were over 155,000 total federal inmates in 2025). Despite this, 4.3% of all substantiated incidents of inmate-on-inmate sexual violence occurred to transgender people. Emily D. Buehler & Shelby Kottke-Weaver, *Sexual Victimization Reported by Adult Correctional Authorities, 2019–2020 – Statistical Tables* 15 tbl. 8 (U.S. Dep't of Just. 2024).[7]

Federal data on reported sexual victimization also reflect the heightened

[6] Available at https://www.bop.gov/inmates/custody_and_care/docs/cy18_prea_report.pdf.

[7] Available at https://bjs.ojp.gov/library/publications/sexual-victimization-reported-adult-correctional-authorities-2019-2020.

risk incarcerated transgender people face.[8] Nearly 40% of transgender inmates housed in state and federal prisons reported experiencing sexual victimization—a rate ten times higher than that reported by incarcerated cisgender people. Beck 2014, *supra*, at tbl. 1; Beck 2013, *supra*, at 8. Over one-third of incarcerated transgender people were victims of inmate-on-inmate sexual violence, and nearly one-sixth were victims of sexual misconduct by staff. Beck 2014, *supra*, at tbl. 2.

Federal data finding a significantly heightened risk of sexual violence for incarcerated transgender people also align with numerous other surveys on transgender experiences. Incarcerated transgender people are targeted

---

[8] The fact that the DOJ now seeks to hide the data does not change the substantial risks faced by transgender women in prison. In December 2025, the government ordered PREA auditors to "immediately pause" "compliance determinations" for transgender-specific screening, case-by-case placement, and safety reassessment, and removed gender-identity questions from the principal federal survey that measures sexual victimization of transgender people in custody. But the government's failure to collect data does not change the fact that the serious risk persists. Memorandum from Tammie M. Gregg, Principal Deputy Dir., Bureau of Justice Assistance, U.S. Dep't of Just., to All DOJ-Certified PREA Auditors, re: National PREA Standards Alignment with Executive Order 14168 (Dec. 2, 2025), filed as Ex. A to Compl., *Poe v. DOJ*, No. 1:26-cv-01552 (D.D.C. May 6, 2026), ECF No. 1-1; Ilan H. Meyer et al., *Erasure of Anti-Trans Violence Data in the United States*, 13 LGBT Health 69 (2026); Sexual Victimization in Prisons Reported by Inmates, 2023–24, Bureau of Just. Stats. (NCJ 310544, Dec. 2025) (no longer reporting victimization by gender identity).

and harassed by staff and inmates because they are transgender. *See* Federica Coppola, *Gender Identity in the Era of Mass Incarceration: The Cruel and Unusual Segregation of Trans People in the United States*, 21 Int'l J. Const. L. 649, 656 (2023). This allows sexual abuse against incarcerated transgender people to thrive in prisons and jails across the United States. *See* Just Det. Int'l, *Targets for Abuse: Transgender Inmates and Prison Rape* 2 (2013).[9] As a result, transgender people face an increased risk of victimization and violence—including "rape, physical violence, and verbal abuse"—while incarcerated. Amanda Graham, *Built Binary: Rethinking the Incarceration of Transgender Individuals Within a Dual-Gendered Prison System*, 58 Ga. L. Rev. 1307, 1314 (2024). In fact, the 2015 United States Transgender Survey demonstrated that respondents, transgender people who had been incarcerated in the preceding year, were over five times more likely to be sexually assaulted by staff and over nine times more likely to be sexually assaulted by other inmates than incarcerated non-transgender people. Nat'l Ctr. For Transgender Equality, *2015 U.S. Transgender Survey* 15, 191 (2016).[10] In an-

---

[9] Available at https://web.archive.org/web/20240123102952/https://justdetention.org/wp-content/uploads/2015/10/FS-Targets-For-Abuse-Transgender-Inmates-And-Prisoner-Rape.pdf.

[10] Available at https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

other survey of transgender incarcerated individuals, a staggering 53% reported that they had been sexually assaulted at some point during their current sentence. Vera Inst. of Just., *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars* 44 (2024).[11]

These risks are particularly acute for incarcerated people who will be perceived as easy targets—especially transgender women placed in men's facilities, who stand out in an environment almost exclusively composed of men. The Plaintiffs here have been classified and housed as women, and all receive female hormone therapy, which causes physical changes such as breast development. Several have undergone genital surgeries. The increased risk this poses is not merely hypothetical; several Plaintiffs have been the victims of sexual assault in men's facilities.

In sum, as this Court previously recognized, the record contains "ample, uncontested evidence" of characteristics that could make Plaintiffs "distinctively vulnerable to harm in men's facilities." *Doe v. Blanche*, 172 F.4th 901, 917 (D.C. Cir. 2026). And on remand, the district court individually assessed each Plaintiff's particular risk factors if they were to be housed in a men's facility. JA595, JA598. The district court correctly determined that moving

---

[11] Available at https://vera-institute.files.svdcdn.com/production/downloads/publications/advancing-transgender-justice.pdf.

Plaintiffs to men's facilities, notwithstanding the earlier, individualized assessment placing each Plaintiff in a women's facility, will subject them to a substantial risk of future sexual assault and other harms. As the district court found, the baseline risk transgender women face when housed in male facilities is exacerbated in this case by specific, individual characteristics of each of the transgender women Plaintiffs. JA595, JA598. Ample evidence shows that transferring these Plaintiffs to men's facilities is "very likely" to cause "needless suffering" and give rise to "sufficiently imminent dangers." *Helling*, 509 U.S. at 33-34. There is no clear error in the district court so finding, and therefore this Court should affirm.

## CONCLUSION

In light of the well-known substantial risks of harm faced by transgender women in men's prisons, and these Plaintiffs in particular, *amici* respectfully urge the Court to affirm the decisions below.

Respectfully submitted,

*/s/ James N. Sasso*
JAMES N. SASSO
RHOCHELLE T. KRAWETZ
WILLIAMS & CONNOLLY LLP
*680 Maine Ave SW*
*Washington, DC 20024*
*(202) 434-5000*

RICHARD SAENZ
WHIT WASHINGTON
LAMBDA LEGAL DEFENSE &
EDUCATION FUND, INC.
*120 Wall Street, 19th Floor*
*New York, NY 10005*
*(212) 809-8585*

SASHA BUCHERT
LAMBDA LEGAL DEFENSE &
EDUCATION FUND, INC.
*815 16th St. NW, Suite 4140*
*Washington, DC 20006*
*(202) 804-6245*

SEPTEMBER 29, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, James N. Sasso, counsel for *amici* and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1) and D.C. Circuit Rule 32, that the attached brief is proportionately spaced, has a typeface of 14 points or more, and contains 4,330 words.

*/s/ James N. Sasso*
JAMES N. SASSO
WILLIAMS & CONNOLLY LLP
*680 Maine Ave SW*
*Washington, DC 20024*
*(202) 434-5000*

SEPTEMBER 29, 2026

## CERTIFICATE OF SERVICE

I, James N. Sasso, counsel for *amici* and a member of the Bar of this Court, certify, that, on September 29, 2026, a copy of the attached brief was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

*<u>/s/ James N. Sasso</u>*
JAMES N. SASSO
WILLIAMS & CONNOLLY LLP
*680 Maine Ave SW*
*Washington, DC 20024*
*(202) 434-5000*

SEPTEMBER 29, 2026