[ORAL ARGUMENT SCHEDULED FOR NOVEMBER 20, 2026]

**Nos. 26-5238, 26-5311 (consol.)**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JANE DOE, et al.,

Plaintiffs-Appellees,

v.

TODD BLANCHE, in his official capacity as Attorney General of the United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH
MCKAYE L. NEUMEISTER
DOMENIC A. CANONICO
*Attorneys, Appellate Staff*
*Civil Division, Room 7231*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ iv

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 3

I. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Eighth Amendment Claims. ........ 3

A. In Vacating Earlier Preliminary Injunctions, This Court Did Not Foreclose the Government's Arguments. ........ 3

B. The Eighth Amendment Does Not Require Prison Officials to House Male Inmates in Women's Facilities. ........ 6

C. Plaintiffs Cannot Obtain an Injunction Based on Speculation About Hypothetical Future Prison Conditions That BOP Could Mitigate. ........ 12

D. Plaintiffs Have Not Demonstrated Individualized Eighth Amendment Violations Warranting Preliminary-Injunctive Relief. ........ 15

a Plaintiffs failed to show objectively intolerable risks. ........ 19

b. Plaintiffs failed to show deliberate indifference. ........ 24

II. Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors. ........ 27

III. The Preliminary Injunction Violates The PLRA. ........ 29

CONCLUSION ........ 31

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Bell v. Wolfish*,
441 U.S. 520 (1979) .......... 10, 28

*City of Grants Pass v. Johnson*,
603 U.S. 520 (2024) .......... 6, 11

*DHS v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026) .......... 29

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) .......... 1, 3, 4, 5, 14, 17, 21, 30

*Dothard v. Rawlinson*,
433 U.S. 321 (1977) .......... 8

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... 2, 8, 9, 10, 12, 13, 14, 18, 19, 25, 26, 27

*Hadix v. Johnson*,
367 F.3d 513 (6th Cir. 2004) .......... 10

*Helling v. McKinney*,
509 U.S. 25 (1993) .......... 2, 9, 13

*Keohane v. Florida Dep't of Corr. Sec'y*,
952 F.3d 1257 (11th Cir. 2020) .......... 10

*Kingdom v. Trump*,
No. 26-5181, 2026 WL 1905418 (D.C. Cir. June 17, 2026) .......... 28

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014) .......... 23

*Lakin v. Barnhart*,
758 F.3d 66 (1st Cir. 2014) .......... 19, 23

*McKune v. Lile*,
536 U.S. 24 (2002) .......... 28

*West Virginia v. B.P.J.*,
146 S. Ct. 2356 (2026) .......... 2, 6, 7, 8, 11

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 22

**Statutes:**

18 U.S.C. § 3621(b) .......... 27

18 U.S.C. § 3626 .......... 28

18 U.S.C. § 3626(a)(1)(A) .......... 31

18 U.S.C. § 3626(a)(2) .......... 3, 29, 30

**Regulatory Materials:**

28 C.F.R. § 115.42(g) .......... 30

## GLOSSARY

| | |
|---|---|
| BOP | Federal Bureau of Prisons |
| FMC | Federal Medical Center |
| JA | Joint Appendix |
| MCFP | Medical Center for Federal Prisoners |
| PLRA | Prison Litigation Reform Act |

## INTRODUCTION AND SUMMARY OF ARGUMENT

For over a year and a half, the district court has impermissibly barred the Federal Bureau of Prisons (BOP) from transferring male trans-identifying inmates to men's prisons. BOP has legitimate penological interests in protecting the privacy, well-being, and security of female inmates in federal custody, and nothing in the Eighth Amendment compels BOP to house men with women. There is nothing cruel or unusual about BOP choosing to adhere to the well-established practice of segregating the inmates in its custody by sex.

Plaintiffs have not shown likely success on the merits of their Eighth Amendment claims. They mistakenly assert that by remanding for further proceedings on their Eighth Amendment claims, this Court's decision in *Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026), forecloses many of the government's legal arguments. But this Court held only that there were no factual findings to support the theory on which plaintiffs sought affirmance—it did not implicitly reject any arguments that plaintiffs' claims were legally defective.

And there are numerous legal defects. The Eighth Amendment does not prohibit prison officials from adopting a policy whereby male inmates may be housed only in men's facilities. Plaintiffs seek a special exemption

from that policy, but the Constitution does not "require[ BOP] to grant individualized exemptions" for trans-identifying inmates from practices that "generally" pass muster. *West Virginia v. B.P.J.*, 146 S. Ct. 2356, 2377 (2026). The Eighth Amendment also does not permit claims against hypothetical prison conditions to which inmates have not been subjected, or speculative future risks that prison officials have had no opportunity to address. Plaintiffs assert that the Supreme Court's decisions in *Farmer v. Brennan*, 511 U.S. 825 (1994), and *Helling v. McKinney*, 509 U.S. 25 (1993), permitted such speculative relief, but even plaintiffs acknowledge that the inmates in those cases were already exposed to the challenged conditions.

Plaintiffs' Eighth Amendment claims fail in any event. Plaintiffs have not established either that the conditions in the prospective men's facilities pose "a substantial risk of serious harm" or that BOP officials acted with "'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834. The district court again relied on categorical reasoning based on generalized evidence in concluding that each and every plaintiff had made the necessary showing to obtain an injunction prohibiting their transfers. That generalized evidence is not sufficient to demonstrate that each of the individual plaintiffs in this case faces sufficiently severe risks in the specific facilities to which they have been designated. And BOP's mere awareness

that transfer could potentially increase some risks to plaintiffs—risks that BOP was (and remains) prepared to manage through other measures—is not sufficient to demonstrate deliberate indifference.

Moreover, plaintiffs have also not demonstrated that the remaining preliminary-injunction factors are satisfied. Plaintiffs' speculative harms cannot outweigh the government's strong interests in enforcing important Executive Branch policy judgments, allowing BOP to exercise its expertise in the difficult and sensitive task of managing the federal prison system, and protecting female inmates from threats to their safety, privacy, and dignity from male inmates being housed in women's prisons. Additionally, at a minimum, the injunction violates the stringent requirement of the Prison Litigation Reform Act (PLRA) that preliminary-injunctive relief be the least intrusive means necessary to remedy the identified harm. 18 U.S.C. § 3626(a)(2).

## ARGUMENT

### I. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Eighth Amendment Claims.

#### A. In Vacating Earlier Preliminary Injunctions, This Court Did Not Foreclose the Government's Arguments.

Plaintiffs' response brief repeatedly misconstrues this Court's decision in *Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026). Properly understood, *Doe*

did not direct the district court to reach any particular outcome on remand or foreclose any of the government's arguments in this appeal.

In issuing the initial preliminary injunctions in this case, the district court had held that housing plaintiffs in men's facilities would violate the Eighth Amendment under reasoning broad enough to "categorically forbid[] placing" every male trans-identifying inmate in BOP custody in men's prisons. *Doe*, 172 F.4th at 905, 909. Plaintiffs abandoned any defense of that categorical theory on appeal, instead asking the Court to affirm "on [the] different—narrower—ground" that plaintiffs' "individual characteristics" "render their housing in men's facilities unconstitutional under the Eighth Amendment." *Id.* at 916. This Court explained, however, that the district court had not actually made any individualized factual findings that would be necessary to support that holding as to each plaintiff. *Id.* at 917. Thus, plaintiffs "ha[d not] shown a likelihood of success on their Eighth Amendment claim" and vacated the injunctions on the merits. *Id.* at 918-19. The Court explained that, on remand, the district court could "exercise its judgment" regarding whether to "elicit further information, make additional findings of fact, or consider additional or alternative legal bases for relief." *Id.* at 917, 919.

This Court thus resolved the previous appeal on the narrow ground that "[t]he existing record does not include findings of fact about the individual plaintiffs' vulnerabilities … to enable [the Court] to sustain the district court's preliminary injunctions" on plaintiffs' ground. *Doe*, 172 F.4th at 906. By vacating and remanding on that narrow ground, the prior panel obviated any need to decide broader legal objections to the earlier preliminary injunctions. Indeed, it would have been unnecessary to resolve those objections at all if the district court subsequently declined to reissue the injunctions on Eighth Amendment grounds in light of individualized findings. But now that the court has purportedly done so, the broader legal objections are again presented and now need to be resolved.

Crucially, this Court *did not* hold that individualized findings alone would entitle plaintiffs to the injunctions granted, and it did not resolve any other arguments regarding the merits of plaintiffs' Eighth Amendment claims. Plaintiffs thus fundamentally err in construing this Court's prior decision as "direct[ing]" the district court to make factual findings supporting the reissuance of a preliminary injunction. Br.9. And plaintiffs are similarly incorrect in suggesting (Br.20-21, 28) that, in vacating and remanding, this Court foreclosed any of the government's broader legal arguments. *See infra* Parts I.B-C.

### B. The Eighth Amendment Does Not Require Prison Officials to House Male Inmates in Women's Facilities.

As the government explained in its opening brief (at 25-32), nothing in the Eighth Amendment prohibits prison officials from adopting a policy of housing male inmates in men's facilities. The permissibility of segregating prisons by sex is well accepted. BOP's decision to adopt a policy of housing male inmates in men's facilities and to no longer make any exceptions to that policy is a reasonable exercise of its expertise. At a minimum, BOP's strict adherence to a sex-segregated housing policy is not a "cruel and unusual punishment," "calculated to superadd terror, pain, or disgrace," that has "long fallen out of use." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (citation modified).

**1.** Plaintiffs contend (Br.21) that they do not challenge the general practice of segregating prisons by sex. Instead, their claims are premised on the notion that they are uniquely entitled to exceptions from that policy because of their status as trans-identifying individuals. That premise is incompatible with the Supreme Court's recent decision in *West Virginia v. B.P.J.*, 146 S. Ct. 2356 (2026), which made clear that the government is "not *constitutionally* required to grant individualized exemptions" for trans-identifying inmates from practices that "generally" pass muster. *Id.* at 2377.

Plaintiffs effectively concede, as they must, that their Eighth Amendment claim is, at bottom, a request for preferential exemptions for male trans-identifying inmates. After all, other groups of male inmates—such as pedophiles and government informants—similarly face elevated risks of harm that would likely be reduced if they were housed in women's prisons. *See* Gov't Br.29-31. But no one doubts—and plaintiffs do not seriously dispute (Br.25-26)—that those male inmates have no right to be housed among women. That concession dooms plaintiffs' position. If other potentially higher-risk male inmates cannot claim an Eighth Amendment entitlement to be housed among women, neither can plaintiffs. Plaintiffs provide no basis for distinguishing themselves from those other inmates, apart from the fact that plaintiffs are trans-identifying and BOP has previously housed plaintiffs and other trans-identifying inmates (but not other *non*-trans-identifying male inmates) in women's prisons. But BOP's prior housing policies and decisions are irrelevant under the Eighth Amendment. *See infra* p.16. And plaintiffs are not "*constitutionally*" entitled to different or special treatment simply because they are trans-identifying. *B.P.J.*, 146 S. Ct. at 2377; *see id.* at 2377 n.4.

Plaintiffs contend that *B.P.J.* is inapposite because it resolved a challenge under the Equal Protection Clause in the context of sports and not

under the Eighth Amendment in the context of prisons. Br.23-25. But the reasoning of *B.P.J.* applies equally here. Like sports, prisons are another "context" where "everyone agrees" that some "sex-based classifications are permitted"—indeed, "amply justif[ied]" by "the inherent physical differences between women and men." *B.P.J.*, 146 S. Ct. at 2376, 2378-79; *see Dothard v. Rawlinson*, 433 U.S. 321, 326 (1977). The prison context is also analogous to athletics in that the "forced" inclusion of men in women's spaces "can create significant safety risks" and privacy concerns for women, whose interests courts "must also account for." *B.P.J.*, 146 S. Ct. at 2367, 2381. Those parallels underscore that the Constitution does "not require an overhaul of women's [prisons] throughout America," any more than women's sports. *Id.* at 2381.

**2.** Plaintiffs do not identify a single case in which any court has ever found that prison officials violated the Eighth Amendment by refusing to create an exception to prison sex-segregation policies for trans-identifying inmates and ordered the housing of male inmates in women's facilities. Plaintiffs seek support from *Farmer* and the individualized nature of its Eighth Amendment inquiry. Br.22, 25. But in *Farmer*, the plaintiff only sought an injunction against confinement in a higher-security *men's* facility, not housing in a *women's* facility. 511 U.S. at 831.

More fundamentally, *Farmer* makes clear that the Eighth Amendment guarantees only "*reasonable* safety," and regardless of whether harm ultimately befalls an inmate, no Eighth Amendment violation occurs so long as prison officials "respon[d] reasonably" to known risks. 511 U.S. at 844 (citation modified). That obligation does not require prison officials to ignore "the realities of prison administration," *Helling*, 509 U.S. at 37, or to jettison important correctional policies any time doing so might marginally reduce the risks to a particular inmate or group of inmates. As *Farmer* makes clear, the deliberate-indifference standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" 511 U.S. at 845. Under the Eighth Amendment, prison officials can and must take account of countervailing correctional interests in calibrating their response to any given risk.

BOP has reasonably adopted a policy whereby it will not house male inmates in women's facilities—in order to safeguard the safety, privacy, and dignity of the female inmates in its custody—and will address any safety or health risks that may arise for particular male inmates by taking appropriate precautionary measures within men's facilities. That decision implicates precisely the sort of correctional judgment concerning "internal order" and "institutional security" for which BOP receives "wide-ranging deference."

*Bell v. Wolfish*, 441 U.S. 520, 547 (1979). BOP's hypothetical future responses to any risks faced by male inmates cannot be categorically labeled unreasonable simply because BOP has chosen not to house them with female inmates.

Plaintiffs acknowledge that "protective measures within men's facilities … are a reasonable response to the risk" "[f]or virtually all … men," Br.25, yet they insist such measures would necessarily be inadequate for them. This merely underscores that plaintiffs are demanding that BOP do more than just "respon[d] reasonably" to risks they may face. *Farmer*, 511 U.S. at 844. They insist that BOP must undertake measures that they believe *best* ensure their safety and health. The Eighth Amendment requires no such thing. *See, e.g.*, *Keohane v. Florida Dep't of Corr. Sec'y*, 952 F.3d 1257, 1277 (11th Cir. 2020) ("[P]risoners aren't constitutionally entitled to their preferred treatment plan[.]"); *Hadix v. Johnson*, 367 F.3d 513, 527-30 (6th Cir. 2004) (failure to employ the best fire-safety practices does not necessarily violate the Eighth Amendment). BOP is not required to compromise other correctional interests simply to satisfy plaintiffs' demands for a *particular* precautionary measure.

To be sure, the general reasonableness of BOP's policy against housing male inmates in women's facilities does not preclude a future Eighth

Amendment challenge to a specific plaintiff's conditions of confinement on the ground that BOP has not taken adequate measures within men's facilities to protect him from known risks. But whatever else BOP does or fails to do to protect plaintiffs, its future response to any such risks would not be unreasonable *simply for the fact* that it has declined to house plaintiffs in women's facilities. *See B.P.J.*, 146 S. Ct. at 2377.

**3.** Plaintiffs also object (Br.26-27) to the government's reliance on *Grants Pass*, 603 U.S. 520, because that case did not involve a conditions-of-confinement claim. But conduct must constitute "cruel and unusual punishment" to be barred by the Eighth Amendment, regardless of the context. That high bar applies equally to prisoners and other litigants. The government has never denied that the Supreme Court's decision in *Farmer* sets out the controlling legal standard for Eighth Amendment conditions-of-confinement claims. But the ultimate question that the *Farmer* standard answers is the same one addressed in *Grants Pass*: whether the challenged conduct of prison officials is "calculated to superadd terror, pain, or disgrace." *Grants Pass*, 603 U.S. at 542 (citation modified). If, as here, the answer is clearly no, then the application of *Farmer*'s inquiry cannot justify a contrary result.

### C. Plaintiffs Cannot Obtain an Injunction Based on Speculation About Hypothetical Future Prison Conditions That BOP Could Mitigate.

Even if the Eighth Amendment could impose some obligation to house male inmates in a women's prison in some circumstances, plaintiffs cannot demonstrate entitlement to such relief in their current posture. As the government's opening brief explained, the Supreme Court has limited injunctive relief under the Eighth Amendment to circumstances where an inmate "show[s] that he *is incarcerated* under conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834 (emphasis added), and that officials are "knowingly and unreasonably disregarding" that risk, and "will continue to do so," *id.* at 846. The use of the present tense to describe the violations in *Farmer* is critical. The Eighth Amendment does not permit intrusion on the management of prisons based on nothing more than conjecture about hypothetical future prison conditions that inmates might experience in different facilities or the adequacy of mitigation measures that prison officials have not had the opportunity to take to address risks that have not yet materialized. *See* Gov't Br.32-37.

Plaintiffs contend (Br.28-29) that Eighth Amendment violations can be demonstrated in this speculative posture, noting that in both *Farmer* and *Helling*, the Supreme Court observed that an inmate may obtain relief under

the Eighth Amendment before he actually experiences the feared harm. As explained in our opening brief (at 34), however, those cases provide no support for an injunction based on wholly speculative risks an inmate has never experienced. While the Supreme Court has recognized that an inmate may obtain relief before an actually existing "*risk* … ripen[s] into actual *harm*," *Farmer*, 511 U.S. at 845 (emphases added), it has never suggested that relief may be based on a mere speculative possibility of experiencing such risks in the first place, *see id.* at 846. *See also Helling*, 509 U.S. at 35 (explaining that a plaintiff "must show that he himself *is being exposed* to unreasonably high levels of" risk to "prove that he is entitled to the remedy of an injunction" (emphasis added)). The Court's use of the present tense to describe the risks in both *Farmer* and *Helling* is critical.

Tellingly, plaintiffs do not identify a single case in which a court awarded an injunction in such a speculative posture. As plaintiffs acknowledge, the "plaintiffs in both [*Farmer* and *Helling*] had been exposed to the challenged conditions." Br.28-29. Plaintiffs nonetheless suggest (Br.29) that *Farmer* endorsed a claim based on "future exposure" to risks from transfer to a different penal institution. That is incorrect. In *Farmer*, the plaintiff was housed in a high-security facility, where he was allegedly beaten and raped, when he brought his claim challenging those conditions.

511 U.S. at 830. BOP subsequently transferred him to an unobjectionable facility, and represented that there was "'no present threat'" of return to a high-risk environment. *Id.* at 851. The Supreme Court remanded without taking any position on the plaintiff's eligibility for injunctive relief on those facts. *See id.*

Plaintiffs also insist that the risks here are not "'hypothetical'" because "[t]he destinations are known," as are plaintiffs' "psychological and medical records," and "how officials might act after transfer." Br.29-30. That is true only in the general sense that the potential safety and treatment measures that BOP will employ, if necessary, are undisputed. *See* Gov't Br.7-8, 48-49.[1] But it is pure speculation to say, before any plaintiffs have ever been housed in the designated facilities, that those feared risks will materialize. And it is pure speculation to conclude, before BOP has had an opportunity to address

[1] Plaintiffs assert that "BOP's principal protective measure" is placing inmates in segregated housing, which has already been deemed "inadequate." Br.30 (citing *Doe*, 172 F.4th at 915). Although the Court said (in rejecting the government's exhaustion argument) that this was BOP's "only proffered administrative relief" in the record during the first appeal, *Doe*, 172 F.4th at 915, that is no longer the case, *see* JA543-44 (Roman Decl.). There is no basis for concluding that the numerous other measures at BOP's disposal would be inadequate.

any risks that arise, that BOP's measures will not guarantee plaintiffs' reasonable safety and health.

Even under plaintiffs' view, the relevant questions are "whether the risk *is concrete* and whether officials *are presently* and unreasonably disregarding it." Br.29 (emphases added). Those questions must necessarily be answered in the negative given the posture of plaintiffs' claims.

### D. Plaintiffs Have Not Demonstrated Individualized Eighth Amendment Violations Warranting Preliminary-Injunctive Relief.

Even assuming that plaintiffs could ever obtain the specific injunctive relief sought under the Eighth Amendment in this hypothetical posture, the district court erred in concluding that plaintiffs satisfied their high burden of establishing a likely Eighth Amendment violation here.

**1.** As the government explained (Gov't Br.38-41), the district court impermissibly disregarded this Court's holding in *Doe* by again finding Eighth Amendment violations on a categorical basis, rather than drawing distinctions among the individual plaintiffs. *See* JA594-606. Plaintiffs assert (Br.31) that the court was merely engaging in "general discussion" to resolve "'overarching arguments,'" and not reaching conclusions on the merits. But that claim cannot be reconciled with the legal conclusions the court reached before undertaking any individualized analysis. *See, e.g.*,

JA600 ("Because Plaintiffs have put forward specific expert evidence of two distinct intolerable risks … and because the government has not sufficiently rebutted those showings, the Court finds that Plaintiffs have the better argument as to their theories of injury under the objective prong of the Eighth Amendment analysis."); JA606 ("[B]ecause the government did not respond reasonably to those known risks, Plaintiffs have satisfied the subjective prong of the Eighth Amendment.").

Plaintiffs also suggest (Br.31) that "[u]niform outcomes" for this whole group of plaintiffs, and the district court's lack of any distinction between their relative risk levels, is "unsurprising" given that BOP previously decided to house these individuals in women's facilities. As BOP has explained, however, those previous decisions were not based on any finding that BOP "could not successfully keep the inmates safe if housed with male inmates." JA514 (Stover Decl. ¶ 5). Rather, those prior housing decisions were made for a variety of reasons unrelated to safety, including that some inmates sought cross-sex surgery and BOP's prior "policy requir[ed] spending at least one year in a female facility to be eligible for such surgery." JA519 (Stover Decl. ¶ 33; *see* JA518-27 (Stover Decl. ¶¶ 29, 33, 38, 46, 49, 55, 65, 69). As discussed, BOP had ample discretion to change that policy. In any event, the court's broad conclusion that each plaintiff faces "two distinct intolerable

risks" in men's facilities, JA600, in no way relies on the fact that BOP previously decided to house plaintiffs in women's facilities, *see* JA594-600.

The categorical nature of the district court's analysis also explains plaintiffs' observation (Br.18-20) that the government has not challenged the "individualized findings." It is true that the government generally has not disputed the individual *characteristics* that each plaintiff has proffered. But the bare recitation of uncontested characteristics—which is all that the court's "individualized findings" amount to, *see* JA1011-41—does not establish that each plaintiff's transfer to men's facilities would likely violate the Eighth Amendment. *See* Gov't Br.41-51. Indeed, many of those characteristics were also known in the prior appeal, yet that did not prevent this Court from vacating the injunctions. *See Doe*, 172 F.4th at 917 (noting "ample, uncontested evidence of plaintiffs' characteristics"). And the government has vigorously challenged the purported finding that each plaintiff faces objectively intolerable risks. *See* Gov't Br.41-51; *infra* pp.18-24.

**2.** The district court also erred in finding that plaintiffs demonstrated a likelihood of success on both prongs of the Eighth Amendment inquiry. To establish that prison officials violated the Eighth Amendment by failing to protect an inmate from a risk of harm, the inmate

"must show that he is incarcerated under conditions posing a substantial risk of serious harm" to his safety or health and that officials acted with "'deliberate indifference'" to that risk. *Farmer*, 511 U.S. at 834. As explained in the government's opening brief (at 41-55), plaintiffs cannot establish either element of that test.

BOP has prepared to transfer nine plaintiffs to two men's medical facilities with extremely low rates of assault and a "largely nonviolent" inmate population that "tend to have only minor infractions in their disciplinary history." JA516-17 (Stover Decl. ¶¶ 22-27).[2] And it determined to transfer four plaintiffs to the men's side of the halfway houses where they are already housed, which also experience rare incidents of violence. JA526-27 (Stover Decl. ¶¶ 64-68). Moreover, BOP has reasonably determined that—as with over 1,000 other BOP inmates diagnosed with gender dysphoria who are safely housed with members of the same sex, JA514 (Stover Decl. ¶ 5)—it is more than capable of ensuring plaintiffs' reasonable safety and health in those facilities. And should any health or safety complications ultimately arise, BOP has various additional measures

[2] After the government's opening brief was filed, another plaintiff (Mary Doe) voluntarily dismissed from this suit and will be transferred to a men's facility. Dkt. 236. And two plaintiffs (Lois and Rachel Doe) were released from custody. Currently, there are only seven remaining plaintiffs awaiting transfer to the medical facilities, and three in halfway houses.

at its disposal to address them. *See* JA543-44 (Roman Decl. ¶¶ 4-13); JA548 (Weidow Decl. ¶ 18).

As the government explained, plaintiffs failed to establish that their transfers will entail risks that are "'sufficiently serious'" and "objectively intolerable." *Farmer*, 511 U.S. at 834, 846; *see* Gov't Br.41-51. Plaintiffs' and the district court's reasoning is premised on sweeping generalizations and unsubstantiated claims about BOP's abilities to manage its facilities and meet plaintiffs' medical and mental health needs. Even accepting that there is some potential risk involved in any prison transfer, "not every risk carries an inherent threat at a substantial level, or of severity beyond the norms," and plaintiffs have not shown that their risks would rise to such levels. *Lakin v. Barnhart*, 758 F.3d 66, 72 (1st Cir. 2014) (Souter, J.). Nor can plaintiffs establish that BOP will act with deliberate indifference when they do not dispute BOP's thorough plans to identify and mitigate risk, *e.g.*, Br.18, 29-30, 41-43, or deny that BOP will act in accordance with those plans, Br.30.

#### a Plaintiffs failed to show objectively intolerable risks.

**i.** In asserting that they have demonstrated a substantial risk of serious harm, plaintiffs contend that the government's evidence regarding the low levels of assault across the inmate population at FMC Rochester and MCFP Springfield "do not answer the relevant question" about specific risks

to "'a newly arrived, visibly feminized transgender woman coming from a women's prison.'" Br.33; *see* Br.34. And plaintiffs contend that the government's statistics underestimate the risk of assault. Br.33. Even if male trans-identifying inmates might face greater risks than the inmate population at large, and even if the number of assaults is higher than the confirmed data reflects, there is no meaningful dispute that the risk of assault would still be extremely low at these particular facilities given their medical-treatment objectives and the nature of the inmate population.

More fundamentally, whereas the government at least tries to quantify the risk levels unique to the specific designated facilities, plaintiffs make no effort whatsoever. Questioning whether the government's evidence perfectly estimates the relevant risk level is not the same as providing evidence to affirmatively establish a different risk level.

In trying to poke holes in the government's evidence, plaintiffs rely on the declaration of their expert, Dr. Alix McLearen. Br.33, 35-36. But Dr. McLearen's assertions cannot possibly support individualized Eighth Amendment determinations about the risks faced at the designated facilities. Plaintiffs (and the district court) rely heavily on her general assertions that male trans-identifying inmates who have some undefined combination of characteristics—such that they are "'perceived as female'"—face "elevated"

risks of sexual abuse in men's prisons, and that corrections officials are generally aware of that risk. Br.33 (quoting JA598) (citing JA485, 487 (McLearen Decl. ¶¶ 13, 19)). Even if those are true as general propositions, they say nothing about the actual level of risk that such inmates typically face. The mere existence of higher-than-average risks plainly does not suffice to satisfy the objective component of the *Farmer* standard. Otherwise, the district court's original injunctions could have been sustained on its categorical theory that the Eighth Amendment prohibits housing *any* such inmates in men's facilities. *Contra Doe*, 172 F.4th at 916, 918.

More importantly, Dr. McLearen's assertions also do not provide any insight into risks at the particular facilities that BOP has selected here: the fact that male trans-identifying inmates may *generally* face elevated risks in men's correctional facilities sheds little to no light on risk levels in the exceptionally safe, dedicated medical facilities to which they have been designated. Nor have plaintiffs presented any specific evidence of the kinds of risks they would face at these or comparable facilities. Instead, they inexplicably contend (Br.33-34) that it was *the government's* burden to prove that they would not face unacceptably high levels of risk. That gets matters backwards: the burden to make "a clear showing" of entitlement to

injunctive relief is on the party seeking relief. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Plaintiffs also defend the district court's reliance on Dr. McLearen's blanket assertion that BOP "cannot adequately prevent harm" to male trans-identifying inmates "who are reassigned from female to male facilities based on a categorical housing policy unrelated to individual circumstances." JA598 (quoting JA497 (McLearen Decl. ¶ 50)); *see* Br.36. While plaintiffs try to defend this as Dr. McLearen's "opinion rest[ing] on her experience," Br.36, it is an improper legal conclusion that BOP's response to likely risks in men's prisons would be insufficient under the Eighth Amendment, which the court could not permissibly credit. Moreover, this broad and unsupported prediction of future developments is just the sort of categorical reasoning that this Court already rejected. *See* Gov't Br.46-47.

**ii.** Plaintiffs also defend the district court's conclusion that being housed in men's prisons would cause intolerable risks because it would exacerbate plaintiffs' gender dysphoria. Br.37-41. But this argument rests on the extraordinary proposition that "the transfer itself," as distinct from the conditions in the designated men's facility, causes the relevant harms. Br.17, 37-38. Indeed, plaintiffs not already in halfway houses are designated for transfer to medical facilities that specialize in treating inmates with

"specialized," "long-term," or "comprehensive medical or mental health care." JA516-17 (Stover Decl. ¶ 22). The upshot of plaintiffs' position is thus that BOP can never transfer inmates already experiencing psychological distress between facilities—regardless of the treatment available in those facilities and BOP's plans to address any medical concerns that may arise—if the transfer itself would increase that distress. The Eighth Amendment does not freeze BOP's housing decisions in this way.

Plaintiffs again err in suggesting that any psychological deterioration or exacerbation of distress rises to the level of an Eighth Amendment violation. Rather, the difference to an inmate's pre-existing condition—*i.e.*, the change caused by the transfer—must alone be objectively intolerable, presenting a "threat at a substantial level," carrying "severity beyond the norms." *Lakin*, 758 F.3d at 72; *see Kosilek v. Spencer*, 774 F.3d 63, 89 (1st Cir. 2014) (en banc) (explaining that courts assess "'the particular risk of harm faced by a prisoner due to the challenged [conduct], rather than the severity of the prisoner's underlying medical condition, considered in the abstract'"). Plaintiffs cannot demonstrate that any transfer to men's facilities would rise to that level of severity, particularly given the efforts BOP would take to provide additional medical care as needed.

Contrary to plaintiffs' suggestion (Br.39-40), BOP's Chief of Psychiatry did not acknowledge that transfer alone would impose "the substantial risk of severe deterioration." Rather, he explained that if any exacerbation of conditions did occur, the transferee facilities would be capable of providing ample care to address them. *See* JA546-54 (Weidow Decl.); *see also* Gov't Br.49-51. Plaintiffs also confusingly suggest that BOP's efforts in that respect would be insufficient because they would treat "the symptoms of harm" rather than "the underlying condition." Br.40. But according to plaintiffs, the specific harm allegedly caused by the transfers would be psychiatric distress and deterioration. There is no reason to think that "psychotherapy or psychotropic medication" could not adequately treat such psychiatric conditions. Br.40.

**b. Plaintiffs failed to show deliberate indifference.**

Plaintiffs also defend the district court's conclusion that BOP was deliberately indifferent because it adopted a policy of housing prisoners solely based on sex while aware that the application of this policy could create some risks to plaintiffs' health and safety. *See* Br.41-44. Specifically, plaintiffs and the court accuse BOP of deliberate indifference precisely because BOP has made plans to minimize potential risks and respond appropriately to any risks that do arise. Remarkably, plaintiffs contend that

this responsible conduct shows that BOP knows of the risks and is deliberately indifferent to them. This catch-22 argument is wholly without merit.

The key questions under the deliberate-indifference standard are whether officials know of risks, and, if so, whether they have acted reasonably in the face of them. *Farmer*, 511 U.S. at 844. To say, as the district court did, that a policy that increases some risks is itself the *response* to those risks is to collapse those inquiries. As the government's opening brief explained (at 54), under the court's reasoning prison officials could never adjust any policy or take any action if doing so would increase the risk to an inmate. That result is incompatible with the standard under *Farmer*, which "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions," 511 U.S. at 845 (quotation marks omitted), and does not unduly block prison officials *ex ante* from implementing changes to prison administration.

Plaintiffs' reliance (Br.44) on *Farmer* and *Helling* fails. Those cases do not stand for the proposition that courts assess the reasonableness of only the action that itself created the risks, without regard to any subsequent actions prison officials would take to mitigate any risks. Indeed, in both of those cases, the plaintiffs had already been subject to the challenged

conditions—*i.e.*, the risks had materialized. Any actions that prison officials took subsequently to address those risks are relevant to whether overall they acted "reasonably." *See Farmer*, 511 U.S. at 845. Plaintiffs cannot benefit from a more lenient standard merely because they brought suit in a hypothetical posture.

Plaintiffs' only response to the severe consequences of their position is to assert that the Eighth Amendment permits risk-increasing policy changes "when the response to the known risk is reasonable." Br.44. Plaintiffs' arguments thus apparently collapse into the district court's conclusion that it would *never* be reasonable to house plaintiffs in men's facilities under *any* conditions, because the only reasonable response to the alleged risks of transferring plaintiffs to men's prisons would be to house plaintiffs in women's prisons. Such a conclusion flies in the face of the deference owed to prison officials that is incorporated into the *Farmer* standard.

Although plaintiffs do not dispute the substantial deference owed to prison officials generally, they contend that it has no force here because BOP itself previously chose to house plaintiffs in women's prisons. Br.45. But that argument rests on a misunderstanding of the reasons for plaintiffs' prior housing placements. As explained (*supra* p.16), those placements were not based on any conclusion that plaintiffs could not be safely housed in men's

facilities. BOP's placement determinations are not a one-way ratchet; rather, BOP has plenary, unreviewable authority over such decisions. *See* 18 U.S.C. § 3621(b). Nothing prevents BOP from adopting a policy of sex-segregation in housing and making individualized placement determinations under that policy.

Plaintiffs also assert (Br.45), that deference does not override the deliberate-indifference inquiry under *Farmer*. But *Farmer* itself incorporates "due regard" for the difficult judgments made by prison officials and the deference owed them in the process. 511 U.S. at 845. Properly applied, those principles preclude any finding that BOP is deliberately indifferent to the potential risks of transferring plaintiffs to men's facilities.

## II. Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors.

As the government explained (Gov't Br.55-57), plaintiffs have not established that they will likely suffer irreparable harm from BOP's planned transfers. In response, plaintiffs assert that they have established imminent irreparable harm based on their claimed likelihood of success in demonstrating that they face substantial risks in men's facilities. Br.46-48. As explained, however, plaintiffs have not demonstrated that merely being housed in men's facilities would expose them to substantial risks of serious

harm that satisfy the first prong of the Eighth Amendment inquiry. *See supra* pp.19-24; Gov't Br.41-51.

The balance of equities and public interest also weigh heavily against a preliminary injunction here. *See* Gov't Br.57-59. As this Court recently recognized in a similar case, the government is irreparably harmed by a federal court's "improper intrusion" into Executive Branch workings. *Kingdom v. Trump*, No. 26-5181, 2026 WL 1905418, at *2 (D.C. Cir. June 17, 2026) (per curiam) (quotation marks omitted). That is especially true here, where officials receive "wide-ranging deference" in questions of prison administration. *Bell*, 441 U.S. at 547. Judicial micromanagement of BOP's "decision[s] where to house inmates" strikes at "the core" of BOP's ability to carry out its mission and important Executive Branch policies. *McKune v. Lile*, 536 U.S. 24, 39 (2002).

Plaintiffs downplay (Br.49-51) BOP's interests in the safe and orderly administration of prisons, but the critical importance of those interests is well-established. *See, e.g.*, *Bell*, 441 U.S. at 547; 18 U.S.C. § 3626. Plaintiffs also assert (Br.49) that there is "no record evidence that any Plaintiff has endangered the safety, privacy, or dignity" of female inmates. Notably, an amicus brief in the record contains ample allegations by female inmates about experiences with male trans-identifying inmates. *See* Kirk Amicus

Br.5-14. But more fundamentally, the government adopted its new policy based on these concerns; it does not need to supply such evidence to demonstrate harms from an injunction prohibiting the implementation of that policy. *See DHS v. League of Women Voters*, No. 26A308, 2026 WL 2879700, at *3 (U.S. Sept. 25, 2026) (per curiam) (The government is "likely to suffer irreparable harm" whenever a court "prevents the Federal Government from using the [policy] it believes is best suited to the task."). In short, plaintiffs' speculative fears about possible future prison conditions (Br.51) cannot outweigh the government's weighty interests in prison administration.

## III. The Preliminary Injunction Violates The PLRA.

At a minimum, the preliminary injunction must be vacated because the district court unjustifiably rejected the government's proposal of an adequate, narrower injunction, in violation of the PLRA. *See* Gov't Br.59-62; 18 U.S.C. § 3626(a)(2).

Plaintiffs defend the district court's broad injunction on the ground that anything narrower would not "correct the harm" identified by the court. Br.51 (quoting 18 U.S.C. § 3626(a)(2)). But the court did not make any such finding. *See* JA637 (relying only on court's own perception of what relief would be "less intrusive"). In any event, plaintiffs fail to show that a

narrower injunction would not correct the harm. They identify no basis for their suggestion that being housed in a dedicated facility with other male trans-identifying inmates, like themselves, would entail "violence," "protective isolation," or "psychological deterioration." Br.52 (citing JA497 (McLearen Decl. ¶ 49)).

Nor does 28 C.F.R. § 115.42(g) prohibit such an arrangement. *Contra* Br.51-52. That regulation allows placements in a "dedicated facility" based on "transgender … status" when the facility is "established in connection with a … legal judgment for the purpose of protecting such inmates." 28 C.F.R. § 115.42(g). Because plaintiffs seek precisely such a "legal judgment … protecting" them, the district court could order their housing in such a facility. *Id.*[3]

Plaintiffs also defend (Br.52-53) the district court's conclusion that its injunction is narrower than the government's proposed alternatives. But neither plaintiffs nor the district court are the arbiters of what is more or less intrusive on BOP's operations. The purpose of the PLRA is to minimize federal-court intrusion into prison administration. *E.g.*, 18 U.S.C. § 3626(a)(2). Thus, the statute permits courts to enter relief "*necessary* to

[3] The kind of "dedicated facility" contemplated under § 115.42(g) is fundamentally different from the individualized segregated housing mentioned in *Doe*, 172 F.4th at 915. *Contra* Br.52.

correct the violation of [a] Federal right," but only by "the least intrusive means." *Id.* § 3626(a)(1)(A) (emphasis added); *see id.* ("no further than necessary"). At a minimum, BOP is entitled to significant deference in judging which of multiple forms of adequate relief is less intrusive. By instead casually disregarding BOP's expert judgment about the importance of housing male and female inmates separately, the district court violated the PLRA.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH
*/s/ McKaye L. Neumeister*
MCKAYE L. NEUMEISTER
DOMENIC A. CANONICO
*Attorneys, Appellate Staff*
*Civil Division, Room 7231*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*McKaye.L.Neumeister@usdoj.gov*

October 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,417 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Georgia, a proportionally spaced typeface.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister